UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOHAMMED THANI A.T. AL THANI,<br><br>                    Plaintiff,<br><br>    -against-<br><br><br>ALAN J. HANKE, IOLO GLOBAL LLC, and<br>JOHN DOES 1-100<br><br>                   Defendants. | Case No.: 20-cv-4765<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Mohammed Thani A.T. Al Thani ("Plaintiff"), by and through his undersigned counsel, as and for his complaint against Alan J. Hanke ("Hanke"), IOLO Global LLC ("IOLO"), and any and all entities and persons acting with or on behalf of IOLO and Hanke in connection with the wrongful conduct described herein (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.    This action involves a brazen theft of funds by a so-called investment adviser and notorious conman, Hanke, and his corporate shell, IOLO, including any and all entities owned and/or controlled by Defendants, perpetrated against Plaintiff.  Plaintiff seeks to hold Defendants accountable for their breaches of contracts, fraudulent inducement, fraud, breach of fiduciary duties, and violation of the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et seq.), stemming from Defendants' attempt to cheat Plaintiff out of millions of dollars through a marketed investment program designed to generate significant returns based on Plaintiff's

1

investment.  Plaintiff seeks to restrain Hanke and his affiliates, agents, representatives, and corporate entities from continuing to defalcate Plaintiff's funds, and seeks injunctive relief to prevent any loss of Plaintiff's invested funds or any profits generated by them.

2.      Hanke was introduced to Plaintiff in early 2019, when Hanke made numerous false and misleading statements in order to induce Plaintiff to invest in a trading program presumably designed to allow Hanke to generate illicit profits for himself.   On the basis of Hanke's false statements, many of which were made directly to Plaintiff's advisers in New York, the parties entered into a Management and Deposit Agreement ("MDA") in March 2019 (the "March MDA"), which set forth the terms of Plaintiff's investment and Defendants' obligations to invest Plaintiff's funds in a trading program managed and operated by IOLO and Hanke. Hanke represented that he would manage the funds invested by Plaintiff for the purpose of generating trading profits.   Hanke expressly represented that he would manage the program through IOLO and that he had direct relationships with the traders who would be operating the trading platform.   Plaintiff gave Hanke his money on the false promise that Defendants would invest certain funds in trade programs, which would pay returns to Plaintiff on a periodic basis. Although Plaintiff advanced funds as required under the March MDA, the only thing he received in return was lies.

3.      Under the March MDA, Defendants were required to make an initial distribution to Plaintiff in the amount of $ 2,400,000 on or about June 19, 2019.   It never came.  Despite this failure to make the required distributions at the outset, Hanke sought to cover up his scheme through a series of manipulations and artifices.  In direct communications with Plaintiff and his advisers, Hanke persuaded Plaintiff to enter into a second MDA in July 2019 (the "July MDA") based upon the promise that payments on the March MDA were imminent, and that the payment

2

delays were due to accounting errors among other excuses.  Distributions on the March MDA never came, yet Hanke continued to claim falsely that Defendants would make the required distributions.

4.      Plaintiff reasonably relied on Hanke's excuses and explanations for the delays, which Plaintiff believed to be genuine.  But Hanke's web of lies has now been exposed.  Plaintiff entrusted $6.5 million to Defendants and believed that Defendants were in good faith performing as investment advisers exactly as they were contractually required – i.e., investing Plaintiff's funds in the trading program to generate profits.   Defendants' representations from the outset were false and their subsequent representations were merely an artifice to extract additional money from Plaintiff in furtherance of their fraudulent scheme, in breach of contract, and in breach of their fiduciary duties.  Plaintiff seeks to recover the money he invested under the MDAs and the investment returns due to him, and to prevent Defendants from absconding with his funds and any profits generated from trading on them.

## THE PARTIES

5.      Plaintiff is a citizen of Qatar, who at all relevant times resided in Doha, Qatar.

6.      Defendant Hanke is an individual who is and, at all relevant times, was the Managing Member of IOLO.  Upon information and belief, Hanke resides in Crystal Lake, Illinois.  Upon information and belief, Hanke is the sole member of IOLO, and IOLO functions as his alter ego.  To perpetrate his wrongdoings, Hanke has created a number of entities with "IOLO" names, including EZ Credit Financing Inc. d/b/a IOLO.

