UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MOHAMMED THANI A.T. AL THANI,

                Plaintiff,

-against-

ALAN J. HANKE, IOLO GLOBAL LLC,
SIDNEY MILLS ROGERS III, LAURA
ROMEO, AMY ROY-HAEGER,
SUBGALLAGHER INVESTMENT TRUST,
SHERRY SIMS, and JOHN DOES 1-100

                Defendants.

Case No.: 1:20-cv-4765 (VEC)

**JURY TRIAL DEMANDED**

## **FIRST AMENDED COMPLAINT**

Plaintiff Mohammed Thani A.T. Al Thani ("Plaintiff"), by and through his undersigned counsel, as and for his complaint against Alan J. Hanke ("Hanke"), IOLO Global LLC ("IOLO"), Sidney Mills Rogers III ("Rogers"), Laura Romeo ("Romeo"), Amy Roy-Haeger ("Roy-Haeger"), SubGallagher Investment Trust ("SGIT"), Sherry Sims ("Sims") and any and all other entities and persons acting with or on behalf of IOLO and Hanke in connection with the wrongful conduct and illegal scheme described herein (collectively, "Defendants"), alleges as follows:

## **NATURE OF THE ACTION**

1.      This action involves a brazen theft of funds by a so-called investment adviser and notorious conman, Hanke, and his corporate shell, IOLO, as well as entities and persons acting in concert with them, including, Rogers, Romeo, Roy-Haegar, SGIT, and Sims, and any and all

entities owned and/or controlled by Defendants.  Plaintiff seeks to hold Defendants accountable for their breaches of contracts, fraudulent inducement, fraud, breach of fiduciary duties, violation of the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et seq.), and conspiracy and aiding and abetting of the above breaches, stemming from Defendants' attempt to cheat Plaintiff out of millions of dollars through a marketed investment program represented as a means of generating significant returns based on Plaintiff's investment.  Plaintiff seeks to restrain Defendants and their affiliates, agents, representatives, and corporate entities from continuing to defalcate Plaintiff's funds, and seeks injunctive relief to prevent any loss of Plaintiff's invested funds or any profits generated by them.

   2.  Hanke was introduced to Plaintiff in early 2019 by Romeo, when Hanke made numerous false and misleading statements in order to induce Plaintiff to invest in a trading program presumably designed to allow Hanke to generate illicit profits for himself.  On the basis of Hanke's false statements, many of which were made directly to Plaintiff and his advisers in New York, the parties entered into a Management and Deposit Agreement ("MDA") in March 2019 (the "March MDA"), which set forth the terms of Plaintiff's investment and Defendants' obligations to invest Plaintiff's funds in a trading program managed and operated by IOLO and Hanke.  Hanke represented that he would manage the funds invested by Plaintiff for the purpose of generating trading profits.  Hanke expressly represented that he would manage the program through IOLO and that he had direct relationships with the traders who would be operating the trading platform.  Plaintiff gave Hanke his money on the false promise that Hanke and IOLO, aided and facilitated by Defendants, would manage Plaintiff's investment funds and generate periodic returns on the invested funds.  Although Plaintiff advanced funds as required under the March MDA, the only thing he received in return was lies.

3.     Under the March MDA, IOLO and Hanke were required to make an initial distribution to Plaintiff in the amount of $ 2,400,000 on or about June 19, 2019.  It never came. Despite this failure to make the required distributions at the outset, Hanke sought to cover up his scheme through a series of manipulations and artifices.  In direct communications with Plaintiff and his advisers, Hanke persuaded Plaintiff to enter into a second MDA in July 2019 (the "July MDA") based upon the promise that payments on the March MDA were imminent, and that the payment delays were due to accounting errors, among other excuses.  Distributions on the March MDA never came, yet Hanke continued to claim falsely that IOLO would make the required distributions.

4.     Plaintiff reasonably relied on Hanke's excuses and explanations for the delays, which Plaintiff believed to be genuine.  But Hanke's web of lies has now been exposed.  Plaintiff entrusted $6.5 million to Hanke and IOLO and believed that Hanke and IOLO were in good faith performing as investment advisers exactly as they represented and were contractually required – i.e., investing Plaintiff's funds in the trading program to generate profits.  Hanke's and IOLO's representations from the outset were false and their subsequent representations were merely an artifice to extract additional money from Plaintiff in furtherance of their fraudulent scheme, in breach of contract, and in breach of their fiduciary duties.  Plaintiff seeks to recover the money he invested under the MDAs and the investment returns due to him, and to prevent Defendants from absconding with his funds and any profits generated from trading on them.

5.     But Hanke and IOLO did not act alone.  Rogers, SGIT, Sims, Romeo, and Roy-Haeger all conspired with and aided and abetted in Hanke and IOLO's misbehavior.  Rogers used his attorney IOLTA Trust Account to create the air of legitimacy and was an instrumental part of the fraudulent investment scheme.  Rogers was part of the overall scheme and created the

false impression that Plaintiff's funds were being handled through legitimate means. Sims and SGIT issued fraudulent surety bonds which were not backed by the assets they claimed. Romeo arranged the introduction of investors to Hanke and backed up Hanke's bogus excuses at meetings. And Roy-Haeger impersonated bank officials to dupe unwitting investors into believing Hanke and IOLO had actually invested their money in a trading program. Each of these Defendants is equally liable for Hanke and IOLO's misconduct.

## THE PARTIES

6.      Plaintiff is a citizen of Qatar, who at all relevant times resided in Doha, Qatar.

7.      Defendant Hanke is an individual who is and, at all relevant times, was the Managing Member of IOLO. Hanke resides in and is a citizen of Crystal Lake, Illinois. Hanke is the sole member of IOLO, and IOLO functions as his alter ego. To perpetrate his wrongdoings, Hanke has created a number of entities with "IOLO" names, including EZ Credit Financing Inc. d/b/a IOLO.

8.      Defendant IOLO is a limited liability company existing under the laws of the state of Wyoming. IOLO's registered office is at 1712 Pioneer Avenue, Suite 500, Cheyenne, WY, 82001. Hanke is the sole member of IOLO, and he is a citizen of Illinois.

9.      IOLO is nothing more than a corporate shell and the alter ego of Hanke. IOLO's listed business telephone line in the MDAs is Hanke's personal cell phone number. IOLO has no corporate email accounts – it uses Hanke's personal SBC Global email address for corporate emails and contract notices. IOLO does not maintain adequate capitalization for its business activities. Hanke paid Plaintiff's advisers and other intermediaries with money out of his own personal accounts when the amount was due from IOLO and was to be taken from the profits Plaintiff's investment earned. Hanke offered at one point to make payments to Plaintiff that

were due from IOLO from money that he personally was owed as a commission on an unrelated transaction. At best, Hanke was commingling his assets with that of IOLO; at worst, IOLO has no assets separate and apart from Hanke's personal assets. Either way, Hanke treats IOLO as his alter ego, and IOLO is nothing more than a corporate shell.

