UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                        :

MOHAMMED THANI A.T. AL THANI,      :

                Plaintiff,       :

                        :          20 Civ. 4765 (JPC)

      -v-                  :

                        :        OPINION AND ORDER

ALAN J. HANKE et al.,             :

                Defendants.   :

-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Mohammed Thani A.T. Al Thani filed an Amended Complaint against Defendants Alan J. Hanke, IOLO Global LLC ("IOLO" and with Hanke, the "Hanke Defendants"), Sidney Mills Rogers III, Laura Romeo, Amy Roy-Haeger, the Subgallagher Investment Trust (the "Trust"), and Sherry Sims (with Rogers, Romeo, Roy-Haeger, and the Trust, "the Co-conspirator Defendants," and collectively with the Hanke Defendants, "Defendants") on September 25, 2020, bringing several common law claims and a claim for violation of section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6. Dkt. 35 ("Amended Compl."). Now before the Court are four motions: the Hanke Defendants' pre-answer motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure or to dismiss for failure to state a claim under Rule 12(b)(6), Dkts. 62, 63, 64, 65 ("Hanke Defendants' Motion"); Roy-Haeger's motion to dismiss for lack of personal jurisdiction or to transfer venue, Dkt. 82 ("Roy-Haeger's Motion");[1] Sims and the Trust's motion to dismiss for lack of personal jurisdiction, Dkt. 96 ("Sims and the Trust's Motion"); and Rogers's motion to dismiss for lack of

---

[1] Roy-Haeger is proceeding in this action *pro se*.

personal jurisdiction, to dismiss or stay the claims against him pursuant to Rule 12(b)(6) or 9 U.S.C. § 3, respectively, pending arbitration, or to sever those claims pursuant to Rule 21 and transfer them to Georgia pursuant to 28 U.S.C. § 1404(a), Dkts. 97, 98 ("Rogers's Motion"), 99.[2]

For the reasons stated below, the Court denies the Hanke Defendants' motion to dismiss in its entirety. As to Roy-Haeger, the Trust, and Rogers, while the Complaint does not make a *prima facia* showing of personal jurisdiction over those Defendants, Al Thani has made a sufficient start toward establishing personal jurisdiction and may be able to make such a showing if given the opportunity to develop the factual record. The Court therefore grants Al Thani's request for jurisdictional discovery as to Roy-Haeger, the Trust, and Rogers, and stays the motions to dismiss under Rule 12(b)(2) as to those Defendants.[3] Because the Court grants jurisdictional discovery, it does not address the other grounds for relief raised by those Defendants.

## I.      Background

### A. Factual Allegations

The following facts are from the Amended Complaint, and are taken to be true for the purposes of this motion. *See LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009). The Court also relies on documents incorporated by reference in the Amended Complaint, most significantly the two Management and Deposit Agreements ("MDAs") entered into by Al

---

[2] Romeo, proceeding *pro se*, filed a "response" to the Amended Complaint, in which she provided factual responses to the allegations in the Amended Complaint and raised several "counter-claims." Dkt. 109. Because this is styled as an answer rather than a motion to dismiss and did not "provide[] any legal argument or standard for dismissal," Al Thani did not file an opposition. Dkt. 119 at 2 n.2. The Court agrees that Romeo's response is not a motion to dismiss.

[3] On March 17, 2021, Sims's attorney reported to the Court that Sims filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Texas in 21-30467-MLV (Bankr. N.D.T.X.). Dkt. 168. In light of the automatic stay triggered by that filing, the Court does not decide today whether it has jurisdiction over Sims, and addresses only the portions of Sims and the Trust's motion to dismiss that pertain to the Trust.

Thani and Hanke, on behalf of IOLO. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

This case concerns allegations that Hanke, an investment adviser and citizen of Illinois, and his "corporate shell," IOLO, a limited liability company based in Wyoming, of which Hanke is the only member, "attempt[ed] to cheat Plaintiff out of millions of dollars through a marketed investment program represented as a means of generating significant returns based on Plaintiff's investment." Amended Compl. ¶¶ 1, 7-8. Specifically, Hanke induced Al Thani to enter into two MDAs and various addenda to these MDAs, pursuant to which Al Thani entrusted Hanke with $6.5 million. *Id.* ¶¶ 1-4, 35. "Hanke expressly represented that he would manage the program through IOLO and that he had direct relationships with the traders who would be operating the trading platform." *Id.* ¶ 2. Al Thani alleges that "Hanke's and IOLO's representations from the outset were false and their subsequent representations were merely an artifice to extract additional money from Plaintiff in furtherance of their fraudulent scheme, in breach of contract, and in breach of their fiduciary duties." *Id.* ¶ 4. But Al Thani alleges that the Hanke Defendants did not act alone. Instead, he alleges that the Hanke Defendants acted in concert with the Co-conspirator Defendants: Rogers, the attorney and the escrow agent for the MDAs, "used his attorney [Interest on Lawyers' Trust Account ('IOLTA')] to create the air of legitimacy and was an instrumental part of the fraudulent investment scheme," *id.* ¶¶ 5, 10; Sims and the Trust issued fraudulent surety bonds, *id.* ¶¶ 5, 13, 19, 110, 125; Romeo introduced Hanke to investors, including Al Thani's representative, and "backed up Hanke's bogus excuses at meetings," *id.* ¶¶ 2, 5, 24-25, 125; and Roy-Haeger "impersonated bank officials to dupe unwitting investors into believing Hanke and IOLO had actually invested their money in a trading program," *id.* ¶ 5.

The scheme began in early 2019 when Romeo, a citizen of Illinois who "holds herself out as a 'Commodity Specialist' for a company called 'Cambridge,'" introduced Hanke and Al Thani via a broker, non-party Samuel Miginnis. *Id.* ¶¶ 2, 11, 23. On January 16, 2019, at Al Thani's behest, Hanke and Romeo met with Miginnis in New York City to discuss the investment program. *Id.* ¶ 24. Hanke and Romeo promised Miginnis, who then relayed the promises to Al Thani, that they would provide (1) "a transaction that would 'meet the Client's needs,'" (2) "[p]rogram funding [that] [would] be structured to provide funds that will best meet the Client's requirements," (3) "protection in the form of 'Private Deposit Insurance on the entire balance [of deposited funds] . . . issued by a Syndication of Insurance Companies, each rated "A" or better by AM Best' or 'by a private banking instrument issued by the depository bank with a face value equal to the participation amount,'" (4) "no co-mingling with other accounts," and (5) distributions "made to the client as specified in the MDA." *Id.* ¶ 25. Hanke represented that to accomplish such investments with other clients, the returns for clients' investments were first deposited with Rogers; in support, he showed Miginnis electronic screenshots of bank statements that supposedly showed the transfer of funds from a lawyer based in Atlanta, Georgia, who Al Thani would later understand was meant to refer to Rogers. *Id.* ¶ 24. Al Thani alleges that all of these statements "were false and were designed to induce Plaintiff's investment." *Id.* ¶ 25. In addition, Al Thani alleges that around this time, Hanke "met with other potential investors in New York at Four Points Capital Partners['] office in Manhattan along with the CEO of Four Points Capital Partners, Mike Martino, who claimed he was a friend of Hanke's and was letting Hanke use his company's offices to meet with potential investors." *Id.* ¶ 26. Hanke continued discussions over e-mail and phone, and Al Thani agreed to invest about two months later. *Id.* ¶ 27.

Al Thani and Hanke, acting on behalf of IOLO, then entered into the first of two MDAs in March 2019 (the "March MDA"), which set forth the terms for Al Thani's investment and the corresponding obligations of IOLO to invest his funds into a trading program managed by the Hanke Defendants. *Id.* ¶ 2; Dkt. 64, Exh. 3 at 2-8. Hanke was to invest the funds on Al Thani's behalf and generate periodic returns. Amended Compl. ¶ 2. Specifically, Al Thani was to transfer $3 million to Hanke via Rogers's escrow account, and Hanke was to invest those funds and make eleven payments to Al Thani, totaling $26.4 million, with a minimum of $2.4 million within 50 international banking days. *Id.* ¶ 28; Dkt. 64 Exh. 3 at 7-8. The March MDA provided that IOLO would be acting in a fiduciary capacity, Dkt. 64, Exh. 3 at 4, so Al Thani alleges that Hanke, who was doing the investing, therefore also had a fiduciary duty to Al Thani. Amended Compl. ¶ 29. Al Thani, IOLO (through Hanke), and Rogers executed an escrow agreement, and Al Thani wired the funds to Rogers's IOLTA Trust Account on March 27, 2019. *Id.* ¶ 30. The funds were released to Hanke around April 9, 2019, yet Defendants "have refused to confirm that the funds that Plaintiff invested were ever transferred to the wealth enhancement program or made part of an asset enhancement transaction." *Id.* ¶ 31. The March MDA also included a clause providing that it would be "governed by and interpreted and construed in accordance with the laws of the State of Wyoming," and that the "law courts of the State of Wyoming may settle any disputes or claims which may arise out of, or in connection with [the March MDA] by arbitration." Dkt. 64, Exh. 3 at 6.

