UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                     :
MOHAMMED THANI A.T. AL THANI,                                        :
                                                                     :
                                          Plaintiff,                 :
                                                                     :
                                                                     :          20 Civ. 4765 (JPC)
                        -v-                                          :
                                                                     :          OPINION AND ORDER
                                                                     :
ALAN J. HANKE et al.,                                                :
                                                                     :
                                          Defendants.                :
                                                                     :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Mohammed Thani A.T. Al Thani filed an Amended Complaint against Defendants Alan J. Hanke, IOLO Global LLC ("IOLO" and with Hanke, the "Hanke Defendants"), Sidney Mills Rogers III, Laura Romeo, Amy Roy-Haeger, the Subgallagher Investment Trust, and Sherry Sims on September 25, 2020, bringing several common law claims and a claim for violation of section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6.  Dkt. 35 ("Am. Compl."). Now before the Court is Rogers's motion to dismiss or stay the claims against him under Rule 12(b)(6) of the Federal Rules of Civil Procedure or 9 U.S.C. § 3, respectively, pending arbitration, or to sever those claims under Rule 21 and transfer them to Georgia under 28 U.S.C. § 1404(a). For the reasons below, the Court construes Rogers's motion as one to compel arbitration, grants the motion to compel, and stays the claims against Rogers pending arbitration.

# I. Background

## A. Facts

The following facts are from the Amended Complaint and the documents incorporated by reference in the Amended Complaint, and are taken to be true for the purposes of this motion.[1] The Court detailed the factual allegations and procedural background in a previous Opinion and Order dated May 11, 2021, *see Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC), 2021 WL 1895033, at *1-4 (S.D.N.Y. May 11, 2021), and as such now focuses only on the allegations specific to Rogers's motion.

Rogers, an attorney living in Georgia, was allegedly involved in a scheme to defraud Al Thani of millions of dollars. Am. Compl. ¶¶ 1, 10. In short, Hanke induced Al Thani to enter into two Management and Deposit Agreements ("MDAs") and various addenda to these MDAs, under which Al Thani entrusted Hanke with $6.5 million. *Id.* ¶¶ 1-4, 35. Rogers's role in this was two-fold. First, Rogers allegedly provided records of fictitious payments to Hanke to further the fraud. *Id.* ¶ 110. Second, and more importantly, Rogers, acting as an Escrow Agent for the fraudulent transactions, "used his attorney [Interest on Lawyers'] Trust Account to create the air of legitimacy

---

[1] Rogers asks the Court to "dismiss or stay the claims against Rogers, pursuant to Rule 12(b)(6) or 9 U.S.C. § 3, respectively, pending arbitration." Motion at 24. The Second Circuit has suggested that whether a motion to dismiss based on an arbitration clause can be construed as a motion to compel arbitration depends on the circumstances, including whether the movant explicitly or implicitly petitioned the court to compel arbitration. *Wabtec Corp. v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 139-40 (2d Cir. 2008); *accord Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). Here, Rogers bases his argument on the enforceability of the arbitration clause, making his motion "effectively a motion to compel arbitration." *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 405 n.1 (S.D.N.Y. 2016). While "[c]ourts deciding motions to compel apply a standard similar to the one applicable to a motion for summary judgment," meaning that they can consider relevant evidence outside the complaint, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019), here the standard does not impact the Court's reasoning, as the parties have only asked the Court to consider documents that are appropriate to consider on a motion to dismiss, *i.e.*, the Amended Complaint and documents incorporated by reference.

and was an instrumental part of the fraudulent investment scheme." *Id.* ¶ 5.  Al Thani's investments were to be deposited with Rogers in escrow before IOLO invested them. *Id.* ¶ 24.  To accomplish this, Al Thani, IOLO (through Hanke), and Rogers entered into escrow agreements in March 2019, *id.* ¶ 30; Dkt. 99, Exh. A ("March Escrow Agreement"), and July 2019, Am. Compl. ¶ 39; Dkt. 99, Exh. B ("July Escrow Agreement"), with Rogers named as the Escrow Agent.  Al Thani was never paid the millions of dollars he was due under the MDAs and addenda to the MDAs, Am. Compl. ¶ 44, and as of the time Al Thani filed the Amended Complaint, Rogers had refused to provide any information on the whereabouts of Al Thani's funds after they were deposited in escrow, *id.* ¶ 24.

