1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 20 Civ. 4765 (JMP)

5   -----------------------------------------x

6   MOHAMMED THANI A.T. AL THANI,

7                           Plaintiff,

8          - against -

9   ALAN J. HANKE, et al.,

10                          Defendants.

11  -----------------------------------------x

12                          December 3, 2021

                            10:00  a.m.

13

14          DEPOSITION of AMY ROY-HAEGER,

15  taken by the Plaintiff, pursuant to

16  Notice, held remotely via Zoom

17  videoconference, before Debbie

18  Zaromatidis, a Shorthand Reporter and

19  Notary Public of the State of New York.

20

21

22

23

24

25

1

2   A P P E A R A N C E S :

3

4       HOGAN LOVELLS US LLP

5       Attorneys for Plaintiff

6            390 Madison Avenue

7            New York, New York

8       BY:   MATTHEW DUCHARME, ESQ.

9

10

11      AMY ROY-HAEGER

12      Pro se

13           928 Melbourne Avenue

14           Melbourne, Florida 32940

15

16

17

18

19

20

21

22

23

24

25

1

2 A M Y   R O Y - H A E G E R,

3 having first been duly sworn by a Notary

4 Public of the State of New York, was

5 examined and testified as follows:

6 EXAMINATION BY MR. DUCHARME:

7     Q.    Good morning, Ms. Roy-Haeger.  I

8 am Matt Ducharme with the law firm of

9 Hogan Lovells.  I represent the plaintiff

10 in this matter Mohammed Thani A.T. Al

11 Thani.  I am going to ask you some

12 questions today.

13         First can you say your full name

14 for the record??

15     A.    Yes, Amy Mary Roy-Haeger.

16     Q.    And, Ms. Roy-Haeger, you and I

17 just had a brief conversation off the

18 record prior to starting today, and you

19 had agreed or consented that we could

20 exceed the two and a half hours for the

21 length of the deposition that we had

22 originally discussed a few months ago.

23     A.    Yes.

24     Q.    Thank you.

25         Ms. Roy-Haeger, have you ever

1              ROY-HAEGER
2    funded that they would be able to pay him
3    back because it was treated as a loan, and
4    I tracked everything.
5        Q.    So you said that they were
6    associates of you and Mr. Hanke.    So is
7    it correct to say that you and Mr. Hanke
8    were business partners?
9        A.    No.    Not business partners but
10   we worked on certain transactions together
11   as brokers, fellow brokers.
12       Q.    And you participated in those
13   transactions with Mr. Hanke for your
14   mutual benefit; is that right?
15       A.    Correct.
16       Q.    Can you describe what those
17   projects were?
18       A.    Sure.    You have many of the
19   e-mails.    There were different
20   commodities.    He had some CBD
21   connections, and we had worked on a couple
22   of potential just contracts for providing
23   CBD oil.    That was one of them, but
24   nothing ever came of that.    There had
25   been several financial transactions.    He

                    ROY-HAEGER

had had a receiver and -- at the time
Craig had had somebody who was trying to
send money from one jurisdiction to
another, and Alan had had a potential
receiver.  We had also worked on a
project with LTNs from the Central Bank of
Brazil.  He had had several clients and
Craig at -- and China Development Fund at
the time proposed that they would be able
to monetize the LTN and put it into an
investment program, so that was the
biggest project we had worked on heavily
until the central Bank of Brazil was not
cooperating.

     Q.    Did you and Mr. Hanke secure
investors for the LTNs?

     A.    He was working -- he was working
with several of his associates on that,
and he had received some investment funds
in order to work the fees that the seller
had.  The holder of the LTN needed to pay
fees to the Central Bank of Brazil, and I
believe he helped secure some of those
fees.

1          ROY-HAEGER

2     Q.     Do you know how much those fees

3  were?

4     A.     I do not.   He did that with his

5  associates, and that was -- that was prior

6  to him becoming involved with Craig on the

7  monetizing side, and then I do believe

8  that -- once Craig took over that and

9  started working between China Development

10  Fund and the Central Bank there may have

11  been fees.   I do not know, but I was not

12  involved.   That was a long time ago.   I

13  do not remember.   I have notes on that I

14  could go look at.

15     Q.     Do you know approximately when

16  this occurred date-wise?

17     A.     Probably 2016 to 2017.

18     Q.     That reminds me going back for a

19  second, Ms. Roy-Haeger.  You still use the

20  e-mail address I think it is LR Funding

21  2016@gmail.   Is that La Renaissance's

22  e-mail address?

23     A.     I mean it was just my personal

24  e-mail address.   The LR did stand for La

25  Renaissance, but I have -- that was just a

1                    ROY-HAEGER
2   personal e-mail address I have used for a
3   long time.   But, yes, I use that as my
4   main e-mail address.
5        Q.    So what was -- you described the
6   CBD project and the LTNs.   What was your
7   role in both of these projects.
8        A.    Just acting as a broker.
9        Q.    So what exactly --
10       A.    Putting a buyer and seller
11  together.   Putting a buyer and a seller
12  together, So we -- as a broker we have one
13  end of the deal.  We have somebody that is
14  holding an asset and needs to sell it or
15  we have somebody that would like to buy an
16  asset or a commodity, and we find the
17  seller.
18       Q.    And you would get commissions
19  for doing that?
20       A.    Correct.   Upon a successful
21  transaction.
22       Q.    Okay.   And were any of these
23  successful?
24       A.    On the commodities side, no.   On
25  the LTN, no.   The Central Bank -- at the

ROY-HAEGER

1
2  time the Central Bank did not follow
3  through with the commitment that they had
4  made to the holder of the LTN.
5      Q.    Okay.    And this is the same
6  Central Bank -- I am sorry.    You said
7  this is Central Bank of Brazil.
8          Are there any other projects
9  besides the two we just talked about that
10  you worked on with Mr. Hanke?
11     A.    Yes.    There was in continuing
12  -- once Vast dissipated, there was another
13  company that had been put together.
14  Several partners in the waste energy or
15  several associates had continued on
16  keeping alive the IP that they had held
17  from when the CEO died of Startech, and so
18  there has been since 2008 when the
19  financial markets fell apart and they had
20  funding they then continued on, the
21  partners, and those guys had set
22  up -- continued on and set up various
23  companies depending on certain
24  jurisdictions and where they were with
25  trying to launch the waste energy company,

1                    ROY-HAEGER

2  and so, therefore, when he -- when one of

3  the principals had decided that they had

4  some sites that had been interested in the

5  technology he started another company, and

6  that was the Vortext Company, and so he

7  was looking for investors, and that is

8  when Alan did put some money into that

9  company for a minority share.

10      Q.    Okay.   Do you know

11 approximately how much money Mr. Hanke put

12 into Vortext?

13      A.    Yes, it was between 25 that to

14 30,000.

15      Q.    Do you know approximately the

16 time period in which he put that money

17 into Vortext?

18      A.    That would have been 2019 to

19 2020.

20      Q.    And Mr. Hanke received equity in

21 Vortext as a result of contributing 25 to

22 30,000?

23      A.    Yes.

24      Q.    I am sorry.   Ms. Roy-Haeger did

25 someone enter the room.   Yes, my husband

1          ROY-HAEGER
2    walked in here.  Our office room goes from
3    the main house to this room and to the
4    garage, and I asked him not to use it, and
5    he forgot.
6          Q.    No problem.   I have a similar
7    situation.   Has he left the room?
8          A.    He has.   In fact let me shut
9    the door because he always leaves the door
10   open as well.
11         Q.    Ms. Roy-Haeger, if you want to
12   go off the record for a couple of minutes
13   that is fine?
14         A.    No, that is okay.
15         Q.    Okay.  Do you know what
16   percentage of Vortext Mr. Hanke owns?
17         A.    It was 5 percent at the time and
18   Vortext has also been shut down.
19         Q.    Okay.  Did you have any equity
20   in Vortext?
21         A.    I did.  Mean was somewhere
22   around I think 25 to 30 percent.
23         Q.    Did you contribute funds to
24   Vortext?
25         A.    I have and over time with the

1          ROY-HAEGER

2  same principals of it I have probably

3  $400,000 invested, but within Vortext I

4  was not the main investor in Vortext.   It

5  was more for the past ten years of the

6  work we had done setting up potential

7  locations, potential sites.

