**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOHAMMED THANI A.T. AL THANI,<br><br>     Plaintiff,<br><br> vs.<br><br>ALAN J. HANKE, IOLO GLOBAL LLC, SIDNEY MILLS ROGERS III, LAURA ROMEO, AMY ROY-HAEGER, SUBGALLAGHER INVESTMENT TURST, SHERRY SIMS, AND JOHN DOES 1-100,<br><br>     Defendant. | Case No. 1:20-CV-4765 (JPC)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

ALSTON & BIRD LLP

Michael C. Hefter
Seth M. Cohen
Scott O'Brien
Morgan Meyer
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400
Michael.Hefter@alston.com
Seth.Cohen@alston.com
Scott.Obrien@alston.com
Morgan.Meyer@alston.com

*Counsel for Plaintiff Mohammed Thani A.T. Al Thani*

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

   I.   The March MDA ................................................................................. 4

   II.  The July MDA ................................................................................. 6

   III. Hanke's Misuse of Plaintiff's Funds ................................................... 8

   IV. Hanke's Pattern of Misrepresentations and Concealment ..................... 9

LEGAL STANDARD ................................................................................. 10

ARGUMENT ................................................................................. 11

   I.   There is No Genuine Issue As to Any Material Fact That IOLO Is Hanke's Alter Ego, and That IOLO Breached the March and July MDAs (Counts I and II) ................................. 11

       A. IOLO is Hanke's Alter Ego ................................................... 11

       B. IOLO Breached the March and July MDAs ............................. 13

   II.  The Record Is Clear That SGIT Breached the Surety Bonds, and That Sims, As the Alter Ego of SGIT is Liable for Damages (Count III) ......................................... 15

   III. There Is No Genuine Issue As To Any Material Fact Concerning Defendants' Fraud and Fraudulent Inducement (Counts IV and V) ........................................... 16

       A. Hanke's Fraudulent Misrepresentations ................................. 16

       B. Roy-Haeger's Fraudulent Misrepresentations .............**Error! Bookmark not defined.**

   VI. There Can Be No Dispute That Sims and Roy-Haeger Aided and Abetted Hanke's Fraud (Count VI) ................................................................................. 21

       A. Knowledge of Hanke's Fraudulent Scheme ............................ 21

       B. Substantial Assistance in Hanke's Fraudulent Scheme .............. 21

V.  The Record Is Undisputed That Hanke, as IOLO's Alter Ego, Breached IOLO's Fiduciary Duties to Plaintiff and Aided and Abetted IOLO's Breach of its Fiduciary Duty (Counts VII and VIII) ........................................................................................................... 23

VI.  There Is No Genuine Dispute of Fact That Hanke's Conduct Violated Section 206 of the Investment Advisors Act ..................................................................................................... 24

CONCLUSION ........................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Ashland Mgmt. v. Janien*,
   604 N.Y.S.2d 912 (1993) ..........................................................................................14

*Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*,
   No. 07CV6665, 2009 WL 1803458 (S.D.N.Y. June 23, 2009) ........................12, 13

*Atias v. Sedrish*,
   133 F. App'x 759 (2d Cir. 2005) ..............................................................................15

*Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85 (2d Cir. 2003) ....................15, 16

*Balmer v. 1716 Realty LLC*,
   No. 05 CV 839, 2008 WL 2047888 (E.D.N.Y. May 9, 2008)..........................12, 13

*Bank Leumi USA v. Ehrlich*,
   98 F. Supp. 3d 637 (S.D.N.Y. 2015)........................................................................25

*Blank v. TriPoint Glob. Equities, LLC*,
   338 F. Supp. 3d 194 (S.D.N.Y. 2008)......................................................................23

*Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*,
   98 F.3d 13 (2d Cir. 1996)..........................................................................................16

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001).......................................................................22

*Cupersmith v. Piaker & Lyons P.C.*,
   2016 WL 5394712 (N.D.N.Y. Sept. 27, 2016) ........................................................21

*Emerson Elec. Co. v. Holmes*,
   No. 16-CV-1390, 2020 WL 4592808 (E.D.N.Y. Aug. 11, 2020) ...........................12

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contrs.*,
   871 F. Supp. 2d 103 (E.D.N.Y. 2012) ..............................................................12, 14

*In re Gas Reclamation, Inc. Sec. Litig.*,
   733 F. Supp. 713 (S.D.N.Y. 1990) ...........................................................................24

*Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers Union Local
   361 v. McNulty*, No. 20-CV-4979, 2023 WL 5747345 at *9 (S.D.N.Y. Sep. 6, 2023) ..........11

*Jacobs v. Maza*,
   2023 WL 5680180 (E.D.N.Y. Aug. 18, 2023).........................................................14

*Jianjun Chen v. 2425 Broadway Chao Rest., LLC*,
  2019 WL 1244291 (S.D.N.Y. Mar. 18, 2019) .......................................................................11

*JP Morgan Chase Bank v. Winnick*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005)...................................................................................22

*Kassover v. UBS AG*,
  619 F. Supp. 2d 28 (S.D.N.Y. 2008).....................................................................................25

*King County v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 448 (S.D.N.Y.
  2013) .....................................................................................................................................21

*Kottler v. Deutsche Bank AG*,
  607 F. Supp. 2d 447 (S.D.N.Y. 2009)...................................................................................21

*Lagemann v. Spence*,
  2020 WL 5754800 (S.D.N.Y. May 18, 2020) .......................................................................18

*Lara v. Port Auth. of N.Y. & N.J.*,
  2023 WL 2185853 (S.D.N.Y. Feb. 23, 2023)...................................................................10, 11

*Marks v. N.Y. Univ.*,
  61 F. Supp. 2d 81 (S.D.N.Y. 1999) .......................................................................................13

*McEssy v. Gray*,
  2019 WL 6829053 (N.D.N.Y. Dec. 13, 2019)........................................................................23

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007)...................................................................................................16

*Nexpoint Diversified Real Est. Tr. v. ACIS Cap. Mgmt. LP*,
  80 F.4th 413 (2d Cir. 2023) ...................................................................................................25

*Oldcastle Precast, Inc. v. United States Fid. & Guar. Co.*, 458 F. Supp. 2d 131 (S.D.N.Y.
  2006) .....................................................................................................................................15

*Rapillo v. Fingerhut*,
  2016 WL 11705140 (S.D.N.Y. Sept. 14, 2016)................................................................23, 24

*Schupak Grp. v. Travelers Cas. & Sur. Co. of Am.*, 716 F. Supp. 2d 262 (S.D.N.Y. 2010)  ........15

*SEC v. LaGuardia*,
  2023 WL 4266014 (S.D.N.Y. June 29, 2023) .......................................................................25

*Securities and Exchange Comm'n v. Knight*,
  No. 23-cv-641, ECF No. 1 (N.D. Tex. Mar. 23, 2023)...........................................................22

