IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MOHAMMED THANI A.T. AL THANI,<br><br>                 Plaintiff,<br><br>vs.<br><br>ALAN J. HANKE, IOLO GLOBAL LLC, SIDNEY MILLS ROGERS III, LAURA ROMEO, AMY ROY-HAEGER, SUBGALLAGHER INVESTMENT TURST, SHERRY SIMS, AND JOHN DOES 1-100,<br><br>                 Defendant. | Case No. 1:20-CV-4765 (JPC)<br><br>**AFFIDAVIT OF SAMUEL MIGINNIS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

STATE OF NEW YORK     )
                                   ) ss:
COUNTY OF NEW YORK  )

      Samuel Miginnis, being duly sworn, deposes and states:

      1. I am the owner of Advanced Capital Resources Corp., an S-Corp that was created to introduce clients to lenders in the financial space to fund projects. Plaintiff Mohammed Thani A.T. Al Thani ("Plaintiff") became a client of Advanced Capital Resources in September 2018 when Plaintiff was seeking a means to enter a wealth enhancement program to fund various humanitarian efforts around the world.

      2. This affidavit is made on my personal knowledge of the facts and circumstances surrounding this case.

      3. On January 16, 2019, I met with Defendant Alan J. Hanke ("Hanke") at 30 Wall Street, New York, NY. The meeting was arranged on Wednesday, January 9th, 2019 by Hanke's introducing broker, Defendant Laura Romeo. At the meeting, Hanke stated that there were various investment programs available that provided a safe haven for Plaintiff's funds. I asked Hanke for

proof of payment from his other clients and their transactions. In person, at the meeting, he showed me bank statements which he claimed were payments made from these transactions he was, at the time, a part of. He stated that, on the bank statements he showed, the payments were from his attorney, as that is where all of his profits from these transactions were sent to and paid from. He gave several options for how to enter the program: a tear sheet program where Plaintiff was to have Citibank UK place his funds on reserve, a block program where Plaintiff was to block his funds within Citibank UK, and a third option of moving the funds to Hanke's attorney where Plaintiff would have insurance in the form of a surety covering his funds.

4. On February 11, 2019, I met with Hanke and Stellios Papi at 30 Wall Street, New York, NY. Prior to this meeting, I provided Mr. Papi with a summary of the meeting that I had with Hanke on January 16, 2019. Plaintiff then instructed Mr. Papi to meet with Hanke to discuss the same topics covered at the January 16, 2019 meeting. On February 11, Hanke laid out the options for Plaintiff to us once again: a tear sheet program where Plaintiff was to have Citibank UK place his funds on reserve, a block program where Plaintiff was to block his funds within Citibank UK, and a third option of moving the funds to Hanke's attorney where Plaintiff would have insurance in the form of a surety covering his funds. Hanke did not disclose that he had been involved in unrelated business dealings with the attorney whom he proposed as the escrow agent for Plaintiff's funds. He showed us the bank statements that he initially showed me, representing that the payments were from his attorney to clients on profits made from his previous/current clients' wealth enhancement programs. During this meeting, Hanke held himself out as an investment professional and provided similar documentation to prove his prior returns. He did not disclose his prior business failures nor any complaints from prior investors in IOLO. Hanke also did not

disclose that IOLO would invest Plaintiff's funds in private funds, as he described only investments in a managed buy/sell program for financial instruments.

5. On May 30, 2019, I had dinner with Hanke and Mr. Papi in New York City. Mr. Papi and I set up this meeting as a congratulatory dinner for a successful transaction, which we believed based on Hanke's surety bond coming in, the executed contract between Hanke and Plaintiff, the movement of Plaintiff's funds into Hanke's attorney's escrow, and the first tranche of profits scheduled to be paid out fifty banking days after the release of funds from escrow (as stated on Plaintiff's contract with Hanke). At the dinner, as per Plaintiff's request, Mr. Papi and I discussed compounding funds and future dealings stemming from the transaction so Plaintiff could reach the goals to fund his humanitarian projects in a more timely manner, which Hanke stated was acceptable.

6. Over time, I became concerned about the status of Plaintiff's investment because the legitimate commissions on the trading of Plaintiff's funds had not yet been paid. Because Plaintiff had rolled his profits (as Hanke represented them) back into the principal investment through the addenda that Plaintiff and IOLO entered into, the only way for me to know whether the trades were generating any returns would be for the intermediaries to be paid their commissions due following the execution of the trades.

7. On August 1, 2019, I participated in a phone call with Hanke and Defendant Amy Roy-Haeger ("Roy-Haeger") to discuss my concern with the status of Plaintiff's investment. As a means to smooth things over and explain the delay in payment, Hanke requested a group call with William Vincent, myself, him, and Roy-Haeger (whom he introduced as the head of compliance for the trade group handling Plaintiff's funds). Hanke and Roy-Haeger explained that the funds were on their way to pay the intermediaries and not to worry. They blamed the logistics in paying

off the projects associated with the overall profits generated before funds can be released. They also blamed an accounting problem, one which I still do not understand.

8. On September 20, 2019, Mr. Papi and I met with Hanke and Romeo in Chicago to discuss the status of Plaintiff's investment. Hanke arrived at the meeting in a new red car that he claimed he purchased from his profits on his trade transactions. Hanke and Romeo proceeded to discuss amongst themselves the purchase of a stand-by letter of credit for one of their other clients. Later in the meeting, Hanke stated to Mr. Papi and myself that these wealth enhancement programs have a tendency to shut down and stop paying out profits, and that it is best for a client to "get in and get out as quickly as possible." This was the first time Hanke expressed this concern to us.

9. On October 28, 2019, Mr. Papi, Plaintiff and I met with Hanke at the Ritz Carlton Hotel in New York City, where he presented us with two documents for Plaintiff to sign. At this point, we were overdue on payments for the Management and Deposit Agreement ("MDA") executed in March 2019 (the "March MDA"), and Plaintiff was owed an additional $10.5 million pursuant to the MDA executed in July 2019 (the "July MDA"). At the meeting, Hanke gave us an amendment for the July MDA, where $7.5M of the profits were to be rolled over into another program which would generate $22.5 Million in profits that were to be paid on February 7th, 2020 (which did not occur). The other document Alan gave us was the completed Addendum #3 for the March MDA.

10. On January 10, 2020, I met with Hanke and Mr. Papi in New York City. Plaintiff requested that Mr. Papi and I set this meeting because of Hanke's failure to meet his contractual obligations. Prior to the meeting, I requested that Hanke bring documentation to prove that the trading platform had generated returns and that Plaintiff would receive funds that week. This is when Hanke first mentioned that there was a problem with the trade account he was using at Standard Chartered in Dubai. He said he had backup plans where he would make the required payments to Plaintiff using

funds from other files he had been paid upon. In response to my request for documentation of such transfers being sent, he sent Mr. Papi pictures of two offline credit card transfers and subsequently showed us those pictures during our meeting. His explanation was that money derived from trade was placed on these credit cards and he would use them to make payment. He also showed us them in person on his phone. He told us that he would also be able to restart the trade and carry it out as intended through the monetization of another bank instrument he had in his possession. Hanke never mentioned this bank instrument again.

Dated: October 25, 2023
New York, New York

Samuel Miginnis

Sworn to before me this 25st d
Day of October 2023

Notary Public

SHERRYANN REEVES
Notary Public, State of New York
No. 01RE0007494
Qualified in Kings County
Commission Expires May 12, 20 24

5