# Exhibit 1

Page 492

```
1
2    UNITED STATES DISTRICT COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    - - - - - - - - - - - - - - - - - -x
                                        :
5    MOHAMMED THANI A.T. AL-THANI,      :
                                        : Case No.:
6                        Plaintiff,     : 20-cv-4765 (JPC)
                                        :
7           -against-                   :
                                        :
8    ALAN J. HANKE et al.,              :
                                        :
9                        Defendants.    :
                                        :
10   consolidated with                  :
                                        :
11   MARTIN JOHN STEVENS,               :
                                        : Case No.:
12                       Plaintiff,     : 20-cv-8181 (JPC)
                                        :
13          -against-                   :
                                        :
14   ALAN J. HANKE et al.,              :
                                        :
15                       Defendants.    :
     - - - - - - - - - - - - - - - - - -x
16
17
                          VOLUME II
18
19
20          Continued remote, videotaped deposition of ALAN
21   J. HANKE, taken pursuant to Notice, was held via videoconference,
22   commencing October 5, 2023, at 9:38 a.m. Central Time, on the
23   above date, before Amanda McCredo, a Court Reporter and Notary
24   Public in the State of New York.
25
```

Page 493

```
1
2  A P P E A R A N C E S: (via videoconference)
3  Appearing on behalf of Mohammed Thani A.T. Al-Thani:
4  MICHAEL HEFTER, ESQ.
   SCOTT O'BRIEN, ESQ.
5  Alston & Bird, LLP
   90 Park Avenue
6  15th Floor
   New York, New York 10016
7  michael.hefter@alston.com
   scott.obrien@alston.com
8  212.210.9400
9
10 Appearing on behalf of Martin John Stevens:
11 PHILIPP SMAYLOVSKY, ESQ.
   Chelney Law Group PLLC
12 28 Liberty Street
   6th Floor
13 New York, New York 10005
   philipp@chelneylaw.com
14 212.653.0022
15
16 Also Present:
17 Alan J. Hanke, pro se
18 Amy Roy-Haeger
19 Sherry Sims
20 Chelsea Gilchrist - videographer
21
22
23
24
25
```

Page 494

```
1
2              I N D E X
3  WITNESS        EXAMINATION BY         PAGE
4  Alan J. Hanke    Mr. Hefter        498
5
6              EXHIBITS
7  EXHIBIT                      PAGE
8  Exhibit 49   PLF00000587 through 588    626
9  Exhibit 49A  Managed Leveraging Program  626
10 Exhibit 50   PLF00000451 through 453    631
11 Exhibit 51   PLF00000935 through 941    638
12 Exhibit 52   PLF0000263          651
13 Exhibit 53   PLF00009673 native      652
14 Exhibit 54   RSM-A00002 through 012    663
15 Exhibit 55   PLF00001940 through 1941   667
16 Exhibit 56   PLF00000890 through 891    668
17 Exhibit 57   PLF00000192 through 193    672
18 Exhibit 58   CTRL00009654 native      677
19 Exhibit 59   CTRL00009520 native      681
20 Exhibit 60   PLF00001097 through 1098   682
21 Exhibit 61   PLF00002107          684
22 Exhibit 62   PLF00001099 through 1104   685
23 Exhibit 63   PLF0000878 through 881    687
24 Exhibit 64   PLF00001628 through 1630   690
25 Exhibit 65   PLF00000530 through 531    694
```

Page 495

```
1
2  Exhibit 66   CTRL00009601 native      698
3  Exhibit 67   PLF00002085 through 2087   701
4  Exhibit 68   HANKE00757.pdf         703
5  Exhibit 69   PLF00000575 through 577    704
6  Exhibit 70   PLF00001921          708
7  Exhibit 71   CTRL00000299 native      713
8  Exhibit 72   PLF00000738 through 740    715
9  Exhibit 73   CTRL00009579 native      719
10 Exhibit 74   PLF00000524 through 528    722
11 Exhibit 75   AH_095588 through 95601    729
12 Exhibit 76   AH_099110 through 116     737
13 Exhibit 77   AH_094257 through 340\    744
14 Exhibit 78   Al Thani Transaction Accounting  768
15 Exhibit 79   Photograph          769
16
17
18
19
20
21
22
23
24
25
```

Page 496

```
1
2       THE VIDEOGRAPHER:  Good morning.  We are
3  going on the record at 9:38 a.m. Central Time
4  on Thursday, October 5, 2023.
5       Please note that this deposition is being
6  conducted virtually.  Quality of recording
7  depends on the quality of camera and Internet
8  connection of participants.  What is seen --
9  what is seen from the witness and heard on
10 screen is what will be recorded.
11      Audio and video recording will continue to
12 take place unless all parties agree to go off
13 the record.
14      This is Media Unit 1 of the video-recorded
15 deposition of Alan J. Hanke in the matter of
16 Mohammed Thani A.T. Al-Thani versus Alan
17 J. Hanke, et. al., consolidated with Martin
18 John Stevens versus Alan J. Hanke, et. al.,
19 filed in the United States District Court,
20 Southern District of New York, case numbers
21 20-cv-765 (JPC) and 20-cv-8181 (JPC).
22      This deposition is being conducted remotely
23 using virtual technology.
24      My name is Chelsea Gilchrist, representing
25 Veritext Legal Solutions, and I am the
```

Page 497

1  videographer.
2      The court reporter is Amanda McCredo, from
3  the firm Veritext Legal Solutions.
4      I am not authorized to administer an oath.
5  I am not related to any party in this action,
6  nor am I financially interested in the outcome.
7      If there are any --
8      MR. HEFTER: Chelsea?  Sorry.
9      THE VIDEOGRAPHER: Yes.
10     MR. HEFTER: You can finish your
11  introduction, and I -- we're frozen with
12  Mr. Hanke, so I can't see any movement on the
13  screen.
14     THE VIDEOGRAPHER: Would you like me to
15  take us off the record before I continue, sir?
16     I can see Mr. Hanke move.  I'm not sure if
17  you can now.
18     MR. HEFTER: We should go off the record,
19  then.
20     THE VIDEOGRAPHER: Got it.
21     We are going off the record.  The time is
22  9:40 a.m.
23         (Recess taken.)
24     THE VIDEOGRAPHER: We are going back on the

Page 498

1          A. Hanke
2  record.  The time is 9:44 a.m. Central Time.
3      I am picking up with the read-on.
4      I am not authorized to administer an oath.
5  I am not related to any party in this action,
6  nor am I financially interested in the outcome.
7      If there are any objections to proceeding,
8  please state them at the time of your
9  appearance.
10     Counsel and all present, including
11  remotely, will now state their appearances and
12  affiliations for the record, beginning with the
13  noticing attorney.
14     MR. HEFTER: Hi, this is Michael Hefter and
15  Scott O'Brien, from the law firm of Alston &
16  Bird, on behalf of plaintiff Mohammed Al-Thani.
17     MR. SMAYLOVSKY: My name is Philipp
18  Smaylovsky.  I'm with Chelney Law Group on
19  behalf of Martin J. Stevens.
20     MR. HEFTER: And for the record, Madam
21  Court Reporter, Mr. Hanke is representing
22  himself, pro se.
23     THE VIDEOGRAPHER: Will the court reporter
24  swear in the witness.
25  A L A N  H A N K E, the witness herein, after having been

Page 499

1          A. Hanke
2      first duly sworn by a Notary Public of the State of
3      New York, was examined and testified as follows:
4  EXAMINATION BY
5  MR. HEFTER:
6      Q   Mr. Hanke, hi.  I'm Michael Hefter, as you
7  know, from Alston & Bird, and I represent the
8  plaintiff Mr. Al-Thani.
9      We've never met before, other than either
10  in court or in a deposition, correct?
11     A   That is correct, sir.
12     Q   And I take it that currently you are
13  sitting in your residence in Illinois?
14     A   I am.
15     Q   And can you just state for the record what
16  the address of your residence is?
17     A   4121 Wyndwood Drive, Crystal Lake, Illinois
18  60014.
19     Q   Thank you.
20     I want to confirm your understanding that
21  me and my law firm are representing an adverse party
22  against you and we're seeking a significant amount
23  of damages against you and IOLOs.
24     Is that your understanding?
25     A   That is what's been presented to me, yes.