7.      Defendant IOLO is a limited liability company existing under the laws of the state of Wyoming.  Upon information and belief, IOLO's registered office is at 1712 Pioneer Avenue, Suite 500, Cheyenne, WY, 82001.

8.      John Does 1-100 are entities owned and/or controlled by Defendants, and such entities were used to perpetrate this fraudulent scheme.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiff is a citizen of a foreign state (Qatar), Defendants are both citizens of the United States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10.     This Court also has subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1367, because this case arises under the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et seq.), a law of the United States, and the remaining claims arise out of the same case or controversy.

11.     This Court has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k) and New York Civil Practice Laws & Rules Section 302 because Defendants transacted business in New York and committed tortious acts in New York, including by negotiating amendments to the MDAs in New York and by making false statements to Plaintiff during negotiations in New York.

12.     Venue is proper, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

## FACTUAL BACKGROUND

13.     On January 9, 2019, a non-party introduced Hanke to one of Plaintiff's advisers to discuss a possible investment by Plaintiff in a wealth enhancement program.

14.     One of Plaintiff's advisers met with Hanke in New York City on January 16, 2019, to discuss the wealth enhancement program.  Plaintiff's adviser asked to see proof that Hanke had paid other investing clients.  Hanke proffered bank statements, which allegedly

4

reflected funds transferred from a lawyer based in Atlanta, Georgia, to Hanke.  Plaintiff learned later that the lawyer was Sidney Mills Rogers III and that he worked with Hanke in perpetrating frauds such as alleged here.  At that time, Hanke explained that returns on other clients' investments were first deposited with Mills Rogers.  As of the date of this filing, Mills Rogers, who also acted as the escrow agent for Plaintiff's investments, has refused to provide any information regarding Plaintiff's funds.

15.     During the January 2019 meeting, Hanke also provided Plaintiff (through his adviser) an outline of the trading program.  Hanke represented and promised, among other things, (1)  a transaction that would "meet the Client's needs"; (2) "[p]rogram funding [that] will be structured to provide funds that will best meet the Client's requirements"; (3) protection in the form of "Private Deposit Insurance on the entire balance [of deposited funds] . . . issued by a Syndication of Insurance Companies, each rated 'A' or better by AM Best" or "by a private banking instrument issued by the depository bank with a face value equal to the participation amount"; (4) that there would be "no co-mingling with other accounts"; and (5) that distributions would be "made to the client as specified in the MDA."   Hanke represented that he would manage and supervise the trading program.

16.     After approximately two months of discussions, Plaintiff agreed to invest with Hanke and IOLO.

## I.     The March MDA

17.     On March 12, 2019, Plaintiff and Hanke (on behalf of IOLO), executed the March MDA.  The March MDA contemplated that Plaintiff would transfer $3 million to Hanke in an escrow account in exchange for a promise that "[f]ifty (50) international banking days following the release of Escrow, a [minimum] payment equivalent to [$2,400,000] shall be paid directly"

into one of Plaintiff's bank accounts "for a total of [11] consecutive payments unless otherwise notified." Pursuant to the March MDA, Plaintiff was to be paid a total of $26,400,000 over the course of 11 installment payments. The March MDA anticipated that these returns would be generated by Hanke investing Plaintiff's initial payment in "asset enhancement transactions."

18.     The parties also agreed that IOLO and Hanke would be acting in the capacity of fiduciaries of Plaintiff.

19.     After executing the March MDA, Plaintiff promptly deposited the required $3 million into an escrow account as contemplated by the agreement. The funds were released from escrow to Hanke on or about April 9, 2019. As of this filing, Defendants have refused to confirm that the funds that Plaintiff invested were ever transferred to the wealth enhancement program or made part of an asset enhancement transaction. Nevertheless, Defendants failed to make the first required distribution of trading proceeds to Plaintiff.

20.     Instead, Hanke offered excuses as to why Defendants were delayed in making the required distributions. These excuses were part and parcel of Hanke's plan to extract additional funds from Plaintiff in furtherance of his investment adviser scheme.