10.     Defendant Rogers is an individual who is and, at all relevant times, was an attorney and the escrow agent for the MDAs. Rogers resides in and is a citizen of Marietta, GA.

11.     Defendant Romeo is an individual who is and, at all relevant times, was engaged in connecting Hanke and IOLO and Plaintiff for the purposes of entering the MDAs. Romeo holds herself out as a "Commodity Specialist" for a company called "Cambridge," but the "Company Website" listing on her LinkedIn profile links to a page for "Anolan Luxe World"— an apparent TV show selling products to consumers. Romeo claims she sells personal protective equipment now, but used to sell bitcoin and "historical bonds." Romeo is not currently a registered securities broker, securities dealer, or a registered investment adviser. Romeo attended a number of meetings between Hanke and IOLO and Plaintiff's advisers. Romeo resides in and is a citizen of Illinois.

12.     Defendant Roy-Haeger is an individual who Hanke and IOLO have held out and continue to hold out as a compliance officer for the trading programs in which Plaintiff's funds were purportedly invested. Upon information and belief, Roy-Haeger is not a compliance officer with any bank or any fund. Roy-Haeger has claimed she is now based out of Florida to take care of her mother, though she used to reside in and have an office in New York. Roy-Haeger now resides in and is a citizen of Florida.

13.     Defendant SGIT is a trust existing under the laws of Wyoming, which issued the surety bonds which purportedly guaranteed Plaintiff's investment under the MDAs and addenda

thereto. Upon information and belief, its grantor and beneficiary is Defendant Sims, a citizen of Texas. Its trustee is Patricia Moore, a citizen of Texas. Moore does not manage SGIT day to day – the trust is managed by Defendant Sims.

14. Defendant Sims is an individual who is and, at all relevant times, was the grantor and beneficiary of SGIT and the day to day manager of SGIT. Sims resides in and is a citizen of Texas.

15. In sworn depositions in unrelated cases, non-party Patricia Moore, the nominal trustee of SGIT, has stated that Sims runs the trust despite being the grantor and beneficiary, that Moore does not know anything about SGIT's assets or activities, that Moore signs forms without reading them if Sims asks her to sign them, that Sims maintains SGIT's official seal, and that Sims is the only person with real knowledge of SGIT's workings. SGIT's listed mailing address in Midlothian, TX is the same as Sims's personal address. SGIT's phone number is the same as Sims's phone number. Based on SGIT's failure to perform under the surety bonds, SGIT is undercapitalized, and its trustee is signing bonds for amounts she is not aware SGIT can pay because Sims tells her to sign the documents.

16. John Does 1-100 are entities owned and/or controlled by Defendants, and such entities were used to perpetrate this fraudulent scheme.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiff is a citizen of a foreign state (Qatar), Defendants are all citizens of the United States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

18. This Court also has subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1367, because this case arises under the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et

seq.), a law of the United States, and the remaining claims arise out of the same case or controversy.

19.  This Court has personal jurisdiction over Hanke and IOLO pursuant to Federal Rule of Civil Procedure 4(k) and New York Civil Practice Laws & Rules Section 302(a)(1) because Hanke and IOLO transacted business in New York  by traveling to New York on multiple occasions to negotiate the MDAs, to discuss performance issues under the MDAs, and to negotiate and execute addenda to the MDAs.  These trips were not merely fortuitous.  Hanke met with the Plaintiff and his advisors in New York and made false representations in the State of New York.  Moreover, Hanke and IOLO purposefully availed themselves of the benefit of using New York's reputation as a financial capital of the world as part of their scheme to lure potential investors into giving their money to Hanke and IOLO.  Hanke and IOLO held meetings with other potential investors in New York City in order to induce those investors to invest with Hanke and IOLO, including meetings at Four Points Capital Partners LLC with Mike Martino, Four Points Capital Partners's CEO, in Manhattan.  Additionally, both MDAs called for Plaintiff's deposit to be "insured by IOLTA Surety provided by the State (New York)" until such time as an escrow agreement and private surety bond were in place.  Hanke and IOLO availed themselves of the benefit of doing business in New York and invoked the protections of New York law to defraud investors into investing their money with Hanke and IOLO.

20.  This Court has personal jurisdiction over Hanke and IOLO pursuant to Federal Rule of Civil Procedure 4(k) and New York Civil Practice Laws & Rules Section 302(a)(2) because Hanke and IOLO committed tortious acts in New York, including by making materially false statements to a broker working on Plaintiff's behalf during a January 2019 meeting in New York City to induce Plaintiff to enter into an MDA, to Plaintiff and Plaintiff's advisers during an

October 2019 meeting in New York to induce Plaintiff to execute a number of addenda to his MDAs to delay payments, and to Plaintiff's advisers at a January 2020 meeting in New York to induce plaintiff to further delay demanding any payments.

21.     This court has personal jurisdiction over remaining Defendants pursuant to Federal Rule of Civil Procedure 4(k) and Civil Practice Laws & Rules Section 302(a)(2), as each of the Defendants acted in concert with Hanke and IOLO for the purposes of committing fraud and facilitating the theft of Plaintiff's investment funds.  Defendants, either through direct meetings in New York with Hanke or through their interactions with Hanke, were aware that Hanke was operating in New York for the purpose of inducing investors, including Plaintiff, to invest in his trading programs and that at least some effects of the conspiracy would be felt in New York.  Hanke's plan was to the benefit of the out-of-state co-conspirator Defendants because they received either direct monetary compensation (Rogers, SGIT and Sims) or, upon information and belief, received payments from Hanke for their participation in the conspiracy (Romeo and Roy-Haeger).  In carrying out his fraudulent activity in New York he was acting on behalf of the other Defendants to secure victims for their fraudulent scheme.

22.     Venue is proper, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

## FACTUAL BACKGROUND

23.     On January 9, 2019, Defendant Romeo introduced Plaintiff to Hanke and IOLO via a broker, non-party Samuel Miginnis ("Miginnis"), to discuss a possible investment by Plaintiff in a wealth enhancement program.