When the Hanke Defendants failed to make the initial distribution of $2.4 million due to Al Thani when promised, Hanke lied to explain the delay. Amended Compl. ¶ 3. Al Thani believed Hanke's excuses, and executed several addenda to the MDA at Hanke's request, each of which rolled the payments due into the principal and increased the amount of upcoming periodic

payments. *Id.* ¶¶ 32-34. The third of these addenda was executed on October 28, 2019 at a meeting in New York City, which Hanke, Al Thani, and Al Thani's advisors attended. *Id.* ¶ 34. While the March MDA required IOLO to procure a surety bond to cover the principal and each addendum required new surety bonds, Defendants only procured surety bonds from the Trust, through Sims, for the initial $3 million investment and the first addendum. *Id.* ¶¶ 36-37. Defendants did not procure surety bonds for the other addenda, as required. *Id.* ¶ 37.

Hanke then persuaded Al Thani to enter into a second MDA with IOLO in July 2019 (the "July MDA" and collectively with the March MDA, the "MDAs"). *Id.* ¶¶ 3-4, 38; Dkt. 64, Exh. 3 at 9-14. Under the July MDA, Al Thani was to invest $3.5 million for a one-time payment of $10.5 million 45 calendar days from the release of the funds from an escrow account. Amended Compl. ¶ 38; Dkt. 64, Exh. 3 at 14. IOLO again agreed to act as a fiduciary to Al Thani, Amended Compl. ¶ 38; Dkt. 64, Exh. 3 at 10, and the July MDA again included a clause stating that it was governed by Wyoming law and that the state courts of Wyoming "may" settle any disputes, Dkt. 64, Exh. 3 at 12. IOLO and Rogers executed another escrow agreement "designed to create the false impression that Plaintiff's funds were safe and would be protected from misuse," and Al Thani released the funds to Rogers's IOLTA Trust Account. Amended Compl. ¶ 39. IOLO secured another surety bond from the Trust. *Id.* ¶ 40. Defendants have not confirmed whether they ever invested these funds, *id.* ¶ 41, and IOLO again failed to make timely payments due under the July MDA, *id.* ¶ 42. After more delays, Hanke traveled to New York City to meet Al Thani on October 28, 2019. *Id.* At this meeting, Hanke made additional false statements regarding the status of the investment and location of the funds, and offered Al Thani an addendum that would change the payment due into a new investment with a new surety bond. *Id.* IOLO never procured

the bond, *id.* ¶ 43, and never paid Al Thani the $22.5 million that became due to him on February 7, 2020, *id.* ¶ 44.

During the course of these events, Hanke made a litany of false statements regarding the delays in payment. *See id.* ¶¶ 46-62. For instance, he told Miginnis that there had been an accounting error that delayed the release of the funds. *Id.* ¶ 46. He also had Roy-Haeger pretend to be the head of compliance at a trading fund they claimed that they were using. *Id.* ¶ 47. In that role, Roy-Haeger claimed that some of the delays were caused by "accounting errors and logistics issues" and that a vice president at a bank had tried to steal the funds. *Id.* Hanke also paid certain commissions to people acting on Al Thani's behest, falsely asserting that these were profits from the investments when in fact they were from his personal funds, in order to "create the false impression that Plaintiff's funds were put into a trading program and were generating profits." *Id.* ¶¶ 48, 50. Hanke also repeatedly asserted that delays in paying the investment returns were due to "some continued unrest in Hong Kong," "some changes back to Dubai and Europe," and other holdups overseas. *Id.* ¶¶ 49, 51, 53. Hanke also created a website for a fake bank to defraud investors, including Al Thani. *Id.* ¶ 58. Al Thani details these events throughout the Amended Complaint, and explains how they induced him to give over significant sums that Defendants seemingly never invested as promised.

## B. Procedural History

Al Thani commenced this action on June 22, 2020, naming the Hanke Defendants and John Does 1-100. Dkt. 1. Al Thani filed the Amended Complaint on September 25, 2020, adding the Co-conspirator Defendants. The Amended Complaint brings claims for (1) breach the March MDA against the Hanke Defendants, Amended Compl. ¶¶ 76-83, (2) breach of the July MDA against the Hanke Defendants, *id.* ¶¶ 84-91, (3) breach of surety bonds against the Trust and Sims,

*id.* ¶¶ 92-98, (4) fraudulent inducement against all Defendants, *id.* ¶¶ 99-112, (5) fraud against all Defendants, *id.* ¶¶ 113-122, (6) aiding and abetting fraud against the Co-conspirator Defendants, *id.* ¶¶ 123-127, (7) breach of fiduciary duties against the Hanke Defendants, *id.* ¶¶ 128-131, (8) aiding and abetting breach of fiduciary duties against Hanke, *id.* ¶¶ 132-136, and (9) a violation of the Investment Advisers Act against the Hanke Defendants, *id.* ¶¶ 137-141.

As is relevant here, each Defendant has moved to dismiss the Amended Complaint under Rule 12(b)(2) for lack of personal jurisdiction. The Hanke Defendants have also moved to dismiss all counts against Hanke individually and the fourth, fifth, seventh, eighth, and ninth causes of action against the Hanke Defendants for failure to state a claim under Rule 12(b)(6). The Court held oral argument on the motions on April 22, 2021.

## II.    Legal Standard

### A.  Motions to Dismiss for Lack of Personal Jurisdiction

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Penguin Grp. (USA) v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (internal quotation marks omitted). A plaintiff bears the burden of raising facts that, "if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (internal quotation marks and brackets omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). Although all allegations are "construed in the light most favorable to the plaintiff," *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993), a court need not "draw argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks*, 714 F.3d at 673 (citations and internal quotation marks omitted). In considering a motion to dismiss for lack of personal

jurisdiction pursuant to Rule 12(b)(2), "courts have 'considerable procedural leeway,' which includes 'permit[ting] discovery in aid of the motion' or conducting 'an evidentiary hearing on the merits of the motion.'" *Shepherd v. Annucci*, 921 F.3d 89, 95 (2d Cir. 2019) (quoting *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013)); *see also Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) ("The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." (internal quotation marks omitted)).

## B. Motions to Dismiss for Failure to State a Claim

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a motion to dismiss, a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving parties favor," *LaFaro*, 570 F.3d at 475 (citation and internal quotation marks omitted), but is "not bound to accept as true legal conclusions couched as factual allegations," *id.* at 475-76 (citing *Iqbal*, 556 U.S. 662). Fraud claims must be pleaded with specificity under Rule 9(b) and therefore must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *see* Fed. R. Civ. P. 9(b). Otherwise, under Rule 8(a)(2), a pleading must

contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## III.    Discussion

### A.  Personal Jurisdiction

The Court begins with the motions to dismiss for lack of personal jurisdiction. In assessing a motion to dismiss for lack of personal jurisdiction, a court must undertake a two-step process. First, the court must establish that there is "a statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013). In assessing this requirement, a court sitting in diversity looks to "the law of the forum in which the court sits." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Here, Al Thani relies on two provisions of N.Y. C.P.L.R. section 302(a): A court may exercise personal jurisdiction over any non-domiciliary who "in person or through an agent" (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state," N.Y. C.P.L.R. § 302(a)(1), or (2) "commits a tortious act within the state," *id.* § 302(a)(2).

Second, a court must assess whether the exercise of jurisdiction comports with due process. *Sonera Holding B.V. v. Çukurova Holding A.*, 750 F.3d 221, 224 (2d Cir. 2014) (per curiam), *cert. denied*, 134 S. Ct. 2888 (2014). In doing so, a court first looks to "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Chloé*, 616 F.3d at 164 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "For purposes of this inquiry, a distinction is made between 'specific' jurisdiction and 'general' jurisdiction." *Id.* "Specific jurisdiction exists when 'a [s]tate exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984)). "A

court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* Al Thani alleges only specific jurisdiction over Defendants.[4]

### 1. The Court Has Jurisdiction Over the Hanke Defendants

The Court begins with the Hanke Defendants' motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) on the basis that (1) there is no personal jurisdiction under N.Y. C.P.L.R. section 302(a)(1) because they did not "transact business" within the state, (2) there is no personal jurisdiction under N.Y. C.P.L.R. section 302(a)(2) because they did not "commit[] a tortious act within the state," and (3) the exercise of jurisdiction over the Hanke Defendants would be unreasonable. The Court addresses each argument in turn.