**B.  The Escrow Agreement[2]**

Paragraph 9 of the Escrow Agreement is entitled "Disputes."  March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.  That paragraph begins with the following provision, which describes what the Escrow Agent may do in the event of a "dispute" "with respect to the payment, ownership or right of possession of the Escrow Deposit":

> The Parties hereto agree that should any dispute arise with respect to the payment, ownership or right of possession of the Escrow Deposit, the Escrow Agent is authorized and directed to retain in its possession, without liability to anyone, except for its bad faith, gross negligence, or willful misconduct, all or any part of the Escrow Deposit until such dispute shall have been settled either by mutual agreement of the Parties concerned and a joint, notarized written instruction notice from the Depositor and Beneficiary shall have been delivered to the Escrow Agent or by an arbitrator's decision, judgment or order issued by a court of competent jurisdiction setting forth the resolution of the dispute.

---

[2] Because the March Escrow Agreement and the July Escrow Agreement are substantively identical and include the same arbitration provision, the Court refers to the "Escrow Agreement" and "arbitration provision" for ease of reference.  These references apply equally to both the March Escrow Agreement and the July Escrow Agreement.

March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.  This is immediately followed by an arbitration provision, which states:

> Any controversy or claim arising out of or relating to this Agreement to which Escrow Agent is a party shall be determined by an independent arbitrator of the Parties' choosing located in Cobb County, Georgia, United States of America, and in accordance with the provisions of the Commercial Arbitration Rules then in effect of the American Arbitration Association.

March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.  The Escrow Agreement thus incorporates the American Arbitration Association's Commercial Arbitration Rules ("AAA Rules"), which provide: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  Dkt. 99, Exh. C.  The "Disputes" paragraph also states: "If for any reason a dispute is not to be resolved by arbitration, as set forth above, any actions and proceedings arising out of or relating to this Agreement shall be heard and determined in the Circuit Court of Cobb County (state court) or the Northern District of Georgia (federal court)."  March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.

The Escrow Agreement also defines Rogers's role and responsibilities as the Escrow Agent.  For instance, the Escrow Agreement states: "The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's bad faith, gross negligence, or willful misconduct was the primary cause of any loss to the Depositor and Beneficiary."  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4.  It also states: "In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in writing by the Depositor and the Beneficiary

or by a final order or judgment of a court of competent jurisdiction."  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4.

## C.  Procedural History

Al Thani commenced this action on June 22, 2020, naming the Hanke Defendants and John Does 1-100.  Dkt. 1.  Al Thani filed the Amended Complaint on September 25, 2020, adding the remaining Defendants.   As is relevant here, the Amended Complaint brings claims for (1) fraudulent inducement against all Defendants, Am. Compl. ¶¶ 99-112, (2) fraud against all Defendants, *id.* ¶¶ 113-122, and (3) aiding and abetting fraud against all Defendants except the Hanke Defendants, *id.* ¶¶ 123-127.

Defendants have filed several motions.  The Hanke Defendants filed a pre-answer motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure or to dismiss for failure to state a claim under Rule 12(b)(6), Dkts. 62, 63, 64, 65; Roy-Haeger moved to dismiss for lack of personal jurisdiction or to transfer venue, Dkt. 82; Sims and the Subgallagher Investment Trust moved to dismiss for lack of personal jurisdiction, Dkt. 96; and Rogers moved to dismiss for lack of personal jurisdiction; to dismiss or stay the claims against him under Rule 12(b)(6) or 9 U.S.C. § 3, respectively, pending arbitration; or to sever those claims under Rule 21 and transfer them to Georgia under 28 U.S.C. § 1404(a), Dkts. 97, 98, 99.  In an Opinion and Order dated May 11, 2021, the Court denied the Hanke Defendants' motion, granted Al Thani's request for limited jurisdictional discovery, and stayed the remaining motions to dismiss.  Dkt. 188.  Rogers moved for reconsideration of that Opinion and Order.  Dkt. 195.  Before the Court could decide Rogers's motion for reconsideration, Rogers withdrew his motion to dismiss for lack of personal jurisdiction and requested that the Court decide the rest of his motion. Dkt. 218.  The Court therefore turns to the rest of Rogers's arguments.