8       Q.    Just so I am clear overtime

9  either contributing it to Vortext or the

10  predecessors you have contributed roughly

11  $400,000 of your own funds to these

12  companies?

13       A.    Yes.   Correct.

14       Q.    And where did you get that

15  money?

16       A.    From -- just over time

17  different -- various investments I had,

18  various -- in exchange for compensation or

19  the business we were doing on the paying

20  stream, so this money I made over ten

21  years.

22       Q.    So for --

23       A.    Some of it.   Some was my

24  husband's money.   Yes.

25       Q.    So personal savings?

1                    ROY-HAEGER

2      A.    Yes, or exchange for services.

3  But yes.

4      Q.    Was all of that money lost when

5  you closed down Vortext or --

6      A.    Yes.

7      Q.    Okay.  Did you ask Mr. Hanke to

8  contribute the 25 to $30,000?

9      A.    I did.

10     Q.    Okay.   And why did you ask him

11  to do that?

12     A.    Because he said he had some

13  experience in waste energy.   He said that

14  he had some potential sites available, and

15  he had had an interest in it.   We were

16  looking for good people to reestablish a

17  company, and I -- he had shown some

18  interest in it.

19     Q.    Okay.  So essentially you had a

20  bunch of money tied up or that you

21  contributed to this company, and you

22  thought Hanke could contribute his

23  experience and also some finances to

24  hopefully make the company profitable.

25  Is that --

1                    ROY-HAEGER

2        A.      Basically to launch a new

3   company and he -- yes, I mean basically he

4   showed an interest.   He showed experience

5   in waste energy, and he had been

6   interested in helping to contribute to

7   launch a waste energy company.

8        Q.      And you welcomed that because

9   you could financially benefit from it if

10  the company was successful because you had

11  an equity share of it, correct?

12       A.      Correct.   And there was a

13  gentleman by the name of Victor -- I

14  forget his last name.   One moment.   It

15  was Victor Sziky.   I will spell his last

16  name.   Sziky, S-Z-I-K-Y for the court

17  reporter.

18       Q.      What was his role with Vortext?

19       A.      His involvment had been as one

20  of the lead principals.   He had been the

21  head distributor that had contacts with

22  South and Latin America at the time when

23  Startech had been active as a

24  manufacturer, and he had been able to

25  secure multiple municipalities in Panama.

1          ROY-HAEGER
2    So he had vast experience in waste energy
3    especially the plasma system that had been
4    the technology of Startech.  He has been
5    continuing to attempt to bring a company
6    to light that would be able to continue
7    the technology that Startech had between
8    himself and another party that had been
9    one of the executives at Startech.
10          And so at the time in 2008 he
11   had secured a large amount of financing
12   until the financial crash, and so he was
13   waiting for the right time, and he has
14   been working for the last ten years to
15   relaunch the technology, and that is when
16   he had approached Alan to relaunch the
17   company.
18       Q.    Now, was the Alan CEO of
19   Vortext?
20       A.    Yes.
21       Q.    Was he compensated for that
22   position?
23       A.    No, he was not.
24       Q.    And you at one point had
25   potential I guess leads I will say in New

1                ROY-HAEGER
2       A.      I truly do not.
3       Q.      Then that's fine.    Just let me
4    know that.
5       A.      I would be happy to get you the
6    information.    I do not recall.
7       Q.      Okay.  I am going to go to page
8    11 of Exhibit 1.    This is an e-mail from
9    Victor to you, Ms. Roy-Haeger, and Victor
10   states that Alan then in April sent
11   $25,000 to our Wells Fargo -- to our Wells
12   account with Alan stating if we need more
13   please advise in advance.
14               This e-mail is dated November
15   22, 2019.    The reference there to Mr.
16   Hanke sending money in April, would that
17   be April 2019?
18       A.      Yes.
19       Q.      So in April 2019 Mr. Hanke sent
20   $25,000 to the Wells account of Vortext,
21   correct?
22       A.      Correct.
23               MR. DUCHARME:  Okay.  I am going
24   to take down this document, and I am going
25   to bring up a new one.    This is going to

1                    ROY-HAEGER
2   the sites.  If I run into somebody that is
3   looking for waste energy, then I refer
4   them to Victor, which is what I did on
5   anything that came in.
6        Q.    I am going to take that exhibit
7   down for now.
8             Let me go back, Ms. Roy-Haeger.
9   We talked about the CBD company, LTNs,
10  Vortext.   Are there other projects or
11  companies in which you and Mr. Hanke were
12  both involved in?
13       A.    No.  It had mostly been about a
14  period of time of about a year where we
15  worked on some of the instruments that had
16  been available.   There were the reefers
17  when he had a reefer out of Thailand that
18  Craig had tried to do a file with but
19  could not get updated screens.  So for
20  whatever reason there was none.   We did
21  try to do the thing with CBD.  I am trying
22  to think.   Then also we had considered a
23  potential fuel transaction when both of us
24  had a connection out of Nigeria for
25  Bonilite, but I did not pursue it.   He

1              ROY-HAEGER

2  had initially looked to do it.  We were

3  looking into it, and that was as far as it

4  had gotten on my side.

5          So we had a lot of potential

6  connections that were the same parties.

7  We knew a lot of the same people, and when

8  a transaction mostly on the commodity side

9  we would present itself we would look at

10  it, analyze it, see if it made sense.  A

11  lot of times in these transactions the

12  files have either been shopped around or

13  they have -- somebody has gotten a hold of

14  it that doesn't actually own it.  So we

15  have to go through and find out if they

16  are really the owner of the fund, and like

17  80 percent of the time they are not, but

18  we have analyzed a lot of transactions but

19  have not gone forward with very many of

20  them.

21     Q.    How is that you and Mr. Hanke

22  had a lot of the same connections?

23     A.    In the broker world of

24  commodities, whether it be financial

25  instruments, whether it be fuel, whether

1          ROY-HAEGER

2    it be sugar, even CBD, any of those types

3    of transactions require money movement.

4    They require letters of credit for

5    shipping.  A lot of the same tools that

6    would be used in various different types

7    of commodities all use a lot of the same

8    backing and the same instruments, and so,

9    therefore, you run into a lot of the same

10   people.  For instance, people that are

11   financing fuel transactions, people that

12   are trying to move sugar, people that are

13   even working on historical assets on these

14   gold-backed instruments, people even

15   trying to finance PPE in the time of

16   Covid.  They are all very similar people.

17   I mean I'VE run into a lot of the same

18   people for the last 20 years.

19        Q.    Did you also try to purchase PPE

20   in the wake of the Covid 19 pandemic with

21   Mr. Hanke involved?

22        A.    Very little.  Mr. Hanke early

23   on decided that he did not want to have

24   anything to do with 3M or any of the big

25   players.  So he had looked at it

1                ROY-HAEGER

2    temporarily on A smaller scale, but from

3    what I know he really didn't do much with

4    it.  I did work on two very large clients

5    with some attorneys that I knew, and it

6    was a very frustrating process, and they

7    had funds tied up in Europe, and the

8    manufacturers want people to have fundS in

9    the states, and the procedures were very,

10   very difficult.

11        Q.    Putting aside the money that was

12   invested in Vortex and putting aside the

13   money that Mr. Hanke deposited in either

14   the La Renaissance or Shield Your

15   Lifestyle bank accounts, did Mr. Hanke

16   send any other funds to any company or

17   project you were involved in?