*Subramanian v. Lupin Inc.*,
   2020 WL 7029273 (S.D.N.Y. Aug. 21, 2020) (*report and recommendation adopted*,
   2020 WL 6075523 (S.D.N.Y. Oct. 15, 2020))..........................................................................20

*Taylor v. City of N.Y.*,
   2022 WL 744037 (S.D.N.Y. Mar. 11, 2022) ........................................................................11

*Wm. Passalacqua Builders v. Resnick Developers S.*,
   933 F.2d 131 (2d Cir. 1991)................................................................................................12

**RULES**

Fed. R. Civ. P. 56(a) ...............................................................................................................11

**STATUTES**

15 U.S.C. § 80b-2 ...................................................................................................................24

15 U.S.C. § 80b-6 ...................................................................................................................24

## PRELIMINARY STATEMENT

This is a case of a clear-cut Ponzi scheme orchestrated by Defendant Alan J. Hanke ("Hanke"), with the assistance of a group of confederates who helped adorn Hanke's misrepresentations with a veneer of legitimacy to defraud Plaintiff of $6.5 million. The extensive record reveals that Hanke, a career pilot and restaurant employee, became involved in a series of failed business endeavors and get-rich-quick schemes beginning in the late 1990s. After a number of his entrepreneurial efforts foundered (and often spawned litigation, as well as a personal bankruptcy), Hanke decided to style himself an investment advisor and promoter and incorporated Defendant IOLO Global LLC ("IOLO")[1] in Wyoming in 2016. Using IOLO as an investment vehicle, Hanke began raising funds from investors for placement into a variety of trading schemes. These schemes largely failed.

Hanke found a potential lifeline in early 2019 when, following an introduction by Defendant Laura Romeo ("Romeo"), he met an individual whom Plaintiff had hired to source potential wealth-enhancement transactions for the purpose of funding Plaintiff's charitable endeavors. Hanke misrepresented himself and IOLO from the start, claiming to be a seasoned investment professional with a track record of generating returns for clients through safe, high-quality trading programs. In these initial meetings, Hanke also represented that Plaintiff's funds would be fully insured by a syndicate of highly rated surety companies and further protected by the involvement of a disinterested attorney, who would act as the escrow agent for Plaintiff's deposit. On the basis of these misrepresentations, Plaintiff invested $3 million with IOLO in March 2019.

---

[1] IOLO is a corporate entity that has been unrepresented since the withdrawal of its (and Hanke's) former counsel, and is accordingly in default. IOLO's default will be the subject of a forthcoming motion for default judgment.

IOLO breached almost immediately by failing to procure surety bonds as required by the contract; instead of procuring highly rated surety bonds, Hanke purchased (using funds invested by Plaintiff) bonds issued by Defendants Subgallagher Investment Trust ("SGIT")[2] and Sherry Sims ("Sims"), his co-conspirator. These bonds were worthless, as Sims well knew, and failed to protect Plaintiff's investment when IOLO subsequently defaulted on its payment obligations. The same cycle repeated itself prior to and following Plaintiff's second investment of $3.5 million in July 2019.

In the weeks following Plaintiff's two cash infusions, Hanke immediately dissipated Plaintiff's funds amongst himself, a large group of cronies related to Plaintiff's investment, and other IOLO investors. The few "investments" that he did make with Plaintiff's funds were borderline farcical and included, *inter alia*, the purchase of a non-functioning bank in the Gambia and a private aircraft for Hanke to use in a charter operation that (quite literally) never got off the ground. In the largest investment, Hanke invested in a stand-by letter of credit ("SBLC") transaction purportedly involving the China Development Fund and a trading entity known as Hagoth. Pursuant to that transaction (the "CDF SBLC"), Hanke caused $1 million of Plaintiff's funds to be transferred not to CDF, but to an individual in Asia named Y.T. Lee. Hanke transferred the funds pursuant to a loan, organized by Defendant Amy Roy-Haeger ("Roy-Heger"), from IOLO to a Hong-Kong-based Australian national (Craig Hubner) who (as they knew) used an alias in his business dealings. At bottom, Hanke and his co-conspirators dissipated Plaintiff's funds while launching a handful of Hail Mary investments, none of which generated any returns. Unsurprisingly, each purported investment disappeared entirely; IOLO never produced a single dollar in returns to Plaintiff.

---

[2] SGIT is a corporate entity that is unrepresented by counsel and is accordingly in default. SGIT's default will be the subject of an upcoming motion for default judgment.

Throughout this period of systematic misuse of Plaintiff's investments, Hanke and Roy-Haeger offered Plaintiff a stream of misrepresentations and excuses that they had no basis to believe to be true, and knew to be false.  The money was always coming next week, next month, until it did not—and Hanke (sometimes with the help of Roy-Haeger) had to come up with a new lie.  Plaintiff brought this suit to remedy the clear breaches and fraud and, for the reasons explained herein, the record could not be clearer.  Plaintiff is entitled to judgment as a matter of law on each of the counts described below.

## **FACTUAL BACKGROUND**

In early 2019, Plaintiff sought investment opportunities to generate funds for charitable use in his home country.  Samuel Miginnis, one of Plaintiff's U.S.-based investment advisors, was introduced to Hanke in January 2019 by Romeo, a purported broker and acquaintance of both Hanke and Miginnis, to discuss potential wealth enhancement options for Plaintiff.  Plaintiff's Statement of Undisputed Material Facts ("SUF") ¶ 16.  Miginnis and Hanke met in New York City twice in early 2019l—on January 9 and February 11—the latter of which included Stellios ("Steve") Papi, another advisor to Plaintiff.  SUF ¶¶ 17-19.  During these meetings, Hanke made several misrepresentations designed to induce Plaintiff's investment, including that: (1) Hanke and IOLO were seasoned investment professionals with a track record of generating profits for clients like Plaintiff; (2) Plaintiff's funds would be used in "trade programs," i.e., invested in financial instruments; and (3) Plaintiff's investments would be protected by highly rated surety bonds and by the use of an escrow account overseen by Sidney Mills Rogers ("Rogers"), an attorney in Georgia, and business partner of Hanke.  SUF ¶¶ 17-20.  At no point did Hanke, or for that matter Rogers, disclose that they jointly shared investment ideas since 2017.  SUF ¶ 21.

3

None of these representations turned out to be true.   Hanke has no professional or educational background in finance or investment management; he went to school for aircraft maintenance and primarily worked in the restaurant industry before involving himself in a wide variety of failed investment schemes and entrepreneurial endeavors.   SUF ¶¶ 1-3.   IOLO had no "trading program" in the traditional sense, but rather it solicited funds to be used for something Hanke called the "platform."   With the benefit of discovery, the "platform" was another way of saying that Hanke believed he was entitled to use the funds as he saw fit.