Page 500

1          A. Hanke
2      Q   And you also understand that me or anybody
3  in my law firm or Mr. Smaylovsky are not
4  representing your interests in any way; is that
5  correct?
6      A   That is correct.
7      Q   And is it my understanding that currently
8  you do not have an attorney that's representing you
9  in connection with these consolidated cases?
10     A   I do not.
11     Q   Thank you.
12     And am I correct that you're the only one
13  sitting in that room at your house with you right
14  now?
15     A   Besides my cat, no other humans.
16     Q   That's fine.  Thank you.
17     So, I heard you testify yesterday that your
18  recollection was that you were deposed once before,
19  approximately 20 to 25 years ago.
20     Did I hear that correctly?
21     A   Yes, sir.
22     Q   Okay.
23     I want to see if I can refresh your
24  recollection.
25     Do you recall having a conversation with

3 (Pages 497 - 500)

Page 501

A. Hanke

1
2 Mr. William Slater Vincent in or around July of
3 2019, when you had indicated to him that you were in
4 a deposition?
5    A   I don't remember, no.
6    Q   And you have no recollection that you were
7 sitting for a deposition in a litigation in or
8 around July of 2019?
9    A   There were, there were -- there was a
10 deposition -- I don't think it was a deposition
11 in -- there was a sitdown with a lawyer.  I don't
12 think it was called a deposition.  It was called a
13 discovery.
14       The other deposition I did was for a case
15 that was in Southern California.  So, I don't think
16 that they were related.
17    Q   Okay.
18       So, sitting here today, you don't have a
19 recollection of being deposed in a case in July of
20 2017?
21    A   Not that I remember, sir.
22    Q   Okay.
23       So, that being said, I just want to go
24 through some ground rules for today.  I think
25 Mr. Smaylovsky also went through them, but I'd like

Page 502

A. Hanke

1
2 to give you my version of them, which is that I'll
3 be asking you questions.  You'll be answering my
4 questions.
5       It's best if we don't talk over each other.
6 It's frequent that it happens.  But for the benefit
7 of the record and the benefit of the court reporter,
8 who is transcribing this, it would be helpful if we
9 try to, the best we can, not speak over each other.
10       If my question is unclear in any way,
11 please ask me to reframe it or just tell me that you
12 don't understand my question.  It's possible that
13 you will not.  So, just let me know.
14       Because you're representing yourself, if
15 you feel that a question that I'm asking is
16 objectionable, you can state on the record,
17 "Objection," and I will either tell you you should
18 go ahead and answer, or reframe my question if I
19 believe that your objection is valid.
20       Do you understand that?
21    A   I do, sir.
22    Q   Okay.
23       The other thing I would say is that I
24 applaud you and Mr. Smaylovsky yesterday about your
25 powering through long periods of time without

Page 503

A. Hanke

1
2 breaks.  I don't know if I could achieve that.
3       But if at any point in time you need a
4 break, please let me know.  And, certainly, if I
5 need a break, I will let you know, as well.
6       Do you understand that?
7    A   I do.
8    Q   Okay.
9       And we will use the same protocol as
10 yesterday in terms of showing you documents, which I
11 think worked pretty well, but we'll do -- we'll use
12 the same protocol as yesterday.
13       So, I'll ask you whether you have seen or
14 access to the exhibit link.
15    A   I do have access to it, and I'm already
16 signed in.
17    Q   Okay.  Great.  Thank you.
18       Okay.  That preliminary stuff out of the
19 way, can you tell me where you went to college?
20    A   I went to several -- I went to college in
21 Rockford, at the Rock Valley Technical School; and I
22 went to the Culinary Institute of America; and I
23 went to American Flyers, which was a technical
24 school.
25    Q   And did you say "Rockville"?

Page 504

A. Hanke

1
2    A   Rock Valley, sir.
3    Q   Oh, Rock Valley.  Thank you.
4       So, Rock Valley, is that -- where is that
5 located?
6    A   Rockford, Illinois.
7    Q   And what -- what degree did you get there?
8    A   Aviation maintenance authorization, and I
9 minored in finance.
10    Q   And is the aviation maintenance a
11 bachelor's degree?
12    A   It's equivalent of one.  It's a -- by
13 rights, I guess you could call it, yes.
14    Q   And the Culinary Institute, that's in New
15 York?
16    A   It's in Hyde Park, New York, through a
17 mentorship program.
18    Q   What did you -- what degree did you get
19 from the Culinary Institute with --
20    A   A six-month culinary mentorship program, an
21 experience program.
22    Q   And then with respect to the aviation
23 degree, where and what was that, if you can explain
24 that to me?
25    A   I was -- I got a private, an instrument,

4 (Pages 501 - 504)

Page 505

1                A. Hanke
2 and a commercial certificate, which is equivalent to
3 the master's in aviation, from American Flyers in
4 DuPage, Illinois.
5     Q    And are you certified by the Federal
6 Aviation --
7     A    Administration?
8     Q    -- Administration to fly planes?
9     A    I am, sir.
10     Q    And do you maintain that certificate?
11     A    I do.
12     Q    After -- and what year did you obtain your
13 bachelor's degree at Rock Valley?
14     A    It was in the early '80s. I'm going to
15 guess around '86. I don't remember exactly. It was
16 a long time ago.
17     Q    I should ask you, what's your birthdate,
18 sir?
19     A    July 1, 1964.
20     Q    And after receiving your degree from Rock
21 Valley, did you enter the workforce?
22     A    I had always been working throughout that
23 whole period of time.
24     Q    And is it fair to say, based on that
25 answer, that you had, you know, multiple jobs at any

Page 506

1                A. Hanke
2 one point in time?
3     A    It's possible. I mean, I grew up in the
4 restaurant business, as my -- as my family
5 background. So, I was always involved in that
6 business, one way or another.
7         And aviation was a dream. So, I was
8 employed by Weber-Stephens Corporation, Weber
9 barbecue, at an early age, flying.
10         I had several different industry positions.
11     Q    Let's -- let's go through those industry
12 positions.
13         So, my understanding is that your parents
14 own several restaurants in or around Chicago; is
15 that right?
16     A    Yes, sir.
17     Q    And does your family still own those
18 restaurants?
19     A    No, sir. Both of my parents are deceased.
20     Q    Did you ever own any of those restaurants
21 independent of your parents or after your parents
22 had retired?
23     A    None of those, no.
24     Q    So, let's focus on your history in the
25 aviation industry after receiving your degrees.

Page 507

1                A. Hanke
2         You indicated that you worked for Weber.
3         Is that the company that makes barbecues
4 and grills?
5     A    Yes, sir. At the time, it was called the
6 Weber-Stephens Corporation.
7     Q    And in what capacity were you flying for
8 them?
9     A    I was hired at 19 years old to fly as a
10 co-pilot on one of their twin-engine aircraft, until
11 I received my commercial certificate at the age of
12 21. And I moved to a captain's position. I think I
13 worked there until I was 25 or 26.
14     Q    So, that would put us in or around 1990,
15 correct?
16     A    Sure.
17     Q    And in connection with flying for
18 Weber-Stephens Corporation, was that flying
19 executives around the country or is that flying
20 product for delivery to stores and the like, or
21 both?
22     A    It was mostly corporate. Every once in a
23 while, there was a product movement, but it wasn't
24 the full-time job.
25     Q    So, in 1990, where did you go work?

Page 508

1                A. Hanke
2     A    I stayed in the aviation industry. I
3 think, around that time, I had bought an airplane
4 and started my own owner/operator Part 135 business.
5 And that lasted through about the year 2000.
6     Q    And what was the name of the Part 135
7 business?
8     A    Alan Air, Incorporated.
9     Q    Is that corporate -- corporate entity still
10 in existence?
11     A    No.
12     Q    Do you know when it ceased being in
13 existence?
14     A    I don't. It lasted a few years after that,
15 but we never pursued any further interests, if I
16 remember correctly.
17     Q    Do you know if it's still a corporation in
18 good standing in the state in which it was
19 incorporated?
20     A    I don't think so. Illinois requires annual
21 reports. And if those aren't paid, I think they go
22 dormant and/or delinquent.
23     Q    Did Alan Air own any assets?
24     A    They did.
25     Q    What were those assets?