21.     In an attempt to accommodate what he thought, at the time, were legitimate excuses, Plaintiff executed a series of amendments to the MDA at Defendants' request.

22.     The First Addendum, which was executed on June 21, 2019, rolled the first payment of $2.4 million into the original investment of $3 million for a total of $5.4 million invested, and increased each periodic payment from $2.4 million to $4.3 million. The Second Addendum, executed on July 25, 2019, rolled the next periodic payment of $4.3 million into the original investment, raising the original investment to $9.7 million, and increased each periodic payment from $4.3 million to roughly $7.8 million. The Third Addendum, executed on October

28, 2019, at the Ritz-Carlton in New York City, rolled the next periodic payment of roughly $7.8 million into the original investment, raising the original investment to roughly $17.5 million, and increased each periodic payment from roughly $7.8 million to roughly $14 million.

23.     Since the March MDA was signed, all eleven payment dates have passed. Though the first three payments were rolled back into the principal, eight payments remain outstanding – totaling over $100 million in missed payments.

24.     Additionally, Section 5.4 of the March MDA required IOLO to procure a surety bond to cover the amount of the principal, and each of the addenda to the March MDA required new surety bonds to cover the increased amount of the principal.

25.      Defendants procured a surety bond for the Plaintiff's initial investment of $3 million from SubGallagher Investment Trust ("SGIT").   Defendants also procured new surety bonds from SGIT covering the $2.4 million increase from the First Addendum and the $4.3 million increase from the Second Addendum.  However, upon information and belief, Defendants never procured a new surety for the roughly $7.8 million increase from the Third Addendum.

## II.     The July MDA

26.     While falsely assuring Plaintiff that payments on the March MDA were imminent, Hanke persuaded Plaintiff to execute the July MDA, which involved an investment of $3.5 million by Plaintiff.  The July MDA was executed on July 29, 2019.  In exchange for the $3.5 million investment, Plaintiff was to receive a one-time payment of $10.5 million "forty-five calendar days" following the release of the $3.5 million from an escrow account.   The terms of the July MDA are virtually identical to the March MDA.

27.     A First Addendum to the July MDA was executed on or about October 7, 2019, and changed the payment instructions for Plaintiff, such that the payments would be made to one of Plaintiff's advisers until such time as Plaintiff elected to receive them.  Like the Plaintiff's funds invested pursuant to the March MDA, as of this time, Defendants have refused to confirm that the $3.5 million invested as part of the July MDA was ever transferred to a wealth enhancement program or made part of an asset enhancement transaction.

28.     When Defendants failed to pay the $10.5 million due after forty-five days, Hanke met with Plaintiff in New York City to discuss the problem on or about October 28, 2019.  At this meeting, Hanke offered Plaintiff a second addendum to the July MDA that would roll $7.5 million into a new investment collateralized with a new surety bond that promised Plaintiff a $22.5 million payout on February 7, 2020.  Defendants also promised the return of the $3 million still due to Plaintiff under the original terms of the July MDA (the outstanding balance once the $7.5 million new principal was subtracted from the originally due $10.5 million).

29.     Upon information and belief, Defendants never procured a surety bond for the $7.5 million that had been rolled into a new investment.

30.     Defendants never paid Plaintiff the $3 million that was already due under the July MDA, nor did they pay the $22.5 million that became due on February 7, 2020.

III.   **Defendants' Web of Lies**

31.     Defendants defrauded Plaintiff into investing money with Hanke, and, from the outset, Hanke has lied repeatedly to avoid making payments due to Plaintiff.

32.     On June 19, 2019, Hanke stated in an email to Plaintiff's advisers that due to "an entirely avoidable" problem, the first tranche of funding had been delayed.  Hanke claimed that an accounting error had caused the delay, but that such accounting error had been corrected, and

8

that Defendants' attorney would release the funds shortly thereafter.  The funds were never released.

33.     Approximately six weeks later, in an August 1, 2019 telephone conversation between Hanke, Plaintiff's advisers, and the purported head of compliance at the trading firm allegedly used by Defendants, Hanke used a supposed "accounting error" again as an excuse. Hanke falsely claimed that the delay in receiving funds was the result of accounting errors and logistics issues related to paying off the projects associated with the funds.