24.     Miginnis met with Hanke and Romeo in New York City on January 16, 2019, at the behest of Plaintiff, to discuss the wealth enhancement program.  Miginnis asked to see proof

8

that Hanke had paid other investing clients. Hanke showed electronic screenshots of bank statements, which allegedly reflected funds transferred from a lawyer based in Atlanta, Georgia, to Hanke. Plaintiff learned later that the lawyer was Defendant Rogers and that he worked with Hanke in connection with the scheme alleged here. At that time, Hanke explained that returns on other clients' investments were first deposited with Rogers. As of the date of this filing, Rogers, who also acted as the escrow agent for Plaintiff's investments, has refused to provide any information regarding Plaintiff's funds after they were deposited with Rogers in escrow in his Interest on Lawyers Trust Account ("IOLTA Trust Account").

25.     During the January 2019 meeting in New York City, Hanke and Romeo also provided Plaintiff (through Miginnis) with an outline of the trading program. They represented and promised, among other things, (1) a transaction that would "meet the Client's needs"; (2) "[p]rogram funding [that] will be structured to provide funds that will best meet the Client's requirements"; (3) protection in the form of "Private Deposit Insurance on the entire balance [of deposited funds] . . . issued by a Syndication of Insurance Companies, each rated 'A' or better by AM Best" or "by a private banking instrument issued by the depository bank with a face value equal to the participation amount"; (4) that there would be "no co-mingling with other accounts"; and (5) that distributions would be "made to the client as specified in the MDA." Hanke represented that he would manage and supervise the trading program. These representations were false and were designed to induce Plaintiff's investment.

26.     In or around the date of this in-person meeting, Hanke met with other potential investors in New York at Four Points Capital Partners's office in Manhattan along with the CEO of Four Points Capital Partners, Mike Martino, who claimed he was a friend of Hanke's and was letting Hanke use his company's offices to meet with potential investors.

27.     After approximately two months of discussions over email and phone, Plaintiff agreed to invest with Hanke and IOLO.

I.     **The March MDA**

28.     On March 12, 2019, Plaintiff and Hanke (on behalf of IOLO), executed the March MDA.  The March MDA contemplated that Plaintiff would transfer $3 million to Hanke via an escrow account held by Rogers in exchange for a promise that "[f]ifty (50) international banking days following the release of Escrow, a [minimum] payment equivalent to [$2,400,000] shall be paid directly" into one of Plaintiff's bank accounts "for a total of [11] consecutive payments unless otherwise notified."  Pursuant to the March MDA, Plaintiff was required to be paid a total of $26,400,000 in the aggregate, over the course of 11 installment payments.  The March MDA anticipated that these returns would be generated by Hanke investing Plaintiff's initial payment in "asset enhancement transactions."

29.     The parties also agreed explicitly that IOLO would be acting in the capacity of a fiduciary of Plaintiff.  As Hanke was doing the actual investing and management of Plaintiff's funds, he likewise had a fiduciary duty to Plaintiff due to the nature of the investing services provided.

30.     Plaintiff, IOLO (through Hanke), and Rogers executed an escrow agreement on March 25, 2019, though the agreement was made retroactively effective to March 8, 2019. Plaintiff promptly transferred funds as required by the MDA by wire transfer to Rogers's IOLTA Trust Account on March 27, 2019.

31.     The funds were released from escrow to Hanke on or about April 9, 2019.  As of this filing, Defendants have refused to confirm that the funds that Plaintiff invested were ever transferred to the wealth enhancement program or made part of an asset enhancement

transaction.  Nevertheless, IOLO failed to make the first required distribution of trading proceeds to Plaintiff.

32.     Instead, Hanke offered excuses as to why IOLO was delayed in making the required distributions.  These excuses were part and parcel of Hanke's plan to extract additional funds from Plaintiff in furtherance of his investment adviser scheme.

33.     In an attempt to accommodate what he thought, at the time, were legitimate excuses, Plaintiff executed a series of amendments to the MDA at Defendants' request.

34.     The First Addendum, which was executed on June 21, 2019, rolled the first payment of $2.4 million into the original investment of $3 million for a total of $5.4 million invested, and increased each periodic payment from $2.4 million to $4.3 million.  The Second Addendum, executed on July 25, 2019, rolled the next periodic payment of $4.3 million into the original investment, raising the original investment to $9.7 million, and increased each periodic payment from $4.3 million to roughly $7.8 million.  The Third Addendum was executed on October 28, 2019, at a meeting attended by Hanke and Plaintiff and the Plaintiff's advisors at the Ritz-Carlton in New York City, at which Hanke induced Plaintiff to roll the next periodic payment of roughly $7.8 million into the original investment, raising the original investment to roughly $17.5 million, and increasing each periodic payment from roughly $7.8 million to roughly $14 million.

35.     Since the March MDA was signed, all eleven payment dates have passed. Though the first three payments were rolled back into the principal, eight payments remain outstanding – totaling over $100 million in missed payments.

36.     Additionally, Section 5.4 of the March MDA required IOLO to procure a surety bond to cover the amount of the principal, and each of the addenda to the March MDA required new surety bonds to cover the increased amount of the principal.

37.      Defendants procured a surety bond for Plaintiff's initial investment of $3 million from SGIT through Sherry Sims, Bond Number 2019-003003AHIOLO#1 (the "First Bond"), dated April 4, 2019.   Defendants also procured new surety bonds from SGIT covering the $2.4 million increase from the First Addendum, Bond Number 2019007004AHIOLO#4 (the "Second Bond"), dated July 25, 2019.   However, Defendants never procured a new surety for the $4.3 million increase from the Second Addendum or for the roughly $7.8 million increase from the Third Addendum.

## II.     The July MDA

38.     While falsely assuring Plaintiff that payments on the March MDA were imminent, Hanke persuaded Plaintiff to execute the July MDA, which involved an investment of $3.5 million by Plaintiff.   The July MDA was executed on July 29, 2019.   In exchange for the $3.5 million investment, Plaintiff was to receive a one-time payment of $10.5 million "forty-five calendar days" following the release of the $3.5 million from an escrow account.   The terms of the July MDA are virtually identical to the March MDA, which included the parties agreeing explicitly that IOLO would be acting in the capacity of a fiduciary of Plaintiff.

39.     On July 30, 2019, Plaintiff, IOLO (through Hanke), and Rogers executed an escrow agreement for the July MDA.   Rogers's execution of the escrow agreement was designed to create the false impression that Plaintiff's funds were safe and would be protected against misuse.   On or about the same day, Plaintiff released $3.5 million to the Rogers's IOLTA Trust

Account pursuant to the terms of the July MDA. Rogers and Hanke did not provide a counter-signed copy of the release from escrow until August 21, 2019.