#### a. Plaintiff Has Made a *Prima Facie* Showing That the Hanke Defendants "Transacted Business" Within New York

New York's long-arm statute allows a court to exercise personal jurisdiction on the basis that a defendant "in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). "The New York Court of Appeals has explained that 'the overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York,' thereby 'invoking the benefits and protections of its

---

[4] In their briefs, some Defendants argue that the Court does not have personal jurisdiction over them on various alternative bases. *See, e.g.*, Hanke Defendants' Motion at 7 (arguing that the Court does not have jurisdiction under N.Y. C.P.L.R. section 302(a)(3), which allows for jurisdiction if a defendant commits a tortious act outside of the state); Sims and the Trust's Motion at 11 (arguing that the Court does not have general jurisdiction). Because Al Thani does not rely on these bases for jurisdiction, the Court does not address them and takes no view of the Court's jurisdiction under those theories.

laws.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) (quoting *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007) and then *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)), *certified question accepted sub nom. Licci v. Lebanese Canadian Bank*, 18 N.Y.3d 952 (2012), *and certified question answered sub nom. Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327 (2012).

"A defendant need not physically enter New York State in order to transact business, 'so long as the defendant's activities here were purposeful.'" *Id.* (quoting *Fischbarg*, 9 N.Y.3d at 380). Courts look to the "totality of the circumstances" when making this assessment, *id.* at 62 (quoting *Farkas v. Farkas*, 830 N.Y.S.2d 220, 221 (App. Div. 2007)), with the "primary consideration" being "the quality of the defendants' New York contacts," *id.* (quoting *Fischbarg*, 9 N.Y.3d at 380). For instance, when assessing a case in which the causes of action primarily arise out of a contract, courts consider "whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) (citations omitted). It is well-established, however, that "[a] single act within New York will, in the proper case, satisfy the requirements of section 302(a)(1)," *Licci ex rel. Licci*, 673 F.3d at 61, and "a defendant's physical presence in the state at the time of the negotiation, making, or execution of a contract generally justifies a finding of purposeful availment and allows a court to exercise personal jurisdiction under CPLR § 302(a)(1)" so long as the claims arise out of those contacts, *USHA Holdings, LLC v. Franchise India Holdings Ltd.*, 11 F. Supp. 3d 244, 269 (E.D.N.Y. 2014) (collecting cases).

The Hanke Defendants argue that the "[g]ravity of the [c]ase" occurred outside of New York state, and thus "the totality of the circumstances militate[] against the application of long-arm jurisdiction over Defendants." Hanke Defendants' Motion at 4. Specifically, they argue that they "do not direct business solicitations to the State of New York," *id.* at 1, they "maintain no physical business address" or "bank accounts in the State of New York," *id.*, they have no "digital footprint/social media accounts" targeting New York, *id.* at 4-5, and Hanke does not reside in New York, *id.* The Hanke Defendants further contend that any events that occurred in New York "were at the request of Plaintiff," *id.* at 1-2, and therefore they did not "*purposefully* avail[] themselves of the benefit of using New York's reputation," *id.* at 5-6 (emphasis in original). In addition, the Hanke Defendants look to the forum selection and choice of law clauses in the MDAs. *Id.* at 6. Finally, the Hanke Defendants argue that the parties' meetings in New York were "[f]ortuities," and that most of the contact to accomplish the scheme was via "phone, facsimile, or electronic mail." *Id.* at 7-8.

Taking the allegations in the Amended Complaint as true, as the Court must, the Court concludes that Al Thani has raised facts to establish a *prima facie* case of personal jurisdiction over the Hanke Defendants. Al Thani alleges that Hanke traveled to New York numerous times to negotiate and execute the MDAs. Amended Compl. ¶ 19. He details these meetings throughout the Amended Complaint, and alleges that during those meetings Hanke committed several acts designed to deceive Al Thani and induce him into investing more money into the fraudulent investment scheme, and to mislead him as to why the promised payments of investment returns had not been made. These connections alone are sufficient. *See, e.g.*, *Khankhanian v. Khanian*, No. 16 Civ. 8396 (JFK), 2017 WL 1314124, at *3 (S.D.N.Y. Apr. 6, 2017) ("Here, Plaintiff alleges that over the course of several meetings . . . , the parties negotiated key terms . . . and finalized

their agreement . . . . This alone is sufficient to establish that Defendant transacted business in New York."); *Saldanha v. Baidyaroy*, No. 91 Civ. 6413 (PKL), 1992 WL 147669, at *4 (S.D.N.Y. June 15, 1992) ("The Court reasonably may infer from plaintiff's affidavit that defendants' visits to New York were important steps in the contract formation process between the parties, since plaintiff asserts that it was during these trips to New York that defendants requested his services."); *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 664 F. Supp. 713, 716 (S.D.N.Y. 1987) ("Here, personal jurisdiction is hardly doubtful. Everett, through its president Dern, was physically present in New York for negotiation of and agreement in principle to the contracts out of which the cause of action arose. These factual allegations present very nearly the 'clearest sort of case' for long-arm jurisdiction under New York law.").

Moreover, Al Thani alleges additional connections with New York reflecting a more substantive ongoing relationship with the state. He alleges that Hanke met with other potential investors in New York, and the Hanke Defendants "purposefully availed themselves of the benefit of using New York's reputation as a financial capital of the world as part of their scheme to lure potential investors." Amended Compl. ¶ 19. In addition, the March MDA contains a clause providing that Al Thani's deposit "will be insured by IOLTA Surety provided by the State (New York)," Dkt. 64-3 at 4, further reflecting the Hanke Defendants' intent to rely on the laws of the State of New York and to benefit from the state's reputation.[5]

And the claims at issue clearly "ar[o]se out of that business activity." *CutCo Indus., Inc.*, 806 F.2d at 365. As noted, Al Thani alleges that Hanke made numerous misrepresentations while

---

[5] Although the Amended Complaint pleads that "both MDAs called for Plaintiff's deposit to be 'insured by IOLTA Surety provided by the State (New York)' until such time as an escrow agreement and private surety bond were in place," Amended Compl. ¶ 19, it appears that only the March MDA, and not the July MDA, required that the IOLTA Surety be provided by New York, *compare* Dkt. 64, Exh. 3 at 4, *with id.* at 10.

in New York to induce Al Thani to invest and enter into various addenda to their agreements to prolong the fraud, and these allegations form the basis for Al Thani's fraud and contract claims. This represents a sufficient "articulable nexus between the business transacted and the cause of action sued upon" to survive dismissal. *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981).

The Hanke Defendants' arguments otherwise, which sound more in an argument to dismiss for *forum non conveniens* rather than for lack of personal jurisdiction, are unpersuasive. First, while the Hanke Defendants may be correct that negotiations that take place exclusively via phone, telephone, fax, and e-mail are generally insufficient to establish that a defendant "transacted business" in New York for jurisdictional purposes, *see, e.g.*, *Wickers Sportswear, Inc. v. Gentry Mills, Inc.*, 411 F. Supp. 2d 202, 209 (E.D.N.Y. 2006), Al Thani does not rely exclusively on wire and electronic communications. Instead, Al Thani relies upon Hanke's physical presence in New York on numerous instances, *see* Amended Compl. ¶ 19, and the Court must credit these allegations. In addition, the fact that Al Thani may have chosen New York as the location for these meetings is irrelevant in the absence of any suggestion that Hanke was forced to come to New York. *See First Cap. Inv. Holdings LLC v. Wilson Cap. Grp.*, No. 10 Civ. 2948 (JSR), 2010 WL 4967833, at *2 (S.D.N.Y. Nov. 30, 2010) ("The fact that the meeting was arranged by the plaintiffs is immaterial. Even if the plaintiffs chose the meeting place, there is no allegation that [defendant] was in any way coerced into attending this meeting."). And, contrary to the Hanke Defendants' blanket statement otherwise, these meetings were intentional meetings held to further the scheme and were clearly not the type of "fortuitous instance" that would be insufficient to support jurisdiction. *See, e.g.*, *Galgay v. Bulletin Co., Inc.*, 504 F.2d 1062, 1065 (2d Cir. 1974) ("The fact that the formal contract was sent unsigned to Philadelphia, so that the last signature was affixed in New York is a purely fortuitous circumstance.").

Finally, the forum selection clause does not support the Hanke Defendants' argument. A choice of law or forum selection clause is surely relevant to whether a defendant "purposefully availed himself of the forum's laws under constitutional jurisdictional constraints," *CutCo Indus., Inc.*, 806 F.2d at 366-67 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)), in that it might support a finding that the defendant consented to jurisdiction, *see, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d Cir. 1977) ("[T]he agreement to resolve disputes by arbitration in New York constituted consent to personal jurisdiction in New York."). But the Hanke Defendants have provided no support for the proposition that a permissive forum selection clause, which provides that a suit "may" be brought in one state (*i.e.*, Wyoming), can somehow be used to *shield* them from jurisdiction in another state (*i.e.*, New York). *See John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors Inc.*, 22 F.3d 51, 53 (2d Cir. 1994) ("[A]n agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere unless it contains specific language of exclusion." (internal quotation marks omitted)).

In sum, Al Thani has made a *prima facie* showing of jurisdiction over the Hanke Defendants under N.Y. C.P.L.R. section 302(a)(1) that is sufficient to overcome their motion to dismiss.