5

## II.  Applicable Legal Standard

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA embodies "a congressional declaration of a liberal federal policy favoring arbitration agreements."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  Thus, it seeks "preserve the parties' ability to agree to arbitrate, rather than litigate, [their] disputes."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

When faced with a motion to compel arbitration, a court faces two main questions: (1) did the parties agree to arbitrate and (2) if so, what is the scope of their arbitration agreement?  *Starke v. Squaretrade, Inc.*, No. 16 Civ. 7036 (NGG), 2017 WL 3328236, at *5 (E.D.N.Y. Aug. 3, 2017), *aff'd*, 913 F.3d 279 (2d Cir. 2019).  "In other words, a party opposing a motion to compel arbitration may challenge the existence or enforceability of an arbitration agreement, or may challenge the applicability of such an agreement to the claims at issue."  *Bezek v. NBC Universal*, No. 3:17 Civ. 1087 (JCH), 2018 WL 2337131, at *14 (D. Conn. May 23, 2018), *aff'd*, 770 F. App'x 599 (2d Cir. 2019).  While the party moving to compel arbitration has the initial burden of showing that the parties agreed to arbitrate, *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (citing *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)), "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration," *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

When determining whether parties agreed to arbitrate, including whether they agreed to arbitrate questions of arbitrability, courts apply "ordinary state-law principles that govern the formation of contracts."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Two principles are particularly relevant here.  First, "an interpretation of a contract that has 'the effect

of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)); *accord Sutherlin v. Sutherlin*, 301 Ga. 591, 585 (2017). Second, "[i]t is a well-recognized tenet of contract interpretation that 'specific terms and exact terms are given greater weight than general language.'" *Int'l Bhd. of Elec. Workers, Loc. Union 43 v. NLRB*, 9 F.4th 63 (2d Cir. 2021) (quoting *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001)).[3]

## III. Discussion

Rogers argues that the claims against him must be arbitrated under Paragraph 9 of the Escrow Agreement. Specifically, Rogers asserts that (1) the contract delegated to the arbitrator the right to determine the scope of the arbitration provision and (2) if the Court were to determine the scope, Al Thani's claims would fall within that arbitration provision. The Court addresses each argument in turn.

## A. Whether the Parties Delegated the Question of Arbitrability to the Arbitrator

The Escrow Agreement is governed by the FAA. 9 U.S.C. §§ 1, 2 (2004); *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967); *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005). "Under the FAA, there is a general presumption that the issue of arbitrability"—whether a particular issue is to be arbitrated—"should be resolved by the courts." *Contec Corp.*, 398 F.3d at 208; *see First Options of Chi.*, 514 U.S. at 944-45. But "[j]ust as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court)

---

[3] The Escrow Agreement includes a Georgia choice-of-law clause. March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9. Rogers does not contest that these principles apply regardless of whether New York or Georgia law applies.

decide whether a particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189-90 (2d Cir. 2019). "[W]hen the parties have contracted to submit the question of the arbitrability of a dispute to arbitrators, courts must respect and enforce that contractual choice." *Id.* at 190.

However, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chi.*, 514 U.S. at 944 (alterations in original) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 649 (1986)). The Second Circuit has held that "[w]here the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve 'as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator.'" *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) (quoting *Contec Corp.*, 398 F.3d at 208). This includes the AAA Rules, which "explicitly empower an arbitrator to resolve questions of arbitrability." *Id.*

But this is not a per se rule. Instead, "context matters." *Id.* "[W]here the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability— constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* at 318-19. "Where, by contrast, the arbitration agreement is narrower, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability." *Id.* at 319. In other words, "where there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the

present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator." *Id.* at 322. This ambiguity then "delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).[4]

Here, the arbitration provision in the Escrow Agreement states that "[a]ny controversy or claim" relating to the Escrow Agreement to which Rogers is a party must be arbitrated "in accordance with the provisions of the Commercial Arbitration Rules then in effect of the American Arbitration Association." March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9. The Escrow Agreement thus incorporates the AAA Rules, which delegate the question of arbitrability to an arbitrator. *See* Dkt. 99, Exh. C. While Rogers contends that this is the end of the matter, Dkt. 98 ("Motion") at 16-17, Al Thani responds that the reference to the AAA Rules is not determinative and instead asks the Court to look to the context of the arbitration provision, *see* Dkt. 122 ("Opposition") at 13-16.