18        A.    That I was involved in.  The one

19   loan agreement that he had done for a

20   company that was in the gold business

21   with -- what was the name of the

22   company -- Gray Eagle and the AU.  He had

23   multiple companies.  The names I forget

24   which one he did it under, but I did

25   introduce Alan to the principal there, and

1                    ROY-HAEGER

2    I believe he did end up doing a loan, and

3    he has not yet been paid back for that

4    loan from my understanding, but I have not

5    followed up on that in probably a year and

6    a half because the principal of Gray Eagle

7    stopped talking to me the minute he got

8    the loan.

9        Q.    And is it possible you are

10   mistaken, that the AUTP is the --

11       A.    Yes.    Correct.    He had

12   multiple names.    I think he did it under

13   AUPT.

14       Q.    And the principal you were

15   referring to is a gentleman by the last

16   name of Porter?

17       A.    John Porter, yes.    Correct.

18       Q.    John Porter.    Okay.    How do

19   you know, Mr. Porter?

20       A.    He was a referral from a friend

21   of mine actually from several parties, but

22   I think I initially met him through Dr.

23   Mark Switzer.

24       Q.    And you connected him to Mr.

25   Hanke?

ROY-HAEGER

1
2     A.    I did.

3     Q.    Because Mr. Porter was looking

4  for a loan?

5     A.    Multiple things.   Mr. Porter

6  was looking to acquire quite a few gold

7  mines and set up a gold investment fund,

8  which would have assets behind the

9  investment fund, which is in all of the

10  projections and any of the people that had

11  take a look at his business plan and the

12  parties that were the other investors for

13  John that I had talked to it was a very

14  solid business plan.   So no, it was

15  not -- at the time it was not for the

16  loan.   It was for looking at what he was

17  putting together for the next five years

18  as far as an investment in a gold fund.

19     Q.    And the purpose of connecting

20  Mr. Hanke is that Mr. Hanke potentially

21  had clients that would be willing to

22  invest in the gold fund?

23     A.    That was it or wanted to --

24  maybe he had clients that would want to be

25  principals in some of the mining

1          ROY-HAEGER

2   operations.  We also had some friends in

3   Brazil that had options on 12 sugar mills

4   that were in process, and John Porter has

5   a very large connection down in Brazil, so

6   we put those two together.  There is a

7   lot of different crossovers.

8       Q.   Okay.  And you understand if

9   Mr. Hanke was going to be providing money

10  to Mr. Porter it wasn't going to be his

11  personal fund.  It was funds from a

12  client, correct?

13      A.   I did not -- I believe so.

14  Yes.

15      Q.   Okay.  And you understand that

16  Mr. Hanke perhaps among other things but

17  at the very least provided Mr. Porter with

18  $600,000?

19      A.   Yes.

20      Q.   And do you have an understanding

21  of where those funds came from?

22      A.   I do now.  Yes.

23      Q.   What is your understanding now?

24      A.   That they came from the same

25  investment from Mr. Al Thani.

ROY-HAEGER

1

2     Q.     When Mr. Porter received that

3     600,000, did you get any form of

4     commission for putting the parties

5     together?

6     A.     There was a fee that was paid.

7     I believe it was $15,000, and it was paid

8     out to the various parties that had been

9     involved, and then in the end I did not

10     keep any of the money.  The money went

11     out to two referring parties.  One was

12     Paul Ramirez, who also claims he is the

13     one who introduced me to Mr. Porter.  The

14     other one was Dr. Mark Switzer.  So the

15     funds were paid as a referral fee for the

16     transaction, and they were all paid out,

17     and you can see through my accounting at

18     Lifestyle that all of that went out.

19     Q.     So the Shield Your Lifestyle

20     account received the $15,000 you were just

21     referring to?

22     A.     Yes, it did.

23     Q.     That was sent to you by Mr.

24     Porter?

25     A.     Correct.

1          ROY-HAEGER

2      Q.      And then you sent all of that

3   out to two other individuals, Paul Ramirez

4   and Dr. Switzer, Mark Switzer, and some of

5   it went to Craig?

6      A.      For keeping -- for whatever

7   expenses he needed for the SBLCs to stay

8   active.    So it was all paid out.    So

9   most of it was paid.    Some as referral

10  fees to Mark and Paul, others to a fee

11  that Craig had needed for expense money.

12     Q.      What do the SBLCs have to do

13  with the $600,000 that went to Mr. Porter?

14     A.      The returns for -- in regards to

15  the transaction with Mr. Porter, it does

16  not have anything to do with it.    In

17  regards to keeping the expenses and the

18  SBLCs intact for the trade agreement that

19  had been signed between Craig and Alan,

20  that is where Alan's profits were to come

21  from.   So Craig said he needed certain

22  expense money, and so it was sent.

23     Q.      And so just so I understand part

24  of the $15,000 you received as a

25  commission for putting together the

1          ROY-HAEGER

2  $600,000 that went from Hanke to Porter

3  and to Craig to pay for expenses he was

4  incurring in connection with a separate

5  transaction that was backed by the SBLC;

6  is that right?

7      A.    That is what I believe.   Yes.

8  Again, I would like to check my records.

9      Q.    Okay.   I will request here on

10  the record that you produce those

11  documents, and by those documents I would

12  like the bank account information showing

13  the flow of the funds we have been

14  discussing in Shield Your Lifestyle and La

15  Renaissance?

16      A.    Okay.

17      Q.    Just give me a second.

18          (Pause.)

19      Q.    Mr. Hanke was expecting

20  obviously to be repaid the $600,000 he

21  sent to Mr. Porter but also was expecting

22  additional payments; is that right?

23      A.    From -- from the loan with John

24  Porter?

25      Q.    Yes.

1          ROY-HAEGER

2          A.     And he has never returned

3     another phone call or e-mail of mine.

4          Q.     Have you received any other sort

5     of commissions either you or your company

6     Shield your lifestyle or your prior

7     company La Renaissance for work you have

8     done for Mr. Hanke or projects you have

9     worked on with Mr. Hanke?

10         A.     I do not believe so.  No.

11         Q.     Are you currently employed?

12         A.     I have a contractor position as

13    executive director of RCA, and then I am

14    self-employed.  So all of them are

15    contractor positions.  I do not have any

16    W-2 from any company or employer.

17         Q.     And RCA is is an acronym for

18    Regulatory Compliance Association?

19         A.     Correct.

20         Q.     How much are you compensated at

21    RCA?

22         A.     I am compensated for hourly work

23    at $21 an hour, and previous to Covid when

24    we did our conferences I was paid about

25    50,000 a year.  I worked 50 hours a week.

ROY-HAEGER

1

2    Now, in 2020 we basically had no ability
3    to do conferences.  So I made about 15 to
4    20,000, and currently I am the only person
5    left, and we are billing at maybe 10 to 20
6    hours a week.  I am just keeping
7    everything going, answering e-mails, and
8    making sure that people who had paid for
9    their certificates are getting their
10   courses, and that is about it because we
11   cannot do any live conferences, which was
12   the gist of our business.
13        Q.    So prior to 2020 prior to the
14   pandemic when you were still doing
15   conferences, was the compensation you were
16   receiving from RCA your primary source of
17   income?
18        A.    Yes, it was.
19        Q.    How long have you been with RCA?
20        A.    Since the end of -- since 2018.
21        Q.    RCA has offices in New York,
22   correct?
23        A.    They have a virtual office in
24   New York.  There is really a conference
25   center.  They put together conferences,

ROY-HAEGER

1
2    and they have a virtual learning
3    management system for courses, and twice a
4    year they would put together a conference
5    where they would bring regulators, asset
6    managers, and the providers which usually
7    are law firms and CPA firms.  That was
8    what they did.  So they put on
9    conferences, so they really only had a
10   virtual office in New York.
11        Q.    What do you mean by a virtual
12   office in New York?
13        A.    A mailing address and a place
14   where -- I mean it is mainly just a
15   mailing address.  There is no full office
16   there.  If we ever wanted to rent one of
17   the conference rooms, we could rent a
18   conference room there.
19        Q.    Does RCA still maintain that
20   mailing address?
21        A.    Yes, it does.
22        Q.    Okay. What is that mailing
23   address.
24        Q.    733 Third Avenue, 16th Floor,
25   New York, New York, 10028.