In that regard, Hanke used Plaintiff's funds to (1) pay out undisclosed and improper fees and "commissions" to a wide variety of individuals, including Hanke himself, Romeo and Defendant Sherry Sims, and additional individuals and entities bearing no connection to Plaintiff's investments; (2) repay IOLO investors who had demanded a return of their investments; and (3) place large sums of money into a handful of highly speculative and undisclosed private "investments" with no real due diligence, all of which have failed to generate a dollar in returns to Plaintiff.   SUF ¶¶ 28-36; 51-63; 76-95.   To induce these investments, Hanke and Sims schemed to provide the assurance of worthless surety bonds, knowing that the bonds were not secured by any real assets.   SUF ¶¶ 6-10.   Roy-Haeger and Hanke are business partners who, since 2018, had been coordinating on any number of financial schemes.   SUF ¶¶ 12-15.   Roy-Haeger played a key role in sourcing deals for Hanke, and was part of the CDF SBLC and other failed investments.   *Id.*

## I.     The March MDA

In March 2019, Plaintiff and Hanke (acting on behalf of IOLO) entered into the first Management and Deposit Agreement (the "March MDA") governing Plaintiff's investment in IOLO's trading platform.   The March MDA represented that IOLO had "specific experience in areas of finance, funding, and investments available for contribution" and would act "on behalf of [Plaintiff] . . . in a fiduciary capacity."   SUF ¶ 22.   Plaintiff was required deposit $3 million into

4

Rogers' escrow account. *Id.*  IOLO had two primary obligations: (1) insure Plaintiff's deposit in full through "a private deposit Surety [], issued by a syndication of Surety companies, each rated 'A' or better by AM Best" within five days of execution of the escrow agreement; and (2) "place the Assets into one or more asset enhancement transactions [] to be structured for [Plaintiff] by IOLO, to produce the desired funding." *Id.*  The "desired funding" was an initial payment to Plaintiff of $2.4 million within 50 days of release of the deposit from escrow, followed by eleven consecutive payments of $2.4 million every twenty days for a total return to Plaintiff of $28.8 million. *Id.*

Pursuant to the terms of the March MDA, Plaintiff wired $3 million into Rogers' IOLTA account on March 27, 2019.  SUF ¶ 24.  On April 4, 2019, Hanke obtained a $3 million surety bond through Sims and SGIT to insure Plaintiff's deposit against loss.  SUF ¶ 25.  SGIT was not rated "A" or better by AM Best (as required by the March MDA), and Hanke conducted no diligence as to SGIT's credit ratings or the assets backing the surety bond.  SUF ¶ 26.  Between March 27, 2019 and April 19, 2019, Hanke directed Rogers to disburse Plaintiff's entire deposit.  SUF ¶ 28-36.  While portions of these disbursements went to certain highly speculative and un-diligenced investments (discussed below), more than $750,000 was wired to Hanke himself, his associates, and investors in IOLO who had become fed up with Hanke's prevarications. *Id.*

IOLO defaulted on its first payment due under the March MDA on June 20, 2019.  SUF ¶ 37.  Through a series of meetings with Plaintiff's representatives and excuses for the delays in payment, Hanke induced Plaintiff to enter into the First Addendum to the March MDA on June 21, 2019.  SUF ¶ 38-40.  The First Addendum rolled IOLO's $2.4 million initial payment obligation into Plaintiff's $3 million deposit, increasing Plaintiff's total investment to $5.4 million in exchange for an extension of time for IOLO to make its required payments.  SUF ¶ 40.  The

5

First Addendum increased the amount of the required periodic payments to $4.32 million, for a total promised return to Plaintiff of $47.5 million, and also required IOLO to obtain a new surety bond to protect the increased amount on deposit.  *Id.*  And while IOLO procured an additional $2.4 million surety bond from SGIT and Sims on July 25, 2019, that bond also did not comply with the requirements of the March MDA.  SUF ¶ 44.

When IOLO again failed to make the initial payment required by the First Addendum, Hanke induced Plaintiff to execute a Second Addendum on July 25, 2019, in exchange for additional time to comply with the contacts.  SUF ¶ 45.  The Second Addendum rolled the First Addendum's $4.32 million initial payment into Plaintiff's funds on deposit (for a total of $9.72 million invested) and required IOLO to make ten consecutive payments of $7.776 million at twenty-day intervals (for a total return to Plaintiff of $77.76 million).  *Id.*  The Second Addendum also required IOLO to obtain an additional surety bond to cover the newly invested $4.32 million, but IOLO never obtained that surety bond.  *Id.*

## II.     The July MDA

In or around this same time, Hanke assured Plaintiff that the payment of the original investments was imminent, and based on his promises, Hanke solicited and induced an additional investment from Plaintiff, resulting in the execution of a new MDA on July 29, 2019 (the "July MDA").  SUF ¶ 46-49.  The July MDA was structured as a short-term investment, with Plaintiff depositing $3.5 million in exchange for a return of $10.5 million within 45 days of release of Plaintiff's funds from escrow.  SUF ¶ 49.  As with the March MDA, IOLO was required to insure Plaintiff's entire deposit through "private deposit Surety [], issued by a syndication of Surety companies, each rated 'A' or better by AM Best."  *Id.*

Plaintiff wired $3.5 million to Rogers' IOLTA account on August 8, 2019.  SUF ¶ 50. IOLO and Hanke obtained a $3.5 million surety bond from SGIT and Sims, but Hanke again did

no diligence and failed to confirm that SGIT was properly rated, as required under the July MDA. At the same time, Sims was aware that the surety bond was issued to induce another significant investment from Plaintiff, yet she never disclosed that the bonds were worthless and provided no protection against the risk of loss.  SUF ¶ 119-121.

Instead, Hanke immediately instructed Rogers to disburse the entirety of Plaintiff's funds in much the same manner as the first tranche of $3 million.  SUF ¶ 51-63.  The recipients of Plaintiff's funds between August 8, 2019 and September 4, 2019 included, among other people and entities: (1) approximately $1 million in total to two former investors in IOLO as a return of their investments; (2) approximately $700,000 to Hanke's personal account for undisclosed reasons; and (3) approximately $215,000 to a group of Hanke's associates whose involvement in Plaintiff's investment and entitlement to commissions were never disclosed to Plaintiff.  *Id.*  In addition, in much the same way that Hanke used the initial $3 million, he caused IOLO to use the funds for to pre-existing and new, and equally speculative, "investments."

IOLO failed to make the payment due under the July MDA and Hanke offered a continuous stream of misrepresentations and excuses to induce Plaintiff to extend the terms of the MDA.  SUF ¶ 64-71.  On October 28, 2019, Plaintiff and Hanke (on behalf of IOLO) executed an Addendum to the July MDA increasing the total amount of Plaintiff's investment to $10.5 million in exchange for a payment of $22.5 million on February 7, 2020.  SUF ¶ 74.  IOLO was obligated to obtain a surety bond to cover this increase in Plaintiff's investment, but failed to do so.  In addition, in another effort to buy time, Hanke offered and executed a Third Addendum onto the March MDA. The Third Addendum contained the same surety requirements as the previous addenda, and Hanke again failed to obtain an additional surety bond to cover the increased deposit.  SUF ¶ 73.