5 (Pages 505 - 508)

Page 509

```
1              A. Hanke
2    A   Back then, it was a Cessna 414, and then it
3  was a C90 King Air.
4    Q   Thank you for that answer, Mr. Hanke.
5        MR. HEFTER:  Chelsea, there is -- one of
6  the defendants wants to get access, and she's
7  having difficulty.
8        So, can we just go off the record and pause
9  for a second and see if we can get her in?
10       THE VIDEOGRAPHER:  Sure.  I will take us
11  off the record.
12       We are going off the record.  The time is
13  9:59 a.m.
14            (Recess taken.)
15       THE VIDEOGRAPHER:  We are going back on the
16  record.  The time is 10:02 a.m.
17 BY MR. HEFTER:
18   Q   So, Mr. Hanke, we were just talking about
19 the Part 135 business, and I believe that took us up
20 to the year 2000.
21       After 2000, did you stop operating the Alan
22 Air business?
23   A   We still continued.  I just don't remember
24 what date that was.  It was a long time ago.
25       But after that aircraft was sold, we
```

Page 510

```
1              A. Hanke
2  stopped operating that business, yes.
3    Q   What business did you enter after that
4  date?
5    A   I was back in the restaurant business, food
6  and beverage business.  I did some work with an
7  aviation firm in Milwaukee, sporadic work as a sales
8  consultant.
9    Q   What was the name of that company in
10 Milwaukee?
11   A   Sterling Aviation.
12   Q   And how long were you engaged in business
13 in the food and beverage industry with respect to
14 Sterling Aviation?
15   A   Sterling Aviation was strictly an
16 aviation-related sales and marketing position.
17   Q   Yup.
18   A   That lasted several years, off and on.  I
19 couldn't tell you, to be exact.
20       And I've always been in the food and
21 beverage business my whole life.  So, that's always
22 been a staple in my background.
23   Q   When you say you've "always been in the
24 food and beverage business," what does that mean?
25   A   Well, from various jobs and positions,
```

Page 511

```
1              A. Hanke
2  whether it be management positions or other
3  consultant, things of that nature.  Mostly on the
4  finance side in that business.
5    Q   Did you receive -- did you receive wages in
6  connection with those positions?
7    A   Yes, sir.
8    Q   Those were W-2s that you received?
9    A   Yes, sir.
10   Q   Do you have records of those W-2s?
11   A   Not from the '90s or 2000s, no, sir.
12   Q   So, is it your testimony that you were
13 employed by corporate entities as a consultant or
14 manager in those businesses?
15   A   Yes.
16   Q   Do you have any ownership interest in any
17 of those entities that you worked for?
18   A   No, sir.
19   Q   You weren't a partner in any of those
20 businesses?
21   A   Not that I can recall.  Nothing that I
22 consulted with, no.
23   Q   All right.
24       You don't recall ever receiving a K-1 from
25 any of the entities in which you were employed?
```

Page 512

```
1              A. Hanke
2    A   Back in the 2000s?
3    Q   Yes.
4    A   Not that I recall, sir.  It's possible, but
5  not that I recall.
6    Q   Did there come a point in time when you
7  shifted away from the food and beverage business and
8  entered into any other type of business?
9    A   I've always been pretty diverse as an
10 entrepreneur.  So, I was always around the
11 restaurant business, aviation business, doing things
12 as a consultant for financial work, like profit and
13 loss statements and things of that nature, to see
14 how the health of the current business is still.
15 I've always been an entrepreneur in those respects.
16   Q   It's fair to say that you do not -- you
17 don't have a degree in accounting, correct?
18   A   I do not have a degree in accounting, no.
19   Q   Is it fair to say, based on that, that
20 you're not a certified public accountant, correct?
21   A   I am not, sir.
22   Q   It's fair to say that you've never worked
23 for an auditing firm?
24   A   I've never worked for an auditing firm.
25   Q   Have you ever been the Chief Financial
```

6 (Pages 509 - 512)

Page 513

A. Hanke

1
2 Officer of any entity?
3   A   Yes.
4   Q   Okay.
5       Which -- which ones are those?
6   A   Free Phone Project and White Label
7 Solutions.
8   Q   I'll get back to those in a second.
9       So, did there come a point in time in the
10 2000s where you went to work for any other entity
11 outside the food and beverage industry?
12   A   I had various positions throughout,
13 especially as a consultant, talking to industries
14 all the time.  There were a lot of things going on
15 back then that are both entrepreneurial that I owned
16 and partnerships that I had.
17   Q   Okay.
18       Do you recall, in August of 1989, that an
19 entity called Northern Illinois Flight Center filed
20 a small claim judgment against you?
21   A   Yes, I do.
22   Q   Okay.
23       Do you recall, in September of 1989, the
24 Buckingham Court Apartments filed an eviction case
25 against you?

Page 514

A. Hanke

1
2   A   Yes, I do.
3   Q   Were you living in the Buckingham Court
4 Apartments at the time?
5   A   No, my girlfriend at the time was.
6   Q   But you don't dispute that the eviction
7 case was filed against you?
8   A   Not at all.  I was the person that was on
9 the lease.  I moved back in with my parents at the
10 time, after a relationship breakup.  She stayed and
11 didn't pay the rent by the agreement, and we got the
12 eviction notice.
13   Q   And is it fair to say that Buckingham Court
14 Apartments are in or around Chicago?
15   A   Crystal Lake, Illinois, sir.
16   Q   How far is Crystal Lake from Chicago?
17       I should know that, but I'll ask you
18 anyway.
19   A   An hour and a half train ride, 45 miles by
20 car.
21   Q   North of the city?
22   A   Northwest.
23   Q   Do you recall, in October 1995, an entity
24 called Dickerson & Associates sued your company
25 IntelliCommunications Network?

Page 515

A. Hanke

1
2   A   I do.
3   Q   And what was IntelliCommunications Network,
4 Inc.?
5   A   They were a reseller of managed phone time.
6 Phone cards were very large back then,
7 popularity-wise, and they were a seller of those
8 phone cards.
9   Q   Whatever happened to that entity?
10   A   Got bought out by MCI and AT&T.
11       And that whole industry fizzled out after a
12 period of time based on cell phones and cellular
13 service.
14   Q   Do you recall that, in or around this same
15 point in time, an entity called Frontier
16 Communications West sued IntelliCommunications
17 Network in a contract dispute?
18   A   Sure do.
19   Q   Going back to the Northern Illinois Flight
20 Center, did you satisfy the judgment in that case?
21   A   Yes.
22   Q   In connection with the eviction case, did
23 you satisfy your lease payment obligations?
24   A   Yes, I did.
25   Q   Did you satisfy the debt that was owed to

Page 516

A. Hanke

1
2 the Dickerson & Associates?
3   A   That wasn't owed.  That went to
4 arbitration.  I won that case.  There was no --
5 there was no remuneration due.  It was a labor
6 dispute.
7   Q   And the Frontier Communications West case
8 against IntelliCommunications, did you satisfy the
9 debt in that case?
10   A   That debt was actually purchased by MCI
11 when Frontier Communications was bought out by that
12 entity.  And that was transferred on the books, if I
13 remember correctly, to MCI.
14   Q   Do you recall that, in February of 1997, an
15 entity called McHenry Industrial LP sued Hanke
16 U. and IntelliCommunications Network?
17   A   I do.
18   Q   And that was a case in which the plaintiff
19 won that case; they received the judgment?
20   A   They did, and we settled that.  That was
21 for the office space that IntelliCommunications
22 rented at the time when we went out of business from
23 MCI's default.
24   Q   Do you recall that individuals named Donald
25 and Barbara Hartman sued you in March of 1997?