34.     On August 9, 2019, Hanke sought to obscure Defendants' failure to make the required distributions under the MDAs by paying commissions to certain persons acting on behalf of Plaintiff.  The payments were designed to create the false impression that Plaintiff's funds were put into a trading program and were generating profits.   Hanke falsely told Plaintiff's advisers that the source of these commissions was generated from profits garnered from Plaintiff's investment in the March MDA.

35.     In an August 18, 2019 email, Hanke falsely claimed that additional delays in receiving funds resulted from "the EID holiday," "some continued unrest in Hong Kong," and "some changes back to Dubai and Europe."  Hanke claimed that all of the previously reported problems had been resolved and that "[a]ll subsequent payments will continue on the first Friday of every month moving forward."  No payments were ever received.

36.     During the week of September 12, 2019, Hanke again paid commissions with funds purportedly generated by Hanke having had invested Plaintiff's money in a further attempt to obscure Defendants' misconduct.

37.     In a November 4, 2019 email, Hanke claimed that the funds had cleared and that payments would be made "no earlier than Wednesday and [would] be completed no later than Friday."  No payments were made in that time period.

38.     In November 2019, Plaintiff's advisers met with Hanke in Fort Lauderdale, Florida, and discussed the delays in Hanke making payments to Plaintiff in accordance with the MDAs.  Hanke claimed that the funds were tied up in Dubai, and stated that he was sorting out the problems and that funds would be paid out shortly.  The funds were never paid.

39.     On December 21, 2019, Hanke represented to Plaintiff's advisers that a representative from the Chinese Development Bank had left Macau for Hong Kong to oversee the release of Plaintiff's funds located there.  Upon information and belief, no such individual existed.  The funds were never released.

40.     On January 10, 2020, Hanke met with Plaintiff's advisers in New York City to discuss the problems with receiving payment.  In this meeting, Hanke blamed the delays on a frozen trade account with Standard Chartered Bank in Dubai, where the funds were purportedly held.  Hanke falsely represented that the issue would be cleared up and the funds deposited soon. The funds were never deposited.

41.     Later in January 2020, Hanke admitted to one of Plaintiff's advisers that the August and September commission payments to intermediaries that Hanke had, at the time, insisted were the proceeds of Plaintiff's investments were, instead, made by Hanke personally, and had no relation to the funds invested by Plaintiff pursuant to the MDAs.

42.     On February 29, 2020, Hanke forwarded an email, purportedly from Metro States Capital Bank, indicating that a payment for the Plaintiff was being processed through its "corresponding [sic] bank, HSBC London."  On March 3, 2020, Hanke sent a follow-up email

claiming that the payment was "expected to be completed today."  The payment was not completed on March 3, 2020, and no such payment has been made to date.

43.     This email was fraudulent.  Upon information and belief, HSBC London is not a correspondent bank for Metro States Capital Bank.  Metro States Capital bank claims to be a London-based bank, so it would have no need for a correspondent bank in London.  A website for Metro States Capital Bank was set up on May 19, 2019, through a privacy-protected registrant, which is often considered a red flag for an illegitimate business.  The website is the only evidence that this bank ever existed.  No corporate documents for the bank could be found in the UK database of corporate filings.  Metro States Capital Bank has links to an entity called Pan Pacific Bank Ltd.  The SWIFT code for Pan Pacific Bank points to its branch existing at the same address as IOLO and a previous Hanke entity (1712 Pioneer Street, Suite 500, Cheyenne, Wyoming), but curiously lists the country as Gambia.  Upon information and belief, Hanke created Metro States Capital Bank as an artifice in his scheme to deprive Plaintiff of his investment.  Hanke created illegitimate "banks" to misrepresent the legitimacy of his alleged investing activities, and then he forwarded fraudulent messages purportedly from the illegitimate banks to Plaintiff's advisers in the United States.

44.     On March 17, 2020, Hanke sent an email to Plaintiff's advisers purporting to provide the details related to the frozen account at Standard Chartered Bank in Dubai, which supposedly held funds from trades that would be used to pay Plaintiff.  Due diligence conducted by Plaintiff has revealed that the alleged Standard Chartered account never existed.