40.     On August 9, 2019, IOLO (through Hanke) procured a surety bond again from SGIT in the amount of $3.5 million, Bond Number 2019-008001AHIOLO#5 (the "Third Bond"), dated August 9, 2019. The General Agreement of Indemnity which accompanied the Third Bond is signed by Hanke and notarized by a Donna Joanne Barry, who lives at the same location as Hanke and appears to be Hanke's wife or long-term cohabitant. At the time, Barry was a new notary who had received her first commission in May 2019.

41.     A First Addendum to the July MDA was executed on or about October 7, 2019, and changed the payment instructions for Plaintiff, such that the payments would be made to one of Plaintiff's advisers until such time as Plaintiff elected to receive them. As with Plaintiff's funds invested pursuant to the March MDA, as of this time, Defendants have refused to confirm that the $3.5 million invested as part of the July MDA was ever transferred to a wealth enhancement program or made part of an asset enhancement transaction.

42.     When IOLO failed to pay the $10.5 million due after forty-five days, Hanke met with Plaintiff in New York City to discuss the problem on or about October 28, 2019. During this meeting, Hanke misrepresented the status of the investment program and the location of Plaintiff's invested funds, and sought to cover-up his breach of contract and fraud by offering Plaintiff a second addendum to the July MDA that would transform the $10.5 million payment due into a new investment collateralized with a new surety bond in the amount of $7.5 million.

43.     IOLO never procured a surety bond for the $7.5 million increase in principal as required by the addendum to the July MDA.

44.     IOLO never paid Plaintiff the $22.5 million that became due on February 7, 2020.

### III. Defendants' Web of Lies

45.     Defendants defrauded Plaintiff into investing money with Hanke, and, from the outset, Hanke has lied repeatedly and utilized other Defendants to avoid making payments due to Plaintiff.

46.     On June 19, 2019, Hanke stated in an email to Miginnis that due to "an entirely avoidable" problem, the first tranche of funding had been delayed. Hanke claimed that an accounting error had caused the delay, but that such accounting error had been corrected, and that Defendants' attorney would release the funds shortly thereafter. The funds were never released. Hanke copied Romeo on the email to Miginnis; yet at no point has Romeo disclosed the whereabouts of Plaintiff's funds.

47.     Approximately six weeks later, on August 1, 2019, Hanke and Roy-Haeger conducted a telephone conference with Plaintiff's advisors. The entire phone call was a charade. Hanke falsely claimed that Roy-Haeger was the head of compliance at the trading firm IOLO was allegedly using to manage Plaintiff's funds. Roy-Haeger stated she ran background checks on investors who wanted to use Hanke. Hanke and Roy-Haeger falsely claimed that the delay in receiving funds was the result of accounting errors and logistics issues related to paying off the projects associated with the funds. Additionally, Roy-Haeger claimed that a vice president at a bank where the proceeds from the trading program were stored had tried to steal the funds.

48.     On August 9, 2019, Hanke sought to obscure Defendants' failure to make the required distributions under the MDAs by paying commissions to certain persons acting on behalf of Plaintiff. The payments were designed to create the false impression that Plaintiff's funds were put into a trading program and were generating profits. Hanke called Miginnis, who is based in New York, and falsely told him that same day that that the source of these

commissions was from profits generated from Plaintiff's investment in the March MDA. Hanke failed to disclose to Plaintiff's advisers or to Miginnis that the funds were being paid out of Hanke's personal funds.

49.     In an August 18, 2019 email, Hanke falsely claimed that additional delays in receiving funds resulted from "the EID holiday," "some continued unrest in Hong Kong," and "some changes back to Dubai and Europe." Hanke claimed that all of the previously reported problems had been resolved and that "[a]ll subsequent payments will continue on the first Friday of every month moving forward." No payments were ever received.

50.     During the week of September 12, 2019, Hanke again paid commissions with funds purportedly generated by Hanke having had invested Plaintiff's money in a further attempt to obscure Defendants' misconduct.

51.     On September 20, 2019, Hanke and Romeo met with Plaintiff's adviser and Miginnis in Chicago. At the meeting, Hanke and Romeo falsely blamed the delays on holdups overseas. Hanke also tried to shift blame by claiming that one never knows when a trade program may stop paying out. Plaintiff still did not receive any funds.

52.     In a November 4, 2019 email to Plaintiff's advisor, Hanke claimed that the funds had cleared and that payments would be made "no earlier than Wednesday and [would] be completed no later than Friday." Hanke claimed this information came from the bank and "the Lawyer", which could only mean Rogers in these circumstances. No payments were made in that time period.

53.     In November 2019, one of Plaintiff's advisers met with Hanke in Fort Lauderdale, Florida, and discussed the delays in Hanke making payments to Plaintiff in accordance with the

MDAs.   Hanke falsely claimed that the funds were tied up in Dubai, and stated that he was

sorting out the problems and that funds would be paid out shortly.   The funds were never paid.

54.     On December 21, 2019, Hanke falsely represented to Plaintiff's advisers that a

representative from the Chinese Development Bank had left Macau for Hong Kong to oversee

the release of Plaintiff's funds located there.   Upon information and belief, no such individual

existed.   The funds were never released.

55.     On January 9, 2020, Hanke met with Plaintiff's advisers in New York City to

discuss the problems with receiving payment.   In this meeting, Hanke blamed the delays on a

frozen trade account with Standard Chartered Bank in Dubai, where the funds were purportedly

held.   Hanke falsely represented that the issue would be cleared up and the funds deposited soon.

The funds were never deposited.   At the same meeting, Hanke provided one of Plaintiff's

advisers with what he claimed were electronic screenshots of bank account statements as a

"proof of funds" showing funds that could be used to pay plaintiff.   These screenshots were fake

and were meant to falsely create the impression that the MDA transactions were real.   Plaintiff

has received no funds from the accounts shown in these supposed "proof of funds" screenshots.

56.     Later in January 2020, Hanke admitted to one of Plaintiff's advisers that the

August and September commission payments to intermediaries that Hanke had, at the time,

insisted were the proceeds of Plaintiff's investments were, instead, made by Hanke personally,

and had no relation to the funds invested by Plaintiff pursuant to the MDAs.

57.     On February 29, 2020, Hanke forwarded an email to Plaintiff's advisor,

purportedly from a financial institution called Metro States Capital Bank, indicating that a

payment for the Plaintiff was being processed through its "corresponding [sic] bank, HSBC

London."   On March 3, 2020, Hanke sent a follow-up email claiming that the payment was

"expected to be completed today." The payment was not completed on March 3, 2020, and no such payment has been made to date.