### b. Plaintiff Has Made a *Prima Facie* Showing That the Hanke Defendants Committed a Tortious Act Within the State

New York also allows for personal jurisdiction if a defendant "in person or through an agent . . . commits a tortious act within the state." N.Y. CPLR § 302(a)(2). In arguing that the Court does not have jurisdiction under this provision of New York's long-arm statute, the Hanke Defendants argue that "[e]ach of the factual allegations in the Amended Complaint . . . which serve as a basis for purported tort liability . . . are all based on the underlying allegations of the purported

breach of the MDAs" and other contract documents, and therefore Al Thani has impermissibly "convert[ed] a breach of contract cause of action into a tort cause of action for purposes of establishing jurisdiction." Hanke Defendants' Motion at 10.

These claims largely parrot the Hanke Defendants' arguments in favor of dismissal pursuant to Rule 12(b)(6), which the Court addresses in section III.B.2, *infra*. As discussed in that section, Al Thani's fraud claims are not duplicative of his contract claims. Accordingly, the facts alleged in Al Thani's Amended Complaint clearly support jurisdiction under section 302(a)(2): Al Thani alleges that the Hanke Defendants committed tortious acts in New York, "including by making materially false statements to a broker working on Plaintiff's behalf during a January 2019 meeting in New York City to induce Plaintiff to enter into an MDA, to Plaintiff and Plaintiff's advisers during an October 2019 meeting in New York to induce Plaintiff to execute various addenda to his MDAs to delay payments, and to Plaintiff's advisers at a January 2020 meeting in New York to induce plaintiff to further delay demanding any payments." Amended Compl. ¶ 20. Al Thani has thus established section 302(a)(2) as well as a viable basis for jurisdiction over the Hanke Defendants under New York law.

### c. Exercise of Personal Jurisdiction Over the Hanke Defendants Comports with Due Process

Having established that the Court has jurisdiction over the Hanke Defendants under two alternative prongs of New York's long-arm statute, the Court turns to whether the exercise of jurisdiction comports with traditional notions of due process, and concludes that it does.

As noted above, Al Thani alleges specific jurisdiction over the Hanke Defendants. In determining whether a court may exercise specific jurisdiction over a defendant, a court looks to whether the defendant "purposefully established 'minimum contacts'" in the forum by "purposefully direct[ing] his [or her] activities at residents of the forum, and the litigation results

from alleged injuries that arise out of or relate to those activities." *Burger King Corp*, 471 U.S. at 472-74 (citations and internal quotation marks omitted). In making this assessment, a court "look[s] to the totality of Defendants' contacts with the forum state." *Chloé*, 616 F.3d at 164. "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp.*, 471 U.S. at 475 (citations and internal quotation marks omitted).

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476 (quoting *Int'l Shoe Co.*, 326 U.S. at 320). Specifically, a court must consider "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloé*, 616 F.3d at 164-65 (citing *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113-14 (1987)). These factors allow a court to determine if, notwithstanding the defendant's minimum contacts with the state, there is "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.,* 471 U.S. at 477.

First, the Hanke Defendants have sufficient minimum contacts with the state. As outlined above, Hanke, on behalf of IOLO, traveled to New York to negotiate business dealings with Al Thani and others. The Hanke Defendants thereby intentionally targeted the state such that they could foresee being haled into court there. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425

F.3d 158, 167 (2d Cir. 2005). Second, the Hanke Defendants have not shown that the exercise of jurisdiction would be unreasonable. *See Burger King Corp.*, 471 U.S. at 477 (explaining that "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable"). The Hanke Defendants' conclusory argument that it would be "patently unfair and markedly unreasonable to Defendants" for Al Thani to bring suit in New York, Hanke Defendants' Motion at 12, carries little persuasive weight. *See Khankhanian v. Khanian*, No. 16 Civ. 8396 (JFK), 2017 WL 1314124, at *4 (S.D.N.Y. Apr. 6, 2017) (concluding that any "inconvenience of traveling to a distant forum alone 'falls short of overcoming the plaintiff's threshold showing of minimum contacts'" (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp*., 84 F.3d 560, 574 (2d Cir. 1996))). Nor is the Court convinced by their argument that the permissive forum selection clause, also discussed above, should allow them to escape jurisdiction. *See* Hanke Defendants Motion at 12.

In short, the Hanke Defendants elected to travel to New York to negotiate the contracts and conduct their business. They cannot now avoid being subject to New York courts.

### 2. Al Thani Has Not Made a *Prima Facie* Showing that the Court Has Jurisdiction over the Trust, Roy-Haeger, and Rogers

The Co-conspirator Defendants also have moved to dismiss on the basis that the Court lacks personal jurisdiction over them. As noted above, because of the automatic stay in effect as to Sims on account of her bankruptcy filing, the Court only considers the motions brought by the Trust, Roy-Haeger, and Rogers at this time.

For personal jurisdiction over the Co-conspirator Defendants, Al Thani relies on N.Y. C.P.L.R. section 302(a)(2), which allows for jurisdiction if a non-domiciliary "*through an agent* . . . commits a tortious act within the state,*"* N.Y. C.P.L.R. § 302(a)(2) (emphasis added), with the

alleged in-state tortious acts being the Hanke Defendants' activities in New York. Amended Compl. ¶ 21. Specifically, Al Thani alleges that the Co-conspirator Defendants "acted in concert with Hanke and IOLO," "were aware that Hanke was operating in New York for the purpose of inducing investors, including Plaintiff, to invest in his trading programs," personally benefitted from the scheme, and knew "that at least some effects of the conspiracy would be felt in New York." *Id.*

New York courts have found that, "[f]or purposes of [N.Y. C.P.L.R. section 302(a)(2)], a co-conspirator can be an agent" in certain circumstances. *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 605 (App. Div. 1998), *aff'd on other grounds*, 94 N.Y.2d 43 (1999); *see also Reeves v. Phillips*, 388 N.Y.S.2d 294, 296 (App. Div. 1976) ("The acts of a co-conspirator may, in an appropriate case, be attributed to a defendant for the purpose of obtaining personal jurisdiction over that defendant."). To establish jurisdiction over an out-of-state defendant based on the acts of that defendant's co-conspirator in the State of New York, a plaintiff must (1) "establish a prima facie case of conspiracy," (2) "allege specific facts warranting the inference that the defendant was a member of the conspiracy," (3) "demonstrate the commission of a tortious act in New York," and (4) "demonstrate the requisite agency relationship between the nondomiciliary defendant and the in-state tortfeasor." *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc*., 218 F. Supp. 369, 394 (S.D.N.Y. 2002), *on reconsideration*, 219 F. Supp. 2d 576 (S.D.N.Y. 2002), *aff'd sub nom. First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004); *accord Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 759 (S.D.N.Y. 2004), *opinion clarified on denial of reconsideration*, No. 02 Civ. 6356 (SHS), 2005 WL 2585227 (S.D.N.Y. Oct. 13, 2005).

### a. Al Thani Has Made a *Prima Facie* Showing of Conspiracy

The Court first addresses whether Al Thani has established a *prima facie* case of conspiracy. To make such a showing, "a plaintiff must allege the underlying tort and four

elements": "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *First Cap. Inv. Holdings LLC*, 2010 WL 4967833, at *2 (quoting *Chrysler Cap. Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991)).

None of the Co-conspirator Defendants, at least in their opening briefs, challenge Al Thani's allegations regarding the existence of the conspiracy.[6]  In any event, the Amended Complaint sufficiently alleges the existence of a conspiracy and that the various Co-conspirator Defendants were members of that conspiracy.  Al Thani alleges that Defendants had a "constructive or actual agreement to engage in fraud," Amended Compl. ¶ 110, and supports his allegations with specific details regarding each of the Co-conspirator Defendants' knowledge of the fraud and active, intentional participation in it, *see, e.g.*, *id.* ¶¶ 125-126.  For instance, Al Thani alleges that "Rogers provided records of fictitious payments to Hanke; Sims and [the Trust] provided worthless surety bonds; Romeo arranged the introduction between Plaintiff and Hanke and participated in multiple phone calls to perpetrate the fraud; and Roy-Haeger impersonated a bank compliance officer as part of Hanke's schemes and participated in multiple phone calls to perpetrate the fraud." *Id.* ¶ 110; *see also id.* ¶ 125.  Al Thani also alleges that this scheme caused him to endure at least $28,496,000 in damages.  *Id.* ¶ 111.  And as the Court already found, the Complaint sufficiently alleges that a member of the conspiracy, Hanke, committed tortious acts in New York.  *See supra* III.A.1.b.

---

[6] Although Sims and the Trust argue for the first time in their reply brief that Al Thani has not alleged a conspiracy, *see* Dkt. 124 at 3-4, 7, it is well-settled that "[a]rguments may not be made for the first time in a reply brief." *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).

### b. Al Thani Has Not Alleged Facts Supporting the Agency Requirement

However, there is a more fundamental problem with Al Thani's Amended Complaint. Nowhere in the Amended Complaint does Al Thani allege that the Hanke Defendants acted in New York *as the agent* of the Trust, Roy-Haeger, or Rogers. Simply put, to the extent Al Thani contends that his Amended Complaint has made a *prima facie* showing of jurisdiction as to those Defendants, he appears to rely on a theory of "conspiracy" jurisdiction that stands at odds with well-established and controlling New York law.