In so arguing, Al Thani emphasizes that the arbitration provision is within a paragraph entitled "Disputes." Right before the arbitration provision, the Escrow Agreement states that "should any dispute arise with respect to the payment, ownership or right of possession of the

---

[4] The Supreme Court recently had the chance to address this approach when it granted certiorari in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 141 S. Ct. 113 (2020), on the question of "[w]hether a provision in an arbitration agreement that exempts certain claims from arbitration negates an otherwise clear and unmistakable delegation of questions of arbitrability to an arbitrator," Petition for Writ of Certiorari, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 2020 WL 529195 (U.S.). The petitioner in that case argued that the Second Circuit's approach, which the Fifth Circuit has also adopted, "conflates the question of who decides arbitrability with the question of whether the dispute is arbitrable." *Id.* at *20-22. But the Supreme Court later dismissed the petition as improvidently granted. 141 S. Ct. 656 (2021). So the Court remains bound by the reasoning of the Second Circuit, as recently reaffirmed in *DDK Hotels.*

Escrow Deposit, the Escrow Agent is authorized and directed to retain in its possession, without liability to anyone, except for its bad faith, gross negligence, or willful misconduct, all or any part of the Escrow Deposit" until the dispute is resolved.  March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.  Al Thani thus asks the Court to find that the arbitration provision only applies to three discrete types of "disputes"—those with respect to the "payment, ownership or right of possession of the Escrow Deposit."  Opposition at 14.

Al Thani further argues that, "[c]onsistent with this understanding," the Escrow Agreement "identifies specific issues that must be decided by a 'court of competent jurisdiction.'"  *Id.*  For instance, the Escrow Agreement states: "The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's bad faith, gross negligence, or willful misconduct was the primary cause of any loss to the Depositor and Beneficiary."  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4.  It also states: "In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in writing by the Depositor and the Beneficiary or by a final order or judgment of a court of competent jurisdiction."  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4.  By contrast, the only reference to "an arbitrator's decision" is within the sentence describing disputes with respect to payment, ownership, or right of possession of the Escrow Deposit.  *See* March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.  Therefore, according to Al Thani, reading the arbitration provision to be limited to disputes about the payment, ownership, or right of possession of the Escrow Deposit is the only way to satisfy two

principles of contract law: that a contract must be read to give effect to all of its provisions and that specific terms are given greater weight than general language.  Opposition at 17-18.

But Al Thani's reading requires the Court to stretch the contractual language more than it can bear.  The arbitration provision, which covers "[a]ny controversy or claim arising out of or relating to this Agreement to which Escrow Agent is a party," March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9, "is a classically broad one," *Mehler v. Terminix Int'l Co. L.P.*, 205 F.3d 44, 49 (2d Cir. 2000).  The arbitration provision does not, on its face, limit arbitration to any specific type of dispute.  In fact, it does not even limit it to a "dispute."  Nor does the Escrow Agreement define "dispute" in a more limited manner that might suggest that Paragraph 9 as a whole only addresses a limited set of disputes.  Thus, reading the language "[a]ny controversy or claim arising out of or relating to this Agreement" to mean only "disputes with respect to the payment, ownership or right of possession of the Escrow Deposit" certainly would not "give[] a reasonable and effective meaning to all terms of a contract."  *Galli*, 973 F.2d at 149 (quoting *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985)).

And at least one of the Escrow Agreement's references to a "court of competent jurisdiction" can be readily squared with the broad arbitration provision.  Al Thani points to the language providing that, in the event of uncertainty on the part of the Escrow Agent as to his or her duties or rights, the Escrow Agreement allows the Escrow Agent to refrain from acting until directed otherwise "by a final order or judgment of a court of competent jurisdiction."  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4.  This can easily be interpreted to mean that Rogers may refrain from releasing the Escrow Deposit until there is a final order or judgment under 9 U.S.C. §§ 9-13, which govern motions to confirm, vacate, or modify arbitration awards.