ROY-HAEGER

1

2     Q.     Did you ever work out of that
3  office?

4     A.     No, I did not.  Again, there is
5  no office there.   It was just a mailing
6  address.

7     Q.     Did you ever rent a conference
8  room?

9     A.     I did not.

10     Q.     You went to New York each time
11  time there was a seminar being hosted by
12  RCA; is that correct?

13     A.     That's correct.

14     Q.     And how often would that occur,
15  and let's focus I guess prior to the
16  pandemic?

17     A.     Spring and fall.  So beginning
18  of May and the beginning of October.

19     Q.     So you would go to New York
20  twice a year?

21     A.     Correct.

22     Q.     Would you go to New York for
23  anything else, any employment?

24     A.     No.

25     Q.     And when you were in New York

1          ROY-HAEGER
2  for the seminars, how long would you stay?
3      A.     We would get there the night
4  before, and then we would do a women's
5  conference the first night.  So I would
6  get there say on a Monday.   We would do
7  the women's conferences Tuesday night and
8  then the big symposium Wednesday and leave
9  Thursday morning.  So three days.
10     Q.     Okay.  And you would recruit
11 people to attend these symposia and
12 seminars?
13     A.     We -- we did.  We had somebody
14 the head of marketing that did that.  I
15 did not.   The head of marketing did it.
16     Q.     Did you ever invite people to
17 attend seminars?
18     A.     I did.   Yes.
19     Q.     People in New York?
20     A.     Yes.
21     Q.     Do you recall who?
22     A.     One of them was Mike Martino.  I
23 invited him there, since he was in the
24 industry, and we actually had members that
25 were asset management companies.   So yes,

1                  ROY-HAEGER
2   I did invite Mike.
3        Q.    Okay.
4        A.    And then any other participants
5   I called in to the company or that we
6   might have had as referrals.
7        Q.    So would you consider that RCA
8   is headquartered in New York?
9        A.    I would say it is a Delaware
10  company whose main clientele are in New
11  York.
12       Q.    And their only mailing address
13  is in New York?
14       A.    No.   They have a mailing
15  address in New York as well as Delaware.
16       Q.    Understood.   The one for
17  Delaware, is that just a legal formality
18  since they are registered in Delaware?
19       A.    It is a registered agent.
20  Correct.
21       Q.    Okay.   I am going to pull up
22  another document, tab 3, which I will mark
23  as Exhibit 3.
24             (Exhibit 3 marked for
25  identification.)

1              ROY-HAEGER

2      Q.    Do you see that, Ms. Roy-Haeger?

3      A.    I do.

4      Q.    This is an e-mail.  I guess I am

5  looking at the e-mail on the first page

6  the bottom half.   It is from you to Mr.

7  Martino, and Mr. Hanke is on this e-mail

8  as well.

9             I think this was in reference

10 what we were just talking about?

11     A.    That is correct.  Yes.

12     Q.    You have a signature block here,

13 and it lists you as the schedule director

14 at RCA, and it has the office address 733

15 Third Avenue, 15th floor, New York, New

16 York that we were just discussing,

17 correct?

18     A.    Correct.   And can you correct

19 my address?  I had the zip code wrong when

20 I gave you the address.

21     Q.    I think the floor -- it says

22 15th floor.

23     A.    It changed right around 2020.

24 It changed from the 15th to the 16th.

25     Q.    Okay.  Now, if it is just a

1                    ROY-HAEGER
2    mailing address, I guess I am confused as
3    to why the floors changed.  I mean were
4    there any physical offices that RCA had
5    access to?
6         A.     No.    The 15th floor is where
7    their check in is, where the administrator
8    who takes in everybody's mail is, and they
9    switched it from the 15th to the 16th
10   floor.    So if you don't put the floor,
11   then it gets lost because there is no
12   office there.    So you have to put the
13   floor, so that it knows to go to the
14   administrator team.
15        Q.     Understood.  And they moved from
16   the 15th to the 16th floor.    It has a
17   direct line here.  Was that your direct
18   RCA line?
19        A.     That was my cell phone at the
20   time.
21        Q.     That is a 646 area code.   That
22   is a New York area code?
23        A.     Correct.    The company gave me
24   that.    Yes.
25        Q.     Did you participate in any way

1                    ROY-HAEGER
2    in the compliance training programs that
3    RCA offers?
4         A.    I took several of the courses
5    just to see more of the format, and I also
6    checked the courses once they were ready
7    to be placed on to the LMS for formatting.
8         Q.    Do you consider yourself an
9    expert in regulatory compliance?
10        A.    I do not.   I consider myself
11   somebody that helps run a certification
12   course and a company that puts on
13   symposia.
14        Q.    Ms. Roy-Haeger, we have been
15   going about an hour and twenty minutes.
16   We can go a little longer, but I am
17   thinking we could take a break shortly.
18   I am at a natural stopping place.   We can
19   do it now or if you want to go a little
20   longer.  It is up to you.
21        A.    Let's go a few more minutes, a
22   little longer.
23        Q.    Sure.
24              How did you first meet Alan
25   Hanke?

1                ROY-HAEGER

2      A.    Wow.  I don't even remember.

3  How did I meet Alan?  I am pretty sure I

4  met Alan from mutual associates with Tracy

5  French.

6      Q.    And who is Tracy French?

7      A.    He is just another associate

8  that is in the same business.

9      Q.    And would you describe that

10  business as commodities trading or --

11      A.    Commodities and financial

12  structuring.

13      Q.    And do you know about how long

14  ago you were introduced to Mr. Hanke?

15      A.    I do not recall.  It had to be

16  four years ago.

17      Q.    Now, at some point in time you

18  connected Mr. Hanke to Craig Hubner,

19  correct?

20      A.    Yes, I did.

21      Q.    Do you know approximately when

22  that was?

23      A.    It would have to be the

24  beginning of 2019.

25      Q.    And what was the purpose?

1          ROY-HAEGER

2      A.     At the time to work on the LTN

3   transaction from Brazil that he had the

4   client for.

5      Q.     When you say he had the client,

6   who is the he in that sentence?

7      A.     Alan.   Alan had the client and,

8   and Craig through some of his connections

9   mainly Chinese Development -- China

10  Development Fund stated that he had the

11  ability to monetize and fund against

12  certain assets.

13     Q.     When you said that Mr. Hanke had

14  a client, was that client Mr. Al Thani?

15     A.     No.   The client was the LTN

16  owner of the instrument in Brazil.

17     Q.     And who was what?

18     A.     I knew you were going to ask me

19  that.   It was -- I don't know.   Can I not

20  look some of these up?  I swear I have a

21  bad short-term memory.

22     Q.     What I could do is maybe

23  follow-up later, Ms. Roy-Haeger, and if

24  you want to voluntarily provide me the

25  information after looking it up, that

1    ROY-HAEGER

2    Q.    How do you know Craig?

3    A.    I met Craig when I was on a trip

4    to Hong Kong, and somebody referred me to

5    Craig as somebody that was very

6    knowledgeable working with financial

7    instruments.    He also had a knowledge on

8    some of the historical assets.

9    Q.    Have you and Craig been engaged

10   in any transactions or projects together?

11   A.    There have been quite a few

12   transactions.    I believe you have a lot

13   of Whatsapps and e-mails and things that

14   have been looked at.    Most of them had not

15   been approved by both sides.    You always

16   have to match up procedures on both ends.

17   So we have looked at quite a few

18   transactions and gone forward with very

19   few mainly because we could not get what

20   we needed or the verifications from the

21   project owner, from the asset owner.

22   Q.    But to the extent that any of

23   these do successfully get put together,

24   you receive a commission for that?

25   A.    What I do for Craig is basically

ROY-HAEGER

1

2　mostly administrative work, and I will do

3　the work there, and if anything is

4　successful then there would be a bonus

5　that would be discussed at the time, but I

6　do not have -- I have -- I do not believe

7　I have any formal compensation agreements

8　from him, but that is -- that is typically

9　how it would work.