III.     **Hanke's Misuse of Plaintiff's Funds**

Although Hanke represented that he was ready to place Plaintiff's funds in a financial trade program, he used Plaintiff's funds to (i) pay himself and his business associates; (ii) the repayment of investors who demanded a return on their investments; and (iii) a series of speculative and self-dealing ventures.  Indeed, it appears that Hanke often wired large sums of Plaintiff's money to individuals or corporations he had never interacted with or performed diligence upon, relying at times on introductions from others such as Roy-Haeger.  Without any basis, Hanke caused IOLO to use Plaintiff's funds as follows:

- By far the largest transaction was a scheme in which Hanke and/or IOLO, through Roy-Haeger, loaned $1 million to Craig Hubner, an individual based in Hong Kong who went by the alias "Carl Brown," for the purpose of an investment in the monetization of two SBLCs.  SUF ¶ 77.  Hanke and Roy-Haeger (acting on Hubner's behalf as his "Attorney in Fact") executed the Loan Agreement on March 28, 2019.  SUF ¶ 77.  Hanke believed that the China Development Bank was involved in this transaction and initially directed Rogers to wire $1 million to that institution, which promptly returned the payment.  SUF ¶ 78.  Hubner then requested that Hanke transfer the funds to an individual in Hong Kong named Y.T. Lee.  SUF ¶ 79.  After speaking with Lee once and conducting a brief internet search of his name, Hanke instructed Rogers to wire $1 million to Lee's personal bank account in Hong Kong.  SUF ¶ 80.  Hanke has never received proof that these funds were in fact invested in the monetization of any financial instruments, and IOLO has received no money in return from Hubner (aka Brown). SUF ¶ 81.

- Approximately $250,000 was transferred for the purchase of Metro States Capital Bank ("Metro States"), a purported bank registered in the Gambia and sold to IOLO by an unnamed individual in Europe.  SUF ¶¶ 82-83.  Metro States was not authorized to do business in the United States, had no employees or managers other than Hanke himself, and has not provided any banking services or generated any revenue during the period of IOLO's ownership. SUF ¶ 83. Hanke used Metro States to generate fictitious account statements and email messages as a last-ditch effort to create the impression that certain investments were performing and to cause Plaintiff to believe the investment would pay out imminently.  SUF ¶¶ 114-115.

- $225,000 transferred to Ekeko Holdings, a Dubai corporation controlled by an individual in Argentina, purportedly for investment in an SBLC held at HSBC in Dubai.  Hanke did no diligence on Ekeko and never received proof that the funds were invested as intended. SUF ¶ 84-85.

- $600,000 in the form of a loan to an individual named John Porter, introduced to Hanke by Roy-Haeger, purportedly for investment in a gold mining operation in the southwestern United States.  Hanke performed no diligence on Porter or the supposed gold mine.  SUF ¶¶ 86-88.

- A $500,000 equity investment in Affinity Financial Networks ("Affinity"), a purported startup based in Denver, Colorado.  Hanke intended to invest a total of $3 million; when he failed to complete the investment, Affinity canceled the contract and did not return the initial payment.  SUF ¶ 89.

- $28,000 transferred to International Global Development ("IGD"), a Florida corporation that purportedly would invest the funds in the delivery of an SBLC or bank guarantee and return $5 million to IOLO.  Hanke does not know if the purported instrument was ever issued, or even which financial institution was supposed to have done so.  SUF ¶ 90.

- $440,000 invested in a "managed leverage program" with an individual named John Cannon, whom Hanke had never met but expected to generate $40 million in profits to IOLO within 45 days.  Hanke performed no diligence on Cannon beyond a basic internet search.  SUF ¶ 91.

- $37,000 transferred to Connect Miami LLC, purportedly to facilitate the transfer of bonds held by a Brazilian national whom Hanke knew only as "Senor Bento" in exchange for $1.8 million.  SUF ¶ 92.

- A $200,000 equity investment in aCARDIOz, a wearable technology startup that has not brought a product to market or generated any revenue to date.  SUF ¶ 93.

- Between $120,000 and $150,000 to subsidize the operating expenses of Vortex Environmental, a waste-energy startup based in Florida that has generated no revenue, in exchange for a 25% equity stake.  SUF ¶ 94.

- $295,000 for the purchase of a small aircraft for use in a charter operation to be managed by Hanke through Alan Air, a corporation he controlled.  Hanke spent an additional $100,000 on maintenance for the aircraft and later sold the plane for $150,000, retaining the proceeds.  SUF ¶ 95.

Unsurprisingly, these facially implausible "investments" have yielded zero returns for IOLO or Plaintiff.  SUF ¶ 76.

## IV.    Hanke's Pattern of Misrepresentations and Concealment

After IOLO's initial default, Hanke continuously misrepresented to Plaintiff and his advisors in multiple emails and texts that Plaintiff's investment was safe and would perform

despite having no basis to believe his own statements.  In June, July, and August of 2019, for example, Hanke misrepresented to Plaintiff's advisors on multiple occasions that Plaintiff's investment was "on track" and IOLO would make payments to Plaintiff in short order; Hanke had no independent basis to believe that these statements were true, and no payments were ever made. SUF ¶¶ 39, 43, 65-68.  On other occasions, Hanke and his co-conspirators actively misled Plaintiff in an effort to conceal the fraud.  On August 1, 2019, for example, Roy-Haeger represented that she was the Head of Compliance for the trade group associated with the supposed SBLC transaction in Hong Kong, when in fact she was not.  SUF ¶ 64.  And in February 2020, Hanke forwarded to Plaintiff's representatives an email from "admin@metrostatescapitalbank.com" stating that "Our corresponding bank, HSBC London, has informed us that your payment is being processed."  SUF ¶ 114.  Metro States was, of course, a bank registered in Gambia  and purchased by Hanke with Plaintiff's funds.  The bank was wholly owned and operated by Hanke himself, with no other employees or managers.  SUF ¶ 115.  The email message was entirely fictitious.  No payment was ever made to or from Metro States, and Hanke never spoke to anyone at "HSBC London" regarding this supposed payment.  SUF ¶ 115-116.  On another occasion, Hanke showed Plaintiff's advisors a screen shot of a bank account showing a large account balance.  SUF ¶¶ 106-107.

Ultimately, it became clear that IOLO and Hanke would never perform under the March or July MDAs, and that SGIT and Sims were similarly unable to make Plaintiff's investment whole pursuant to the worthless surety bonds issued on Plaintiff's behalf.  This action followed.