7 (Pages 513 - 516)

Page 517

A. Hanke

1
2  A   They did.
3  Q   What ended up happening with that case?
4  A   That was also settled.  That was a dispute
5  from a down payment on a home that we didn't pay
6  through with.  So, they wanted to keep the escrow
7  money.
8      We ended up settling that case.
9  Q   Do you recall that, in October 1997, Home
10 State Bank and National Association sued you and
11 IntelliCommunications Network for approximately
12 $103,000?
13 A   Yes.
14 Q   They obtained a judgment against you and
15 the company?
16 A   Yes.
17 Q   Was that judgment ever satisfied?
18 A   No.  That was included in my bankruptcy
19 back then.
20 Q   When did you file for bankruptcy the first
21 time?
22 A   I think it was in the mid '90s.  I don't
23 remember exactly what date it was.
24 Q   And when I say "the first time," you
25 understand that you filed bankruptcy within the past

Page 518

A. Hanke

1
2  year in the Northern District of Illinois, correct?
3  A   Correct.
4  Q   That was the second time that you had filed
5  for bankruptcy?
6  A   Yes.
7  Q   Was there any other time?
8  A   No, sir.
9  Q   Did you disclose to the bankruptcy court
10 last year that you had filed for bankruptcy
11 previously?
12 A   Yes.
13 Q   Do you recall that, in February of 1998, an
14 entity called Chrysler Financial Corporation sued
15 you?
16     I'll stop there.
17 A   Sorry, sir?
18 Q   I'll withdraw that.  I'll ask that again.
19     Do you recall, in February of 1998,
20 Chrysler Financial Corporation sought a
21 approximately $8,000 judgment against you?
22 A   I do.
23 Q   Was that judgment ever satisfied?
24 A   That was part of the bankruptcy.  All of
25 that was involved with the IntelliCommunications

Page 519

A. Hanke

1
2  closing.
3  Q   What was the relationship between Chrysler
4  Financial Corporation and IntelliCommunications?
5  A   It was a leased automobile for the company.
6  Q   Okay.
7      Do you recall that, in December 1998, an
8  entity called Sysco Food Services sued you and Kim
9  Wideman?
10 A   Yes.
11 Q   And who is Kim Wideman?
12 A   My girlfriend at the time.
13 Q   Were you ever married?
14 A   No, sir.
15 Q   Have you ever been married before?
16 A   No, sir.
17 Q   When I say "before," from today --
18 A   No, sir.  I've never been married.
19 Q   Do you have any children?
20 A   No, sir.
21 Q   Going back to the Sysco Food Services, do
22 you recall that, in 1999, an approximate $11,000
23 judgment was issued against you and Ms. Wideman?
24 A   Yes.
25 Q   Was that judgment ever satisfied?

Page 520

A. Hanke

1
2  A   I think it was.
3  Q   Okay.
4      What was the claim there?
5  A   I leased a portion of a restaurant and
6  tavern.  I had the food side.  I did not control the
7  liquor side.  That tavern closed, and we were out of
8  business within three days.
9  Q   Where was that located?
10 A   Crystal Lake, Illinois.
11 Q   Have you ever lived anywhere else other
12 than Crystal Lake, Illinois?
13 A   I did have a short time in Farmingdale,
14 Long Island, for about six months.  I lived in
15 Walker, Minnesota, for a short period of time.  But
16 mostly right here in Illinois.
17 Q   And what were you doing in Farmingdale, New
18 York?
19 A   I was living with a friend of mine, working
20 out of Fort Lee, New Jersey and, during the time
21 when the debit and credit cards were a popular item,
22 selling those into the New York market and
23 recruiting people to sell those.
24 Q   Was that separate and apart from your time
25 obtaining your degree from the Culinary Institute?

8 (Pages 517 - 520)

Page 529

A. Hanke
you filed a false police report still pending?
A I didn't know there was a litigation about a false police report, sir. Excuse me. I didn't know there was. I had no idea.
There is no litigation pending whatsoever with Mr. Lillie, that I'm aware of.
Q Since the settlement?
A Yes, sir.
Q Are you familiar with an entity called Hands in Hand, LLC?
A Yes.
Q And what's in Hands in Hand, LLC?
A That was an LLC started to -- during the pandemic era to do business in test kits and hand sanitizer.
Q And you formed that entity with Mr. Richard Presley?
A Yes, sir.
Q And it was formed in Wyoming in 2000 and -- in May of 2020?
A I don't remember the date, but it was in Wyoming, yes.
Q Well, we all know, because I think it's emblazoned in our minds, that the pandemic started

Page 530

A. Hanke
late February or early March of 2020.
A Sure.
Q So, is it fair to say that the entity was formed after we all learned that we were in an epidemic?
A Yes, sir.
Q And is that entity still in business?
A It is not.
Q Does it remain active as a corporate entity?
A Not that I'm aware of. I think the same as in Illinois. If you don't do the corporate documents every year in Wyoming, it just goes dormant.
Q And with respect to the corporate structure, were you and Mr. Presley equal members of the LLC?
A Yes.
Q 50/50?
A Yes, sir.
Q Did Hands in Hand ever engage a sale of PPP?
A Hand sanitizer and only one sale.
Q What was the -- what was the volume, in

Page 531

A. Hanke
dollar amount, of that one sale?
A It was -- it was 20,000, I think, or something like that. It was one pallet of hand sanitizer, or two pallets, something like that. I don't remember right now.
Q Was the entity paid for that?
A Yes, sir.
Q Did the entity pay taxes on the receipt of that?
A They would have paid taxes on any profits that were received. But, actually, we ended up losing money on that particular transaction.
Q Are there financial statements of that entity?
A Not that I kept, no.
Q Were they ever prepared?
A Not that I'm aware of.
Q Do you know if the entity engaged in business after December 31, 2020, or was it just a --
A I have idea.
Q -- five-, six-month thing?
A Yeah, I don't -- you know, I don't think so.

Page 532

A. Hanke
Q Do you know an entity by the name of Vortex Environmental Alternatives, LLC?
A I sure do.
Q And what's that entity?
A That's a waste-to-energy company.
Q And that was formed in Florida in May of 2019?
A Yes, sir.
Q And it was dissolved in October 2020?
A I don't know when it was dissolved.
Q And that is an entity in which you had some relationship with Amy Roy-Haeger?
A I sure did.
Yeah. She brought the gentleman who had a waste-to-energy technology to the table, who was looking for an investment to get this project started in a manufacturing standpoint and to sell this product to developing countries.
Q And do you know -- do you remember his name?
A I'm really bad at remembering names, I'm sorry. If I was reminded of it, I would be more than happy to tell you if it was right, but I --
Q That's okay.

Page 533

A. Hanke

1
2   A   -- do not --
3   Q   We'll get it. I have it in the files.
4   A   Okay.
5   Q   Do you recall, in February and March of
6   2020, you reserved two N-numbers with the Federal
7   Aviation Administration?
8   A   Yes.
9   Q   What's an N-number?
10  A   It's the November -- architecture of the
11  number that goes on the tail of an airplane.
12  Q   Do those N-numbers currently have any
13  aircraft associated with them?
14  A   No, not at all.
15  Q   Do you know that a gentleman by the name of
16  Donald -- do you know a gentleman by the name of
17  Donald Cahalan or --
18  A   Say again, sir? Donald?
19  Q   Let me withdraw that.
20      Do you know that, in or around
21  November 2016, a judgment was filed against you in
22  the amount of $104,000 in McHenry County by a
23  gentleman by the name of Donald Cahalan?
24  A   Donald Cahalan? Yes, sir.
25  Q   It's Cahalan, C-A-H-A-L-A-N, for the court

Page 534

A. Hanke

1
2   reporter, I think?
3   A   Correct.
4   Q   Has that judgment been satisfied?
5   A   That was actually -- I'm not sure what the
6   technical legal term is, but it's been removed.
7   Q   And what did Mr. Cahalan claim in
8   connection with obtaining the judgment?
9   A   He claimed, at the time, that he was owed
10  funds relational to an investment he made in the
11  first version of IOLO or the Free Phone Project.
12  Q   And the first version of IOLO, would that
13  be EZ Credit Financing, Inc.?
14  A   Yes, sir.
15  Q   We'll get there in a moment.
16  A   All right.
17  Q   Also, in 2016, am I correct that a
18  gentleman by the name of James Thompson filed a
19  judgment against you in the approximate amount of
20  $103,000?
21  A   Those two -- the two -- the three of us
22  were partners, and those two judgments came at the
23  same time, but they were both settled or released.
24  Q   And so, when you say the three of you were
25  partners, you were -- you the three of you were

Page 535

A. Hanke

1
2   partners in EZ Credit Financing?
3   A   Yes, sir.
4   Q   Which is an entity that was formerly known
5   as Getting There Financial, Inc.?
6   A   It was at first, yes.
7   Q   And that was formed in Wyoming in February
8   of 2013; am I correct?
9   A   Yes, sir.
10  Q   And that entity was formed to run a
11  no-credit-check, rent-to-own program in the wireless
12  industry; is that correct?
13  A   Not just wireless, but electronics.
14  Q   And EZ Credit Financing, Inc., looks like,
15  to me, as a C corporation; is that right?
16  A   That's correct.
17      I think it was a Subchapter S by election.
18  Q   Fair enough.
19      But in terms of the equity, how was the
20  equity split between Mr. Cahalan, Mr. Thompson,
21  yourself, and perhaps others?
22  A   Yeah. I think, at the time, it was all of
23  us an equal share, 33 and a third.
24  Q   Got it.
25      And is it fair to say that Mr. Cahalan and