45.     On March 24, 2020, Hanke asserted that he would soon have funds for Plaintiff from a different transaction that had closed, which Hanke was owed a substantial commission

on.  Hanke claimed he would pay the amounts owed to Plaintiff from those funds.  Those purported funds were never paid to Plaintiff.

46.     On April 4, 2020, Hanke told Plaintiff's advisers that Mills Rogers had received a call from HSBC indicating that the funds were en route to Plaintiff's account.  Those funds were never received.

47.     Hanke's string of lies has gone on long enough.  It has become apparent that no funds are forthcoming, that Defendants have stolen Plaintiff's money, breached their fiduciary duties, committed fraud, and will not comply with their obligations to provide the contractually required payments.

**COUNT ONE – BREACH OF THE MARCH MDA**
**(Against Defendants Hanke and IOLO)**

48.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

49.     Plaintiff and IOLO entered into the March MDA and three addenda that rolled certain payments into the original investment and increased the remaining payouts.  Hanke, as IOLO's alter ego and IOLO's only member, is liable for breaches of the contract because he caused IOLO to breach the contract and the corporate veil may be pierced in this instance.

50.     Plaintiff fulfilled all of his obligations under the March MDA.

51.     Defendants breached Section 3.2 by failing to invest Plaintiff's funds into "one or more asset enhancement transactions."

52.     Defendants breached Sections 5.3.2 and 5.4, as amended, by failing to provide a surety bond in the amount of $7,776,000.

53.     Defendants breached Section 7 and Appendix B of the March MDA, as amended, by failing to undertake commercially reasonable efforts to make any of the minimum periodic payments of roughly $14 million every twenty banking days.

54.     As a result of Defendants' material breaches of the March MDA, Plaintiff has suffered damages in an amount to be determined at trial, but, in any event, no less than $111,974,400, plus interest.

## COUNT TWO – BREACH OF THE JULY MDA
### (Against Defendants Hanke and IOLO)

55.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

56.     As laid out above, Plaintiff and IOLO entered into the July MDA and one addendum that re-invested a portion of the payment that was due into another investment that would pay out in February 2020.  Hanke, as IOLO's alter ego and IOLO's only member, is liable for breaches of the contract because he caused IOLO to breach the contract and the corporate veil may be pierced in this instance.

57.     Plaintiff fulfilled all of his obligations under the July MDA.

58.     Defendants breached Section 3.2 by failing to invest Plaintiff's funds into "one or more asset enhancement transactions."

59.     Defendants breached Sections 5.3.2 and 5.4, as amended, by failing to provide a surety bond in the amount of $7,500,000.

60.     Defendants breached Section 7 and Appendix B of the July MDA, as amended, by failing to undertake commercially reasonable efforts to make the minimum payments of the original $3 million remaining under the original July MDA and the $22.5 million under the amended July MDA on February 7, 2020.

13

61.     As a result of Defendants' material breaches of the March MDA, Plaintiff has suffered damages in an amount to be determined at trial, but, in any event, no less than $25.5 million, plus interest.

### COUNT THREE – FRAUDULENT INDUCEMENT
**(Against All Defendants)**

62.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

63.     As detailed above, Hanke, as managing member of IOLO, knowingly made numerous misrepresentations of material fact to Plaintiff including that Plaintiff's funds would be invested in a trading program, that the trade funds Plaintiff's money was allegedly invested in were profitable, that the deposited funds would be insured in a January 2019 outline, and that the release of payment to Plaintiff was only being held up by technical accounting errors on June 19, 2019.

64.     Hanke's false representations and assurances were made with the intent to induce Plaintiff to enter into the March MDA and then the July MDA to provide IOLO and Hanke with money they never intended to return.

65.     Hanke's misrepresentations about the March MDA were material to Plaintiff as they concerned whether he would receive a return on the investment and whether the initial investment would be insured against loss – a key factor in determining whether to invest money in these kinds of transactions.

66.     Hanke's misrepresentations about the July MDA were material to Plaintiff as they concerned whether the investments he had already made would provide a return on the investment – a key factor in determining whether to invest more money using the same adviser in a similar investment vehicle.