58.     This email was fraudulent. Upon information and belief, HSBC London is not a correspondent bank for Metro States Capital Bank. Metro States Capital bank claims to be a London-based bank, so it would have no need for a correspondent bank in London. A website for Metro States Capital Bank was set up on May 19, 2019, through a privacy-protected registrant, which is often considered a red flag for an illegitimate business. The website is the only evidence that this bank ever existed. No corporate documents for the bank could be found in the database of corporate filings in the United Kingdom. Metro States Capital Bank has links to an entity called Pan Pacific Bank Ltd. The SWIFT code for Pan Pacific Bank points to its branch existing at the same address as IOLO and a previous Hanke entity (1712 Pioneer Street, Suite 500, Cheyenne, Wyoming), but curiously lists the country as Gambia. Upon information and belief, Hanke created Metro States Capital Bank as part of a bank fraud and artifice to defraud investors, including Plaintiff. Since filing the original complaint, the website for Metro States Capital Bank has been dramatically curtailed to the point where all previous pages, including pages about the bank and a terms and conditions page, have all been deleted with the only remaining page being a login page requesting a username and password. Hanke created illegitimate "banks" to misrepresent the legitimacy of his alleged investing activities, and then he forwarded fraudulent messages purportedly from the illegitimate banks to Plaintiff's advisers in the United States.

59.     On March 17, 2020, Hanke sent an email to Plaintiff's advisers in the United States and London purporting to provide the details of Plaintiff's investment returns. The email was designed to create the impression that the funds were frozen at an account at Standard

Chartered Bank in Dubai. Due diligence conducted by Plaintiff has revealed that the alleged Standard Chartered account never existed.

60.     On March 24, 2020, Hanke claimed that he would soon have funds for Plaintiff from a different transaction that had closed, which Hanke was owed a substantial commission on. Hanke claimed he would pay the amounts owed to Plaintiff from those funds. Those purported funds were never paid to Plaintiff.

61.     On or about April 1, 2020, Hanke and Roy-Haegar spoke by phone with Plaintiff's advisers regarding the delays in sending payments to Plaintiff. Roy-Haeger falsely claimed that she expected several projects to complete, freeing up the funds to disburse within the week. Later in the week, Hanke informed Plaintiff's advisers that he had spoken to Roy-Haeger and that at least one project was on track to complete within the week, with funds coming soon after. No funds were ever received from these alleged transactions.

62.     On April 4, 2020, Hanke told Plaintiff's advisers that Rogers had received a call from HSBC indicating that the funds were en route to Plaintiff's account. Those funds were never received.

63.     Defendants' string of lies has gone on long enough. It has become apparent that no funds are forthcoming, that Defendants have stolen Plaintiff's money, breached their fiduciary duties, committed fraud, and will not comply with their obligations to provide the contractually required payments.

**IV.     SGIT Defaults on Payment of the First Bond**

64.     On March 24, 2020, after waiting almost a year for payments that never arrived, Plaintiff called the First Bond with SGIT.

65.     The bonds, which have virtually identical terms, state that each bond is a "cash and cash equivalent guarantee, is an operating, fully-confirmed instrument and is subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600." Each bond lasts 365 days and requires prompt payment of the bond amount to the Obligee upon written notice of default by the Principal. While payment must be made promptly, in no event may payment be made later than 180 days after receipt of the notice of default. Additionally, the SGIT "may not demand of the [Plaintiff] that [Plaintiff] . . . perform any thing or act, (b) give any notice, (c) furnish any clerical assistance, (d) render any service, (e) furnish any papers or documents, or (f) take any action of any nature or description which is not required of [Plaintiff] to be done" under the bonds. The only thing the bonds require of Plaintiff is to present written notice of an event of default to SGIT.

66.     Each bond was accompanied by a General Agreement of Indemnity ("GAI") between the SGIT, IOLO (via Hanke), and Plaintiff. The GAIs are virtually identical. The GAIs define "Event of Default" to include "[a]ny declaration of default by [Plaintiff] on any BOND, or any actual or alleged abandonment, forfeiture, or breach of, or failure, refusal or inability to perform, any CONTRACT . . . contained in a BOND, or the filing of any suit or commencement of any action or proceeding by . . . [Plaintiff] of an obligation against [IOLO]."

67.     The communication with SGIT calling the First Bond followed discussions between SGIT, through Sims, and one of Plaintiff's advisers, whereby Plaintiff's adviser informed SGIT of IOLO's breach of the March MDA by failing to make the required payments under the March MDA, as amended. The email to Sims also noted that the calling of the bond was conditional on IOLO's continued refusal to make the required payments under the March MDA.

68.     On July 7, 2020, Plaintiff's counsel sent a follow up letter to SGIT through Sims, reminding Sims that Plaintiff had called the First Bond, that IOLO still had not made any payments under the MDAs, and that, as a separate and new ground for default, Plaintiff had commenced a lawsuit against IOLO in the Southern District of New York related to IOLO's breach of contract and fraud.  Plaintiff also called the Second Bond and the Third Bond, neither of which had expired.

69.     After hearing nothing from Sims or SGIT, Plaintiff's counsel sent a follow-up letter on August 10, 2020, requesting an update on when payment would be made and reminding SGIT of the impending deadline to make payment under the First Bond or face litigation arising from SGIT's breach of contract.  SGIT and Sims have not responded to the August 10th letter.

70.     The First Bond is currently in default as SGIT has failed to satisfy its obligations under the First Bond on or before September 20, 2020, the last date for performance thereunder.

71.     Though the maximum payment date on the Second and Third Bonds have not yet arrived, SGIT has likewise not paid out those bonds.

72.     Since August 25, 2020, SGIT and Sims have stopped responding to Plaintiff's emails and calls.

73.     Upon information and belief, SGIT cannot satisfy its obligations under the Bonds because it has insufficient, or no, assets to perform under the Bonds.  The collateral ensuring the creditworthiness of the bonds was a critical feature of the transaction for Plaintiff, and was an integral part of the fraud perpetrated by Defendants.  As part of the discussions between the parties, an attorney representing SGIT, Michael Casey, provided Plaintiff's advisers with a letter dated April 1, 2019, stating SGIT had assets worth $350 million under escrow with Casey at Simmons Bank in Arlington, Texas.  Casey claimed that less than $47 million of that amount

was tied up guarantying other bonds, and that $15 million of that $47 million covered bonds set to expire in the next 60 days.

74.     On a phone call with Plaintiff's advisers after the Bonds had issued, Sims stated that the valuation provided by Casey came from an appraisal of SGIT's bonds by a person named Larry Wright.  Wright, who Sims claimed was a former partner of hers, appears to be a convicted felon, based on charges of selling worthless bonds to government contractors and other financial crimes.  Sims later indicated that the appraisal value was not accurate.

75.     Plaintiff entered into the MDA's and entrusted his funds with IOLO and Hanke on the false promise by Hanke, IOLO, SGIT and Sims that the Bonds were backed by sufficient assets and would be available to protect Plaintiff in these exact circumstances.