As a preliminary matter, New York does not provide for some abstract form of conspiracy jurisdiction divorced from the defendant's intentional contacts with the forum. Instead, the source of this "conspiracy" jurisdiction upon which Al Thani relies is section 302(a)(2), which allows for jurisdiction over a nonresident on the basis that someone committed a tort in New York as the out-of-state conspirator's "agent." N.Y. C.P.L.R. § 302(a)(2). Accordingly, this is quite dissimilar from the criminal venue statute, 18 U.S.C. § 3237, which broadly provides that venue is proper in any district where a conspiracy offense was "begun, continued, or completed."

In *Kreutter v. McFadden Oil Corp.*, the New York Court of Appeals expounded upon the agency requirement of section 302(a), explaining that while a plaintiff need not establish a "formal agency relationship" to establish jurisdiction, a plaintiff must "convince the court that [the in-state defendant] engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of the [out-of-state defendants] and that they *exercised some control over* [the in-state defendant] in the matter." 71 N.Y.2d 460, 467 (1988) (emphasis added); *see also Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981) ("[B]efore an agency relationship will be held to exist under section 302(a)(2), a showing must be made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and *under some control by*, the nonresident principal." (emphasis added)); *Mario Valente Collezioni, Ltd. v.*

*Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 36 (2d Cir. 2001) (same); *Barbato v. Giacin*, 132 N.Y.S.3d 641, 641 (App. Div. 2020) (reversing the trial court's finding of jurisdiction over a woman based on her husband's in-state actions because "there [was] no basis to infer that the husband's actions . . . in New York benefitted the [woman] or that the husband acted in New York at [her] behest").

As noted above, an in-state conspirator can, "*in an appropriate case*," be an agent. *Reeves*, 388 N.Y.S.2d at 296 (emphasis added). However, the plaintiff must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirator[] was to the benefit of the out-of-state conspirator[]; and (c) the co-conspirator[] acting in New York acted 'at the direction or under the control' or 'at the request or on behalf of' the out-of-state defendant." *First Cap. Asset Mgmt., Inc.*, 218 F. Supp. 2d at 394.

Al Thani attempts to read out this control requirement, arguing that "[w]hile a small handful of federal courts had predicted that under New York law," the "control" requirement "would require an agency-like relationship, New York state courts have adopted a more expansive view and have held that the third prong is met when, among other things, the plaintiff alleges that 'the out-of-state coconspirator has knowledge of the tortious acts being perpetrated in New York.'" Dkt. 122 at 6-7 (quoting *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 8 (App. Div. 2013)). Al Thani relies principally on two cases in support of his proposed standard. First, in *Lawati*, the Appellate Division appeared to interpret the "control" requirement as necessitating only that the out-of-state co-conspirator be "aware of the torts being committed by [the other] defendants in New York." 961 N.Y.S.2d at 8 (citing *Dixon v. Mack*, 507 F. Supp. 345, 351-52 (S.D.N.Y. 1980)). In support of this view, the court in *Lawati* cited to *Dixon v. Mack*, a pre-*Grove Press* and pre-*Kreutter* case from this District in which the court held that "the activity of the co-

conspirators in New York" must be "to the benefit of the out-of-state conspirator." 507 F. Supp. at 351. Second, in *Wimbledon Financing Master Fund, Ltd. v. Weston Capital Management*, the Appellate Division found that, although the out-of-state defendants "did not mastermind the conspiracy, their receipt of 'hush money' allow[ed] the reasonable inference that they exerted 'control' to the extent that the fraud could not have been accomplished without their acquiescence to the proxy and other misconduct." 76 N.Y.S.3d 121, 123-24 (App. Div. 2018) (citing *Lawati* 961 N.Y.S.2d at 8).

To the extent that Al Thani argues that control is not required under New York law, that view stands in conflict with the plain language of section 302(a) and with precedent from both the New York Court of Appeals and the Second Circuit as outlined above. In other words, insofar as the intermediate appellate court in *Lawati* did not require any showing of "control," such holding cannot be reconciled with the agency relationship that is plainly required by N.Y. C.P.L.R. section 302(a), and that is laid out in *Kreutter* and the vast majority of cases from both New York state courts and federal courts in this District.[7] And Plaintiff points to nothing to suggest that the New York Court of Appeals has since abandoned the control requirement or would adopt a lower standard. *See Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 91-92 (2d Cir. 2010) ("The holdings of

_____

[7] Whereas *Lawati* arguably abandoned the "control" requirement, the court in *Wimbledon* explicitly recognized that the plaintiff was required to show that the out-of-state defendant exercised some "control" over the in-state actor. 76 N.Y.S.3d at 123. It simply found that the "control" prong was met because the out-of-state defendants' "receipt of 'hush money' allow[ed] the reasonable inference that they exerted 'control' to the extent that the fraud could not have been accomplished without their acquiescence to the proxy and other misconduct." *Id.* at 123-24. Even assuming that *Wimbledon* is an appropriate interpretation of the "control" requirement and does carry some persuasive weight, it does not change the Court's assessment of the facts here. Although Al Thani alleges that the Hanke Defendants provided a benefit to the Co-conspirator Defendants, he has not alleged that the Hanke Defendants paid the Co-conspirator Defendants to keep them from exposing the scheme, as appears to have been the case in *Wimbledon*. While the distinction is slight, the facts in *Wimbledon* reflect a greater level of coercion that Al Thani has simply not alleged here.

New York's highest court, which it has never repudiated, presumptively control. Where lower state courts appear to have misconstrued or ignored binding precedent, we are obliged to follow the Court of Appeals."); *cf. Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 132 (2d Cir. 1984) ("[T]he decision of an intermediate state court on a question of state law is binding on [a diversity court] unless we find persuasive evidence that the highest state court would reach a different conclusion."). In fact, the Second Circuit has recently reaffirmed the same control theory outlined in *Kreutter* and *Grove Press*. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) ("Under [New York law], there is jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.'" (quoting *Grove Press, Inc.*, 649 F.2d at 122)).

The Court therefore adheres to the standard set in many cases establishing that section 302(a) requires a showing of "control," in that the in-state actor "acted 'at the direction or under the control' or 'at the request or on behalf of' the out-of-state defendant." *First Cap. Asset Mgmt., Inc.*, 218 F. Supp. 2d at 394; *accord, e.g.*, *Related Cos., L.P. v. Ruthling*, No. 17 Civ. 4175 (JSR), 2017 WL 6507759, at *14 (S.D.N.Y. Dec. 18, 2017); *Biz2Credit, Inc. v. Kular*, No. 14 Civ. 8223 (ER), 2015 WL 2445076, at *8 (S.D.N.Y. May 21, 2015); *Norex Petroleum Ltd. v. Blavatnik*, 22 N.Y.S.3d 138 (Sup. Ct.), *judgment entered sub nom. Norex Petroleum Ltd. v. Blavatnik, et al.* (Sup. Ct. 2015), *and aff'd, appeal dismissed*, 59 N.Y.S.3d 11 (2017). This control requirement is vital: "Although the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.'" *Charles Schwab Corp.*, 883 F.3d at 85 (quoting *Bank Brussels Lambert v. Fiddler*

*Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)); *see also Burger King Corp.*, 471 U.S. at 475 ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person.'" (citations omitted)). To abide by due process, the defendant must "*himself*" create the contacts in the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis in original). As Rogers suggests in his reply brief, a pure conspiracy-based theory of jurisdiction would threaten firmly-established due process requirements. *See* Dkt. 136 at 4-5.

When viewed under this proper standard, the allegations in the Amended Complaint do not make a *prima facie* case of jurisdiction over the Trust, Roy-Haeger, or Rogers, because Al Thani has not alleged that any of these Defendants exercised any control over Hanke in New York. For instance, Al Thani alleges that the Court has jurisdiction over the Trust based on its (and Sims's) role in "issu[ing] fraudulent surety bonds which were not backed by the assets they claimed," Amended Compl. ¶ 5, and the due diligence Sims did on the deal, which ostensibly would have involved reviewing the MDAs, including their IOLTA surety clause, Dkt. 119 at 14. But as the Trust points out, there are no allegations that it (or Sims) exerted control over Hanke's actions in New York. *See* Dkt. 134 at 5-6.

A similar analysis applies to Roy-Haeger, who has moved to dismiss, in part, on the basis that she has no personal connections to New York, that the Amended Complaint does not allege she was present in New York or aware of any meetings in New York, and that personal jurisdiction is lacking. *See* Roy-Haeger's Motion at 2-4. The Amended Complaint focuses on calls that Roy-Haeger made to Miginnis while he was in New York, the latter fact Roy-Haeger may not have even known. Amended Compl. ¶¶ 5, 21; Dkt. 119 at 13; Dkt. 121, Declaration of Samuel Miginnis, ¶ 7 ("I do not recall if I specifically mentioned that I was based in New York to Roy-

Haeger, however, it is possible I mentioned this fact to Roy-Haeger or that she was aware that I was based in New York from conducting her own background research on me.").[8]  And the Amended Complaint does not allege that Roy-Haeger exercised any control over Hanke's actions in New York or that she had any contacts explicitly directed at New York.  The Court therefore finds that the Amended Complaint fails to support a *prima facie* case for jurisdiction over Roy-Haeger as well.