But the Escrow Agreement's language that a "court of competent jurisdiction" may "determine[]" whether the Escrow Agent's "bad faith" was the "primary cause of any loss to the Depositor and Beneficiary" requires closer analysis.  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4.  Al Thani suggests this provision is a carve-out for a court to decide Rogers's bad faith.  In support of this argument, Al Thani principally relies on two cases—*DDK Hotels, LLC v. Williams-Sonoma, Inc.*, No. 19 Civ. 226 (ILG), 2020 WL 4194195 (E.D.N.Y. July 20, 2020), and *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289 (M.D. Fla. 2018)—in which courts found that incorporation of the AAA rules did not mandate that the arbitrator decide questions of arbitrability.  Motion at 15-16.  In *DDK Hotels*, which was recently affirmed on appeal, *see DDK Hotels, LLC*, 6 F.4th 308, the district court assessed an arbitration provision that incorporated the AAA Rules but stated that the only arbitrable issues were "Disputed Matters," which it defined as "instances where 'the [Joint Venture] Members (acting through the Board) are unable to agree on a matter requiring Board or Member approval,'" 2020 WL 4194195, at *12.[5]  Because the arbitration provision was narrow, the incorporation of the AAA Rules alone did not "render[] the

---

[5] The contract in *DDK Hotels* stated, in relevant part:

(a) Mediation.  If the Members (acting through the Board) are unable to agree on a matter requiring Board or Member approval (a "Deadlock"), except as provided in Section 16(c), any Member may serve on the other Member a notice (a "Deadlock Notice") specifying the matter in dispute (the "Disputed Matter"). . . .

(b) Arbitration.  The parties unconditionally and irrevocably agree that . . . all Disputed Matters that are not resolved pursuant to the mediation process provided in Section 16(a) may be submitted by either Member to binding arbitration administered by the American Arbitration Association ("AAA") for resolution in accordance with the Commercial Arbitration Rules and Mediation Procedures of the AAA then in effect. . . .  The parties' agreement to arbitrate and any and all disputes (except with respect to injunctive relief) is governed by and subject to the rules of the New York Arbitration Law and the Federal Arbitration Act, or, in each case, any successor or replacement statutes thereto.  The . . . prevailing party shall be entitled to recover its reasonable attorneys' fees and arbitration costs.

*DDK Hotels*, 2020 WL 4194195, at *3 n.5.

parties' intent to delegate arbitrability of [a] supplemental claim" to an arbitrator "clear [or] unmistakable."  *Id.*  In *Temple*, the arbitration provision provided that "the parties agree to submit their claims for arbitration '[s]hould a dispute arise concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto.'"  360 F. Supp. 3d at 1301 (alteration in original) (emphasis omitted).  The court there found that the incorporation of the AAA Rules alone was insufficient to show the parties intended to delegate questions of arbitrability, as the contract "limit[ed] arbitration to disputes concerning a list of specific items." *Id.*

Unlike in *DDK Hotels* and *Temple*, however, there is no explicit carve-out here.  The Escrow Agreement refers to a court of competent jurisdiction "determin[ing]" if Rogers engaged in bad faith, gross negligence, or willful misconduct.  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4.  While this provision clearly reflects the parties' intent to limit the liability of the Escrow Agent absent bad faith, gross negligence, or willful misconduct, it does not actually suggest the parties sought to *empower* a court to determine such issues when presented in a controversy or claim arising out of the Escrow Agreement to which Rogers is a party.

While Al Thani contends that the language in Paragraph 4 requires that a court must decide "issues that concern Rogers's bad faith," *see* Opposition at 17, "bad faith" is not generally a standalone claim.  To interpret this provision as allowing Al Thani to sue in a federal court every time Rogers's bad faith is at issue would conflict with the unambiguous and broad language in Paragraph 9 that "[a]ny controversy or claim arising out of or relating to this Agreement to which Escrow Agent is a party shall be determined by an independent arbitrator."  March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.  It would also, as a practical matter, be difficult to implement.  This is not the only mention of bad faith in the Escrow Agreement.  The contract

explicitly limits Rogers's liability absent "bad faith" if he withholds the Escrow Deposit pending the arbitration of a dispute with respect to the payment, ownership, or right of possession of the Escrow Deposit.  March Escrow Agreement ¶ 9; July Escrow Agreement ¶ 9.  Under Al Thani's reading, an arbitrator would decide the dispute, even if Rogers is involved, only to have a court then decide Rogers's bad faith.  But what if Rogers's bad faith is relevant to resolving the dispute?