10　　　Q.　　And when you say successful that

11　means just the investment is made,

12　correct?

13　　　A.　　Correct.　　It is not the

14　investment made.　No.　　Most of these

15　transactions require somebody putting up

16　an asset, somebody from a financial

17　institution point of view putting money

18　against that asset, and the commodity

19　transaction is successfully executed;

20　therefore, either a commodity was bought

21　and sold and in turn there would be a

22　profit on it or there was an investment

23　made from the leveraging of the assets.

24　　　Q.　　And did that ever occur such

25　that you received a commission?

1          ROY-HAEGER

2      A.     No.

3      Q.     So of all the projects you have

4  worked on with Craig Hubner, none of them

5  ultimately were successful?

6      A.     No, they were not.    Hang on a

7  minute, please.

8          (Pause.)

9      A.     Go ahead.

10     Q.     Are you still working and

11  collaborating with Mr. Hubner on potential

12  investments?

13     A.     No, I am not.    I am simply

14  waiting for him to -- he is working on

15  multiple transactions on his own to make

16  good on the loan agreement that he has

17  with Mr. Al Thani, and now that he knows

18  what is behind it -- he was not aware of

19  it at the time, and he is -- so no, I am

20  waiting for him to make good on that.    I

21  do not speak to him hardly at all other

22  than to ask where he is on his current

23  transactions that he is going to do to

24  make good on this transaction.    That is

25  the extent of any conversations right now.

1        ROY-HAEGER

2        Q.      So Craig and Alan entered into a

3    loan agreement, correct?

4        A.      That's correct.

5        Q.      And were you involved with the

6    negotiation or execution of that loan

7    agreement?

8        A.      I was working as an admin role

9    and for whatever reason, and I don't know

10   what made me do this, but Craig said I

11   feel like they would want U.S.

12   jurisdiction.  So will you sign this as a

13   power of attorney, attorney in fact, so

14   that we could get it over to Alan with

15   proper jurisdiction, and unfortunately

16   without thinking I accepted that role to

17   do it, and I executed the agreement

18   unfortunately.  That is how my name got

19   on it.  He had done the agreement.  He

20   had negotiated the terms with Alan, but

21   for whatever reason he had me sign as

22   power of attorney.

23       Q.      Why do you say that it was

24   unfortunate?

25       A.      Because that brought me into the

1    ROY-HAEGER

2         Q.    I want to try to better

3    understand I guess the flow of the money.

4         A.    Okay.

5         Q.    Right before I get there, you

6    mentioned a Pedro.  Do you have a last

7    name?

8         A.    Lobo, L-O-B-O.

9         Q.    Okay.  So the loan agreement

10   obviously is between Craig and Mr. Hanke.

11   So that million dollars that Hanke was

12   putting up, you understood that wasn't

13   Hanke's personal funds, correct?

14        A.    Correct.

15        Q.    You understood that that would

16   have come from an investor?

17        A.    Yes, I did.

18        Q.    And here that was Mr. Al Thani,

19   correct?

20        A.    I am trying to remember at what

21   time I was informed of who the investor

22   was.  I really don't know the timeframe

23   of when I was made aware of who the

24   investor was.  I was not aware of any of

25   the contracts or the contents of contracts

1              ROY-HAEGER
2    that Alan had signed with him, but I don't
3    know the time frame of when I was informed
4    who the investor was.  I could look it up
5    in my notes and get that to you.
6         Q.     So after the loan agreement,
7    where did the money go?
8         A.     So the money initially was to be
9    sent to the China Development Fund's
10   account.  And I believe it was PNB Paribas
11   at the time, and that was to come from Mr.
12   Mills Rogers' escrow account to be sent to
13   the account of CDF.
14             For whatever reason, and I never
15   really could quite understand it, that
16   transaction was not received in good order
17   by PNB Paribas Bank.  For whatever reason
18   they did not want to take a wire from a
19   U.S. bank.  At the time it was from Bank
20   of America.  Nobody could ever really
21   figure out why that transaction got held
22   up.  So they sent the money back, and
23   then eventually Craig was able to give him
24   out of Macaw an account directly with the
25   chief investment officer for China

                    ROY-HAEGER
 1
 2   Development Bank, which is Y.T. Li.   So
 3   there were -- since he was the CIO it was
 4   sent to his account at Macaw where it was
 5   received properly and was able to be
 6   brought in.
 7        Q.    So the money is then wired to
 8   Y.T. Li, who you say is CIO of China
 9   Development Fund?
10        A.    Correct.
11        Q.    Then where does it go?
12        A.    That I have no idea.   I didn't
13   have any access to this account.   I could
14   not get any proof of where that money
15   went, and they simply said it was used to
16   custody assets, but I have not been able
17   to get proof of any of that.
18        Q.    And so the Pedro Lobo you
19   mentioned, what was his role here?
20        A.    His role was that he is the one
21   who had brought Hagoth Trade to the table.
22   He introduced Hagoth to Craig Hubner.   He
23   works closely with China Petroleum Company
24   and had a very high lineage between U.K.
25   and Hong Kong as his father helped

1                    ROY-HAEGER

2   go through multiple parties.  I had no

3   idea why I was updating them or what their

4   role was or what contracts he had with

5   them, but when Alan asked me to update

6   them on behalf of the transaction Alan had

7   been involved in with Craig I went ahead

8   and did the updates.

9        Q.    So if I understand correctly you

10  are saying you don't know necessarily if

11  Lance and Lumbard had invested necessarily

12  in this transaction with Craig?

13       A.    That is correct.  The only

14  transaction I know is a million dollars

15  was sent on that loan agreement, and in

16  turn Alan received -- was to receive a

17  participations in the transaction of the

18  SBLCs from both -- that both Craig and

19  Pedro had put together with their

20  investors.

21       Q.    Okay.  But let me just finish

22  the question.

23            So it was your understanding

24  that Lance and Lombard were ex pecting to

25  be paid out of any profits generated from

1          ROY-HAEGER

2   their transaction with Craig, correct?

3       A.    At a later date way after the

4   investment had occurred and later only

5   when I was introduced to them I was made

6   aware that that was the expectation.

7       Q.    Okay.   Why was that the

8   expectation if they did not put any money

9   into the transaction with Craig?

10      A.    I have no idea.   I can only

11  assume that it -- with the returns Alan

12  was to to expect from this that that was

13  part of his analysis of his investments he

14  had made within his own firm based on

15  other contracts he might have had with

16  investors.   That -- I have no idea.   All

17  I know is Alan was expecting a certain

18  amount from a contract he had with Craig,

19  and what he did further from that with his

20  own investors I have no idea.   I am not

21  privy to any of that.

22      Q.    Just so I have this right, to

23  your understanding the only investment to

24  that transaction with Craig was the

25  million dollars that originated from Mr.

1          ROY-HAEGER
2  Al Thani notwithstanding that fact Mr.
3  Hanke's intent was to use any profits from
4  that transaction to pay individuals beyond
5  just Mr. Al Thani including Lance Barker
6  and Lombard; is that correct?
7          A.     That's correct.
8          Q.     Okay.  And who is Lance Barker?
9          A.     My understanding is Lance is a
10 registered representative in the financial
11 markets, and he manages certain investor
12 assets.    So he is a licensed
13 representative in the business.
14         Q.     And in connection with the
15 updates you were providing Mr. Barker, he
16 was representing Lombard at that point in
17 time; is that correct?
18         A.     He was requesting information as
19 having -- my understanding was they were
20 creating an annuity structure part of
21 which he had agreed to bring certain funds
22 to the table and he was working to
23 leverage the assets of Lombard in order to
24 set up this other financial structure in a
25 form of a private annuity.    So what role

ROY-HAEGER

1

2  he played, what he was supposed to bring

3  to the table I do not know.