## LEGAL STANDARD

"Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Lara v. Port*

*Auth. of N.Y. & N.J.*, 2023 WL 2185853, at \*2 (S.D.N.Y. Feb. 23, 2023) (citing Fed. R. Civ. P. 56(a)).  Unless the "evidence is such that a reasonable jury could return a verdict for the non-moving party," there is no genuine dispute as to any material fact.  *Jianjun Chen v. 2425 Broadway Chao Rest., LLC*, 2019 WL 1244291, at \*4 (S.D.N.Y. Mar. 18, 2019).  When the moving party meets its initial burden, "the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial using affidavits or other evidence in the record, and cannot rely on the mere allegations or denials contained in the pleadings."  *Taylor v. City of N.Y.*, 2022 WL 744037, at \*6 (S.D.N.Y. Mar. 11, 2022) (internal quotations omitted).  And while the Court must resolve all ambiguities in favor of the non-moving party, "the court should not accord the nonmoving party the benefit of unreasonable inferences, or inferences at war with undisputed facts."  *Id.* at \*7.

## ARGUMENT

**I.    There is No Genuine Issue As to Any Material Fact That IOLO Is Hanke's Alter Ego, And That IOLO Breached the March and July MDAs (Counts I and II)**

### A.    IOLO is Hanke's Alter Ego

"Under New York law, a party seeking to pierce the corporate veil must show that (1) the alleged alter ego exercised complete domination over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil."  *Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers Union Local 361 v. McNulty*, No. 20-CV-4979, 2023 WL 5747345 at \*9 (S.D.N.Y. Sep. 6, 2023).  Factors to consider when determining whether there is complete domination over the corporation include an "absence of formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, the issuance of stock, election of directors, keeping of corporate records," inadequate capitalization, use of company funds for personal purposes, and "common or shared addresses, phone numbers, or other forms of communication."  *Wm.*

11

*Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131 (2d Cir. 1991).  There is no set rule as to how many of these factors need to be present to find corporate domination, as the court will look to the specific context of the case to achieve an equitable result.  *Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC,* No. 07CV6665, 2009 WL 1803458 (S.D.N.Y. June 23, 2009) (finding an absence of corporate formalities such as lacking any documentation on corporate formation or positions, inadequate capitalization, overlap in ownership, and common office space and equipment sufficient to pierce the corporate veil); *Balmer v. 1716 Realty LLC*, No. 05 CV 839, 2008 WL 2047888, at *4 (E.D.N.Y. May 9, 2008) (finding common owners, corporate informality, inadequate capitalization, and shared information such as office spaces, addresses, and phone numbers to be sufficient to pierce the corporate veil).

The record demonstrates that Hanke exercised complete domination over IOLO and treated the corporate entity as his alter ego.  Hanke testified that he was the sole owner, manager, and employee of IOLO, and that he made all management decisions on behalf of IOLO.  SUF ¶ 3.  Hanke further admitted that IOLO had no board of directors, no shareholders, no financial statements, and no office or business address other than Hanke's home in Illinois (despite the fact that IOLO was incorporated in Wyoming).  *Id.*  And while IOLO had its own bank account for a brief period of time, none of Plaintiff's funds deposited into Rogers' IOLTA account were transferred to IOLO; instead, as Rogers' transaction ledger reveals, Hanke directed Rogers to transfer Plaintiff's funds either directly to third parties or into Hanke's own bank account.  SUF ¶¶ 28-36; 51-63.  Hanke further admitted that whenever he incurred expenses in connection with IOLO's business, he used his personal funds to do so, and did not seek reimbursement from IOLO.  SUF ¶ 3.  On this record, there can be no reasonable dispute that Hanke so dominated IOLO that

he must be considered the alter ego of the entity. *See Balmer*, 2008 WL2047888; *Atateks Foreign Trade*, 2009 WL 1803458.

## B.    IOLO Breached the March and July MDAs

To recover for breach of contract under New York law, Plaintiff must show "(1) the existence [of] a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages resulting from the breach." *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999). Hanke does not dispute that he (acting on behalf of IOLO) entered into a valid contract with Plaintiff through the execution of the March and July MDAs, or that Plaintiff performed under both contracts by depositing funds into Rogers' IOLTA account for investment by IOLO. SUF ¶¶ 22, 24, 49-50. There can also be no dispute that IOLO breached both the March MDA and July MDA in identical ways.

*First*, nothing in the record demonstrates that IOLO obtained deposit insurance meeting the requirements set forth in the MDAs. Both contracts required IOLO to insure Plaintiff's deposit in full through "a private deposit Surety [], issued by a syndication of Surety companies, each rated 'A' or better by AM Best" within five days of the execution of the Escrow Agreement." SUF ¶¶ 22, 49. While IOLO procured surety bonds from SGIT in connection with Plaintiff's initial deposit for both the March and July MDAs, these bonds were (by Hanke's admission under oath) not "rated 'A' or better by AM Best." SUF ¶ 26. In fact, Hanke testified that he did not know whether surety bonds had been rated at all when he procured them, including the one bond insured with the First Addendum to the March MDA. *Id.*

*Second*, IOLO failed to provide any bond in connection with the Second Addendum and Third Addendum to the March MDA. And in any event, the bonds were worthless; and therefore, could not satisfy the conditions in the MDA. *See supra* pp. 4, 6.

13

*Third*, Hanke has admitted that IOLO failed to make the payments to Plaintiff required by the two MDAs—indeed, IOLO made no payments at all under either contract, and Plaintiff suffered a total loss of his investment.  SUF ¶¶ 37, 41, 45, 67, 75.  Apart from certain commissions paid to Plaintiff's representatives, Plaintiff has received zero of the approximately $134 million that IOLO promised to provide through its purported wealth enhancement program.  *Id.*

These are clear breaches of IOLO's obligations under the MDAs and the Addenda thereto, and no reasonable juror could conclude otherwise.  Plaintiff's damages stemming from these breaches are equally clear.  With respect to the breach of the surety provisions, the sole purpose of the deposit surety was to insure Plaintiff's "entire Deposit."  SUF ¶ 22.  This protection from risk of loss was central to Hanke's inducement of Plaintiff's investment, and the failure to obtain properly rated deposit insurance was a cause of Plaintiff's loss.  SUF ¶¶ 118-119.  The bonds issued by SGIT were worthless, and SGIT was unable to meet its payment obligations when Plaintiff called the bonds following Hanke's default.  *Id.*  Similarly, IOLO's failure to meet its clear payment obligations under the MDAs and their Addenda caused damages in the form of the loss of the investment returns that Plaintiff contracted for.  Where, as here, contract damages beyond simple restitution are "provable with reasonable certainty" and "were within the contemplation of the parties at the time of the contract," they are recoverable as expectation damages.  *Jacobs v. Maza*, 2023 WL 5680180, at *11 (E.D.N.Y. Aug. 18, 2023) (quoting *Atias v. Sedrish*, 133 F. App'x 759, 760 (2d Cir. 2005)).  IOLO agreed to pay Plaintiff sums certain on particular dates and to backstop Plaintiff's investment in full via the surety bonds.  Accordingly, IOLO (and Hanke, as IOLO's alter ego) are liable in the full amount of the returns contemplated by the March and July MDAs, as well as the Addenda.  *See Ashland Mgmt. v. Janien*, 604 N.Y.S.2d 912, 915 (1993).