Page 536

A. Hanke

1
2   Mr. Thompson brought actions against you in
3   connection with a dispute over the operation of EZ
4   Credit Financing?
5   A   No, they didn't bring any action at all.
6   They did file a claim against it, but not against
7   the operations.
8   Q   And what was the nature of their claim, I
9   should ask?
10  A   I'm sorry. Sir, I didn't hear you.
11  Q   Sorry.
12      What was the nature of the claim?
13  A   Just that they felt that they were owed
14  their money back after the investment, and it was
15  determined later that they, you know -- an
16  investment was an investment, that they couldn't do
17  that. That's why it was dropped.
18  Q   Got it.
19      Now, there came a point in time when EZ
20  Credit Financing turned into IOLO; is that correct?
21  A   Yes.
22  Q   And there are multiple IOLO entities?
23      IOLO Advisors LLC, correct?
24  A   Yes, sir.
25  Q   And that was formed in Wyoming in December

12 (Pages 533 - 536)

Page 537

A. Hanke

1
2 of 2018?
3    A    Yes.
4    Q    And it remains active?
5    A    Not that I'm aware of.  Again, it hasn't
6 been paid or...
7    Q    And at the time that EZ Credit became IOLO,
8 was there a change in the ownership structure of the
9 entity?
10    A    I don't think there was.  I think it just
11 remained the same.
12    Q    Meaning that IOLO was owned in thirds by
13 you, Mr. Cahalan, and Mr. Thompson?
14    A    When we changed -- when EZ Credit Financing
15 was changed, a lot of things changed with it.  We
16 had new investors.  The technology changed, the
17 software changed, all of that changed.
18         We ended up closing the one business and
19 basically beginning a new business.
20    Q    And in connection with the new business,
21 what was the nature of the new business for IOLO?
22    A    Similar products and services but with
23 different technology.  We used stores and brokers to
24 elicit the customers instead of just -- and the
25 Internet website, those types of things,

Page 538

A. Hanke

1
2 pay-for-click, more technology-driven.
3    Q    And was EZ Credit Financing -- before it
4 turned into IOLO, was that a profitable entity?
5    A    No.
6    Q    Did it have any revenue?
7    A    No.
8    Q    I guess it stands to reason it wouldn't
9 have profits, either, if it doesn't have revenue?
10    A    Yes.
11    Q    And then the entity -- the IOLO entity,
12 which continued the same business with somewhat
13 different technology, what was the name of that
14 entity?
15    A    That was it.  It was IOLO.
16    Q    Was that IOLO Holdings, IOLO Global, IOLO
17 Advisors?
18    A    None of those.  It was just IOLO.
19    Q    Just IOLO.
20         And according to its website, IOLO stands
21 for "I Only Live Once"; is that correct?
22    A    No.  And I didn't know -- even know it had
23 a website.
24    Q    So, your testimony is IOLO does not mean "I
25 Only Live Once"?

Page 539

A. Hanke

1
2    A    There was no acronym for it at all.  I just
3 came up with the name.
4         Matter of fact, we didn't even come up with
5 it; somebody in New York did, so...
6    Q    Who was that?
7    A    I think it was a gentleman that worked at
8 Sheridan Capital, if I remember correctly.
9    Q    Did EZ Credit Financing have financial
10 statements?
11    A    I don't remember if they were created for
12 there or not.
13    Q    Balance sheet?
14    A    They didn't do any revenue, so I don't
15 think any were created for that particular entity.
16    Q    No income statement?
17    A    Again, I don't remember.  I would have to
18 look back to see.
19    Q    Which reminds me, are you registered with
20 the Securities and Exchange Commission as a broker?
21    A    No, sir.
22    Q    Or a broker-dealer?
23    A    No, sir.
24    Q    So, the IOLO business that was in the -- in
25 the rent-to-own program, did that entity have any

Page 540

A. Hanke

1
2 financial statements?
3    A    Yes.
4    Q    It had an income statement and balance
5 sheet?
6    A    Yes.
7    Q    And did it have any revenue?
8    A    Yes.
9    Q    Did it make any profit?
10    A    No.  That's why it was eventually shut
11 down.
12    Q    And do you maintain the financial
13 statements of that IOLO?
14    A    I don't know if I still have them or not.
15    Q    Did there come a point in time when you
16 established IOLO Global?
17    A    Yes.  It's -- it formed.
18    Q    And that was formerly known as the Discover
19 Financial Group, LLC?
20    A    It was.
21    Q    All right.
22         And were you an owner in Discover Financial
23 Group, LLC?
24    A    No, sir.
25    Q    Who -- who were the owners of that?

13 (Pages 537 - 540)

Page 541

A. Hanke

1
2    A    It wasn't.  It was just a company formed by
3    the company corporation in Wyoming prior to its
4    purchase and the name change.
5    Q    Could you just repeat that?  I missed that.
6        It was formed --
7    A    It was a company formed in Wyoming prior to
8    my purchasing it.
9    Q    Got it.
10       And who formed it?
11   A    I think Wyoming Company Corporation did.
12   Q    And you acquired that LLC?
13   A    Yes, sir.
14   Q    Did you pay consideration for that?
15   A    Can you rephrase the question?
16   Q    Did you pay any money for acquiring
17   Discover Financial Group, LLC?
18   A    Yes.
19   Q    What was -- what was the consideration for
20   that transaction that you paid?
21   A    It was a couple hundred dollars.
22   Q    Who did you pay it to?
23   A    The Wyoming Company Corporation.
24   Q    Do you know when you acquired Discover
25   Financial Group, LLC?

Page 542

A. Hanke

1
2    A    I do not.
3    Q    What was the business of IOLO Global LLC at
4    the time it was formed?
5    A    It didn't do any business.
6    Q    And it doesn't do any business today?
7    A    No, sir.
8    Q    It's never done any business?
9    A    No, sir.  I think I formed that entity
10   in -- with anticipation of doing some business.  I
11   don't think I ever put anything underneath it.
12   Q    Were you the only owner of that business?
13   A    Yes, sir.
14   Q    That was separate and apart from the IOLO
15   that came out of the EZ Credit, right?
16   A    Yes, sir.
17   Q    So, we're going to get -- during the course
18   of the day, we're going to get to the point where
19   we're talking about the management and deposit
20   agreement between Mr. Al-Thani and IOLO Global LLC.
21   A    Okay.
22   Q    And I'm trying to, in my head, square your
23   answer that IOLO Global never did any business with
24   the fact that it entered into a contract with my
25   client.

Page 543

A. Hanke

1
2        How do you explain that?
3    A    I can't.  I have five or six of those IOLO
4    entities; Advisors, Global -- several of them -- all
5    under the heading of IOLO Holdings.
6        So, I'm not trying to misrepresent, but
7    thanks for reminding me.
8    Q    Okay.  Thanks.  Thanks.  That's helpful.
9        So, let's talk about IOLO Holdings LLC.
10   A    Okay.
11   Q    Is it your testimony that IOLO Global LLC
12   is a subsidiary of IOLO Holdings LLC?
13   A    Yes.
14   Q    And do you have an organizational chart
15   that describes the relationship between the IOLO
16   entities?
17   A    Not an organizational chart.
18       I think, during the discovery process, I
19   provided the corporate documents for those entities.
20   Q    And IOLO Holdings was formed in Wyoming in
21   or around December 2018, correct?
22   A    Yes, sir.
23   Q    And that entity remains active?
24   A    I don't think it's active, either, for the
25   same reasons I mentioned before about the others.

Page 544

A. Hanke

1
2    Q    Do you know if the Wyoming Secretary of
3    State's files have been updated based on the
4    business of IOLO Holdings or IOLO Global at this
5    time?
6    A    I don't know, sir.  I haven't looked.
7    Q    Okay.
8        Did you use counsel to incorporate these
9    entities in Wyoming?
10   A    No, sir.
11   Q    And with respect to IOLO Holdings LLC, are
12   you the only owner of that entity?
13   A    Yes, sir.
14   Q    It has no employees, correct?
15   A    None.
16   Q    It does not have a board of directors,
17   correct?
18   A    Correct.
19   Q    All management decisions of IOLO Holdings
20   LLC are made by you, correct?
21   A    Yes, sir.
22   Q    Does IOLO Holdings LLC prepare financial
23   statements?
24   A    It has not yet.
25   Q    And when I mean "financial statements," you

14 (Pages 541 - 544)

Page 545

A. Hanke

know that I mean a balance sheet and an income statement, correct?

A I do.

Q You're aware what those terms mean?

A Yes.