14

67.     Plaintiff justifiably relied on Hanke's false representations and assurances when he entered into the March MDA and the July MDA.

68.     Had Plaintiff known that these representations and assurances were false, he would not have entered into the March MDA and the July MDA and would not have given IOLO and Hanke his money.

69.     IOLO and John Doe entities 1-100 are liable for Hanke's misrepresentations because he was their agent, sole member, and alter ego and because they participated in Hanke's fraud.

70.     As a proximate result of Defendants' fraudulent conduct, Plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial, but, in any event, no less than $6.5 million.

71.     Plaintiff is also entitled to an award of punitive damages given Defendants' egregious, knowing, and/or intentional behavior.

## COUNT FOUR – FRAUD
### (Against All Defendants)

72.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

73.     As detailed above, Hanke, as managing member of IOLO, knowingly made numerous misrepresentations of material fact to Plaintiff, including:

a.  By telling Plaintiff in a June 19, 2019 email that the delay in receiving the first tranche of funding had been due to an accounting error that had caused Defendants' attorney to not release the funds, that the accounting error had been corrected, and that the funds would be released soon;

b. By telling Plaintiff's advisers on an August 1, 2019 telephone call that the delay in receiving funds was due to problems with the logistics in paying off the projects associated with the funds and accounting errors.

c. By telling Plaintiff's advisers on August 9, 2019 that the fees they had received were paid out of the first tranche of funds when Hanke knew for a fact that the money had been paid out of pocket by Hanke, as Hanke admitted to Plaintiff's advisers in a January 2020 conversation.

d. By blaming further delay on "the EID holiday," "some continued unrest in Hong Kong," and "some changes back to Dubai and Europe" in an August 18, 2019 email and stating that "[a]ll subsequent payments will continue on the first Friday of every month moving forward."

e. By telling Plaintiff in a November 4, 2019 email that the funds had cleared and payments would be made "no earlier than Wednesday and [would] be completed no later than Friday."

f. By telling Plaintiff's advisers in a December 2019 meeting that Hanke was sorting out the problems with payment and that the funds would be paid out soon.

g. By misrepresenting to Plaintiff's advisers that a frozen trade account with Standard Charter Dubai causing the holdup in a January 10, 2020 meeting in New York City.

h. By later (March 17, 2020) sending Plaintiffs documentation of the supposedly frozen bank account that included the bank account number, which turned out to be a fake account number.

    i.   By forwarding what purported to be an email from Metro States Capital Bank, claiming that a payment was being processed on February 29, 2020.

    j.   By stating on March 24, 2020 that Hanke would soon have funds from a different transaction that had closed where Hanke was owed a commission and which Hanke would use to pay Plaintiff.

    k.   By telling Plaintiff's advisers on April 4, 2020 that Defendants' attorney had received a call from HSBC stating that the funds were en route to his account.

74.    Hanke intended to deceive Plaintiff by continually lying about the reasons for delays in providing funds, lying to his advisers about the source of their fee payments, and lying about whether the trades had actually created profits.

75.    Hanke's misrepresentations were made with the intent of inducing Plaintiff to rely on the misrepresentations in agreeing to delay payments, to delay requesting his deposits back, and to delay calling the surety bonds, among other actions.

76.    Plaintiff reasonably relied on those material misrepresentations by, among other things, agreeing to sign addenda to the two MDAs delaying payments, delaying calling the surety bonds, and delaying requesting his deposits back under Section 5.5 of the MDAs.

77.    Plaintiff would not have taken those actions but for Hanke's fraudulent misrepresentations.

78.    IOLO and John Doe entities 1-100 are liable for Hanke's misrepresentation because he was their agent, sole member, and alter ego and they participated in his fraudulent scheme.

79.     As a proximate result of Defendants' fraudulent conduct, Plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial, but, in any event, no less than $36.9 million.

80.     Plaintiff is also entitled to an award of punitive damages given Defendants' egregious, knowing, and/or intentional behavior.