## COUNT ONE– BREACH OF THE MARCH MDA
### (Against Hanke and IOLO)

76.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

77.     Plaintiff and IOLO entered into the March MDA and three addenda that rolled certain payments into the original investment and increased the remaining payouts.

78.     Plaintiff fulfilled all of his obligations under the March MDA.

79.     IOLO breached Section 3.2 by failing to invest Plaintiff's funds into "one or more asset enhancement transactions."

80.     IOLO breached Sections 5.3.2 and 5.4, as amended, by failing to provide surety bonds in the amount of $4,300,000 and $7,776,000.

81.     IOLO breached Section 7 and Appendix B of the March MDA, as amended, by failing to undertake commercially reasonable efforts to make any of the minimum periodic payments of roughly $14 million every twenty banking days.

82.     Hanke is liable for all of IOLO's breaches because, as alleged in Paragraph 9, *supra*, IOLO is Hanke's alter ego and the corporate veil may be pierced due to Hanke's and IOLO's failure to respect corporate formalities.

83.     As a result of IOLO's material breaches of the March MDA, Plaintiff has suffered damages in an amount to be determined at trial, but, in any event, no less than $111,974,400, plus interest.

## COUNT TWO – BREACH OF THE JULY MDA
### (Against Hanke and IOLO)

84.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

85.     As alleged above, Plaintiff and IOLO entered into the July MDA and one addendum that re-invested a portion of the payment that was due into another investment that would pay out in February 2020.

86.     Plaintiff fulfilled all of his obligations under the July MDA.

87.     IOLO breached Section 3.2 by failing to invest Plaintiff's funds into "one or more asset enhancement transactions."

88.     IOLO breached Sections 5.3.2 and 5.4, as amended, by failing to provide a surety bond in the amount of $7,500,000.

89.     IOLO breached Section 7 and Appendix B of the July MDA, as amended, by failing to undertake commercially reasonable efforts to make the minimum payments of the $22.5 million due under the amended July MDA on February 7, 2020.

90.     Hanke is liable for all of IOLO's breaches because, as alleged in Paragraph 9, *supra*, IOLO is Hanke's alter ego and the corporate veil may be pierced due to Hanke's and IOLO's failure to respect corporate formalities.

91.     As a result of IOLO's material breaches of the March MDA, Plaintiff has suffered damages in an amount to be determined at trial, but, in any event, no less than $22.5 million, plus interest.

## COUNT THREE – BREACH OF SURETY BONDS
### (Against SGIT and Sims)

92.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

93.     As alleged above, Plaintiff, IOLO, SGIT entered into the Bonds, which provided for payment of the bond amount if IOLO breached the MDAs.

94.     Plaintiff fulfilled all of his obligations under the Bonds by calling the Bonds and noting IOLO's default on the MDAs.

95.     SGIT breached Section 3 of the First Bond by failing to pay out on the First Bond within 180 days of receipt of the notice of default.

96.     SGIT breached Section 3 of the Second Bond and Third Bond by failing to pay out on the Second and Third Bond promptly upon receipt of the notice of default.

97.     Sims is liable for all of SGIT's breaches because, as alleged in Paragraph 15, *supra*, SGIT is Sims's alter ego and the formalities of a trust are not being respected.

98.     As a result of SGIT's material breaches of the March MDA, Plaintiff has suffered damages in an amount to be determined at trial, but, in any event, no less than $8.9 million, plus interest.

## COUNT FOUR – FRAUDULENT INDUCEMENT
### (Against All Defendants)

99.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

100.     As detailed above, Hanke, as managing member of IOLO and acting as IOLO's agent, knowingly made numerous misrepresentations of material fact to Plaintiff including that Plaintiff's funds would be invested in a trading program, that the trade funds Plaintiff's money was allegedly invested in were profitable, that the deposited funds would be insured in a January 2019 outline, and that the delay in payments required under the MDAs were on account of numerous false excuses.

101.     Hanke's false representations and assurances were made with the intent to induce Plaintiff to enter into the March MDA and then the July MDA to provide IOLO and Hanke with money they never intended to return.

102.     Hanke individually, and acting as managing member of IOLO and as IOLO's agent, also knowingly made numerous misrepresentations of fact to Plaintiff regarding delays in payment, including:

a.     By telling Plaintiff in a June 19, 2019 email that the delay in receiving the first tranche of funding had been due to an accounting error that had caused Defendants' attorney to not release the funds, that the accounting error had been corrected, and that the funds would be released soon.

b.     By telling Plaintiff's advisers on an August 1, 2019 telephone call that the delay in receiving funds was due to problems with the logistics in paying off the projects associated with the funds and accounting errors.

c. By telling Plaintiff's advisers on August 9, 2019 that the fees they had received were paid out of the first tranche of funds when Hanke knew for a fact that the money had been paid out of pocket by Hanke, as Hanke admitted to Plaintiff's advisers in a January 2020 conversation.

d. By blaming further delay on "the EID holiday," "some continued unrest in Hong Kong," and "some changes back to Dubai and Europe" in an August 18, 2019 email and stating that "[a]ll subsequent payments will continue on the first Friday of every month moving forward."

e. By inducing Plaintiff to enter into the Third Addendum by making up additional excuses for the payment delays during an in-person meeting with Plaintiff that took place on October 28, 2019, at the Ritz-Carlton in New York City.

103. Hanke's false representations and assurances about the delays were made with the intent to induce Plaintiff to enter into the addenda to the March MDA and the addendum to the July MDA to avoid making payments of money Plaintiff was already due and converting that money into additional principal that Hanke and IOLO never intended to return.

104. Hanke's misrepresentations about the March MDA were material to Plaintiff as they concerned whether he would receive a return on the investment and whether the initial investment would be insured against loss – a key factor in determining whether to invest money in these kinds of transactions.

105. Hanke's misrepresentations about the July MDA were material to Plaintiff as they concerned whether the investments he had already made would provide a return on the investment – a key factor in determining whether to invest more money using the same adviser in a similar investment vehicle.

106.     Hanke's false representations about the addenda to the MDAs were material to Plaintiff as they concerned when he would receive his payment and led to Plaintiff investing more with Hanke and IOLO rather than calling for payments immediately.

107.     Plaintiff justifiably relied on Hanke's false representations and assurances when he entered into the March MDA and the July MDA and the addenda thereto.

108.     Had Plaintiff known that these representations and assurances were false, he would not have entered into the March MDA and the July MDA and addenda thereto and would not have given IOLO and Hanke his money or allowed them to convert money already owed him into new principal in his investment.