There is arguably a more colorable claim of control with respect to Rogers.  Al Thani alleges that Rogers used his attorney IOLTA Trust Account to "create the air of legitimacy" and in doing so "was an instrumental part of the fraudulent investment scheme."  Amended Compl. ¶ 5; *see also id.* ¶ 110.  Rogers argues that "taking all of the allegations in light most favorable to [Al Thani], [Rogers] acted at the behest of [Hanke], the purported in-state co-conspirator, not the other way around."  Rogers's Motion at 11 (alterations in original) (quoting *Related Companies, L.P.*, 2017 WL 6507759, at *14).  In response, Al Thani relies principally upon *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418 (E.D.N.Y. 2012).  *See* Dkt. 122 at 10.  In *Emerald Asset Advisors*, the court considered an action against numerous defendants for allegedly absconding with the plaintiff's funds, including an attorney, Schaffer, who held the funds in an escrow account.  895 F. Supp. 2d at 422-25.  Schaffer moved to dismiss on personal jurisdiction grounds, and the court concluded that, while a "close[] question," the plaintiff had made the

---

[8] As noted below, *see infra* n.9, the Amended Complaint alleges generally that the Co-conspirator Defendants, including Roy-Haeger, were aware of the effects of the conspiracy in New York.  *See* Amended Compl. ¶ 21.  While this pleading is normally sufficient, the above sworn statement from Plaintiffs' own witness certainly calls into question Roy-Haeger's knowledge as to activity occurring in New York, and this issue as well may be explored by the parties during jurisdictional discovery.

requisite showing of control under section 302(a)(2) because "the money was placed in Schaffer's escrow account." *Id.* at 431-32.

Based on the allegations in the Amended Complaint, the Court cannot conclude that Rogers's receipt of funds is sufficient to establish control. Again, underlying the control requirement is the idea that a defendant must "have 'purposefully availed itself of the privilege of doing business in the forum.'" *Charles Schwab Corp.*, 883 F.3d at 85 (quoting *Bank Brussels Lambert*, 305 F.3d at 127). Rogers's receipt of funds alone, without any additional allegations regarding his ties to the state or the in-state actor's actions, is not enough to establish that Hanke was an "agent" over whom Rogers exercised some control. While the degree of control need not be overwhelming, and can be met, for instance, by participation in a joint venture or partnership, *see CutCo Indus., Inc.*, 806 F.2d at 366, Al Thani has simply not alleged any facts to allow the Court to find that Rogers exercised control over Hanke's actions in New York.

In sum, Al Thani fails to allege that the Hanke Defendants acted under the control of the Trust, Roy-Haeger, or Rogers. However, throughout his briefing and at oral argument, Al Thani has requested that, if the Court were to find his allegations insufficient, he be permitted to conduct jurisdictional discovery. *See, e.g.*, Dkt. 78 at 4 n.1. "It is well settled under Second Circuit law that, even where plaintiff has not made a prima facie showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014); *see APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ( "[A] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." (internal quotation marks omitted)). A plaintiff is entitled to discovery "when the allegations are sufficient to articulate a colorable basis for personal

jurisdiction, which could be established with further development of the factual record." *Leon*, 992 F. Supp. 2d at 194; *accord Ayyash v. Bank Al–Madina*, No. 04 Civ. 9201 (GEL), 2006 WL 587342, at *5 (S.D.N.Y. March 9, 2006).

Here, Al Thani provides significant details regarding a conspiracy to defraud him of millions of dollars, pursuant to which Hanke committed tortious acts in New York with the vital assistance of the out-of-state Co-conspirator Defendants. Because Al Thani dealt primarily with Hanke, it is not surprising that he would not know the inner-workings of the conspiracy and the relationships between the co-conspirators. Accordingly, although it is entirely possible that Al Thani will be unable to make a case that the Trust, Roy-Haeger, or Rogers is subject to the jurisdiction of this Court, he has at least raised a colorable basis for personal jurisdiction. Accordingly, the Court grants Al Thani's request for jurisdictional discovery as to these three Defendants.[9]

## B. Failure to State a Claim

---

[9] Rogers further contends that Al Thani has not sufficiently alleged that Rogers knew the Hanke Defendants were acting in New York, as the only allegations regarding knowledge are "conclusory" "lump" pleadings. Rogers's Motion at 12; *see* Amended Compl. ¶ 21 ("Defendants, either through direct meetings in New York with Hanke or through their interactions with Hanke, were aware that Hanke was operating in New York for the purpose of inducing investors, including Plaintiff, to invest in his trading programs and that at least some effects of the conspiracy would be felt in New York."). The Amended Complaint is admittedly sparse in this respect. Nonetheless, broad allegations of knowledge are simply not the type of "lump" pleading that courts fear will fail to give a defendant fair notice of the grounds of the plaintiff's claims, *see Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001), or fail to demonstrate the specific acts by which the defendant purposefully availed itself of the privilege of acting in the state, *see HDtracks.com, LLC v. 7digital Grp. PLC*, No. 18 Civ. 5823 (JFK), 2019 WL 6170838, at *6 (S.D.N.Y. Nov. 19, 2019). Even under a more demanding Rule 9(b) standard, for instance, knowledge may be "alleged generally." Fed. R. Civ. P. 9(b). And Rogers has not submitted an affidavit denying knowledge, so the allegations in the Amended Complaint are presumed true. *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). The parties will nonetheless have the opportunity to further develop this as well during jurisdictional discovery.

In addition to moving to dismiss under Rule 12(b)(2), the Hanke Defendants have moved to dismiss all claims against Hanke in his individual capacity and to dismiss the fourth, fifth, seventh, eighth, and ninth causes of action against the Hanke Defendants for failure to state a claim under Rule 12(b)(6). None of these arguments are persuasive.

### 1. Al Thani Has Alleged Sufficient Facts to State a Claim Against Hanke Individually

First, Hanke argues that Al Thani has not sufficiently pleaded that Hanke should be liable for the MDAs, to which IOLO, but not Hanke, was a party. Hanke Defendants' Motion at 13-15. Hanke argues that he was not "directly responsible" for the investments at issue, and "[t]o the extent Plaintiff is seeking to pierce the corporate veil or establish individual liability by other means, he failed to state a claim against Hanke for which relief may be granted." *Id.* at 15. Al Thani responds that the Amended Complaint asserts claims against Hanke personally, therefore obviating the need for the Court to consider the corporate veil theory, and that he has alleged enough facts to proceed under his alternative veil-piercing theory regardless. Dkt. 78 at 13-14.

It is well-settled that an employee can be liable for fraud personally. *See, e.g.*, *White v. Nat'l Home Prot., Inc.*, No. 09 Civ. 4070 (SHS), 2010 WL 1706195, at *5 (S.D.N.Y. Apr. 21, 2010) ("Where a plaintiff asserts tort claims such as for fraud or fraudulent misrepresentation, there is no need to pierce the corporate veil in order to hold corporate officers or employees individually liable for their own acts of fraud."); *Marc J. Bern & Partners LLP v. U.S. Legal Support, Inc.*, No. 17 Civ. 6771 (ER), 2018 WL 2943784, at *6 (S.D.N.Y. June 11, 2018) ("It is well established that employees are liable for their torts, even when acting within the scope of their employment."). And the Amended Complaint undoubtably brings claims against Hanke personally. *See* Amended Compl. ¶¶ 99-112. For instance, it alleges that Hanke "knowingly made numerous misrepresentations of material fact to Plaintiff including that Plaintiff's funds would be

invested in a trading program, that the trade funds Plaintiff's money was allegedly invested in were profitable, that the deposited funds would be insured in a January 2019 outline, and that the delay in payments required under the MDAs were on account of numerous false excuses." *Id.* ¶ 100. It further alleges that "Hanke individually, and acting as managing member of IOLO and as IOLO's agent, also knowingly made numerous misrepresentations of fact to Plaintiff regarding delays in payment," and lists a slew of factual allegations in that regard. *Id.* ¶ 10.[10]

Al Thani has also alleged facts that would allow it to proceed under an alter ego theory of liability. Under New York law, which the Court assumes applies to these claims, a court can pierce the corporate veil if there is fraud or the corporation has been used as an alter ego. *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir. 1990).[11] The defendant "must have used [the corporation] to perpetrate a fraud or have so dominated and disregarded [the corporation's] corporate form that [the corporation] primarily transacted [the defendant's] personal business rather than its own corporate business." *Id.* at 703-04 (internal quotation marks omitted); *see also Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (requiring that a party seeking to pierce the corporate veil show "(1) the owners exercised complete

---

[10] In his reply papers, Hanke contends that "[i]t is well settled in New York, however, that professionals are not liable either in tort or contract absent privity." Dkt. 84 at 5-6 (quoting *Widett v. U.S. Fid. & Guar. Co.*, 815 F.2d 885, 886 (2d Cir. 1987)). In *Widett*, a landscape architectural firm employed by Monroe County brought a negligence claim against one of Monroe County's subcontractors. 815 F.2d at 885. The Second Circuit, relying on New York law, held that the architectural firm could not sue the subcontractor for negligence because it did not have a contractual relationship. *Id.* at 886-87. But this case does *not* stand for the proposition that an employee cannot be individually liable for his own misconduct absent a personal contractual relationship, as the Hanke Defendants appear to suggest.