And Al Thani's argument ignores the rest of the very sentence he cites.  The Escrow Agreement states that Rogers will not be liable unless a "court competent jurisdiction determines that the Escrow Agent's bad faith, gross negligence, or willful misconduct *was the primary cause of any loss* to the Depositor and Beneficiary."  March Escrow Agreement ¶ 4; July Escrow Agreement ¶ 4 (emphasis added).  To accept Al Thani's argument would thus seemingly be to interpret this provision as a carve-out for a court to resolve the "primary cause of any loss," as it would be necessary to determine whether that primary cause was bad faith, gross negligence, willful misconduct, or something else.  But carving out the "primary cause of any loss" would essentially eviscerate the broad and clear arbitration provision, as it would suggest that any time there is loss, the parties could bring their claim in court.  *See Galli*, 973 F.2d at 149 (explaining that courts should "avoid[] if possible" "an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless'" (quoting *Garza*, 861 F.2d at 27)).  Simply put, the Escrow Agreement does not have a "qualifying provision . . . that arguably excludes the present dispute from the scope of the arbitration agreement."  *DDK Hotels, LLC*, 6 F.4th at 322.

Perhaps Paragraph 4's reference to a "court of competent jurisdiction"—or rather that paragraph's failure to reference an arbitrator—was the product of imprecise drafting that, if read in isolation, could muddy the parties' intent.  But there is no ambiguity in Paragraph 9's

requirement that any claim relating to the Escrow Agreement involving Rogers be determined by an arbitrator. *Cf. Bank of Am., N.A. v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 09 Civ. 8619 (PAC), 2011 WL 13383580, at *4 (S.D.N.Y. Feb. 16, 2011) ("Although it is 'a cardinal rule of construction that the court adopt an interpretation that renders no portion of the contract meaningless,' the context and structure of the rest of the section clearly reveals that the 'directly to' language in § 7.18(a) is simply surplusage." (quoting *Ga. Pacific Consumer Prod., LP v. Int'l Paper Co.*, 566 F. Supp. 2d 246, 251 (S.D.N.Y. 2008))). This unambiguous and broad arbitration provision—which cannot be reasonably interpreted as having a carve-out—combined with the Escrow Agreement's incorporation of the AAA rules, constitutes "clear and unmistakable" evidence of the parties' agreement to delegate issues of arbitrability to an arbitrator.

## B.  Whether to Dismiss or Stay the Claims Against Rogers

The Court must therefore determine whether to dismiss this action, Rogers's principal request, or stay it, which Rogers requests in the alternative. If all claims are referred to arbitration and a party requests a stay, the Court must grant a stay. *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015). However, "the FAA's policy favoring a stay over dismissal does not apply where a defendant primarily seeks dismissal and only requests a stay in the alternative." *Dylan 140 LLC v. Figueroa*, No. 19 Civ. 2897 (LAK) (DF), 2019 WL 12339639, at *6 (S.D.N.Y. Nov. 8, 2019), *aff'd*, 982 F.3d 851 (2d Cir. 2020). Nonetheless, the Second Circuit has "counsel[ed] that courts should stay litigation pending arbitration to avoid 'convert[ing] an otherwise-unappealable interlocutory stay order into an appealable final dismissal order,' thus 'enabl[ing] parties to proceed to arbitration directly." *Dylan 140 LLC v. Figueroa*, 982 F.3d 851, 859 n.2 (2d Cir. 2020) (second and third alteration in original) (quoting *Katz*, 794 F.3d 341, at 346). Moreover, a stay is particularly appropriate when the parties must arbitrate the question of the arbitrability, since any

claims that the arbitrator determines are not arbitrable would proceed before this Court. *See Bonner v. Point72 Asset Mgmt., L.P.*, No. 18 Civ. 1233 (AT), 2018 WL 11223154, at *3 (S.D.N.Y. July 5, 2018).

In light of this, the Court stays the claims against Rogers pending arbitration. The Court declines to stay the non-arbitrable claims against the remaining Defendants. *See KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) ("The [FAA] has been interpreted to require that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation."); *see also Merrick v. UnitedHealth Grp. Inc.*, 127 F. Supp. 3d 138, 154 (S.D.N.Y. 2015) (declining to stay claims against defendants whose claims are not subject to arbitration); *Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 353 (S.D.N.Y. 2014) (same), *aff'd*, 633 F. App'x 544 (2d Cir. 2015).

## IV. Conclusion

For the aforementioned reasons, Rogers's motion to dismiss is construed as a motion to compel, the motion is granted, and the claims against Rogers are stayed pending arbitration. The Clerk of the Court is respectfully directed to terminate the motion pending at Docket Numbers 97 and 195.

SO ORDERED.

Dated: September 21, 2021
New York, New York

JOHN P. CRONAN
United States District Judge