4       Q.    All right.

5       A.    Lombard was his client.

6       Q.    Who is Lombard?

7       A.    Lombard is an insurance company,

8  which is a subsidiary to my understanding

9  either of Black Rock or Blackstone, and

10 they are an insurance company that was

11 creating projects.  They were doing an

12 offshore annuity structure, and they

13 needed either money to put the structure

14 together or investors, and so they were

15 Lance's client, and Lance was working to

16 help them put together the structure.

17      Q.    And Lance then took some of

18 Lombard's money and gave it to Mr. Hanke

19 for investment purposes?

20      A.    That is my understanding.  I

21 have not seen any contracts, but that is

22 my understanding.

23      Q.    And Lance Barker is based in New

24 York, correct?

25      A.    Correct.

1              ROY-HAEGER
2      Q.     Do you know if Lombard is based
3  in New York?
4      A.     I do not.
5      Q.     Now, there were other
6  individuals that were also seeking updates
7  from you related to the transaction with
8  Craig.   That was Mike Martino, correct?
9      A.     Correct.
10     Q.     And he was working at a company
11 Four Point; is that right?
12     A.     Yes.   That is correct.
13     Q.     Is it the same sort of situation
14 where Mr. Martino -- Mr. Martino on behalf
15 of Four Point did not invest in that
16 transaction with Craig but was still
17 expecting to receive payouts from any
18 profits from that transaction??
19     A.     That is my understanding.
20     Q.     And Mr. Martino is based in New
21 York?
22     A.     Yes, he is.
23     Q.     Are Four Point's offices also in
24 New York?
25     A.     They are.

1                ROY-HAEGER

2     Q.    Okay.  Were there any other

3 individuals that you were updating about

4 this transaction with Craig besides --

5     A.    I think mostly just the team of

6 Mr. Al Thani.  Mr. Hanke had put me on a

7 call.  I believe there was an attorney

8 involved.  There were a couple other

9 parties.  Then I started getting copies

10 of e-mails from from several parties, and

11 then out of the blue this lawsuit with Mr.

12 Stevens comes into play, who I didn't even

13 know who he was until a year later when

14 apparently he was on a phone call that

15 Alan had asked me to do an update call,

16 and he was on that phone call.  I have no

17 idea of anything having to do with him and

18 cannot believe I am in a lawsuit with him.

19     Q.    Thank you.

20     A.    I don't know how many more of

21 those China parties are out there.

22     Q.    Do you recall how many update

23 phone calls you provided to Mr. Al Thani's

24 representatives?

25     A.    No, there is two that I

1          ROY-HAEGER
2    remember.   It could have been more.
3         Q.    We will get to those in a bit,
4    but generally the purpose of the call was
5    for you to update Mr. Al Thani's
6    representatives as to the status of the
7    transaction, correct?
8         A.    Correct.
9         Q.    And at a point in time Mr. Al
10   Thani's representatives as well as Mr.
11   Barker, Mr. Martino started getting upset
12   that the transaction wasn't paying out,
13   correct?
14        A.    Correct.
15        Q.    And so you would provide these
16   updates as a way to alleviate their
17   concerns, correct?
18        A.    I would provide whatever updates
19   I could based on the request for Alan to
20   have somebody other than himself giving
21   the updates, so that they could hear it
22   from a closer source to the person that
23   had executed that trade agreement.
24        Q.    So Mr. Hanke represented you as
25   someone that was closer to the transaction

1              ROY-HAEGER
2    than he was?
3        A.    He -- I am not sure how he
4    represented me because I have heard a
5    variety of issues, but I was -- I was
6    speaking to Craig more often, getting the
7    updates, and, yes, I would say I was
8    closer to the sources with Craig than he
9    was.  Correct.
10       Q.    And that is why Mr. Hanke wanted
11   you on those calls because you were closer
12   to the details of the transaction?
13       A.    Yes.
14       Q.    And that was aimed at providing
15   some assurances to these disgruntled
16   investors that their money would be
17   forthcoming, correct?
18       A.    I am not sure about assurances,
19   but that at least somebody would give them
20   details of what the current update was
21   regarding the transaction that Hagoth was
22   supposed to be paying out on and stating
23   that they were being paid.  So you can
24   imagine if somebody is stating that
25   payments are eminent, and that message is

ROY-HAEGER

1
2  start updating on any other transaction
3  that Craig was involved with.  So he would
4  then update me on certain transactions he
5  was doing whether it be with China
6  Development Fund or any other broker he
7  worked with, and so I started getting
8  multiple updates on any other type of
9  transaction he had, and unfortunately
10  those transactions did not pay out either.
11      Q.     But my question, Ms. Roy-Haeger,
12  was simply that on these phone calls and
13  e-mail updates putting aside the source of
14  your information, the update frequently
15  was that the money would be forthcoming,
16  correct?
17      A.     That I would -- well, basically
18  if you want to interpret it that way, but
19  my update would be here is the status.
20  They state this.  It does appear that it
21  is going to be forthcoming, and that we
22  will continue to update you and give you
23  status points, but part of the message
24  that was being communicated and passed
25  down was that there were transactions that

1                    ROY-HAEGER
2    were scheduled for payouts.  Hagoth
3    continued to state that the payout was
4    coming.  And so was that information
5    passed along?  Yes.   How it is
6    interpreted, did I purposely state that I
7    wanted to tell him it was imminent?  If I
8    was being told it was, then I would pass
9    that on.   I would not state that if
10   I -- if it was not being told to me that
11   it was imminent.  So I was not trying to
12   get them to hang on to avoid a lawsuit.
13        Q.     You stated there was a point in
14   time where you switched to also updating
15   disgruntled investors as to the status of
16   other transactions, and that was because
17   the -- there were some doubts about the
18   likelihood of the main transaction paying
19   out; is that correct?
20        A.     Yes, that is correct.
21        Q.     And when did that occur?
22        A.     That was probably the end of
23   2019.  So about six months into it I would
24   say.
25        Q.     Did you inform any of the

1          ROY-HAEGER

2    himself to get those cards downloaded, and

3    in the end there was something N.K. had

4    done that it was not a proper download.

5    I don't remember the specifics, but again

6    N.K. didn't do something he was supposed

7    to do, and that did not work.

8              Then N.K. ended up sending from

9    UBS a 103 wire, so he told them it was

10   going to be a 103 wire sent from UBS into

11   the account in Macaw that had come in, and

12   when they sent the copy of the Swift it

13   was for not funds -- not cash funds as

14   promised, but it was for a credit facility

15   that was only to be activated one year

16   from there.  So there was nothing they

17   could do with that, and every time they

18   tried something and CDF would put their

19   resources toward it, N.K. would have some

20   glitch or some hiccup in it.  It is like

21   the guy was grasping at straws, but he was

22   playing games and promising one thing and

23   delivering something else.

24        Q.    Going back to the calls you had

25   with Mr. Al Thani's representatives, do

1            ROY-HAEGER

2    you remember an agent of Mr. Al Thani Sam

3    McGuinness on the line?

4        A.    I do.

5        Q.    On both of those calls?

6        A.    Yes.

7        Q.    Ms. Roy-Haeger, I think we are

8    at a good stopping place now.

9        A.    Okay.

10        Q.    If you want to take a ten-minute

11    break.  Let's come back at 12:20 if that

12    is okay.

13        A.    Okay.  Sounds good.

14            (Recess taken.)

15    BY MR. DUCHARME:

16        Q.    Ms. Roy-Haeger I am going to

17    mark my tab 18 as Exhibit 5.  I will

18    share my screen with you.

19            (Exhibit 5 marked for

20    identification.)