## II.   The Record Is Clear That SGIT Breached the Surety Bonds, and That Sims, As The Alter Ego of SGIT is Liable for Damages (Count III)

Under New York law, breach of a surety bond is a breach of contract claim.  *See, e.g., Oldcastle Precast, Inc. v. United States Fid. & Guar. Co.*, 458 F. Supp. 2d 131 (S.D.N.Y. 2006); *Schupak Grp. v. Travelers Cas. & Sur. Co. of Am.*, 716 F. Supp. 2d 262 (S.D.N.Y. 2010).  It is incontrovertible that SGIT breached the surety bonds.  Plaintiff, IOLO and SGIT entered into the Bonds, which provided for payment of the bond amount if IOLO breached the MDAs.  SUF ¶ 25. Plaintiff fulfilled all of its obligations under the Bonds by calling the Bonds and noting IOLO's default on the MDA's.  SUF ¶ 118.

Sims is liable for all of SGIT's breaches because SGIT is Sims's alter ego and the formalities of a trust are not being respected.  To pierce the veil of a corporate trust, "the Second Circuit has assumed that New York courts would allow the veil of a trust to be pierced in situations where the complete domination of a trust has been shown. To make such a showing, [Plaintiff] must establish that (1) the owner of the Trust exercised such control that the Trust had become a mere instrumentality of the owner; (2) the owner used this control to commit a fraud or 'other wrong'; and (3) the fraud or wrong resulted in injury or loss."  *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 91-92 (2d Cir. 2003).

The record evidence demonstrates that SGIT and Sims are one in the same.  Sims ran the business of SGIT from her home.  SUF ¶ 7.  SGIT had no office and no business address other than a post office box in Texas.  *Id.*.  SGIT had only one email account, with Sims the only user of that account as of 2019 when she conducted SGIT business, in part, from her personal phone. After Sims's business partner, Larry Wright, departed SGIT in late 2017 / early 2018, Sims was the only remaining businessperson left to operate SGIT.  SUF ¶¶ 7-8.  It was her company, and she personally benefitted from the issuance of these bonds.  SUF ¶ 119.  Indeed, Moore testified

15

in a separate litigation bearing stark similarities to this case that she lacked a complete understanding of what a surety bond or guaranty was, did not maintain SGIT's seal, and did not speak to the people seeking bonds from SGIT, because "Sherry takes care of all that." SUF ¶¶ 120-121. Moore also signed whatever Sims gave to her and had no knowledge of whether SGIT had assets to back its bonds. *Id.* Under these circumstances, there can be no question that the Court can pierce the SGIT veil. *See Babitt,* 332 F.3d 85, 91-92.

### III. There Is No Genuine Issue As To Any Material Fact Concerning Defendants' Fraud and Fraudulent Inducement (Counts IV and V)

Under New York law, fraud requires a showing that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied on the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996). Similarly, misrepresentations of "present fact, not contractual promises regarding prospective performance," give rise to claims of fraudulent inducement. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181-82 (2d Cir. 2007). The undisputed facts show that Hanke and Roy-Haeger made consistent materially false representations to Plaintiff in order to induce his investment in (or extension of) the March and July MDAs, perpetuated fraud through active concealment, and ultimately misappropriate large portions of Plaintiff's funds for the benefit of themselves and their associates.

#### A. Hanke's Fraudulent Misrepresentations

The factual record demonstrates that from the outset of Hanke's relationship with Plaintiff to the filing of the instant suit, Hanke has made a series of knowing misrepresentations designed to induce Plaintiff's investments and to conceal and extend his fraud once he and IOLO defaulted on their obligations under the March and July MDAs. During meetings with Plaintiff's

16

representatives prior to the execution of the March MDA, Hanke presented a variety of wealth enhancement program options for Plaintiff and represented that he had a track record of generating returns for IOLO's investment clients.  SUF ¶¶ 17,19.  Hanke showed Plaintiff's representatives account statements that purportedly proved that he had generated returns for prior investors, yet failed to disclose that his investors were seeking a return of their funds.  *Id.*  He also represented that Plaintiff's deposit would be protected by the involvement of Rogers as escrow agent and surety bonds that IOLO would procure, yet failed to disclose his extensive dealings with Rogers, Roy-Haeger, and Romeo on unrelated investment schemes or the fact that the bonds that he intended to purchase would (1) be paid for from Plaintiff's funds and (2) be utterly worthless.  SUF ¶¶ 20-21.  There is no question that these representations were false when made, as Hanke in fact was seeking Plaintiff's investment in part to repay prior investment clients who had demanded a return of their funds.

Hanke also represented, both to Plaintiff's representatives and in the March and July MDAs themselves, that Plaintiff's funds would be invested in asset enhancement programs to produce the promised returns.  SUF ¶¶ 17, 19, 22, 49.  In fact, a substantial percentage of Plaintiff's funds went directly into the pockets of Hanke, his associates and business partners or promoters on other deals, Romeo, Sims, and IOLO's aggrieved former investors.  SUF ¶¶ 28-36, 51-63.  Hanke failed to disclose any of these so-called payments and "commissions" to Plaintiff, nor that Plaintiff's funds would be used to repay prior investors who had sought a return of their own funds.  Moreover, Hanke failed to disclose at any point prior to the March and July MDAs that he was using the Plaintiff's funds (i) for majority and minority positions in other private companies, or (ii) for highly speculative financial investments issued by shady banks through foreign nationals who Hanke did not know.  Where an investment advisor offers "entirely baseless" representations regarding his

background and intended use of funds that are "designed to induce [plaintiff's] reliance" and investment, the advisor is liable in fraud. *Lagemann v. Spence*, 2020 WL 5754800, at *8 (S.D.N.Y. May 18, 2020) (*report and recommendation adopted*, 2020 WL 7384009 (S.D.N.Y. Dec. 16, 2020).