Q With respect to IOLO Global LLC, you're the only owner, correct?

A Yes.

Q It doesn't have a board of directors, correct?

A Correct.

Q It doesn't have any other shareholders, correct?

A Correct.

Q You make all the management decisions for IOLO Global LLC, correct?

A Correct.

Q With respect to IOLO Holdings LLC and IOLO Global LLC, it does not have a business address -- strike that.

It does not have an office in which business operations are done?

A None, other than my home office, no.

Q So, all of the business of IOLO Holdings

Page 546

A. Hanke

LLC and IOLO Global LLC are done at your home in Crystal Lake, Illinois, correct?

A Yes.

Q In connection with this litigation, IOLO Global LLC does not have counsel, correct?

A Correct.

Q You have not sought to substitute counsel after Mr. Herndon's withdrawal in this case, correct?

A Correct.

Q IOLO Holdings LLC does not have independent counsel, correct?

A Correct.

Q With respect to IOLO Advisors LLC, that entity is operated by you solely, correct?

A Yes.

Q You're the -- you're the only owner?

A Yes.

Q The only manager?

A Yes.

Q It has no employees?

A Correct.

MR. HEFTER: Why don't we take a five-minute break.

Page 547

A. Hanke

THE WITNESS: Very good.

THE VIDEOGRAPHER: All right. We are going off the record. The time is 10:48 a.m.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record. The time is 10:58 a.m.

BY MR. HEFTER:

Q Going back to IOLO Global and IOLO Holdings --

Mr. Hanke, can you hear me?

A I can, sir.

Q Okay.

Do those entities maintain bank accounts?

A There were bank accounts opened at PNC during that time, but I think they're all closed now.

Q And the accounts at PNC, were they in the name of IOLO Holdings LLC and/or IOLO Global LLC?

A I think there was one of each.

Q And do you have a personal account at PNC Bank?

A I do.

Q And you do, and you had one during the time of 2020, around?

Page 548

A. Hanke

A At some point, we moved from Woodforest National Bank to PNC Bank. I just don't remember when that was.

Q So, we know in the record that you had multiple meetings with representatives of Sheikh Mohammed in this case, right?

A They said they were, yes.

Q Is it your testify -- testimony that you didn't travel to New York to meet with the Sheikh in this case?

A Is that a question, sir? I'm sorry.

Q I think it's a question, yeah.

A Could you ask me again?

Q Sure.

Is it your testimony that you did not travel to New York to meet with Sheikh Mohammed at the -- at the Ritz-Carlton hotel on Central Park South in New York City?

A I met with somebody there, sir. I'm not sure if that was the gentleman or not. I did not ask for an ID.

Q Okay.

So, we've established that you traveled to New York, correct?

Page 669

A. Hanke
1
2    A   It doesn't refresh my memory, but, again,
3  sir, I'm not disputing meeting him.  I just don't
4  remember the dates.
5    Q   Okay.
6        Let's mark as 56 an email exchange between
7  Mr. Hanke and Mr. Miginnis on or about June 20,
8  2019.
9    A   Sorry, sir.  What number are we looking at?
10 I'm sorry.  56?
11   Q   Fifty-six.
12       (PLF00000890 through 891 was
13       marked as Exhibit 56 for
14       identification, as of this
15       date.)
16   A   Okay, sir.  I have it up.
17 BY MR. HEFTER:
18   Q   Okay.
19       As I said, this is a document bearing a
20 Bates number PLF 890, and it's an email exchange on
21 or about June 20, 2019, between Mr. Miginnis and
22 Mr. Hanke.
23       Have you seen this document before?
24   A   Yes.
25   Q   And in the email to Mr. Hanke, after you

Page 670

A. Hanke
2  say, "Apologize for the slight delay while I was not
3  feeling well," you say, "I'm happy to provide you
4  with the Addendum for Mr. Al Thani according to your
5  direction."
6        Do you see that?
7    A   Yes, sir.
8    Q   And the addendum was a document, an
9  agreement, in which the deposit would be increased
10 and there would be adjustment to the payout
11 schedule, correct?
12   A   Yes, sir.
13   Q   Now, you also say "Additionally, I have
14 confirmed that the initial Payment will be processed
15 no later than July 5, 2019 or sooner if able."
16       Now, the initial payment that you're
17 referring to is the additional payment that was due
18 20 international business days after the receipt of
19 Mr. Al-Thani's funds, correct?
20   A   Yes, sir.
21   Q   And that never happened?
22   A   Correct.
23   Q   And when you say "I have confirmed that the
24 initial Payment will be processed no later than
25 July 5th," that was a false statement, correct?

Page 671

A. Hanke
2    A   No, sir.  That's what I was told by Amy
3  Roy-Haeger and Jonathan Cannon both, that had the
4  two largest contracts.
5    Q   So, what you're relying upon is the
6  representations of Ms. Roy-Haeger and Mr. Cannon
7  that the initial payment will be processed no later
8  than July 5th, 2019?
9    A   Absolutely.  I have to rely on the contract
10 holders to supply me the information necessary.
11   Q   Okay.
12       And that was the only thing that you relied
13 upon in telling Mr. Miginnis that you have confirmed
14 that the initial payment will be processed no later
15 than July 5, 2019?
16   A   That's not the only thing.  That is the
17 thing.  That is the major thing.  I have to rely
18 upon the information gathered from those contract
19 holders.
20   Q   And so, you did nothing else before
21 confirming that statement to Mr. Miginnis?
22   A   I'm not sure I understand the question,
23 sir.
24   Q   I'll move on.
25       Let me -- let me mark as Hanke Exhibit 57 a

Page 672

A. Hanke
2  document entitled "Addendum #1 to an existing MDA."
3    A   Okay, sir.  I have it up.
4    MR. HEFTER:  Wrong document.
5    MR. O'BRIEN:  My apologies.  Just a moment.
6  BY MR. HEFTER:
7    Q   While the document is being pulled up, at
8  the May 30, 2019, meeting at the Bailey with you and
9  Mr. Papi, you assured them that Mr. Al-Thani's
10 investment was safe, correct?
11   A   I think every time Mr. Papi or Mr. Miginnis
12 and I met, regardless, it was for an update.  Safety
13 wasn't always an issue; it was a payment.  That's
14 what we were all waiting for.
15   Q   And you assured them at those meetings --
16 at that meeting that a payment was imminent?
17   A   As I was being assured by my contract
18 holders that it was, as well.
19   Q   You represented to them that a payment was
20 imminent, correct?
21   A   Absolutely.
22   Q   Let's turn to the addendum.
23       (PLF00000192 through 193 was
24       marked as Exhibit 57 for
25       identification, as of this

46 (Pages 669 - 672)

Page 549

A. Hanke

1
2  A   Yes, sir.
3  Q   And in that meeting, you discussed my
4  client's investment, correct?
5  A   In that meeting, we discussed an
6  investment, yes.  I'm not sure if it was with your
7  client, though.
8  Q   Okay.
9     With respect to the -- and you had to take
10 an airplane to get there, right?
11 A   Yes, sir, I did.
12 Q   Right.
13    And you had to take a taxicab from the
14 airport to Midtown Manhattan, correct?
15 A   I did.
16 Q   With respect to the expenses that related
17 to that business that you had in New York, out of
18 what bank account did those expenses come from,
19 IOLO's or your personal bank account?
20 A   Probably my personal account.
21 Q   Did you ever submit an expense
22 reimbursement form to IOLO Holdings or IOLO Global
23 when you were traveling on business with respect to
24 IOLO's business?
25 A   No.

Page 550

A. Hanke

1
2  Q   Is it fair to say that all of the expenses
3  that you incurred as a result of that business came
4  out of your personal bank accounts?
5  A   That would be a fair statement.
6  Q   Do you know the most amount of cash that
7  the bank accounts of IOLO Holdings LLC or IOLO
8  Global LLC ever had?
9  A   I do not, sir.
10 Q   Do you own an entity called Tiderco,
11 T-I-D-E-R-C-O, LLC?
12 A   I do.
13 Q   And that was formed in Wyoming in 2015?
14 A   Yes.
15 Q   What was the business of Tiderco?
16 A   It didn't do any business.
17 Q   What was its intended purpose?
18 A   We were going to go into the lease-to-own
19 automobile business at the time, but it never panned
20 out.
21 Q   Who is "we"?
22 A   Myself and a business partner.
23 Q   Who is that?
24 A   The same guy, Donald Cahalan and Jim
25 Thompson.