**COUNT FIVE – BREACH OF FIDUCIARY DUTIES**
**(Against Defendants Hanke and IOLO)**

81.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

82.     IOLO and Hanke owed fiduciary duties under the common law, the MDAs (Section 3.1), and the Investment Advisers Act to Plaintiff by virtue of the MDAs, the fund management services that the Defendants provided to Plaintiff, and the trust and confidence that Plaintiff placed in Defendants.

83.     IOLO and Hanke breached their fiduciary duties to Plaintiff by misappropriating his funds for their own use, failing to invest his money as the MDAs contemplated, and by violating the duty of candor by failing to disclose that the alleged trades that IOLO and Hanke had invested Plaintiff's money in were not turning a profit and by lying about the reason for delays in making payments.

84.     The Defendants' breaches of their fiduciary duties proximately caused Plaintiff harm in an amount to be determined at trial, but, in any event, no less than $137,474,400. Plaintiff is entitled to (a) rescind the MDAs and recover all amounts paid to Defendants under the MDAs and all costs incurred by Plaintiff, (b) a preliminary injunction compelling the Defendants live up to their fiduciary duties to redress their breach of trust and candor to Plaintiff, including a constructive trust directing the Defendants to deposit $137,474,400 into an escrow

account before these amounts are dissipated by Defendants to pay other clients or to pay their debts unrelated to Plaintiff, and (c) in the alternative to recover all amounts paid to the Defendants under the MDAs and all costs incurred by Plaintiff compelling Defendants to live up to their fiduciary duties.

## COUNT SIX – VIOLATION OF THE INVESTMENT ADVISERS ACT
### (Against Both Defendants)

85.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

86.     Pursuant to the MDAs, Hanke and IOLO served as investment advisers to and fund managers for Plaintiff.  Plaintiff compensated IOLO and, through it, Hanke for performing investment advisery and fund management services for Plaintiff.

87.     In the course of their engagement with Plaintiff, IOLO and Hanke engaged in fraudulent, deceitful, and manipulative conduct by keeping $137,474,400 of Plaintiff's money to which they were not entitled under the MDAs or any other agreements, by failing to pay the minimum payout amounts required by the MDAs, and by telling blatant lies to excuse delays in making payments.

88.     The Defendants' fraudulent, deceitful and manipulative conduct was in violation of Section 206 of the Investment Advisers Act (15 U.S.C. § 80b-6). By virtue of IOLO and Hanke's misconduct and their violation of the Investment Advisers Act, Plaintiff is entitled under Section 215 of the Investment Advisers Act (15 U.S.C. § 80b-15) to rescind the MDAs and recover all amounts paid to the Defendants under the MDAs and all costs incurred by Plaintiff in compelling Defendants to live up to the Act, together with a preliminary injunction in the form of a constructive trust directing that Defendants deposit $137,474,400 into an escrow account

before these amounts are dissipated by Defendants to pay their debts unrelated to Plaintiff or to pay other clients.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1. Judgment in favor of Plaintiff on all of his claims;

2. An award of all compensatory and consequential damages suffered by Plaintiff resulting from IOLO and Hanke's wrongful conduct;

3. An award of punitive damages for IOLO and Hanke's egregious, knowing, and/or intentional fraudulent behavior;

4. Disgorgement of any profits earned from Defendants' use of Plaintiff's funds;

5. A preliminary injunction (a) compelling Defendants to live up to their fiduciary duties and their duties under the Investment Advisers Act and to redress their breach of trust to the Funds, including a constructive trust directing Defendants to deposit $137,474,400 into an escrow account before these amounts are dissipated by Defendants to pay their debts unrelated to Plaintiff or to pay other clients, which will be effective during the pendency of this action, and (b) restraining and enjoining Defendants from selling, transferring, assigning, encumbering, or taking any other action with respect to the funds placed into escrow;

6. An award of all attorneys' fees, costs, and expenses incurred by Plaintiff in connection with this action; and

7. Such additional relief as the Court deems fair and just.

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff  demands a trial by jury on all issues so triable in this action.

Dated: June 22, 2020                                     Respectfully Submitted,

By:   /s/ Michael C. Hefter
Michael C. Hefter
Peter W. Bautz
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
michael.hefter@hoganlovells.com
peter.bautz@hoganlovells.com