109.     IOLO and John Doe entities 1-100 are liable for Hanke's misrepresentations because he was their agent, sole member, and alter ego and because they participated in Hanke's fraud.

110.      Rogers, SGIT, Sims, Romeo, and Roy-Haeger all participated in the fraudulent scheme and also are all liable for Hanke's fraudulent misconduct because they were part of a conspiracy to engage in fraud.  They were in a constructive or actual agreement to commit fraud. They each took intentional, overt acts in furtherance of the fraud – Rogers provided records of fictitious payments to Hanke; Sims and SGIT provided worthless surety bonds; Romeo arranged the introduction between Plaintiff and Hanke and participated in multiple phone calls to perpetrate the fraud; and Roy-Haeger impersonated a bank compliance officer as part of Hanke's schemes and participated in multiple phone calls to perpetrate the fraud.

111.     As a proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial, but, in any event, no less than $28,496,000.

112.     Plaintiff is also entitled to an award of punitive damages given Defendants'
egregious, knowing, and/or intentional behavior.

### COUNT FIVE – FRAUD
**(Against All Defendants)**

113.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs
as if fully set forth herein.

114.     As detailed above, Hanke, as managing member of IOLO, knowingly made
numerous misrepresentations of material fact to Plaintiff, including:

    a.  By telling Plaintiff in a June 19, 2019 email that the delay in receiving the first
tranche of funding had been due to an accounting error that had caused
Defendants' attorney to not release the funds, that the accounting error had been
corrected, and that the funds would be released soon.

    b.  By telling Plaintiff's advisers on an August 1, 2019 telephone call that the delay
in receiving funds was due to problems with the logistics in paying off the
projects associated with the funds and accounting errors.

    c.  By telling Plaintiff's advisers on August 9, 2019 that the fees they had received
were paid out of the first tranche of funds when Hanke knew for a fact that the
money had been paid out of pocket by Hanke, as Hanke admitted to Plaintiff's
advisers in a January 2020 conversation.

    d.  By blaming further delay on "the EID holiday," "some continued unrest in Hong
Kong," and "some changes back to Dubai and Europe" in an August 18, 2019
email and stating that "[a]ll subsequent payments will continue on the first Friday
of every month moving forward."

e.  By telling Plaintiff in a November 4, 2019 email that the funds had cleared and payments would be made "no earlier than Wednesday and [would] be completed no later than Friday."

f.  By telling Plaintiff's advisers in a December 2019 meeting that Hanke was sorting out the problems with payment and that the funds would be paid out soon.

g.  By misrepresenting to Plaintiff's advisers that a frozen trade account with Standard Charter Dubai causing the holdup in a January 10, 2020 meeting in New York City.

h.  By later (March 17, 2020) sending Plaintiffs documentation of the supposedly frozen bank account that included the bank account number, which turned out to be a fake account number.

i.  By forwarding what purported to be an email from Metro States Capital Bank, claiming that a payment was being processed on February 29, 2020.

j.  By stating on March 24, 2020 that Hanke would soon have funds from a different transaction that had closed where Hanke was owed a commission and which Hanke would use to pay Plaintiff.

k.  By telling Plaintiff's advisers on April 4, 2020 that Defendants' attorney had received a call from HSBC stating that the funds were en route to his account.

115.  Hanke intended to deceive Plaintiff by continually lying about the reasons for delays in providing funds, lying to his advisers about the source of their fee payments, and lying about whether the trades had actually created profits.

116.     Hanke's misrepresentations were made with the intent of inducing Plaintiff to rely on the misrepresentations in agreeing to delay payments, to delay requesting his deposits back, and to delay calling the surety bonds, among other actions.

117.     Plaintiff reasonably relied on those material misrepresentations by, among other things, agreeing to sign addenda to the two MDAs delaying payments, delaying calling the surety bonds, and delaying requesting his deposits back under Section 5.5 of the MDAs.

118.     Plaintiff would not have taken those actions but for Hanke's fraudulent misrepresentations.

119.     IOLO and John Doe entities 1-100 are liable for Hanke's misrepresentations because he was their agent, sole member, and alter ego and they participated in his fraudulent scheme.

120.     Rogers, SGIT, Sims, Romeo, and Roy-Haeger all participated in the fraudulent scheme and also are all liable for Hanke's fraudulent misconduct because they were part of a conspiracy to engage in fraud. They were in a constructive or actual agreement to commit fraud. They each took intentional, overt acts in furtherance of the fraud – Rogers provided records of fictitious payments to Hanke; Sims and SGIT provided worthless surety bonds; Romeo arranged the introduction between Plaintiff and Hanke and participated in multiple phone calls to perpetrate the fraud; and Roy-Haeger impersonated a bank compliance officer as part of Hanke's schemes and participated in multiple phone calls to perpetrate the fraud.

121.     As a proximate result of Hanke and IOLO's fraudulent conduct, Plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial, but, in any event, no less than $28,496,000.

122.     Plaintiff is also entitled to an award of punitive damages given Hanke and IOLO's egregious, knowing, and/or intentional behavior.

## COUNT SIX – AIDING AND ABETTING FRAUD
### (Against Rogers, SGIT, Sims, Romeo, and Roy-Haeger)

123.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

124.     As alleged in Paragraphs 99-122, *supra*, an underlying fraud existed which was perpetrated by Hanke and IOLO acting in concert with the other Defendants.

125.     Defendants had actual knowledge of this fraud perpetrated by Hanke and IOLO. Rogers was an active participant by providing a statement showing false payments to Hanke and refusing to provide information on the whereabouts of Plaintiff's funds to Plaintiff despite repeated requests to do so.  SGIT and its alter ego, Sims, lured Plaintiff into a false sense of security regarding his investment by issuing fake surety bonds that had no financial backing. Romeo knew of the fraud because she actively introduced investors, like Plaintiff, to Hanke and attended meetings where she backed up Hanke's bogus reasons for delays.  Roy-Haeger actually knew of the fraud because she actively lied about what her job was to Plaintiff at Hanke's request to further delay Plaintiff from demanding payment.

126.     Defendants provided substantial assistance to Hanke and IOLO in carrying out their scheme.  Rogers provided a respectable front for the deposit – an IOLTA Trust Account – and refused to give Plaintiff information on where his money had gone.  SGIT and Sims procured fraudulent surety bonds to trick investors into thinking that their investments were safe, when in fact they were not.  Romeo introduced potential clients to Hanke so that the scheme could even take place.  Roy-Haeger impersonated bank and trading program compliance officers

to dupe investors into thinking there was an actual trading program and that payments would be made soon.