[11] In their briefing papers, the Hanke Defendants apply New York law to these claims. As Al Thani notes, however, Wyoming law may be applicable to some of the claims here under New York choice-of-law principles. *See* Dkt. 78 at 14-15 n.8. Because the parties have not briefed the issue and because it appears that New York law requires a higher showing for fraud claims regardless, *see id.*, the Court assumes New York law applies for the purpose of the Hanke Defendants' motion to dismiss.

domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (quoting *Morris v. N.Y. Dep't of Tax'n and Fin.*, 82 N.Y.2d 135, 141 (1993)).

Al Thani alleges that Hanke "is and, at all relevant times, was the Managing Member of IOLO" and "the sole member of IOLO," and that "IOLO functions as his alter ego." Amended Compl. ¶ 7; *see also id.* ¶ 9 ("IOLO is nothing more than a corporate shell and the alter ego of Hanke."). Al Thani further alleges that "[t]o perpetrate his wrongdoings, Hanke has created a number of entities with 'IOLO' names, including EZ Credit Financing Inc. d/b/a IOLO." *Id.* ¶ 7. He also asserts that (1) the business telephone line for IOLO in the MDAs is Hanke's personal cell phone number, (2) IOLO similarly has no corporate email accounts and instead it "uses Hanke's personal SBC Global email address for corporate emails and contract notices," and (3) IOLO does not maintain adequate capitalization for its business activities. *Id.* ¶ 9. That is not all. Al Thani further alleges that, when IOLO was due to pay money to Al Thani, Hanke paid Al Thani's advisers with money out of his personal accounts, and that "Hanke offered at one point to make payments to Plaintiff that were due from IOLO from money that he personally was owed as a commission on an unrelated transaction." *Id.* Therefore, the Amended Complaint alleges that, "[a]t best, Hanke was commingling his assets with that of IOLO; at worst, IOLO has no assets separate and apart from Hanke's personal assets," but that "[e]ither way, Hanke treats IOLO as his alter ego, and IOLO is nothing more than a corporate shell." *Id.*

Although the Hanke Defendants call Plaintiff's veil-piercing allegations "conclusory," stating that the Amended Complaint "fails to establish that Hanke's putative domination over IOLO was the means by which wrong was done to Plaintiff," Dkt. 84 at 7, the Amended Complaint clearly alleges both that Hanke completely dominated and controlled IOLO and that Hanke used

IOLO as a corporate shell to perpetrate the fraud. *See, e.g.*, *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, No. 01 Civ. 11765 (CSH), 2003 WL 124521, at *3 (S.D.N.Y. Jan. 15, 2003) (concluding that a plaintiff sufficiently pleaded an alter ego claim where the defendant individual "was the only character representing defendants on stage during the drama culminating in" the claims, and noting that "whether that dominant role as an actor translates into 'domination' for purposes of alter ego analysis furnishes a legitimate subject of discovery"). Al Thani's allegations are sufficiently detailed to survive a motion to dismiss.

### 2. The Fraud Claims Are Not Duplicative of the Contract Claims

The Hanke Defendants seek to dismiss Al Thani's two fraud claims: the fourth cause of action for fraud in the inducement and the fifth cause of action for fraud. "Proof of fraud under New York law requires a showing that '(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).

New York law also provides a cause of action for fraudulent inducement if a defendant makes a "misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract." *WIT Holding Corp. v. Klein*, 724 N.Y.S.2d 66 (App. Div. 2001); *see Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) ("New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement."); *Wall v. CSX Transp., Inc.*, 471 F.3d

410, 416 (2d Cir. 2006) ("New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced." (citing *WIT Holding Corp.*, 724 N.Y.S.2d 66)).  To maintain a separate claim for fraud in the inducement, a defendant must "*either*: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc.*, 98 F.3d at 19-20 (emphasis added); *accord Intelligen Power Sys., LLC v. dVentus Techs. LLC*, No. 14 Civ. 7392 (PAE), 2015 WL 3490256, at *9 (S.D.N.Y. June 2, 2015).

The Hanke Defendants argue that the claim for fraud in the inducement should be dismissed because (1) the Amended Complaint "speaks only to timeline delays and speculative information" regarding "promissory" or "future events" and (2) the claim "relate[s] back to the breach of contract cause of action . . . and there is no independent duty . . . that is separate and apart from the breach of contract cause of action."  Hanke Defendants' Motion at 15-18.

The Hanke Defendants' argument is unavailing.  Al Thani has alleged that the Hanke Defendants made numerous misrepresentations of present fact, including that Hanke lied about the cause of the delays, Amended Compl. ¶ 102; *see also id.* ¶¶ 24-25, and the source of the first payments, *id.* ¶¶ 42, 55, 102.  These are plainly statements about present fact, not future events. *See Intelligen Power Sys., LLC*, 2015 WL 3490256, at *10 ("Under New York law, there is a crucial distinction 'between a promissory statement of what *will be done in the future* that gives rise only to a breach of contract cause of action and a misrepresentation of a *present fact* that gives rise to a separate cause of action for fraudulent inducement.'" (emphasis in original) (quoting *Allegheny Energy, Inc.*, 500 F.3d at 184)).  And these statements were not part of the MDAs, and

thus were collateral to the contract and "therefore involve[d] a separate breach of duty." *Gosmile, Inc. v. Levine*, 915 N.Y.S.2d 521, 524 (App. Div. 2010); *see Trodale Holdings LLC v. Bristol Healthcare Invs. L.P.*, No. 16 Civ. 4254 (KPF), 2018 WL 2980325, at *5 (S.D.N.Y. June 14, 2018) (finding allegations that the "[p]laintiff misrepresented the status of its efforts with respect to the tasks it needed to complete before the transactions closed by securing financing and lease arrangements . . . were statements of present existing fact that went to Plaintiff's present actions and state of mind, not to a future promise to perform or not"); *accord Intelligen Power Sys., LLC*, 2015 WL 3490256, at *9. "That the alleged misrepresentations would represent, if proven, a breach of the contractual warranties as well does not alter the result." *Allegheny Energy, Inc*., 500 F.3d at 184.

The Hanke Defendants make a similar argument in moving for dismissal of the fifth cause of action, which pleads fraud. They argue that the allegations "relate back to the breach of contract cause of action," "there is no independent duty alleged that is separate and apart from the breach of contract cause of action," and "the element of reliance is also lacking in that any such duty to pay would arguably have arisen prior to or at the time of execution of the MDAs, *not* as a result of any subsequent discussion to delay payment." Hanke Defendants' Motion at 19-20. The Hanke Defendants, with little explanation, also argue that the "economic loss doctrine bars recovery for claims arising out of 'the violation of a professional duty.'" *Id.* at 19.

These arguments too are unpersuasive. Al Thani alleges that Hanke, on numerous, specific instances, deceived him about the delays in providing the funds, the source of the fee payments, and the profits from the trades in order to induce Al Thani to perpetrate and extend the scheme, and that Al Thani reasonably relied on those misrepresentations. Amended Compl. ¶¶ 114-117. This is sufficient to raise a claim for fraud, *see, e.g.*, *Am. Media, Inc. v. Bainbridge & Knight*

*Lab'ys, LLC*, 22 N.Y.S.3d 437, 439-40 (App. Div. 2016), and "[t]he issue of reasonable reliance is one of fact unsuitable for resolution on this motion to dismiss," *id.* Nor is their economic loss theory persuasive. They cite a single case in support, *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 17 (2d Cir. 2000), where the Second Circuit held that professionals can be subject to tort liability regardless of their contractual duties. It is simply not clear why the economic loss rule would bar recovery here. *See id.* at 18 ("[T]he rule allows [purely economic] recovery in the limited class of cases involving liability for the violation of a professional duty.").

### 3. Al Thani Has Alleged the Existence of a Fiduciary Duty to Support a Claim for Violation of Fiduciary Duties

The Hanke Defendants also argue that the Court should dismiss the seventh cause of action for breach of fiduciary duties. "Under New York law, a claim for breach of fiduciary duty requires a fiduciary relationship between the parties and a breach of that duty." *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 372 (S.D.N.Y. 2011), *aff'd*, 484 F. App'x 616 (2d Cir. 2012). "A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) (quoting Restatement (Second) of Torts § 874 cmt. a). A fiduciary relationship does not typically arise when parties engage in arms-length business transactions absent express language in a contract or a prolonged course of dealings between the parties. *Intellivision*, 784 F. Supp. 2d at 372. However, "New York courts have held that, where a 'defendant had discretionary authority to manage [plaintiff's] investment accounts, it owed [plaintiff] a fiduciary duty of the highest good faith and fair dealing.'" *Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 523-24 (S.D.N.Y. 2018) (quoting *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 7, 16 (App. Div. 2010), *aff'd*, 18 N.Y.3d 341 (2011)); *see also Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 712 (2d Cir.