21        Q.    Do you see that document?

22        A.    I do.

23        Q.    And this is an e-mail from you

24    to Mr. Hanke on September 20, 2019, and

25    you are providing an update to Mr. Hanke

1            ROY-HAEGER
2   on the transaction, correct?
3        A.     Yes.
4        Q.     And when I say transaction, I
5   am -- you understand I am referring to the
6   transaction involving Craig in which Mr.
7   Al Thani's million dollars was invested.
8   You understand that?
9        A.     I do.
10       Q.     And so if you look at the e-mail
11  below, it is from Mr. Hanke at 9:01 a.m.
12  to you, and he says that "Steve Papi, Sam
13  McGuinness, and Mr. Abaz Sheikh head of
14  security have arrived in had Chicago.
15  They have demanded a meeting with me at 3
16  p.m. central.  I need something written,
17  tangible, and verifiable to give them when
18  I arrive today."
19           Do you see this?
20       A.     Yes, I do.
21       Q.     And so the response that you
22  provided was for the purpose of Mr. Hanke
23  providing that update to Mr. Al Thani's
24  representatives at this meeting in
25  Chicago, correct?

```
 1              ROY-HAEGER
 2     A.     Correct.
 3     Q.     And you did this on numerous
 4  occasions, correct?
 5     A.     Correct.
 6     Q.     Providing updates --
 7     A.     Yes --
 8     Q.     Sorry.  That is --
 9     A.     That is correct.
10     Q.     Thank you.
11            And you essentially were
12  dictating what Mr. Hanke would say to Mr.
13  Al Thani's representatives by providing
14  this update because you were the source of
15  the information; is that correct?
16     A.     Yes.
17     Q.     Okay.  I will take that
18  document down.
19     A.     Okay.
20     Q.     I am going to mark my tab 12 as
21  Exhibit 6, and I am going to share that
22  with you.
23            (Exhibit 6 marked for
24  identification.)
25     Q.     Ms. Roy-Haeger, do you see that
```

1               ROY-HAEGER

2       A.      So my understanding is that

3    letterhead was simply a company Craig was

4    involved with.

5       Q.      Okay.

6       A.      That update was coming from

7    Craig.

8       Q.      If the update was coming from

9    Craig, why didn't Craig sign the letter?

10      A.      I do not know.   He just told me

11   Steven was an associate of his in that

12   company.

13      Q.      So I am going to mark my tab 16,

14   and I will share my screen.

15      A.      Okay.   Let me see this.

16              (Exhibit 7 marked for

17   identification.)

18      Q.      This is -- well I am going to go

19   down here.   Let's see.   So this here on

20   page 2 is an e-mail from Steve Papi, who

21   you understand is a representative of Mr.

22   Al Thani, correct?

23      A.      Correct.

24      Q.      And on January 3, 2020 he sends

25   an e-mail to Mr. Hanke saying that because

```
 1              ROY-HAEGER
 2   of the failures to comply with the
 3   contractual agreements he essentially
 4   wants to meet up with Mr. Hanke in the
 5   United States to discuss; is that right?
 6       A.    Yes.
 7       Q.    Okay.   And then going up the
 8   page, Mr. Papi sends a follow-up e-mail on
 9   January 4, 2020 to Mr. Hanke stating that
10   he awaits his response, and he says "PS
11   even New York can work.   Just advise."
12   Do you see that?
13       A.    I do.
14       Q.    All right.   And so that was Mr.
15   Papi suggesting that they could meet in
16   New York, correct?
17       A.    Correct.
18       Q.    Okay.   And then going up the
19   page, the first page, Mr. Hanke then
20   forwards this e-mail to you and says "This
21   just in from Steve.   I need some support
22   and answers." Correct?
23       A.    Correct.
24       Q.    And you say "let's discuss in
25   detail tomorrow unless you want to now."
```

1          ROY-HAEGER
2    Do you see that?
3         A.    I do.
4         Q.    And so this essentially was Mr.
5    Hanke asking you for details again of the
6    transaction, so he could then provide
7    those details to Mr. Al Thani's
8    representatives at a meeting that they
9    were contemplating in New York, correct?
10        A.    Correct.
11        Q.    And did you then speak with Mr.
12   Hanke and provide him details on the
13   transaction?
14        A.    I am assuming I did.  I was
15   working to get him something in writing,
16   and the result of that was the letter.
17   Whenever Alan would ask for updates I
18   would give him whatever the current update
19   was.
20        Q.    And so you would have
21   essentially told Mr. Hanke what he could
22   say to Mr. Papi at this meeting in terms
23   of the status of the transaction, correct?
24        A.    I would have given him whatever
25   the most recent update was that I could

1           ROY-HAEGER

2   get.   Yes.

3       Q.    Okay.   I am going to mark my tab

4   15 as Exhibit 8.

5           (Exhibit 8 marked for

6   identification.)

7       Q.    I will share my screen.   So you

8   see this is an e-mail from Mr. Papi again

9   to Mr. Hanke just a few days later on

10  January 6, 2020, and he is asking for an

11  update, and he says I will be heading to

12  New York and arrive Wednesday p.m. for a

13  meeting."

14          Do you see that?

15      A.    I do.

16      Q.    So at this point in time, Mr.

17  Hanke and Mr. Papi agreed to meet in New

18  York, correct?

19      A.    Correct.

20      Q.    All right.   And you were

21  provided with this e-mail.   Do you see

22  Mr. Hanke sent it to you later that day on

23  January 6?  Correct?

24      A.    Yes.

25      Q.    Do you see it?

1          ROY-HAEGER

2      A.      Yes.

3      Q.      So you were aware that Mr. Hanke

4   was meeting with Mr. Papi in New York,

5   correct?

6      A.      Correct.

7      Q.      And the purpose of the meeting

8   was to to provide Mr. Papi with an update

9   as to the transaction, correct?

10      A.      Correct.

11      Q.      And Mr. Hanke is turning to you

12   to seek an update that he can then give to

13   Mr. Papi, correct?

14      A.      Correct.

15      Q.      And you then provided that

16   update to Mr. Hanke to then relay to Mr.

17   Papi at the meeting in New York, correct?

18      A.      Correct.

19      Q.      Did you provide any documents to

20   Mr. Hanke that he could then share with

21   Mr. Papi at his meeting?

22      A.      I don't remember.  I think

23   there were two updates in writing.  One

24   was the one you previously showed me, and

25   then there was another further one that

1         ROY-HAEGER
2         A.      No, I don't, but I would have
3     given them any update I would have
4     received from both Pedro or Craig, and
5     Pedro usually you have updated Craig.  So
6     this time he had it -- what Pedro had done
7     is copied a message on to my Whatsapp,
8     which is why when I sent it and forwarded
9     it to Alan it looks like it came from me.
10    So I had to state that that was a copied
11    message that Pedro had sent to me.  Yes, I
12    would have gotten as many updates as I
13    could in order to go into stating whatever
14    factual information I had for that call.
15        Q.      Understood.
16                How did you introduce yourself
17    during that call? Do you recall?
18        A.      I do not think I introduced
19    myself.   I just got on and answered
20    questions and gave an update, but I really
21    don't remember.   It was put on very
22    quickly, and everybody had been on the
23    call.   Alan joined me on the call and
24    asked me to start giving updates.
25        Q.      Got you.   Now, let's look at

1          ROY-HAEGER

2   page 13 at -- hold on one moment.   At

3   7:52 a.m. on January 9, 2020, you state "I

4   am sending an e-mail with details on this

5   transfer, which is being completed in

6   eight hours, as they are moving it now."

7          Do you see that?

8      A.    I do.

9      Q.    And you recall previously we

10   were looking at e-mails during this very

11   time period in which Mr. Hanke was going

12   to be meeting with Mr. Papi and Mr.

13   McGuinness in New York, correct?

14      A.    Correct.

15      Q.    So is it your understanding that

16   you were sending those details on the

17   transfer to Mr. Hanke on the early morning

18   of January 9, 2020, so he could then share

19   this information with Mr. Papi and Mr.

20   McGuinness at the meeting in New York?

21      A.    That makes sense.   Yes.   I am

22   trying to read these to refresh my memory

23   here.