As evidenced by the extensive correspondence in the record, upon IOLO's default on its payment obligations under the March and July MDAs, Hanke repeatedly represented to Plaintiff that his investments were performing and payment was imminent. Several examples (among dozens) include: On July 19, 2019, Hanke claimed that the delay in payment was "due in part to an accounting error" but that Plaintiff's investment was "back on track" and payment would be released within a few days. SUF ¶ 43. This is clearly relating to the investment in the CDF SBLC. One month later, Hanke again represented that IOLO's payments would be delayed due to external factors—this time the Muslim holidays and "continued unrest in Hong Kong"—but that "[a]ll subsequent payments will continue on the first Friday of every month moving forward." SUF ¶ 68. Less than a month after that misrepresentation, Hanke told Plaintiff's representatives that "your transaction funds have already begun to arrive at the paymaster for distribution" and that the payment would be "completed on Friday." SUF ¶ 70. And on March 3, 2020, Hanke forwarded to Plaintiff's representatives an email from Metro States Capital Bank in which a bank "admin" account informs Hanke that "HSBC London[] has informed us that your payment is being processed" and "will be made to your designated account once it is completed." SUF ¶ 114. Hanke admitted that he was the sole owner, manager, and employee of Metro States, but never disclosed to Plaintiff that his funds had been used to purchase the bank. SUF ¶ 115. Indeed, there is no evidence in the record that HSBC London was involved in the monetization of the CDF SBLC, or any other transaction for that matter. Rather, the record demonstrates a shell game of references to

banks in Hong Kong, Dubai, Macau and other non-Western havens.  The only conclusion that a reasonable juror could draw is that Hanke sent this email from the Metro States "admin" account to himself (or directed that it be sent to him) for the purpose of deceiving Plaintiff into believing that he would be receiving a distribution from his IOLO investment in short order.

No payments were ever made to Plaintiff, however, and (as Hanke admits) he had no independent basis to believe that the statements discussed above were true when made.  SUF ¶¶ 43, 68, 114, 116.  Indeed, Hanke's correspondence with his co-conspirators shows that he did not believe that any of his purported "investments" would in fact generate returns that would satisfy IOLO's obligations under the MDAs.  For example, in response Roy-Haeger regarding the status of the CDF SBLC, on August 30, 2019, Hanke wrote "Amy.  With all respect none of that makes sense.  It's all excuses."  SUF ¶ 75.  Several days later he again expressed his belief that IOLO would not see any profits from this investment, writing "none of this is believable anymore. . . . I'm screwed."  *Id.*  During this same period, however, Hanke repeatedly assured Plaintiff that his investment was safe and full payment was imminent.  SUF ¶¶ 65, 68-70.  And in January 2020, during a period when Hanke continued to inform Plaintiff that the trading profits would arrive soon, Hanke exchanged text messages with Romeo about moving other investors' funds into "another group altogether that's paying just fine" so that these investors would "not have the same experience" as Plaintiff.  SUF ¶ 108.

Hanke's misrepresentations served dual purposes in furtherance of Hanke's fraud.  First, these statements concealed and extended the life of his scheme to defraud Plaintiff.  Second, Hanke was able to induce Plaintiff to both invest an additional $3.5 million in IOLO's so-called "trading program" and enter into multiple addenda to both the March and July MDAs.  *See Subramanian v. Lupin Inc.*, 2020 WL 7029273, at *12-13 (S.D.N.Y. Aug. 21, 2020) (representations of "present

fact . . . [that] induced [plaintiff] to enter into" an amended contract constituted fraud) (*report and recommendation adopted*, 2020 WL 6075523 (S.D.N.Y. Oct. 15, 2020)).   In light of the uncontroverted record of Hanke's clear misrepresentations, Plaintiff is entitled to judgment as a matter of law as to fraud and fraudulent inducement.

### B.       Roy-Haeger's Fraudulent Misrepresentations

Hanke's correspondence and the affidavit submitted by Samuel Miginnis, Plaintiff's representative, show that there is no dispute as to whether Roy-Haeger made a knowing misrepresentation to Plainitff regarding her role in IOLO's purported trading program and the likelihood that IOLO would perform.   On August 1, 2019, Roy-Haeger spoke to Plaintiff's representative on a call organized by Hanke to "provide an Al Thani transaction update with payment confirmation."   SUF ¶ 64.   During this call, Roy-Haeger claimed that she was the "head of compliance" for the "trade group" that was managing Plaintiff's investment and represented that the profits from Plaintiff's investments would be paid out in short order.   *Id.*   These representations were false when made, as Roy-Haeger knew.   At the time she made these statements, she was aware that the investment in the CDF SBLC was illusory.   SUF ¶ 66.   In fact, she was the person who engineered the investment with her connection, Craig Hubner.   SUF ¶¶ 13, 15.   Even though she had contact with Plaintiff's advisors, and was aware that Hanke was soliciting an additional $3.5 million, she never disclosed to them that the investment was at risk or was never real in the first place.   The refund shows clearly that (i) Roy-Haeger and Hanke were in regular communication about multiple business deals—in fact Hanke called Roy-Haeger his "trade partner"; (ii) Roy-Haeger was the point person for the CDF SBLC deal; and (iii) she was instrumental in the participation of fictitious letters to convince third parties that the CDF SBLC deal was real.   SUF ¶¶ 13, 15, 64, 99, 117.   Moreover, she sourced the deal with John Porter, pursuant to which Hanke invested $600,000 in the form of a loan to invest in a gold mine in the

20

Southwest.  SUF ¶¶ 13, 86.  If Hanke's fraud were uncovered, she would clearly be implicated. Roy-Haeger's statements were intended to conceal the fraudulent scheme by convincing Plaintiff that his funds had in fact been invested in the monetization of an SBLC through Roy-Haeger. Because there is no dispute that Roy-Haeger made knowing misrepresentations in order to induce Plaintiff's reliance, she is liable for fraud and fraudulent inducement as a matter of law.

**IV.    There Can Be No Dispute That Sims and Roy-Haeger Aided and Abetted Hanke's Fraud (Count VI)**

The record is clear that Sims and Roy-Haeger actively assisted Hanke in his scheme to defraud.  To establish a claim for aiding and abetting fraud, a plaintiff must show "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009).  There can be no dispute that Sims and Roy-Haeger both knew of Hanke's fraud and substantially assisted him in accomplishing it.

**A.    Knowledge of Hanke's Fraudulent Scheme**

To demonstrate knowledge by a "reasonable inference of actual knowledge."  *King County v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 448 (S.D.N.Y. 2013).  The record is replete with evidence and sworn testimony showing that Sims and Roy-Haeger unquestionably knew that Hanke and IOLO's purported "trading program" was nothing more than a scheme to defraud Plaintiff for their own benefit and for the benefit of Hanke's other associates and investors. In fact Sims and Roy-Haeger personally benefitted financially.

**B.    Substantial Assistance in Hanke's Fraudulent Scheme**

Substantial assistance in fraud exists "where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so, enables the fraud to proceed."  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).  The "critical test" for substantial

assistance "is not . . . whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005). Here, no reasonable juror could conclude that Sims and Roy-Haeger did not play critical roles in either effectuating or concealing Hanke's fraudulent scheme.