Page 551

A. Hanke

1
2  Q   Got it.
3     Speaking of automobiles, do you still drive
4  a 2015 GMC Yukon Denali?
5  A   No, sir.
6  Q   What happened to that vehicle?
7  A   It got repossessed when this proceeding
8  started, during my bankruptcy.
9  Q   Do you still drive a 2018 Cadillac CT6?
10 A   No, sir.
11 Q   What happened to that vehicle?
12 A   That got repossessed due to these
13 proceedings and my bankruptcy.
14 Q   And do you still own or drive two 2016
15 Mercedes-Benzes GL450s?
16 A   I never did.
17 Q   Did you ever own any Mercedes?
18 A   No.  They were licensed to me, never titled
19 to me.  They were bought and purchased by another
20 entity.  I was just a broker in the sale of the two
21 cars.
22 Q   Was there ever a period of time -- before
23 we get off bank accounts, do you own any securities
24 accounts?
25 A   No.

Page 552

A. Hanke

1
2  Q   Like any -- a brokerage account, if that
3  was not -- unclear?
4  A   No, I do not.
5  Q   Do you own any publicly traded securities?
6  A   No.
7  Q   Was there -- did there come a point in time
8  that you owned class B shares in an entity called
9  PNG Telecommunications?
10 A   Back in the early '90s, yes.
11 Q   And is it fair to say that, in 2001, you
12 were sued in Illinois in connection with the conduct
13 of a Mr. August Ghilarducci?
14 A   I don't remember that or had any part in
15 that suit.  I think that was dropped.
16 Q   You don't remember any of the details of
17 the litigation brought by an individual named Steven
18 Holt -- Holtz?
19 A   Yeah.  It was -- was a dispute from a
20 shareholder of a company that I bought into.  It was
21 all previous to my getting involved there.  I was
22 only named by -- because I was on the company at the
23 time, but that was all dropped or paid.  I had
24 nothing to do with it.
25 Q   You're aware that Mr. Ghilarducci was

16 (Pages 549 - 552)

Page 745

1              A. Hanke
2 Ms. Roy-Haeger?
3    A   Or Mr. Hubner to Ms. Haeger.
4    Q   Let's move on.
5        Let me mark for identification a document,
6 Exhibit Hanke Exhibit 77, which is a document
7 bearing the Bates numbers AH_094275 [sic] to
8 AH_094340.
9              (AH_094257 through 340 was
10             marked as Exhibit 77 for
11             identification, as of this
12             date.)
13 BY MR. HEFTER:
14   Q   Has that popped up yet?
15   A   It just did, sir.
16   Q   Okay.  Great.
17       So, this is a file that reflects text
18 messages between you and Mr. Mills Rogers --
19   Q   Okay.
20   Q   -- between July 2017 and October of 2020.
21   A   Okay.
22   Q   Do you know when you first started working
23 with Mr. Mills Rogers?
24   A   I would guess somewhere around July of
25 2017.  I couldn't -- I wouldn't know exactly.

Page 746

1              A. Hanke
2    Q   Do you know -- do you know if the
3 relationship spans before July of 2017?
4    A   No.  I didn't even think it was that far
5 back.
6    Q   So, let me turn your attention to
7 AH_094260.
8    A   Let's see if I can find it here.
9        Tell me the number again, sir.  I'm sorry.
10   Q   AH_094260.
11   A   I was way away from that.
12       Okay, sir.
13   Q   You'll see, three-quarters down the page,
14 on October 4, 2017, at 10:10 a.m. --
15   A   Yes.
16   Q   -- you state to Mills Rogers [as read],
17 "Okay.  Desperately need one sealed NIQD box today
18 in Miami for an opening."
19       Do you see that?
20   A   Yes, sir.
21   Q   What does that mean?
22   A   That's a one sealed box of the Iraqi dinar.
23   Q   And were you involved in the trading of
24 Iraqi dinar?
25   A   I was.

Page 747

1              A. Hanke
2    Q   Was that business run out of IOLO?
3    A   Good question.
4        No, it was not.
5    Q   What entity was involved in those
6 transactions?
7    A   Some of them are through Bala Trading.
8        But other than that, they're all individual
9 broker deals that would have just come
10 commission-wise.
11   Q   Okay.
12       And then Mr. Mills Rogers says, in response
13 [as read], "I have a box in Miami trying to reach
14 holder now.  Please stand by."
15   A   Yes.
16   Q   So, Mr. Mills Rogers was also trading in
17 Iraqi dinar?
18   A   I think he had a contact.  I don't think he
19 was trading in Iraqi dinar.  I think he was like an
20 introducer, an intermediary, in transactions
21 involving Iraqi dinar.
22   Q   That was both with you and independent of
23 you?
24   A   Everybody got in that industry with
25 everybody else.  It was kind of a wild west of

Page 748

1              A. Hanke
2 people selling and buying.
3    Q   Let's turn to the next page, 09461.
4    A   Okay.
5    Q   And then, at August 8, 2017, there's a
6 reference, a third of the way down, to -- from Mills
7 Rogers to you [as read]:  "Need to discuss ten box
8 FPA and loose IQD and IQD boxes.  Thank you, Mills."
9        Is that all related to Iraqi dinar?
10   A   You're looking at 8/8/2017 at 8:59 a.m.,
11 yes, sir.
12   Q   Yes.  Yes.  Okay.
13       He, at one point, mentions to you, on
14 October 22, that there was a "Miami Zim deal."
15       Does that ring a bell?
16   A   Yeah, I didn't really get involved with
17 Zimbabwe currency.
18   Q   Ah.  Okay.
19       He also mentions, at some time, that there
20 was a reference to Ghana and Nigeria.
21       Was that also currency deals?
22   A   Yes.
23   Q   Did you get involved in those deals?
24   A   Investigated them, but not -- I never
25 completed any or did anything with those.

65 (Pages 745 - 748)

A. Hanke

1              A. Hanke
2   Q  Further down on page -- on AH_092463 --
3   A  Okay.
4   Q  -- there is a reference to "MTN"?
5   A  Yes.
6   Q  Those are medium-term notes?
7   A  They are.
8   Q  All right.
9     And were you involved in transactions
10 involving medium-term notes with Mr. Mills Rogers?
11   A  I was involved with transactions concerning
12 MTNs with many individuals, including Mills Rogers,
13 yes.
14   Q  All right.
15     And was Mills Rogers acting as a paymaster
16 with respect to the medium-term notes or was he
17 acting as a broker?
18   A  He would have been a broker or introducer.
19   Q  At one point, he says, "Did you review the
20 revised CMO package?"
21     Do you know what that refers to?
22   A  No.
23     Can you show me where that's at?
24   Q  Yeah, sure. It's on AH_09 --
25     I'm just going to go chronologically, so it

A. Hanke

1 will make it easier for you.
2     It's AH_094264, 11:51 a.m., or -- you say,
3 "I have reviewed the CMO in brief."
4   A  Don't know. I don't recall what that
5 means.
6   Q  Let's turn to 094267.
7   A  Okay. Go ahead, sir.
8   Q  Pardon?
9   A  Go ahead.
10   Q  Oh. Yeah.
11     If you look at 4:52 p.m., the second entry
12 on that page.
13   A  Yes.
14   Q  He says [as read], "I have a buyer for SPS
15 who is paying 300 million per bond in Miami and
16 350 million per bond in Zurich."
17     Do you see that?
18   A  Yes.
19   Q  And this was a transaction in which Mills
20 Rogers was -- was referring or sourcing to you?
21   A  That is correct, yes.
22   Q  And did you end up doing a deal with him on
23 that?
24   A  I did not.

A. Hanke

1              A. Hanke
2   Q  If you turn to 094271.
3   A  Okay, sir.
4   Q  It says -- at 7/23/2018, July 23, 2018, at
5 10:30 a.m., you say to Mr. Mills Rogers, "Stand by
6 for a call. The person whom you will be meeting is
7 Jay Alexander."
8   A  I see that.
9   Q  Who is Jay Alexander?
10   A  Another broker. Don't know.
11   Q  Did he source transactions for you?
12   A  There were people all the time sourcing
13 transactions and introducing other people. I
14 just -- that was just one of them.
15   Q  Was he involved in any of the transactions
16 involving IOLO?
17   A  I don't know if he was or not.
18     The next name there, Mark Bailey, I don't
19 know if those two guys were associated or not.
20   Q  Yeah, that's a good point.
21     Let's turn to AH_092472.
22   A  272, okay.
23   Q  And then at 10:22 on that day, which is
24 September 5, 2018, you say to him, "Sorry. Am still
25 on with Mark Bailey. Will return."