127.     Defendants aiding and abetting of Hanke and IOLO's fraud has caused Plaintiff damages in an amount not less than $28,496,000.

## COUNT SEVEN – BREACH OF FIDUCIARY DUTIES
### (Against Hanke and IOLO)

128.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

129.     IOLO owed fiduciary duties under the common law, the MDAs (Section 3.1), and the Investment Advisers Act to Plaintiff by virtue of the MDAs, the fund management services that IOLO provided to Plaintiff, and the trust and confidence that Plaintiff placed in IOLO. IOLO breached its fiduciary duties to Plaintiff by misappropriating his funds for its own use, failing to invest his money as the MDAs contemplated, and by violating the duty of candor by failing to disclose that the alleged trades that IOLO had invested Plaintiff's money in were not turning a profit and by lying about the reason for delays in making payments.

130.     Hanke is liable for all of IOLO's breaches because, as alleged in Paragraph 9, *supra*, IOLO is Hanke's alter ego and the corporate veil may be pierced due to Hanke and IOLO's failure to respect corporate formalities.

131.     IOLO's breaches of its fiduciary duties proximately caused Plaintiff harm in an amount to be determined at trial, but, in any event, no less than $134,474,400.  Plaintiff is entitled to (a) rescind the MDAs and recover all amounts paid to IOLO under the MDAs and all costs incurred by Plaintiff, (b) a preliminary injunction compelling Hanke and IOLO to live up to their fiduciary duties to redress their breach of trust and candor to Plaintiff, including a constructive trust directing the Hanke and IOLO to deposit $134,474,400 into an escrow account

before these amounts are dissipated by Hanke and IOLO to pay other clients or to pay their debts unrelated to Plaintiff, and (c) in the alternative to recover all amounts paid to the Defendants under the MDAs and all costs incurred by Plaintiff compelling Defendants to live up to their fiduciary duties.

## COUNT EIGHT – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
### (Against Hanke)

132.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

133.     As alleged in Paragraphs 128-131, *supra*, an underlying breach of fiduciary duties existed which was perpetrated by IOLO at the direction of Hanke.

134.     Hanke had actual knowledge of this breach of fiduciary duties perpetrated by IOLO because he directed IOLO to engage in the activities which constituted a breach of fiduciary duties.

135.     Hanke provided substantial assistance to IOLO in carrying out its breaches of its fiduciary duties.  Hanke never caused IOLO to invest Plaintiff's funds into trading programs. And Hanke instead took the money which IOLO was to use to uphold its fiduciary duties and converted it for his own use.

136.     Hanke's aiding and abetting of IOLO's breaches of fiduciary duties has caused Plaintiff damages in an amount not less than $134,474,400.

## COUNT NINE – VIOLATION OF THE INVESTMENT ADVISERS ACT
### (Against Hanke and IOLO)

137.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

138.     Pursuant to the MDAs, Hanke and IOLO served as investment advisers to and fund managers for Plaintiff.  Plaintiff compensated IOLO and, through it, Hanke for performing investment advisory and fund management services for Plaintiff.

139.     The MDAs stated that Plaintiff was an "accredited investor" within the meaning of the Securities Act of 1933.  It also stated that IOLO had "specific experience in the areas of finance, funding, and investments," that IOLO was making available "their various financial, insurance, and banking services" through the MDA, and that the sole purpose of IOLO and Plaintiff entering the MDA was for IOLO to provide "asset management and investment services."  IOLO was to receive compensation for providing these "asset management and investment services."  IOLO was advising Plaintiff as to the advisability of investing in trading programs to receive a return on investment, thus meeting the definition of an investment adviser.

140.     In the course of their engagement with Plaintiff, IOLO and Hanke engaged in fraudulent, deceitful, and manipulative conduct by keeping $137,474,400 of Plaintiff's money to which they were not entitled under the MDAs or any other agreements, by failing to pay the minimum payout amounts required by the MDAs, and by telling blatant lies to excuse delays in making payments.

141.     Hanke and IOLO's' fraudulent, deceitful and manipulative conduct was in violation of Section 206 of the Investment Advisers Act (15 U.S.C. § 80b-6).  By virtue of Hanke and IOLO's misconduct and their violation of the Investment Advisers Act, Plaintiff is entitled under Section 215 of the Investment Advisers Act (15 U.S.C. § 80b-15) to rescind the MDAs and recover all amounts paid to Hanke and IOLO under the MDAs and all costs incurred by Plaintiff in compelling Hanke and IOLO to comply with the Act, together with a preliminary injunction in the form of a constructive trust directing that Hanke and IOLO deposit

$134,474,400 into an escrow account before these amounts are dissipated by Hanke and IOLO to pay their debts unrelated to Plaintiff or to pay other clients.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1. Judgment in favor of Plaintiff on all of his claims;

2. An award of all compensatory and consequential damages suffered by Plaintiff resulting from IOLO and Hanke's wrongful conduct and the remaining Defendants' participation in and aiding and abetting of that conduct;

3. An award of all compensatory and consequential damages suffered by Plaintiff resulting from SGIT and Sims's default on the First, Second, and Third Bonds.

4. An award of punitive damages for IOLO and Hanke's egregious, knowing, and/or intentional fraudulent behavior, and the remaining Defendants' participation in and aiding and abetting and conspiracy to engage in such behavior;

5. Disgorgement of any profits earned from Defendants' use of Plaintiff's funds;

6. A preliminary and permanent injunction (a) compelling Hanke and IOLO to comply with their fiduciary duties and their duties under the Investment Advisers Act and to redress their breach of trust to the Funds, including a constructive trust directing Hanke and IOLO to deposit $137,474,400 into an escrow account before these amounts are dissipated by Defendants to pay their debts unrelated to Plaintiff or to pay other clients, which will be effective during the pendency of this action, and (b) restraining and enjoining Hanke and IOLO, or any third party affiliated or associated with Defendants, from selling, transferring, assigning, encumbering, or taking any other action with respect

to the funds placed into escrow or any assets, investment returns or profits generated from the use of Plaintiff's investment funds;

7.  An award of all attorneys' fees, costs, and expenses incurred by Plaintiff in connection with this action; and

8.  Such additional relief as the Court deems fair and just.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable in this action.

Dated: September 25, 2020    Respectfully Submitted,

       By: /s/ Michael C. Hefter
         Michael C. Hefter
         Matthew A. Ducharme
         Peter W. Bautz
         HOGAN LOVELLS US LLP
         390 Madison Avenue
         New York, NY 10017
         Telephone: (212) 918-3000
         Facsimile: (212) 918-3100
         michael.hefter@hoganlovells.com
         matthew.ducharme@hoganlovells.com
         peter.bautz@hoganlovells.com