36

2014) ("The contract at issue, an investment management agreement, afforded [the defendant] considerable discretion with respect to [the plaintiff's] portfolio. This gave rise to a duty of care . . . ."). Moreover, "[a]ny one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby." *Wechsler v. Bowman*, 285 N.Y. 284, 291 (1941); *accord Senior Health Ins. Co. of Pa.*, 345 F. Supp. 3d at 524.

The Hanke Defendants argue that the breach of fiduciary duties claim should be dismissed because "this transaction is and was merely an arm's length business deal, and, as such, no fiduciary relationship arose between the parties when they executed the MDAs." Hanke Defendants' Motion at 21. But the MDAs state that IOLO was acting "in a fiduciary capacity," Dkt. 64, Exh. 3 at 4, 10, and it is undisputed that Hanke had discretion to invest Al Thani's money entrusted to him. Accordingly, Al Thani has properly alleged a claim for breach of fiduciary duty.

### 4. Al Thani Has Adequately Alleged that Hanke Aided and Abetted IOLO's Breach of Fiduciary Duty

The Hanke Defendants argue there can be no liability for the eighth cause of action, aiding and abetting a breach of fiduciary duty, because (1) there was no fiduciary duty, making an aiding and abetting violation impossible, *see* Hanke Defendants' Motion at 21-22, and (2) Al Thani does not allege that the Hanke Defendants had knowledge of the nefarious activity of the third-party investors, who the Hanke Defendants contend are actually responsible for the fraud, and did not substantially assist those actors, *see id.* at 22-23.

The Court easily dispels these arguments. First, as noted above, Al Thani has pleaded that IOLO and Hanke owed Al Thani a fiduciary duty based both on the explicit wording of the MDA and the nature of the deal. Second, the Court need not credit the Hanke Defendants' alternative explanation of the fraud, and instead looks to the facts alleged in the Amended Complaint for

purposes of this motion. Those facts are sufficient to support a finding that Hanke aided and abetted IOLO's breach of fiduciary duty. *See* Amended Compl. ¶¶ 132-136.

### 5. Al Thani Has Alleged a Violation of the Investment Advisers Act

Finally, the Hanke Defendants argue that the Court should dismiss the ninth cause of action, violation of the Investment Advisers Act ("Investment Advisers Act" or "the Act"), because Al Thani has not alleged that the Hanke Defendants are investment advisers or entered into an investment advisory contract. *See* Hanke Defendants' Motion at 24-25.

The Investment Advisers Act provides that "[i]t shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). "[T]here exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract . . . ." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). Specifically, section 215(b) of the Investment Advisers Act provides that "[e]very contract made in violation of" the Act "shall be void." 15 U.S.C. § 80b-15(b). This "reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser— consciously or unconsciously—to render advice which was not disinterested." *Sec. Exch. Comm'n v. Wall St. Transcript Corp.*, 422 F.2d 1371, 1376 (2d Cir. 1970) (quoting *Sec. Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963)).

"In order to maintain a private action under section 215 of the [Investment Advisers Act], a plaintiff must allege that he or she entered into a contract for investment advisory services with an investment adviser." *Welch v. TD Ameritrade Holding Corp.*, No. 07 Civ. 6904 (RJS), 2009 WL 2356131, at *27 (S.D.N.Y. July 27, 2009); *accord Kassover v. UBS AG*, 619 F. Supp. 2d 28, 32 (S.D.N.Y. 2008). The Act defines an "investment adviser" as "any person who, for

compensation, engages in the business of advising others, . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities, but does not include," among other things, "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b-2. "This is a 'broad definition,'" *Sec. Exch. Comm'n v. Ahmed*, 308 F. Supp. 3d 628, 652 (D. Conn. 2018) (quoting *Financial Planning Ass'n v. Sec. Exch. Comm'n*, 482 F.3d 481, 484 (D.C. Cir. 2007)), "and reaches persons who receive compensation for investing funds of their clients or who advise their 'customers by exercising control over what purchases and sales are made with their clients' funds,'" *id.* (quoting *Abrahamson v. Fleschner*, 568 F.2d 862, 870-71 (2d Cir. 1977)).

The allegations in the Amended Complaint are sufficient to survive a motion to dismiss. First, Al Thani alleges that Hanke was an investment adviser. *See* Amended Compl. ¶ 1 ("This action involves a brazen theft of funds by a so-called investment adviser and notorious conman, Hanke, and his corporate shell, IOLO . . . ."). He also alleges facts supporting a finding that the parties entered into an investment advisory agreement. *See, e.g.*, *id.* ¶¶ 2 ("Plaintiff seeks to hold Defendants accountable for their . . . violation of the Investment Advisers Act . . . stemming from Defendants' attempt to cheat Plaintiff out of millions of dollars through a marketed investment program represented as a means of generating significant returns based on Plaintiff's investment."), 2 ("[T]he parties entered into . . . the []March MDA[], which set forth the terms of Plaintiff's investment and Defendants' obligations to invest Plaintiff's funds in a trading program managed and operated by IOLO and Hanke."), 23 ("On January 9, 2019, Defendant Romeo introduced Plaintiff to Hanke and IOLO via a broker, [Miginnis], to discuss a possible investment

by Plaintiff in a wealth enhancement program."), 138 ("Plaintiff compensated IOLO and, through it, Hanke for performing investment advisory and fund management services for Plaintiff."), 139 (relaying that "[t]he MDAs stated that Plaintiff was an 'accredited investor,'" that "IOLO had 'specific experience in the areas of finance, funding, and investments,' that IOLO was making available 'their various financial, insurance, and banking services' through the MDA, and that the sole purpose of IOLO and Plaintiff entering the MDA was for IOLO to provide 'asset management and investment services'"), 139 (contending that IOLO "m[et] the definition of an investment adviser" because "IOLO was to receive compensation for providing these 'asset management and investment services'" and "was advising Plaintiff as to the advisability of investing in trading programs to receive a return on investment").

These allegations go to the heart of the investment adviser assessment. *See Ahmed*, 308 F. Supp. 3d at 653 (finding that the plaintiff had alleged that the defendant was an investment adviser based on the defendant's role in "identifying, analyzing, and recommending investment opportunities" for the funds at issue and "negotiating the terms of the investments and managing the relationships with the companies in which the [funds] invested," and because he was compensated for his role). And these allegations are quite unlike those summary allegations in other cases where courts have found that the plaintiffs alleged only a brokerage relationship. *See, e.g.*, *Kassover*, 619 F. Supp. 2d at 34 (dismissing a claim because the plaintiffs failed to allege (1) "that an investment advisory contract existed," (2) that the so-called adviser "was paid any special compensation for providing [p]laintiffs with investment advice," and (3) "that the investment advice provided to [p]laintiffs was not solely incidental to the maintenance of their brokerage accounts"); *Bogart v. Shearson Lehman Bros.*, No. 91 Civ. 1036 (LBS) (NG), 1993 WL 33643, at *3 (S.D.N.Y. Feb. 3, 1993) (dismissing the plaintiff's claim under the Investment

Advisers Act because the "only consideration alleged to have been paid . . . is commissions" and there was "no allegation of a separate investment adviser's fee" or even a contract between the plaintiff and supposed adviser); *Hall v. Paine, Webber, Jackson & Curtis, Inc.*, No. 82 Civ. 2840 (DNE), 1984 WL 812, at *2 (S.D.N.Y. Aug. 27, 1984) ("Here plaintiff has made no allegation that she paid any non-commission compensation to the defendant or that any advice she received was not incidental to the management of her securities brokerage account . . . ."). The Court therefore denies the Hanke Defendants' motion to dismiss Al Thani's claim under the Investment Advisers Act.

### IV.    Conclusion

For the aforementioned reasons, the Hanke Defendants' motion to dismiss, Dkt. 62, is denied in its entirety. Al Thani's request for jurisdictional discovery as to Rogers, the Trust, and Roy-Haeger is granted, and the motions to dismiss filed by those Defendants, Dkts. 82, 96, 97, are stayed. The parties shall meet and confer regarding the appropriate scope of any jurisdictional discovery, and shall file a letter by May 17, 2021 proposing a schedule for completion of that discovery. The Court will then set a schedule for jurisdictional discovery as well as for any supplemental briefing after the completion of jurisdictional discovery. The Clerk of the Court is respectfully directed terminate the motion pending at Docket Number 62.

SO ORDERED.

Dated: May 11, 2021
New York, New York

_____
JOHN P. CRONAN
United States District Judge