24      Q.    It looks like that is the only

25   message at all in January of 2020.   So I

1              ROY-HAEGER
2        A.     Yes, I am not sure that he ever
3   changed the letter.   I don't think he
4   did.  I would have to go look.   I can go
5   look and see if there was ever a follow-up
6   letter done.
7        Q.     Yes, I would like to make that
8   request on the record.   Yes, please.
9        A.     On that day it was
10  July -- somewhere in the end of June 26.
11  Okay.
12       Q.     Correct.   So we spoke earlier
13  about Mr. Mike Martino of Four Point.   Do
14  you recall that?
15       A.     Yes.
16       Q.     Okay.  And he was one of the
17  disgruntled investors in which you were
18  providing updates to in connection with
19  the Hagoth transaction among others,
20  correct?
21       A.     Correct.
22       Q.     And you met with Mr. Martino in
23  New York?
24       A.     Yes, I went to his office
25  because I had asked Mr. Hanke if he knew

1                    ROY-HAEGER
2     anybody that had an extra office that we
3     could use instead of just our virtual
4     office and that conference facility for
5     smaller meetings.  So he suggested and
6     introduced me via e-mail or text to Mr.
7     Martino, and I took my head of marketing,
8     and we went there to specifically look at
9     his office to see if he would be
10    interested in renting us a space.  At the
11    time we were thinking about actually
12    hiring one party that would be in New
13    York, since we were all out of Florida for
14    RCA.
15         Q.    And when --
16         A.    That never came to pass.
17         Q.    And when was this meeting?
18         A.    That was -- I don't remember.
19    You should have it in your notes.  Let me
20    see.  That was -- I was there for one of
21    my conferences.  So it had to be November
22    because I was there for the conference.
23         Q.    Let's look at some text messages
24    and maybe that will help.
25         A.    Okay.

1                    ROY-HAEGER

2       Q.      I am going to mark tab 26 as

3    Exhibit 14.

4            (Exhibit 14 marked for

5    identification.)

6       Q.      First of all, do you recognize

7    this document?

8       A.      I didn't share it with you.    I

9    apologize.    Do you see it now,

10   Ms. Roy-Haeger?

11      A.      Yes.

12      Q.      And this is screen shots of text

13   messages that you had with Mr. Martino,

14   correct?

15      A.      Correct.

16      Q.      Wednesday, April 24, 2019 Mr.

17   Martino says "GM."   I assume he means

18   good morning.   "Hope mom is well.

19   Looking forward to your visit.   Let me

20   know what works.   TY."

21            Do you see that?

22      A.      Yes.

23      Q.      And then Mr. Martino asks "I

24   might come down with AH Wednesday."

25            Is AH Alan Hanke?

1          ROY-HAEGER

2      A.      Yes, Alan apparently had a

3  meeting there with Mike and was in town

4  the day I was flying in for the

5  conference.  So he thought about coming

6  down to our conference, but then Alan flew

7  out early that morning.  Mike did stop by

8  at our conference for the reception

9  afterwards.

10      Q.      Okay.  So this refreshes your

11  recollection as to the date of your

12  meeting with Mr. Martino in New York? It

13  was in or around May 6, 2019.

14      A.      I am trying to think because

15  there was one time I met with him, and

16  then one other time when he came over.  I

17  think it was around the same time.  What

18  day did I meet with him? I am trying

19  think.  Is there another screen on that?

20  What is after that?

21      Q.      If we go to this page just say

22  "I am here with K Wok," and you say "Great

23  seeing you," and this looks like it

24  is -- it is hard to tell because these are

25  sort of -- I don't know which way to go.

1              ROY-HAEGER
2    I guess this would be from --
3        A.     So he was saying he may come
4    over in the afternoon with K Wok.  K Wok
5    was his compliance person at his business.
6    So then Alan left, took the flight out,
7    and then they stopped by for the
8    reception.  So he and K Wok came over to
9    our reception.
10       Q.     Got you.    Okay.
11              And so you did see Mr. Martino
12   that night at the reception?
13       A.     At the reception, yes.
14       Q.     Okay.  And at that point in time
15   you were aware that Mr. Martino had
16   invested some money with Mr. Hanke,
17   correct?
18       A.     Yes, in a very previous
19   conversation about it.  I had not
20   realized it then, and I think that was
21   right after I had been at his office.
22   That is what I am trying to figure out if
23   it was then or if it was previously.  I
24   don't remember.  But, yes, we just spoke
25   basically about the industry in general.

```
 1              ROY-HAEGER
 2  in New York?
 3      A.    I don't remember.
 4      Q.    You don't remember exactly what
 5  you discussed in the meeting in May?
 6      A.    No.
 7      Q.    Okay.  I am going to go to page
 8  15.  So this is from August 7, 2019, in
 9  or around that date.  It looks like Mr.
10  Martino is asking for an address.  You
11  tell him you are at the Marriott in New
12  York, and you say "Lance wants to meet
13  also." And you ask "Do you want to meet
14  together or separate."
15              Do you see that?
16      A.    I do.
17      Q.    So this was you speaking with
18  Mr. Martino trying to coordinate a meeting
19  while you were in New York, correct?
20      A.    Correct.  We had had a special
21  women's conference, so I was there for a
22  day.
23      Q.    And you suggest or open the
24  possibility of having a meeting with
25  Lance.
```

1          ROY-HAEGER
2          Why did it make sense to
3    potentially have the meeting with Mr.
4    Martino together with the meeting with
5    Lance?
6        A.    Because they were friends, and
7    they would always call together to try to
8    get updates in the beginning a couple of
9    times, and so rather than when -- I had
10   very little time because I was only there
11   a day.  Rather than say the same thing and
12   give him updates separately, they were
13   friends.  I figured it would be easier if
14   we did it one time because I had very
15   limited time.
16       Q.    Understood.  And this was
17   providing -- so the intent of this meeting
18   was to provide both Lance and Mr. Martino
19   updates as to the transaction, the one Mr.
20   Al Thani invested $1 million into,
21   correct?
22       A.    Yes, correct.
23       Q.    And you did in fact meet with
24   Lance in New York around this time and
25   provided him an update in New York,

1              ROY-HAEGER
2  correct?
3      A.    Correct.
4      Q.    Did you also meet with Mr.
5  Martino at this time?
6      A.    I don't think so.  I am trying
7  to remember because there had been talk
8  about him swinging by for five minutes at
9  the hotel, but I think I recall that he
10  said he got busy, and he was going to go
11  out with family, and he didn't have time,
12  but I really don't remember if it was --
13  it was for about a two-minute meeting as
14  he was walking passed, but I don't think
15  he ever came, and I can't remember.
16      Q.    But you still updated both Mr.
17  Martino and Lance periodically whether it
18  be an in-person meeting such as this one
19  in August or via Whatsapp, text e-mail,
20  directed toward them, correct?
21      A.    Correct, because they kept
22  calling.  So I didn't really have a
23  choice.
24      Q.    Okay.  On this page 12 you say
25  "I am still backed up at the office on

1              ROY-HAEGER
2              THE WITNESS:  Thank you.  Did
3    you make a list?  I think I have a partial
4    list, but are you going to send me a list
5    of the items you wanted me to provide
6    here?
7              MR. Ducharme:   We can go off
8    the record.
9              (Time noted: 2:25 p.m.)
10
11
12
13
14
15
16              AMY ROY-HAEGER
17
18   Subscribed and sworn to before me
19   this    day of            , 2021
20
21                                    .
22
23
24
25

C E R T I F I C A T I O N

I, DEBBIE ZAROMATIDIS, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, AMY ROY-HAEGER, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

*Debbie Zaromatidis*

DEBBIE ZAROMATIDIS

1
2                    E X H I B I T S
3
4
5    EXHIBIT         DESCRIPTION                    PAGE

6    1               E-mail                         33
7    2               E-mail                         38
8    3               E-mail                         56
9    4               Loan agreement                 69
10   5               E-mail                         93
11   6               E-mail                         96
12   7               E-mail                         100
13   8               E-mail                         103
14   9               E-mail                         106
15   10              E-mail                         110
16   11              E-mail                         114
17   12              E-mail                         114
18   13              Whatsapp messages              130
19   14              Text messages screen shot      146
20   15              E-mail                         158
21   16              Text mesaages screen shot      164
22
23
24
25