The surety bonds that Sims caused SGIT to issue to IOLO were critical to Hanke's fraudulent scheme, as Hanke claimed that Plaintiff's investment was fully insured in order to induce Plaintiff's investment. SUF ¶ 20. Sims testified that she understood that Hanke had purchased a $10 million "blanket" policy from SGIT in order to support "transactions he was working on," and subsequently Sims "would get an email stating [Hanke] needed this bond, [and] that bond would be printed and sent out." SUF ¶ 119. Yet as she admitted under oath, Sims herself had "no knowledge of surety, never been in surety, never did surety," but nonetheless wrote $6.5 million in surety bonds at Hanke's request to support his transaction with Plaintiff. SUF ¶ 8. She concedes that she had no understanding of whether the surety bonds were capable of insuring Plaintiff's funds, but issued them nonetheless in exchange for a 2.5% fee on the policy purchased by Hanke. SUF ¶ 119. The surety bonds that Sims issued to induce Plaintiff's investment were worthless,[3] and SGIT has not paid out despite Plaintiff calling the bonds. SUF ¶¶ 9, 118. Accordingly, there can be no dispute that Sims affirmatively assisted Hanke's scheme by providing worthless surety bonds to induce Plaintiff's investment in IOLO.

As discussed above, Roy-Haeger misrepresented herself as the head of compliance for a fictional "trade group" that was managing Plaintiff's investment on an August 1, 2019 call with

---

[3] Sims has been charged by the Securities and Exchange Commission with aiding and abetting a separate (but similar) Ponzi scheme through SGIT. *See* Complaint, *Securities and Exchange Comm'n v. Knight*, No. 23-cv-641, ECF No. 1 (N.D. Tex. Mar. 23, 2023). The SEC alleges that Sims "issu[ed] surety bonds through SGIT that investors relied upon when making their [] investments," but (as here) those bonds "proved to be worthless." *Id.* ¶¶ 94-95.

Plaintiff's representatives in which she and Hanke offered false assurances that Plaintiff's returns from IOLO's trading program were imminent.  SUF ¶ 64.  She held no such role.  Moreover, she was a key person overseeing deals for Hanke, and was personally involved in many transactions, not only with respect to Plaintiff's funds, but others as well.  She was part of direct communications with investors on facilitated false statements.

### V.    The Record Is Undisputed That Hanke, as IOLO's Alter Ego, Breached IOLO's Fiduciary Duties to Plaintiff and Aided and Abetted IOLO's Breach of its Fiduciary Duty (Counts VII and VIII)

A breach of fiduciary duty under New York Law necessitates "(1) the existence of a fiduciary duty between the parties, (2) the knowing breach of that duty by the defendant, and (3) damages suffered by plaintiff as a result of the breach." *Rapillo v. Fingerhut*, 2016 WL 11705140, at *19 (S.D.N.Y. Sept. 14, 2016).  Courts are clear that "[i]nvestment advisors owe a fiduciary duty to the clients they advise," *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 220 (S.D.N.Y. 2008), and misrepresenting the use of an investment client's funds is a clear breach of that fiduciary duty.  *See McEssy v. Gray*, 2019 WL 6829053, at *18 (N.D.N.Y. Dec. 13, 2019).

There is no dispute here that IOLO acted as Plaintiff's investment advisor and represented in its contracts with Plaintiff that it would do so "in a fiduciary capacity."  SUF ¶ 22.  The record is similarly clear that IOLO (acting through Hanke, its sole manager) breached that fiduciary duty in a number of ways.  Immediately after receiving Plaintiff's two deposits, Hanke directed the disbursement of a large percentage of Plaintiff's funds to himself, his business associates in the form of undisclosed and unexplained "commissions," and former investors in IOLO.  SUF ¶¶ 28-36, 51-63.  Also, he invested Plaintiff's funds in his own aviation company.  SUF ¶ 95.  And to the extent that Hanke did "invest" a portion of Plaintiff's funds (rather than distribute them to himself or third parties in the form of commissions and investment returns), he did so by blindly

23

wiring money to a series of investment vehicles on which he did little to no diligence, and which failed to return a single dollar to IOLO.  SUF ¶¶ 76-95.  There can be no dispute that IOLO repeatedly and thoroughly breached its fiduciary duty to Plaintiff.  And because, as explained *supra*, IOLO is Hanke's alter ego, Hanke is primarily liable for IOLO's breach.

Even if Hanke were not IOLO's alter ego, however, he is indisputably liable for aiding and abetting IOLO's breach of its fiduciary duty in his capacity as IOLO's sole owner and manager. A claim for aiding and abetting a breach of fiduciary duty requires only "(1) [a] breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in that breach; and (3) plaintiff suffered actual damages as a result of the breach."  *Rapillo*, 2016 WL 11705140, at *19; *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 721 (S.D.N.Y. 1990) (assisting in the preparation of investment solicitations and benefiting from fraud constitutes aiding and abetting a breach of fiduciary duties); *see supra* [pp. 11-12]

### VI. There Is No Genuine Dispute of Fact That Hanke's Conduct Violated Section 206 of the Investment Advisors Act

Finally, the record is clear that Hanke's conduct violated § 206 of the Investment Advisors Act, which makes it "unlawful for any investment advisor . . . to employ any device, scheme, or artifice to defraud any client . . . [or] to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  *SEC v. LaGuardia*, 2023 WL 4266014, at *5 (S.D.N.Y. June 29, 2023) (citing 15 U.S.C. § 80b-6).  The Act applies to "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."  *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 660 (S.D.N.Y. 2015) (citing 15 U.S.C. § 80b-2).

In conversations with Plaintiff and his advisors, as well as in the language of the March and July MDAs, Hanke held himself and IOLO out as investment advisors who would act as Plaintiff's fiduciaries in providing asset management and investment services.  SUF ¶¶ 17, 19. Hanke also raised money for IOLO from multiple investors for investment in private companies and financial instruments.  SUF ¶¶ 15, 76-95.  As discussed in detail above, he did so as part of a broad scheme to defraud Plaintiff of $6.5 million in order to enrich himself and pay back former IOLO investors.  As such, Plaintiff is entitled as a matter of law to the "limited private remedy" provided by § 215 of the Investment Advisors Act, *Nexpoint Diversified Real Est. Tr. v. ACIS Cap. Mgmt. LP*, 80 F.4th 413 (2d Cir. 2023), which voids the advisory contract and includes recission and restitution for the consideration provided in connection with the voided agreement.  *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 34 (S.D.N.Y. 2008).

## CONCLUSION

For the reasons set forth herein, the Court should grant Plaintiff's motion for summary judgment.

Dated: New York, New York
          October 23, 2023

ALSTON & BIRD LLP

*/s/ Michael C. Hefter*
Michael C. Hefter
Seth M. Cohen
Scott M. O'Brien
Morgan E. Meyer
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400
Michael.Hefter@alston.com
Seth.Cohen@alston.com
Scott.Obrien@alston.com
Morgan.Meyer@alston.com

*Counsel for Plaintiff Mohammed Thani A.T. Al Thani*