A. Hanke

1              A. Hanke
2   A  Okay.
3   Q  And then the next entry says [as read], "Hi
4 Alan. Have you set a time to talk with Excelsior
5 today? If pm, please text me and I will join the
6 cc. Thank you, Mills."
7     Do you see that?
8   A  I do.
9   Q  Does that refresh your recollection in
10 terms of the timing of the Excelsior investment?
11   A  Timing, no.
12     I'm not sure how that all played out
13 timing-wise, but it does remind me of the names,
14 yes.
15   Q  Okay.
16     And then if you go down to the bottom of
17 the page, we see a reference to Javid.
18   A  I see -- yeah, okay. I'm looking.
19     I don't see it, but it doesn't -- on 94272?
20   Q  Yeah, we can move on. It's not an
21 important point.
22   A  Okay.
23   Q  Let's go to 094277.
24   A  Okay, sir.
25   Q  At the top, Mr. Mills Rogers, at 1:48 of

66 (Pages 749 - 752)

Page 753

1          A. Hanke
2 that -- on that day, says [as read], "All jokes
3 aside, do the now missing funds include the second
4 deal or are those funds being sent separately?
5 Please call to discuss."
6          And you respond [as read], "Just the 675
7 got messed up.  The 1 million will be released later
8 today."
9          Do you see that?
10 A  I do.
11 Q  Do you remember what deal that refers to?
12 A  No idea.  No clue.
13          What was the date of this?  10/29/18?
14 I have no idea.
15 Q  10/29/18 -- 2018, yeah.
16          No idea?
17 A  No.
18 Q  Well, let's go to AH_094279.
19 A  Okay.
20 Q  At the top, on November 7, 2018, he --
21 Mr. Mills Rogers indicates that he needs [as read],
22 "a five-minute talk about the monthly schedule for
23 the two paymaster transactions we closed plus
24 possible future transactions next ted, and I need a
25 10-minute cc after your 2:00 p.m. today to discuss

Page 754

1          A. Hanke
2 the fall -- 4 Excelsior transactions."
3 A  Okay.
4 Q  He goes on to say [as read], "The submarine
5 cable deal and the SBLC deal, as we need to talk
6 about the schedules and prepare the FPAs.  Please
7 call my cell.  Thank you, Mills."
8          So, at this point in time, you had done
9 transactions with Excelsior?
10 A  I don't know if it was Excelsior or not.  I
11 don't remember who that was or -- at the time.  I
12 think it had something to do with -- looking back
13 above this, I think that had something to do with --
14 I don't know if it had something to do with
15 Excelsior or not.  I don't remember.
16 Q  You don't have a recollection of the
17 submarine cable deal or the SBLC --
18 A  Oh, sure.  Yeah, that was just an
19 investment.  Some guys were pitching a deal about
20 picking up old submarine cables on the ocean floor
21 to recycle.  That's all that was.
22 Q  And what about the SBLC deal that's being
23 referred to here?
24 A  Yeah, we were trying to get another SBLC
25 deal done, but it never worked out.

Page 755

1          A. Hanke
2 Q  But, at this point in time, had Excelsior
3 invested money with you or IOLO?
4 A  I don't remember, at that point, no.
5 Q  You would have records to reflect that?
6 A  I would.
7 Q  And do you know if those were produced to
8 us in the litigation?
9 A  Yes, sir.
10 Q  There's -- let's turn to AH_094281.
11 A  Okay.
12 Q  There is a -- at 11/29/2018, at 5:24, there
13 is a reference to a Brad Barker fuel transaction.
14          Do you see that?
15 A  What time, sir?
16 Q  11/29 at 5:24, 2018.
17 A  Okay.  Yes, I see it.
18 Q  What does that refer to?
19 A  I don't know.
20          It was probably another broker that had a
21 fuel deal, like everybody did back then.
22          No idea.
23 Q  I think we talked about the -- a gentleman
24 by the name of John Rickman?
25 A  Yes, sir.

Page 756

1          A. Hanke
2 Q  And who -- can you remind me who he was
3 again?
4 A  He was one of the people involved with SRM
5 Services.
6 Q  Ah, okay.  We talked a lot about them
7 yesterday, and I don't want to repeat that.  So, I'm
8 moving on.
9          So, let's go to December 11, 2018, which is
10 AH_094283.
11 A  Okay.
12 Q  And then, at 2:51 p.m., on that date,
13 again, December 11, 2018, it says "The Martino funds
14 are in my account."
15          Do you see that?
16 A  I do.
17 Q  So, does that refresh your recollection as
18 to when Martino --
19          And is it -- Martino was -- is related to
20 Four Points Capital?
21 A  Yes, sir.
22 Q  Does that refresh your recollection when
23 Four Points Capital made an investment with you?
24 A  Yes.
25 Q  And was it in or around this period of

67 (Pages 753 - 756)

Page 773

1          A. Hanke
2    Q    Did you review any documents in connection
3 with the preparation of the deposition?
4    A    Other than the one we discussed earlier,
5 which you just showed as an exhibit, I did not.
6    Q    Yeah, I was referring to prior to the
7 beginning of the deposition.
8    A    Sorry, sir.  No.
9    Q    Oh, that's okay.  That's fine.  I
10 understood -- I understood your answer.
11        MR. HEFTER:  I have no further questions
12   for you at this time, Mr. Hanke.
13        THE WITNESS:  Okay, sir.
14        MR. HEFTER:  Thank you very much.
15        THE WITNESS:  Okay.  Appreciate you.  Thank
16 you.
17        MR. HEFTER:  Thanks, everybody.
18        Do you have any -- for the court reporter,
19   do you have any questions for us, the lawyers?
20        THE VIDEOGRAPHER:  I can take us off the
21   record if there is nothing further for the
22   record, but, Amanda, let me know if you want to
23   get anything on the record.
24        THE COURT REPORTER:  We can go off the
25   record.

Page 774

1          A. Hanke
2        THE VIDEOGRAPHER:  All right.  We are going
3   off the record at 6:02 p.m. Central Time, and
4   this concludes today's testimony given by Alan
5   Hanke.  The total number of media units used
6   was nine and will be retained by Veritext Legal
7   Solutions.
8        (Time adjourned: 6:02 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 775

1
2          C E R T I F I C A T E
3
4    I, AMANDA McCREDO, a Shorthand Reporter
5 and Notary Public of the State of New York, do
6 hereby certify:
7    That the witness whose examination is
8 hereinbefore set forth was duly sworn, and that
9 such examination is a true record of the
10 testimony given by such witness.
11 I further certify that I am not related to any
12 of the parties to this action by blood or
13 marriage, and that I am in no way interested in
14 the outcome of this matter.
15
16
17 _____
18      AMANDA McCREDO
19
20
21
22
23
24
25

Page 776

1
2     ERRATA SHEET FOR THE TRANSCRIPT OF:
3 Case Name:      Al-Thani v. Hanke et al.
4 Dep. Date:    October 5, 2023
5 Deponent:    Alan J. Hanke
6
7        CORRECTIONS:
8 Pg.  Ln.  Now Reads      Should Read      Reason
9 ___  ___  _____  _____  _____
10 ___  ___  _____  _____  _____
11 ___  ___  _____  _____  _____
12 ___  ___  _____  _____  _____
13 ___  ___  _____  _____  _____
14 ___  ___  _____  _____  _____
15 ___  ___  _____  _____  _____
16 ___  ___  _____  _____  _____
17 ___  ___  _____  _____  _____
18 ___  ___  _____  _____  _____
19
                  _____
20                Signature of Deponent
21 SUBSCRIBED AND SWORN BEFORE ME
22 THIS___DAY OF_____, 20__
23 _____
24 (Notary Public)  MY COMMISSION EXPIRES:_____
25

72 (Pages 773 - 776)

Page 777

```
 1
 2
 3              ACKNOWLEDGMENT OF DEPONENT

        I,               , do hereby
 4
 5      certify that I have read the foregoing
 6      pages, and that the same is a correct
 7      transcription of the answers given by me
 8      to the questions therein propounded,
 9      except for the corrections or changes in
10      form or substance, if any, noted in the
11      attached Errata Sheet.
12
13
14      _____
              ALAN J. HANKE
15
16  Subscribed and sworn to
17  before me on this_____ day
18  of _____, _____.
19  _____
20  Notary Public
21
22
23
24
25
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.