UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                        :

MOHAMMED THANI A.T. AL THANI,      :

                     Plaintiff,        :

                                  :

            -v-                 :        20 Civ. 4765 (JPC)

                                  :

ALAN J. HANKE *et al.*,             :

                                  :

                  Defendants.     :

                                  :

-------------------------------------------------------------------X
                                          :

MARTIN JOHN STEVENS,             :

                     Plaintiff,        :

                                  :

            -v-                 :        20 Civ. 8181 (JPC)

                                  :

ALAN J. HANKE *et al.*,              :

                                  :        <u>OPINION AND ORDER</u>

                  Defendants.     :

                                  :

-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      In these two cases, which have been consolidated for pretrial purposes, Plaintiffs

Mohammed Thani A.T. Al Thani ("Al Thani") and Martin Stevens proceed against Alan Hanke,

his company IOLO Global LLC ("IOLO"), several of Hanke's alleged associates—Sherry Sims,

Amy Roy-Haeger, Laura Romeo (a defendant only in Al Thani's case), and Sidney Mills Rogers

III—and corporate trusts Subgallagher Investment Trust ("SGIT") (a defendant only in Al Thani's

case) and Guarantee Investment Trust ("GIT") (a defendant only in Stevens's case).  Plaintiffs

allege that Defendants orchestrated a Ponzi scheme through which they were defrauded of millions

of dollars.  In both cases, the schemes, as alleged, followed the same course: Plaintiffs invested

money in Hanke's trading program through the execution of management and deposit agreements with IOLO, which, *inter alia*, represented that Plaintiffs' investments were protected by highly-rated sureties; the hoped-for returns failed to materialize by the due date; Hanke insisted that payment was imminent; and Plaintiffs entered into addenda that modified the payment plans in the original agreements with the expectation of even greater returns. In the end, the transactions that IOLO entered into with Plaintiffs' funds failed to generate a single dollar in profits to IOLO, and the bonds were worthless. Plaintiffs never received the promised returns, nor did they recover their original investments. As a result, Plaintiffs commenced their respective actions, each bringing claims for breach of contract, breach of fiduciary duty and aiding and abetting the same, fraudulent inducement, fraud and aiding and abetting the same, and violations of the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. § 80b-15(b).

Following the close of discovery, Plaintiffs have now moved for partial summary judgment. Al Thani moves for summary judgment against IOLO and Hanke (as IOLO's alter ego) on two of his breach of contract claims (Counts One and Two) and his claim for breach of fiduciary duty (Count Seven), against SGIT and Sims (as SGIT's alter ego) on his third breach of contract claim (Count Three), against Hanke and Roy-Haeger on his two fraud claims (Counts Four and Five), against Hanke on his claim for aiding and abetting IOLO's breach of fiduciary duty (Count Six) and his IAA claim (Count Nine), and against Sims and Roy-Haeger on his claim for aiding and abetting fraud (Count Eight). Stevens moves for summary judgment against IOLO and Hanke on one of his breach of contract claims (Count One), his general fraud claim (Count Three), and his breach of fiduciary duty claim (Count Five), against just Hanke on his fraudulent inducement claim (Count Two), against Sims on his aiding and abetting fraud claim (Count Four), and against GIT on his second breach of contract claim (Count Six).

Over the course of the litigation, the actions as against Rogers were stayed pending arbitration, and the Court granted the requests of counsel for Hanke, IOLO, Sims, SGIT, and GIT to withdraw their representation.  The corporate Defendants failed to retain new counsel and so have not opposed Plaintiffs' motions or otherwise participated in this action since their attorneys' withdrawals.  Hanke, now *pro se*, has not filed any opposition to the summary judgment motions.  On the other hand, Sims and Roy-Haeger, also proceeding *pro se*, filed oppositions.  Then, while Plaintiffs' motions were pending, Hanke was indicted by a grand jury in the Eastern District of New York, where he pleaded guilty to one count of conspiracy to commit securities fraud.  Given these circumstances, Plaintiffs have asked this Court to treat their motions as unopposed with respect to Hanke and grant summary judgment on their claims against him on collateral estoppel grounds in light of his guilty plea.  Plaintiffs also ask the Court to treat their motions as unopposed as to Sims, because her submissions were untimely.  These developments, however, do not relieve this Court of its obligation to examine Plaintiffs' proffered record support and determine independently whether Plaintiffs are entitled to summary judgment.

Because many of Plaintiffs' positions simply do not hold water at least at the summary judgment stage, Plaintiffs' motions for summary judgment are largely denied, except as to certain of their breach of contract claims.  In Al Thani's case, the Court grants summary judgment on Counts One and Two against IOLO and Hanke for breaches of the relevant management deposit agreements, but only as to liability.  In Stevens's case, the Court grants summary judgment on Count One against IOLO and Hanke for breach of the relevant management and deposit agreement, only as to liability, and on Count Six against GIT for breach of the financial guarantee, also only as to liability.  All other claims survive.

## I.  Background

### A.    Facts[1]

#### 1.  Alan Hanke and His Associates

Alan Hanke is the sole owner of IOLO Holdings LLC, a Wyoming corporation formed in

late 2018, and its subsidiary IOLO.  Smaylovsky Decl., Exh. 1 ("Hanke Dep. Tr.") at 543:11-22,

---

[1] Except where otherwise indicated, all docket citations refer to the docket in *Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC) (S.D.N.Y.) ("*Al Thani Matter*").  All docket citations referring to the docket in *Stevens v. Hanke*, No. 20 Civ. 8181 (JPC) (S.D.N.Y.) ("*Stevens Matter*") are so indicated.

The following facts are largely taken from Al Thani's and Stevens's statements of undisputed material facts submitted pursuant to Local Civil Rule 56.1(a), Dkt. 383 ("Al Thani 56.1 Stmt."); Stevens Matter, Dkt. 161 ("Stevens 56.1 Stmt."), the declarations filed in support of each Plaintiff's motion for summary judgment, and the supporting exhibits attached to those declarations, *see* Dkts. 382 ("Miginnis Affidavit"), 384 ("Hefter Decl."); Stevens Matter, Dkts. 158 ("Stevens Decl."), 159 ("Smaylovsky Decl.").  The Court further draws from the transcripts of Amy Roy-Haeger's depositions, Dkt. 411, Exhs. 1, 2 ("Roy-Haeger Dep. Tr."), which the Court directed counsel for Al Thani to provide, *see* Dkt. 410.  Hanke has not filed a responsive statement pursuant to Local Civil Rule 56.1(b) or otherwise responded to any of the facts asserted in either Plaintiff's Rule 56.1 statement.  While Sims and Roy-Haeger, who are proceeding *pro se*, have filed submissions in opposition, including personal affidavits and documents styled as "Response[s] in Opposition" that intersperse the word "disputed" in various places, none of these submissions contains counterstatements "followed by citation to evidence which would be admissible," as required under Local Rule 56.1(d).  *See generally* Dkts. 399-406.  In these circumstances, the Court may deem Plaintiffs' facts admitted.  *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."); *SEC v. LaGuardia*, No. 19 Civ. 895 (ALC), 2023 WL 4266014, at *1 (S.D.N.Y. June 29, 2023) ("[T]he failure to respond [to a Rule 56.1 statement] may allow the district court to accept the movant's factual assertions as true." (alterations in original) (quoting *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004)); Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").  Nevertheless, in exercising its "discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion," *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (internal quotation marks omitted), the Court has confirmed that each fact asserted in Plaintiffs' Rule 56.1

544:11-13, 545:7-9.[2]  Hanke used IOLO as an investment vehicle and raised funds from investors, including Stevens and Al Thani, for placement into a variety of trading schemes.  *See, e.g.*, *id.* at 18:16-22 (Hanke testifying that Stevens was one of the clients he obtained for his trading program), 619:9-16 (Hanke testifying as to Al Thani's initial investment of $3 million in IOLO); Stevens Decl. ¶ 19 (explaining that Hanke informed him that IOLO would be the operating entity for Hanke's trading program).  These trading schemes largely failed.  Hanke Dep. Tr. at 624:19-23 ("[Q]: So, if I look down the 13 investments that IOLO made, it's fair to say, is it not, that none of these investments have paid out a single dollar of returns?  A[:] It's fair to say, but hard to hear.  Yes.").  IOLO had no board of directors or shareholders, and Hanke made all management decisions for that entity.  *Id.* at 545:10-18.  In addition, neither IOLO Holdings LLC nor IOLO had an office for conducting its business other than Hanke's home in Illinois, and Hanke paid all expenses related to the business of these entities out of his personal bank account, although they each maintained their own bank accounts for some period.  *Id.* at 545:19-546:4, 547:14-20, 549:16-550:5.

Hanke began working with Sidney Mills Rogers III,[3] a licensed attorney, on various investment transactions in mid-2017.  *Id.* at 162:18-24, 745:17-746:5.  As the paymaster for IOLO's investment program, Rogers kept a transaction ledger for funds that flowed through his

---

statements that is relied upon in this Opinion and Order is supported by its corresponding citation to the record.  The Court otherwise cites directly to the record.

[2] In fact, Hanke testified that he had "five or six of these IOLO entities," including IOLO Advisors LLC, "all under the heading of IOLO Holdings."  Hanke Dep. Tr. at 543:3-5.

[3] As discussed at *infra* I.B.3, on September 21, 2021, the Court ordered arbitration and stayed all claims in against Rogers in the Al Thani Matter pending that arbitration, Dkt. 231, and on October 26, 2021, the parties stipulated to staying the Stevens Matter as to Rogers also pending arbitration, Stevens Matter, Dkt. 95.  While Al Thani describes Rogers as a "non-party" in his Rule 56.1 statement, Al Thani 56.1 Stmt. at 2, Rogers has not been terminated as a party in this action.

Interest on Lawyer Trust Account ("IOLTA") on IOLO's behalf.  *Id.* at 175:15-18; *see* Hefter

Decl., Exh. 3 ("Rogers Ledger").

Sherry Sims was introduced to Hanke in Dallas, Texas, in early 2019, after which Hanke

asked Sims to be his "Surety Provider."  Al Thani 56.1 Stmt. ¶ 6; *see also* Dkt. 333 (declaration

by Al Thani's attorney, Michael Hefter, submitted in connection with Al Thani's opposition to

Sims's motion to dismiss), Exh. C (e-mail sent by Hanke to Sims (sgit@sgitllc.com) on February

17, 2019); Smaylovsky Decl., Exh. 6 ("Sims Dep. Tr.") at 19:8-12 (Sims testifying that when she

was communicating as part of SGIT's business, she used "the sgitllc.com email account").

 At the time, Sims was among three individuals involved in SGIT, a trust formed under

the laws of Wyoming.  Sims Dep. Tr. at 8:24-9:1 (Sims describing SGIT), 10:14-20 (Sims

discussing Larry Wright's departure from SGIT around 2018), 14:5-9 (Sims testifying that there

were only "four people in all of SGIT from the start": Larry Wright, Michael Casey (Sims's

attorney), Pat Moore (the trustee), and Sims herself).  Sims testified that William Vincent wrote

SGIT's trust.  *Id.* at 9:2-9.  Sims also testified that Vincent was her attorney from 2013 to 2020,

and that he "then took on [Al Thani] as a client."  *Id.* at 44:16-19.

SGIT had no office and no business address other than a post office box in Texas, and Sims

conducted SGIT's business remotely on her laptop, iPad, or phone, using either the single e-mail

account for SGIT (with the domain name "sgitllc.com") or her personal e-mail accounts.  *Id.* at

14:14-15:19, 18:23-20:9.  According to Sims, Hanke prepaid certain fees to SGIT for its provision

of surety bonds for transactions in which Hanke was involved.  *Id.* at 55:18-23.  Specifically,

Hanke "did two blanket policies . . . 10 million and then he came in behind that and did a 5

million," and SGIT received 2.5 percent of that $15 million total.  *Id.* at 51:14-52:8.  But "SGIT

[did not] know where the funds came from for the fees that [it] received."  *Id.* at 55:9-17.  After

the trustee of SGIT resigned, GIT was formed specifically to allow Sims (as trustee of GIT) to provide surety bonds that Hanke had already paid SGIT to provide.  Stevens 56.1 Stmt. ¶¶ 50, 51; *see also* Sims Dep. Tr. at 56:11-20.  GIT operated in the same manner that SGIT did.  Sims Dep. Tr. at 35:15-21.

Amy Roy-Haeger, a consultant based out of Florida, met Hanke sometime before 2016. Roy-Haeger Dep. Tr. at 189:11-25, 190:2-4, 258:12-18.  She was previously affiliated with an entity called Regulatory Compliance Association, where she was involved in putting together compliance conferences for the securities industry.  *Id.* at 191:3-192:11.  In connection with her roles and positions in "the broker world," she knew a lot of the same potential investors that Hanke knew.  *Id.* at 41:5-42:18.

## 2. The Al Thani Matter

Al Thani, who is a citizen of Qatar, *see* Dkt. 35 ("Al Thani Complaint") ¶ 6, and is referred to by his counsel as "Sheikh Mohammed," *see, e.g.*, Hanke Dep. Tr. at 548:5-7, began "seeking a means to enter a wealth enhancement program to fund various humanitarian efforts around the world" in late 2018.  Miginnis Affidavit ¶ 1.  Samuel Miginnis, one of Al Thani's investment advisers, first learned of Hanke through Laura Romeo[4]—Hanke's old friend with whom he reconnected in or around 2015, Hanke Dep. Tr. at 573:9-18—on January 9, 2019, when Romeo sent Miginnis information on Hanke's investment program.  Hefter Decl., Exh. 12 (e-mail chain showing that Romeo forwarded information from Hanke on a managed leveraging program[5] to

---

[4] Romeo is a Defendant only in the Al Thani Matter, and Al Thani has represented that he intends to voluntarily dismiss his claims against her.  Dkt. 407 (Plaintiffs' joint reply memorandum) at 1 n.2.

[5] Although Hanke attached information about a "Managed Levering Program" called "Program 100" in that January 9, 2019 e-mail, he testified that he did not create Program 100, that

Miginnis on January 9, 2019); Miginnis Affidavit ¶ 3.  The next week, on January 16, 2019,

Miginnis met with Hanke in New York City, New York.  Miginnis Affidavit ¶ 3; *see also* Hefter

Decl., Exh. 13 at AH_098154 (text message from Miginnis on January 16, 2019, ostensibly asking

Hanke is if he was on his way).  According to Miginnis, Hanke explained at that meeting that he

could offer various investment programs to provide a "safe haven" for Al Thani's funds.  Miginnis

Affidavit ¶ 3.  Miginnis further attested that in response to Miginnis's request for proof of payment

to prior investors, Hanke showed him bank statements that, according to Hanke, represented

payments to investors resulting from trades that Hanke had facilitated.  *Id.*  In fact, as Hanke

testified, he had never generated any returns for an investor.  Hanke Dep. Tr. at 145:5-9 ("[Q]:

Have you—have you generated any returns for any investor?  A[:] Not yet.  There are still some

outstanding contracts.").  According to Miginnis, Hanke further explained that Al Thani could

choose from several trading options, including moving the funds directly to Hanke's attorney

(presumably Rogers) for investment by IOLO with a surety bond to protect Al Thani's deposit.

Miginnis Affidavit ¶ 3.  Hanke testified that the pair did not discuss a potential investment

specifically by Al Thani in this initial conversation, but rather that Miginnis had merely mentioned

that he had several clients.  Hanke Dep. Tr. at 632:3-8.

Irrespective of whether Al Thani specifically was discussed in that January 16, 2019 initial

conversation, by early February 2019, Hanke and Miginnis were in fact exchanging e-mails about

an investment by Al Thani himself.  Hefter Decl., Exh. 14 (e-mails between Hanke, Miginnis, and

Romeo sent on February 1, 2019, and February 6, 2019).  In an e-mail sent on February 1, 2019,

Miginnis asked Hanke to "verify the returns that [they] have assumed are congruent with historical

---

Program 100 "was never really instituted," and that neither Al Thani nor Stevens invested in that
particular program.  Hanke Dep. Tr. at 630:20-24, 638:23-639:16.

returns for each program [Hanke's] company provides," proposed a call with one of Al Thani's advisers, and informed Hanke that Al Thani's legal advisers were working on the legal paperwork to finalize the investment. *Id.* at PLF00000452. And on February 11, 2019, Hanke met with Miginnis and Stellios (Steven) Papi, another adviser to Al Thani, at Miginnis's office in New York City. Al Thani 56.1 Stmt. ¶ 19. At this meeting, Hanke held himself out as an investment professional and provided documents purportedly showing prior returns to his investors. *Id.* Hanke stressed the protections that would be afforded to Al Thani's funds through Rogers's escrow services and highly rated surety bonds, and he discussed making investments in the monetization of financial instruments such as stand-by letters of credit ("SBLCs"). *Id.* At no point did Hanke disclose that IOLO might invest Al Thani's money in private companies. *Id.*

### a. Al Thani's First Deposit Under the March MDA

On March 12, 2019, Al Thani and IOLO, through Hanke, executed a management and deposit agreement. Hefter Decl., Exh. 17 ("March MDA"). This agreement represented that "IOLO ha[d] specific experience in areas of finance, funding, and investments available for contribution." *Id.* at Recitals. It provided, *inter alia*, that:

- "IOLO for and on behalf of [Al Thani] shall fulfill its mandate in a fiduciary capacity," *id.* § 3.1;

- "[Al Thani] grants to IOLO full power, and sole authority to perform every reasonable act necessary to be done for the transaction in the same extent as [Al Thani] might or could do or cause to be done by virtue hereof if personally present," *id.* § 3.3;

- Al Thani's deposit would be "insured by private deposit Surety [], issued by a syndication of Surety companies, each rated 'A' or better by AM Best" within five days of the execution of the Escrow Agreement, *id.* §§ 5.3.2, 5.4, which Al Thani, Hanke, and Rogers had executed on March 25, 2019 (backdated to March 8), Hefter Decl., Exh. 18; and

- Al Thani would deposit $3 million into Rogers's IOLTA for investment by IOLO, March MDA, App'x A (captioned "Client Assets").

9

Under the agreement's terms, IOLO was required, "[u]pon receipt and clearing of [Al Thani's] Assets into the IOLTA[,] . . . [to] place the Assets into one or more asset enhancement transactions [] to be structured for [Al Thani] by IOLO, to produce the desired funding referenced in Appendix B[.]" *Id.* § 3.2. Appendix B, in turn, provided that IOLO would return $2.4 million to Al Thani within fifty international banking days of the release of Al Thani's initial deposit from escrow, and then make additional payments of $2.4 million every twenty banking days for a total of twelve payments—or $28.8 million total. *Id.*, App'x B (captioned "Client Funding"). Moreover, the March MDA provided that "[i]n the event of any non-performance by IOLO after the period specified in Appendix B, [Al Thani] may at [his] discretion, extend additional time to IOLO to cure the condition of non-performance, or [Al Thani], at [his] discretion, may choose to request the return of its original Assets and IOLO shall comply with this request within seven (7) business days." *Id.* § 5.5. Lastly, it contained the following choice-of-law provision: "This Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Wyoming." *Id.* § 14 (captioned "Governing Law").

In accordance with these terms, on March 27, 2019, Al Thani wired $3 million into Rogers's IOLTA. Rogers Ledger at RSM-A00002 (recording a deposit of $3 million on March 27, 2019, with description "Mohammad Al Thani deposit"); *see also* Hefter Decl., Exh. 19 (Citibank record showing an outgoing payment of $3 million from Al Thani's account on March 26, 2019). And on April 4, 2019, Hanke obtained a $3 million surety bond through Sims and SGIT—with SGIT as "Guarantor," IOLO as the "Principal," and Al Thani as the "Obligee"—to insure Al Thani's deposit against loss; the bond did not require Al Thani to make any payment to SGIT. Hefter Decl., Exh. 20 ("April 4, 2019 Financial Guarantee").

The April 4, 2019 Financial Guarantee provides, among other things, that SGIT "is held and firmly bound unto [Al Thani] . . . in the amount of $3,000,000 . . . to which payment Guarantor unconditionally binds themselves," *id.* at 2 (ECF pagination), that SGIT "jointly and severally bind themselves . . . to [Al Thani] for the performance of the [MDA]," *id.* ¶ 1, and if IOLO "shall be declared in default, by written notice to SGIT, acting in its capacity as Guarantor, shall remedy the default or defaults only by promptly, but not later than one hundred eighty (180) days after SGIT receives notice of any default under the [MDA] from [Al Thani], mak[ing] payment to [Al Thani] under [the Financial Guarantee]," *id.* ¶ 3. It further provides, "This guarantee shall be governed and construed in accordance with the law of the State of Texas." *Id.* ¶ 8.

SGIT was not rated "A" or better by AM Best, as required under the terms of the March MDA. Al Thani 56.1 Stmt. ¶ 26. Hanke testified that he was not aware of SGIT's rating at the time. Hanke Dep. Tr. at 648:3-6. As to what due diligence he performed to determine SGIT's rating, Hanke testified that "the bonds that w[ere] reported to [him] backing the SGIT sureties were rated bonds," but that he did "no diligence whatsoever" to determine whether there was any value to those bonds. *Id.* at 648:7-10, 649:2-4. He explained:

> I was presented with the trust that was backing the surety. We spoke about bonds, as well, and the trust was supposed to have, then, whatever—valued by gold. That's how I determined that there was a value in SGIT, SubGallagher Investment Trust. I did not inspect it.

*Id.* at 651:7-12. Hanke further testified in the context of what diligence he performed that "[Sims] had a good friend of hers, an attorney in Georgia called William Slater Vincent, who came highly recommended by her as a personal person." *Id.* at 649:18-20.

### b.  Hanke's Use of Al Thani's First Deposit

As shown in Rogers's transaction ledger, Al Thani's deposit was swiftly disbursed as payments to Hanke himself and to various promoters and agents with whom Hanke had done business, unauthorized fees and commission payments, the pay-off of a creditor of IOLO, and a series of unauthorized and undisclosed investments.  Specifically, in late March 2019, Hanke directed disbursements of $149,500 and $74,500 respectively to Rick Presley and Tom Ward, his business associates, for unspecified "commissions," and $74,500 to his own personal account.  *See* Rogers Ledger at RSM-A00002.  In April 2019, he directed the distribution of $250,000 to SGIT for "Surety Bonds," *id.* at RSM-A00003, and a total of $30,000 for "advance fees" in connection with Harbour Distribution, a prior IOLO investor, to a group of five individuals that included Hanke and Rogers, *id.* at RSM-A00004; *see also* Hanke Dep. Tr. at 300:11-301:2 (Hanke discussing certain individuals' entitlement to commissions for having "brought" Harbour Distribution).  Hanke further used $150,000 of Al Thani's initial investment for a "return" of investment to Four Points Global, also a prior investor in IOLO.  Rogers Ledger at RSM-A00005; Hanke Dep. Tr. at 756:12-757:3.

The remainder of the three million dollars invested by Al Thani was used for investments in various companies and financial instruments, the largest of which investments was an approximately $1 million loan to Craig Hubner, who apparently went by "Carl Brown" at times (the "Hubner Loan").  *See* Hanke Dep. Tr. at 402:3-16, 447:19-23 (Hanke testifying that "Craig Hubner" and "Carl Brown" are the same person).  Under the terms of this loan agreement, which was executed on March 28, 2019, IOLO was obligated to lend Hubner $1 million toward the monetization of two SBLCs in return for $3 million in interest payments and twenty biweekly payments of $1 million each.  Hefter Decl., Exh. 45 ("Hubner Loan Agreement") §§ 1.2(d), 2.1.

12

The SBLCs' issuer was intended to be Bangko Sentra NG Pilipinas, but Hubner, as the borrower, agreed that IOLO, as the lender, would send the $1 million dollar payment to an account in the name of China Development Fund Limited ("CDF") at BNP Paribas Hong Kong Branch. *Id.* §§ 1.1, 1.4.

As further documented in Rogers's transaction ledger, those funds were initially transferred to China Development Bank ("CDB"), but that transaction was reversed. Rogers Ledger at RSM-A00002 (entry on March 29, 2019, for a wire transfer of $997,500,000 to "China Devt Bank, Ltd"), RSM-A00003 (entry on April 12, 2019, showing a $997,500,000 deposit for "return of 3/29/19 wire to China Devt Bank, Ltd."). With Hanke's approval, the funds were thereafter funneled to an individual named Y.T. Lee, who Hanke, based on representations by Hubner and Roy-Haeger, believed was the director at CDF, a subsidiary and a part of CDB. *See id.* at RSM-A00004 (entry on April 17, 2019, showing wire transfer of $980,000,000 to "Lee Yang Thang"); Hanke Dep. Tr. at 623:2-6, 662:4-8; Roy-Haeger Dep. Tr. at 213:17-19 (Roy-Haeger testifying that "YT Lee was presented as the chief investment officer for [CDF]"). Apparently, Lee had instructed Hanke to send the funds instead to Lee's own personal account at Hang Seng Bank Limited in Hong Kong so that they might be "applied to the . . . contemplated portfolio that Craig [Hubner] ha[s] identified." *See* Hefter Decl., Exh. 46 (e-mail sent on April 17, 2018, from "Yang T Lee" to Hanke with Roy-Haeger copied).

Before Hanke authorized this transfer, his investigation into Hubner, Lee, and the financial institutions involved in this purported transaction was limited to a brief internet search of their names and a single phone call with Lee. *See* Hanke Dep. Tr. at 622:10-25, 624:12-18, 659:12-17; *see also* Hefter Decl., Exh. 47 (Hanke writing in an e-mail to Hubner sent on June 3, 2019: "When you asked for the funds, I gave freely and without question."). Hanke never received proof that

Al Thani's funds were in fact invested in the monetization of the SBLCs described in the loan agreement with Hubner (or any SBLCs, for that matter), and IOLO has received no payments from CDF, Lee, Hubner, or anyone else involved in the purported monetization trade. *See* Hanke Dep. Tr. at 661:18-662:3.

In April and May 2019, Hanke authorized the transfer of approximately $250,000 of Al Thani's funds from Rogers's IOLTA to a company called "Federal Business Services," which Hanke understood to be controlled by a person in "Germany or Zurich." *See* Rogers Ledger at RSM-A00003, RSM-A00005; Hanke Dep. Tr. at 584:5-9. These payments were for the purchase of a "start-up" bank called Metro States Capital Bank, which was located in the Gambia and not authorized to do business in the United States. Hanke Dep. Tr. at 581:5-12, 582:9-18. Pursuant to that transaction, IOLO Holdings LLC became the sole owner of Metro States Capital Bank, which had no employees or managers (other than Hanke) and has not provided any banking services or generated any revenue during the period of ownership by IOLO Holdings LLC. *See id.* at 581:9-584:19.

On April 10, 2019, Hanke authorized the transfer of $225,000 of Al Thani's funds from Rogers's IOLTA to a company called "Ekeko Holdings," which Hanke understood to be a Dubai company controlled by an individual in Argentina. Rogers Ledger at RSM-A00003; Hanke Dep. Tr. at 585:6-12, 588:4-13. This payment was for investment in the monetization of an SBLC held by HSBC Dubai, in which Ekeko Holdings purportedly had an interest. Hanke Dep. Tr. at 585:4-586:4. While Hanke confirmed that the SBLC in question was listed on Euroclear, which he understood to be the "gold standard of verification," *id.* at 587:3-588:22, he performed no further diligence on the investment or on Ekeko Holdings, *id.* at 587:3-588:13. IOLO has never received any payment in connection with its investment in Ekeko Holdings. *Id.* at 588:14-18.

14

On April 18, 2019, Hanke authorized the transfer of $600,000 of Al Thani's funds from Rogers's IOLTA to an entity called "AU-TP," which Hanke understood to be controlled by John Porter, to whom he had been introduced by Roy-Haeger. *See* Rogers Ledger at RSM-A00004; Hanke Dep. Tr. at 554:19-22, 556:3-6, 589:24-590:10; Roy-Haeger Dep. Tr. at 259:4-21. This payment purportedly was a loan for the exploration and extraction of a gold mine in "southern Nevada or southern Oklahoma." Hanke Dep. Tr. at 557:4-7. In addition to interest payments, IOLO was to receive "a backend contract for gold futures and mining" as well as an interest in "life insurance policies that were about to be bought and sold." *Id.* at 555:2-556:2, 557:4-15. Hanke did not independently verify whether Porter had any experience in mining gold or whether there were any gold deposits in Nevada, Oklahoma, or "wherever else Mr. Porter was going to mine gold." *Id.* at 556:18-20, 557:20-23. IOLO has received no payments from Porter, and Hanke has not sought to recover the funds. *Id.* at 556:14-558:9.

On April 18, 2019, Hanke authorized the transfer of $500,000 of Al Thani's funds from Rogers's IOLTA to a company called "Affinity Financial Networks," a technology startup based in Denver, Colorado. *See* Rogers Ledger at RSM-A00004; Hanke Dep. Tr. at 590:11-17, 592:18-20. This payment was intended to be the first tranche of a $3 million equity investment in Affinity Financial Networks. Hanke Dep. Tr. at 590:22-591:13. Hanke never completed the investment, and so Affinity Financial Networks cancelled the contract. *Id.* at 590:22-592:17. Affinity Financial Network failed to return the initial payment, and Hanke has not attempted to recover it. *Id.* at 592:3-592:6.

Lastly, on May 17, 2019, Hanke authorized the transfer of approximately $28,000 of Al Thani's funds from Rogers's IOLTA to a company called "International Global Development." Rogers Ledger at RSM-A00006. Hanke believed that he was investing in the delivery of "an

SBLC—or a bank guarantee" from a bank, possibly Chase Bank in Florida, in exchange for an approximately $5 million to $10 million return. Hanke Dep. Tr. at 593:13-596:15. IOLO has received no return on this investment, and Hanke does not know if the purported instrument was ever issued or delivered. *Id.* at 595:14-596:15.

### c. The First and Second Addenda to the March MDA

Pursuant to the March MDA's terms, the first payment was due around the first week of June 2019—that is, fifty international banking days from the release of the deposit into Rogers's IOLTA. March MDA, App'x B. In advance of that deadline, on May 30, 2019, Hanke, Papi, and Miginnis met in New York City and discussed future dealings stemming from Al Thani's reportedly successful transaction. Al Thani 56.1 Stmt. ¶ 38; *see also* Hanke Dep. Tr. at 667:13-25. On June 20, 2019, Hanke informed Miginnis that he expected the initial payment, which was delayed "due to the items [they had] discussed yesterday," to be processed no later than July 5, 2019, "or sooner if able." Hefter Decl., Exh. 24 (e-mail sent on June 20, 2019, by Hanke to Miginnis). Hanke also conveyed that he would happily provide Al Thani with an addendum. *Id.*

The next day, on June 21, 2019, Hanke, acting on IOLO's behalf, and Al Thani executed the first addendum to the March MDA. Al Thani 56.1 Stmt. ¶ 40; *see* Hefter Decl., Exh. 65 ("First Addendum to the March MDA"). The addendum, in modifying Appendix A of the March MDA (captioned "Client Assets"), rolled IOLO's initial deposit of $2.4 million (referenced in Appendix B of the March MDA) into Al Thani's initial $3 million deposit, thereby increasing Al Thani's total investment to $5.4 million. First Addendum to the March MDA at 2 (ECF pagination). The addendum contained the same surety bond requirements as did the March MDA with respect to the increased deposit amount. *Id.* at 2 (ECF pagination). Also through this addendum, the "desired funding" referenced in Section 3.2 and described in Appendix B of the March MDA was modified

16

to include eleven consecutive payments of $4.32 million at twenty-day intervals, for a total of $47.5 million. *Id.* at 3 (ECF pagination). IOLO never made any of these eleven payments to Al Thani. Hanke Dep. Tr. at 677:8-19.

Around this time and at least as of July 16, 2019, Hanke appeared to be aware of problems with the investment in the CDF SBLCs. That day, he asked Hubner to "[p]lease ensure the wire gets sent today," explaining that he was "under immense pressure to get funds in hands" and that he had "already lost a large amount of credibility." Hefter Decl., Exh. 30 (e-mail). Hanke followed up on July 24, 2019, conveying that "[the] situation has now turned critical for [him] and [his] reputation," that he was in "$8.765M in arrears," and that "[n]o excuses are tolerable." *Id.*, Exh. 31 (e-mail). The record is devoid of any evidence that Hanke disclosed these problems to Al Thani's advisers.

On or around July 19, 2019, Miginnis followed up with Hanke as to the status of the payments on the investment. Al Thani 56.1 Stmt. ¶ 43. In response, Hanke told both Miginnis and Papi that there was a delay in processing the transaction "due in part to an accounting error that occurred at [his] own hand," and represented, "[i]f all goes as planned, they will process and audit on Monday for a Tuesday release of funds or earlier if capable." Hefter Decl., Exh. 26 (e-mail chain showing communications between Hanke and Al Thani's advisers between July 19, 2022, and July 22, 2022) at PLF00000879. Hanke testified that this representation was based solely on information he received from others, including Roy-Haeger and Hubner, and that he had no independent basis to believe that this statement was true when made. Hanke Dep. Tr. at 690:7-19.

On July 25, 2019, Hanke and SGIT executed a second financial guarantee, pursuant to which SGIT issued a $2.4 million bond to cover Al Thani's increased deposit as reflected in the

First Addendum to the March MDA.  Hefter Decl., Exh. 27.  Once again, this bond was not "A" rated by AM Best as required by the terms of the March MDA, and Hanke performed no diligence as to the quality or backing of the bond.  Al Thani 56.1 Stmt. ¶ 44.

That same day, Hanke, on IOLO's behalf, and Al Thani executed a second addendum to the March MDA.  Hefter Decl., Exh. 28 ("Second Addendum to the March MDA").  The second addendum modified Appendix A once again by rolling the $4.32 million deposit under the first addendum to the March MDA into Al Thani's latest investment total of $5.4 million, for a total deposit of $9.72 million.  *Id.* at 2 (ECF Pagination).  And the "desired funding" described in Appendix B was again modified to entail ten consecutive payments of $7.776 million at twenty-day intervals for a total of $77.76 million.  *Id.*  This addendum contained the same surety bond requirement as the March MDA with respect to the increased deposit amount of $9.72 million.  *Id.* at 1 (ECF Pagination).  There is no indication in the record, however, that Hanke procured any additional bonds.

### d.  Al Thani's Second Deposit Under the July MDA

Also on July 25, 2019, Hanke sent Papi a summary of Program 100 and stated that "[h]igher amounts above $10M would be by separate discussion."  Hefter Decl., Exh. 32 (e-mail).  On July 26, 2019, Papi confirmed that Al Thani would invest an additional $3.5 million with IOLO "for 45 days . . . in return for $10m back to" Al Thani under the same terms as provided in the March MDA.  *See* Hefter Decl., Exh. 33 (e-mail from Papi to Hanke).  Accordingly, on July 29, 2019, Hanke (on IOLO's behalf) and Al Thani executed another Management and Deposit Agreement, which provided that Al Thani would deposit $3.5 million with IOLO (into Rogers's IOLTA) with the "desired funding" described as the payment of $10.5 million within forty-five days of the release of Al Thani's funds from escrow.  Hefter Decl., Exh. 34 ("July MDA") § 3.2; *id.*, App'x

B.  The July MDA contained substantially the same terms as did the March MDA, *see generally id.*, including the same choice-of-law provision selecting Wyoming law for the governance, interpretation, and construction of the agreement, *id.* § 15.  On August 8, 2019, Al Thani wired $3.5 million to Rogers's IOLTA pursuant to the terms of the July MDA.  *See* Rogers Ledger at RSM-A0007.

### e.  Hanke's Use of Al Thani's Second Deposit Under the July MDA

As with Al Thani's first deposit, Hanke immediately authorized the disbursement of the entirety of Al Thani's funds, primarily to himself, a variety of associates (many of whom had no ostensible connection to Al Thani's investments), and former investors.  On August 9, 2019, Hanke directed for "commissions" $20,000 to Rogers, $71,500 to Romeo, and $74,500 to Rick Presley. Rogers Ledger at RSM-A00008, RSM-A00009.  He also directed the distribution of $498,750 to Harbour Distribution, the distribution of $199,500 to Four Points Global, and the distribution of $249,375 to an entity called ARCSA, which was associated with a group of former investors in IOLO but which, according to Hanke, had not directly invested any money with IOLO.  *Id.* at RSM-A00007, RSM-A00008; Hanke Dep. Tr. at 611:14-612:2.  Also on August 9, 2019, Hanke directed the distribution of $20,000 to Ted Henderek for no stated reason, *see* Rogers Ledger at RSM-A00009, and on August 29, 2019, Hanke directed the distribution of an additional $13,300 to Henderek, *id.* at RSM-A00011.  Hanke testified that Henderek was "a person that was introduced to me by [Rogers]" and acted as "just another introducer, consultant-broker type of person" with no specific role in IOLO's trading program.  Hanke Dep. Tr. at 610:9-22.  Hanke also directed the distribution of $5,000 each to Javid Mirza and Will Anderson on August 9, 2019, *see* Rogers Ledger at RSM-A00009, and an additional $3,325 to each of them on August 29, 2019, *id.* at RSM-A00011.  According to Hanke, Mirza and Anderson were entitled to commissions in

19

connection with Harbour Distribution's investment. *See* Hanke Dep. Tr. at 300:11-301:2. On August 29, 2019, Hanke also directed the distribution of $331.668.75 to Harbour Distribution and the distribution of $125,000 to SGIT. Rogers Ledger at RSM-A00010. And lastly, Hanke directed the distributions of $249,375 and $448,875 to his personal account. *Id.* at RSM-A00007, RSM-A00010.

During this time, Hanke also used Al Thani's funds to enter into more investments that ultimately would not generate a single dollar in profits to IOLO. *See* Hanke Dep. Tr. at 624:19-23. For instance, on August 9, 2019, Hanke authorized the transfer of approximately $440,000 of Al Thani's funds to a company called "SMB Holdings." *See* Rogers Ledger at RSM-A00007. This payment represented an investment in a "managed leverage program" operated by Jonathan Cannon, whom Hanke never met but understood to live in New York. Hanke Dep. Tr. at 596:16-597:23, 600:7-9. Hanke performed a "[p]retty extensive Internet search" on Cannon and "the attorney that was used for transaction," but he received no evidence that the funds were ever put into a trading program. *Id.* at 599:3-600:21. Hanke expected a return of $40 million on his investment within forty-five days, but he received no returns and has not sought to recover the funds. *Id.* at 598:4-600:21. On September 4, 2019, Hanke authorized the transfer of $37,000 of Al Thani's funds from Rogers's IOLTA to a company called "Connect Miami LLC." Rogers Ledger at RSM-A00011. This payment was an investment in the transfer of bonds to the Brazilian banking system by an individual Hanke believed to be named "Señor Bento." Hanke Dep. Tr. at 600:22-602:16. Hanke anticipated that IOLO would receive $1.8 million in return for its investment, but ultimately received nothing. *Id.* at 601:25-602:15.

Hanke also testified at his deposition about IOLO's investments in aCARDIOz and Vortex Environmental. *Id.* at 604:5-609:23. These investments were provided by Hanke in a general list

of "contracts that IOLO [had] entered for the purpose of generating a return to" nine IOLO investors (including both Al Thani and Stevens), but specific transactions for aCARDIOz and Vortex Environmental are not reflected in the Rogers Ledger. *Id.* at 577:15-19, 579:20-579:18; *see generally* Rogers Ledger; Al Thani Rule 56.1 Stmt. ¶¶ 93, 94 (discussing Hanke's testimony on these transactions but providing no support for the proposition that the investments were made using Al Thani's funds). The Court thus cannot discern whether Al Thani's funds in particular were used to make those investments. The Court, however, notes that neither of these investments generated any revenue for IOLO. *See* Hanke Dep. Tr. at 604:12-605:7, 606:4-24, 607:7-609:23.

### f. Hanke's Continued Misrepresentations and Additional Addenda to the MDAs

Throughout this period, Hanke continued to represent that Al Thani would receive payments of his investments imminently. On August 1, 2019, Hanke organized a call among himself, Miginnis, and Roy-Haeger, whom he called his "trade partner," to "provide an Al Thani transaction update with payment confirmation." Hefter Decl., Exh. 36 (e-mail from Hanke to Miginnis and Vincent[6]). According to Miginnis, Roy-Haeger held herself out on this call as the head of compliance for CDF, and "explained that the funds were on their way to pay the intermediaries" and had been delayed by issues of logistics and accounting. Miginnis Affidavit ¶ 7. Roy-Haeger testified that she "d[id] not think [she] introduced [her]self" at all on this call. Roy-Haeger Dep. Tr. at 123:16-19. She explained, "I just got on and answered questions and gave an update, but I really don't remember." *Id.* at 123:19-21. With respect to these updates, Roy-Haeger testified that she likely relayed any information she had received from Hubner. *Id.* at

---

[6] As mentioned at *supra* I.A.1, Sims testified that Vincent was her attorney between 2013 and 2020, and that he later took on Al Thani as a client. Sims Dep. Tr. at 44:16-19.

123:2-14; *see also id.* at 320:15-21 (Roy-Haeger testifying: "[Papi and Miginnis] thought I was involved in the actual trade, which I was not.  So I really wanted to stick with just updating the facts of where the status was with the transaction for the trade and the status of the loan being paid back.").

On August 6, 2019, Hanke represented to Papi that the payment due under the Second Addendum to the March MDA "[wa]s scheduled to be paid the week of the 19th," that he had "confirmed the date with Sam [Miginnis] and William [Vincent]," and that "they ha[d] the following months schedule[d] as well."  Hefter Decl., Exh. 37 (e-mail chain).  Then, in response to multiple requests for updates, on August 18, 2019, Hanke represented to Papi and Miginnis that "[d]ue to the EID holiday and some continued unrest in Hong Kong the next payment date for the first transaction ha[d] been moved slightly forwar[d] to the first Friday in September" and that "[a]ll subsequent payments [would] continue on the first Friday of every month moving forward."  Hefter Decl., Exh. 35 (e-mail chain).  Hanke testified that he believed this statement to be true at that time based on discussions he had with others, including Roy-Haeger and Hubner.  Hanke Dep. Tr. at 694:19-22.

On September 11, 2019, Hanke represented to Miginnis that "all is good.  Funds [for Al Thani] have been received and are in process."  Hefter Decl., Exh. 13 (text message history).  On Thursday, September 12, 2019, Hanke represented to Papi and Miginnis that "[their] transaction funds have already begun to arrive at the paymaster for distribution," which would be "completed on Friday."  Hefter Decl., Exh. 38.  On or around September 20, 2019, Hanke informed Roy-Haeger by e-mail that Papi and Miginnis had traveled to Chicago and demanded to meet with him day that, and that he thus "need[ed] something written, tangible and verifiable to give them."  Hefter Decl., Exh. 39 (e-mail chain).  Roy-Haeger responded with a detailed explanation of her

understanding that the funds would be cleared in the following week.  *Id.*  At the meeting, Hanke informed Miginnis and Papi that he could not predict when an investment like Al Thani's would "stop paying out profits," such that it was important to get in and out of the transaction as quickly as possible.  Miginnis Affidavit ¶ 8.  According to Miginnis, "[t]his was the first time Hanke expressed this concern."  *Id.*

On or about October 28, 2019, Al Thani, accompanied by Papi and Miginnis, met with Hanke in New York.  *Id.* ¶ 9; *see also* Hefter Decl., Exh. 40 (e-mail from Papi to Hanke sent on October 29, 2019).  Before this meeting, Hanke represented that Al Thani's investments were sound and were expected to pay out "without delay."  Hefter Decl., Exh. 40 (e-mail from Hanke to Papi sent on October 27, 2019).  At that meeting, Hanke (on IOLO's behalf) and Al Thani executed a third addendum to the March MDA, which rolled the overdue initial payment of $7.776 million into Al Thani's initial deposit, for a total of $17.496 million invested, and described a "desired funding" plan that entailed eight payments of $13.996 million on twenty-day cycles following the initial payment, for a total of approximately $112 million.  Hefter Decl., Exh. 41 ("Third Addendum to the March MDA"); *see also* Hanke Dep. Tr. at 703:11-704:22.

In addition, Al Thani asserts that on October 28, 2019, Hanke (acting on behalf of IOLO) and Al Thani executed a second addendum to the July MDA (although Al Thani does not mention a first addendum to this MDA), which increased Al Thani's deposit to $10.5 million and described the "desired funding" as a payment of $22.5 million on February 7, 2020.  *See* Al Thani 56.1 Stmt. ¶ 74.  In support of this statement, Al Thani cites an undated document that includes those terms and is entitled "Addendum #2 to an existing Management and Deposit Agreement bearing [certain

transaction codes matching those in the July MDA]."  Hefter Decl., Exh. 42 ("Second Addendum to the July MDA").[7]

Throughout November 2019, Al Thani's advisers continued to press Hanke on the status of these payments, and Hanke continued to provide assurances as to the timing of the payments that were proving to be false.  On November 4, 2019, Hanke, "acknowledg[ing] [Papi's and Miginnis's] attempts to reach [him]," represented to them that "the funds [would] arrive . . . no later than [that] Wednesday and be completed no later than [that] Friday," claiming that the "information [came] directly from the [l]awyer and the bank."  Hefter Decl., Exh. 15 (e-mail sent by Hanke to Papi and Miginnis on November 4, 2019).  On November 14, 2029, Hanke sent Vincent a copy of a SWIFT message,[8] representing that the payment was "returned" but "re-issued . . . from HSBC Macau, and [was] expected to arrive anytime in which payment will be forthwith."  *Id.*, Exh. 48 (e-mail sent by Hanke to Vincent on November 14, 2019).  On November 18, 2019, Vincent asked Hanke to provide "his best guess as soon as possible" as to when he would receive a wire from Mills.  *Id.*, Exh. 49 (Vincent's text message history) at AH_095595.  Vincent followed up the next day, asking Hanke "to send an email to Steve Papi as soon as possible stating in writing when [Vincent was] to get the next wire," *id.* at AH_095596, and on November 21, 2019, he asked Hanke for "the name of the trader and his contact information so that [Vincent] might reach out to him," *id.* at AH_095597.  Hanke responded that he would forward a letter that

---

[7] Under its caption, however, the document provides, "This Addendum #2 applies to the Management and Deposit Agreement dated 03 March 2019."  *See* Second Addendum to the July MDA at 2 (ECF Pagination).

[8] "The [C]ourt takes judicial notice of the fact that Society Worldwide Interbank Financial Telecommunication ('SWIFT') provides an electronic communication system by the same name for use in interbank correspondence."  *MAM Apparel & Textiles Ltd. v. NCL Worldwide Logistics USA, Inc.*, No. 19 Civ. 3750 (NGG), 2020 WL 4336362, at *2 n.3 (E.D.N.Y. July 28, 2020).

he had received to Vincent, instructing Vincent to "only share upwards." *Id.* And two days later, Hanke represented to Vincent that the wire would be sent to Al Thani "later tonight." *Id.* No money arrived, and on November 27, 2019, Hanke again represented to Vincent that he had "asked for the [] confirmation just a few minutes ago" and would "send [it] immediately" upon receipt." *Id.*

Exchanges between Hanke and Al Thani's representatives of this nature continued through December 2019 and early 2020. And at the same time that Hanke was providing assurances to Al Thani's representatives, his correspondences with his associates indicated his skepticism that the investments would generate the desired funding.

On December 3, 2019, Hanke met with Papi in Fort Lauderdale, Florida. *See* Hefter Decl., Exh. 51 (text messages between Hanke and Papi) at AH_099113. The next day, Hanke represented to Papi that his trade group was "[c]ustodising [sic] the sblc today." *Id.* at AH_099114. In making this statement, Hanke had relied on information provided to him by Cannon. Hanke Dep. Tr. at 742:14-744:6. On December 6, 2019, Romeo told Hanke, "I don't think I can cont[inue] to promote the trade that the sheik [sic] is in since the trader is not following the contract and doing his own thing. Very disappointed in his behavior." *See* Hefter Decl., Exh. 52 at AH_096669. Yet, six days later, Hanke represented to Papi in an e-mail that "HKMA"—that is, the Hong Kong Monetary Authority, *see* Hanke Dep. Tr. at 710:2-6—was "signing off on [the] transfer of funds" that very day. *See* Hefter Decl., Exh. 25. And on December 14, 2019, Hanke again told Papi that funds were "scheduled for Monday release" and that "if solid proof is not provided by close of business on Monday we will go ahead and complete the bond purchase." *See* Hefter Decl., Exh. 53. Then, on December 22, 2019, after a continued string of excuses and non-performance from Hanke, *see* Hefter Decl., Exh. 49, at AH_095598, Vincent expressed his frustration, stating, "I

wish I could get the truth out of you Alan. . . .  According to you[,] the payment should have been received 9 weeks ago.  You told Steve [Papi] it would be very very soon this past Thursday which means tomorrow latest if Steve was told the truth," *see id.* at AH_095599.  On January 1, 2020, Hanke represented to Al Thani's advisers that the payments had again been delayed due to "shortened hours" at "[b]anks, and financial institutions" due to the holidays and "much international travels by the involved parties."  *See* Hefter Decl., Exh. 54 (e-mail sent from Hanke to Papi, Miginnis, and Vincent on January 1, 2020) at PLF00000572-PLF00000573.

Around this time, Hanke turned to Roy-Haeger for information on the status of the investments.  Specifically, on January 4, 2020, Hanke forwarded an e-mail from Papi demanding a meeting and wrote to Roy-Haeger, "I need some support and answers."  Hefter Decl., Exh. 55. The next day, Roy-Haeger responded, "Let's discuss in detail tomorrow.  Unless you want to now." *Id.*

Then, on January 10, 2020, Hanke met with Papi and Miginnis in New York.  Miginnis Affidavit ¶ 10.  Before the meeting, Miginnis had instructed Hanke to "bring something (like a bank document or something from the platform) to show that the funds have been generated and are to be received this week."  Hefter Decl., Exh. 13 at AH_098190.  At the meeting, Hanke mentioned for the first time that there was an issue regarding a specific trade account, claimed to have a backup plan to pay Al Thani using funds from another transaction, and showed Papi and Miginnis pictures on his phone of two offline credit card transfers as proof that the funds were in transit.  Miginnis Affidavit ¶ 10.

On January 15, 2020, Hanke and Romeo engaged in the following text exchange, which reflected their dissatisfaction with trading program in which Al Thani's funds had been invested:

ROMEO: Ok any update on the Sheikh transfer

26

ROMEO: I thought the wire was sent

ROMEO: My concern is bri[ng]ing others into the program and having the same problem getting paid

ROMEO: This is not good

HANKE: Laura.  Others will not have the same experience.  We use another group altogether that's paying just fine.

ROMEO: yes we need to switch to another group.  I don't want to have the same problem with these guys.  It just seems like sheiks [sic] trader just keep telling bs stories not to send a swift in 4 months is unacceptable.

ROMEO: I[t] seems like one lie after another which is very stressful when we make promises to people and don't deliver

HANKE: we've been with a new group for months

ROMEO: can we switch the sheik [sic] to the new group

HANKE: working on it

Hefter Decl., Exh. 52 at AH_096683.  Nevertheless, on January 18, 2020, Hanke represented to Papi that he "was told by China Development Bank . . . that they are still expecting the transaction to be complete within[] the next few business days," and further provided a picture and biography of an individual who purportedly was involved in the transaction.  Hefter Decl., Exh. 57 (e-mail chain) at PLF00000739.  In fact, Hanke had never spoken to anyone at CDB, and he based these representations solely on information he had received from Roy-Haeger.  Hanke Dep. Tr. at 717:6-18, 718:12-16.  On January 23, 2020, Romeo texted Hanke: "is there any way to cut the sheik [sic] a bank transfer and settle this because big trouble is br[ew]ing.  He wants to see action today.  The excuses have run out."  Hefter Decl., Exh. 52 at AH_096689.  That same day, Hanke assured Papi that "the funds have been processed and [are] on the way."  Hefter Decl., Exh. 58 (e-mail).

On February 5, 2020, Miginnis demanded that Hanke send "the confirmation that the bank sent [him] showing the funds were sent," and Hanke again represented that "the sending bank received authority to send [the funds] th[at] afternoon" and reassured Miginnis that the money was "[o]n it's [sic] way."  Hefter Decl., Exh. 13 (text messages between Hanke and Miginnis) at AH_0098196.  Almost a month later, on March 3, 2020, Hanke forwarded to Papi and Miginnis an e-mail from Metro States Capital Bank.  Hefter Decl., Exh. 61 at PLF00000525-PLF00000526. That forwarded e-mail, which was addressed to Hanke and sent from "admin@metrostatescapitalbank.com," stated, "Our corresponding bank, HSBC London, has informed us that your payment is being processed.  As a result, your payment will be made available to your designated account once it is completed."  *Id.*  In forwarding that e-mail, Hanke represented to Papi and Miginnis, "Per our conversation and email[,] this is expected to be completed today."  *Id.* at PLF00000524.  Miginnis had apparently asked Hanke to forward to Papi this "bank email . . . as evidence of transfer" that Miginnis and Papi "badly need[ed] [] for [Al Thani]."  Hefter Decl., Exh. 13 at AH_098199.

But when Miginnis learned approximately one week later that Hanke himself owned Metro States Capital Bank, he told Hanke that this "proof" was "not [] acceptable" because the bank "is under your ownership" and "[t]herefore, proof of transfer or proof of process from that bank is looked at a little funny."  *Id.* at AH_098203; *see also* Hanke Dep. Tr. at 582:25-583:22 (Hanke testifying that he was the sole owner Metro States Capital Bank, which had no employees or managers other than himself).  Hanke responded that the "[f]unds are definitely there" but that the "proof will be from HSBC [and] no one else."  Hefter Decl., Exh. 13 at AH_098203.  Yet, according to Hanke's own testimony, no money was ever transferred to Metro States Capital Bank, and Hanke had no contact with HSBC.  Hanke Dep. Tr. at 726:20-24, 728:22-24.  Ultimately,

IOLO never made any payments to Al Thani under either MDA or any of the addenda thereto, except for a $500,000 payment made to Papi. Hanke Dep. Tr. at 624:24-625:20.

On March 5, 2020, Vincent informed SGIT (through Sims) by e-mail that Al Thani "[would] have to call the [April 4, 2019] Financial Guarantee if Alan Hanke/ IOLO Global, LLC is in default . . . and has not extended for another year the above referenced Financial Guarantee on or before March 31, 2020." Hefter Decl., Exh. 64. Vincent concluded, "Hopefully [Al Thani] will not need me to send such an email on April 1, 2020." *Id.* It is unclear whether Al Thani's representatives subsequently made a demand for payment under the April 4, 2019 Financial Guarantee, and, if so, whether SGIT fulfilled its obligations thereafter.[9]

On April 13, 2020, Al Thani's counsel at DLA Piper sent Hanke a demand letter in connection with his default under the MDAs. Hefter Decl., Exh. 66. Hanke nevertheless continued to seek assurances to provide to Al Thani. On June 22, 2020, Roy-Haeger forwarded Hanke correspondence from Hubner (as "Carl Brown"), which provided a long explanation of the delay of the returns from the loan and represented that the payment would be sent on or before July 10, 2020. *Id.*, Exh. 56. That same day, Hanke responded:

> This doesn't state funds in next few days. It states July 10, 2020. THAT'S OVER TWO WEEKS AWAY!!!! Can someone get me a simple letter on letterhead that states that funds are imminent and will be made available by ????? date? I don't need all the rhetoric and past stuff. Anyone reading it will not believe it anyways. PLEASE. All I [am] asking for is a simple signed letter that will keep everyone calm until the payment is made.

---

[9] In his Rule 56.1 statement, Al Thani claims, "On March 5, 2020, [Al Thani's] representatives called the first SGIT surety bond in light of IOLO and Hanke's default. No payment was made by SGIT." Al Thani 56.1 Stmt. ¶ 118. But in support of that proposition, Al Thani provides a record citation only to the March 5, 2020 e-mail sent from Vincent to Sims, which appears merely to relay Al Thani's *intent* to call the first surety bond later on April 1, 2020. *See* Hefter Decl., Exh. 64.

*Id.* On June 26, 2020, Hanke followed up with text that he had personally drafted, which text instructed Roy-Haeger to "[a]sk Craig to put . . . on some letterhead and sign and date." *See* Hefter Decl., Exh. 62. Hanke further instructed that the text he had prepared "should be on CDF letterhead" because "the funds were sent to CDF directly regardless of where they ended up." *Id.* He added, "Regardless, I need this on a letterhead of some sort even if not on CDF letterhead." *Id.* Roy-Haeger duly provided a letter dated June 27, 2020, with the text Hanke had requested, but on the letterhead of Chinatown Cultural Industries Group Limited. *See* Hefter Decl., Exh. 63; *see also* Roy-Haeger Dep. Tr. at 303:15-304:22 (Roy-Haeger testifying that she asked Hubner to put the provided text on "a formal letterhead," and that Hubner complied except that he "did it on a different company name").

> On July 4, 2019, Roy-Haeger wrote to Hubner:
>
> Craig, how did Alan get left hanging? No call? This is so not fair to him. There was great pressure from your side to get the 1M sent to YT. Call after call to keep YT happy. Alan performed, had to fight the accounts to find the money, and then performed again AGAINST his attorney's advice. Now he just got hammered, not good. Why are all these deals not closing? This is NOT GOOD AT ALL . . . . someone had better fix Alan.

Hefter Decl., Exh. 47 (e-mail).

### 3. The Stevens Matter

In September 2018, Stevens, a retired engineer, came across a managed leveraging program, advertised as "Program 100," on a website operated by SRM Services ("SRM"). Stevens Decl. ¶¶ 5, 6; *see also* Stevens 56.1 Stmt. ¶ 3. The next month, on October 5, 2018, Stevens participated in a conference call with Hanke, as the "Program Manager," and two consultants affiliated with SRM, John Rickman and Jim Lamontagne. Stevens 56.1 Stmt. ¶ 4. According to Stevens, on this call, Hanke proposed to leverage Stevens's initial investment and undertake trades

that would generate a steady payment stream Stevens could use to, among other things, finance a plastic recycling venture Stevens started in 2006.  Stevens Decl. ¶ 8.  Hanke, however, testified that the program in which Stevens ultimately invested was neither Program 100 nor a "leverage program" at all.  Hanke Dep. Tr. at 19:19-20:6, 24:21-23.[10]  Hanke further denied discussing a "managed leveraging program" directly with Stevens on this call.  *Id.* at 46:10-14, 47:13-17.

On October 10, 2018, Stevens received an e-mail (through forwarding by Rickman) with a "Program Manager Information Sheet" attached that Hanke had prepared, signed, and initialed. Stevens Decl. ¶¶ 10-11; *id.*, Exh. 2 (e-mail sent from Rickman to Stevens on October 10, 2018) at 4-9 ("Program Manager Information Sheet"); Hanke Dep. Tr. at 26:9-27:2, 28:22-30:20, 31:2-14. The Program Manager Information Sheet stated that Hanke's company, Bala Trading LLC (the predecessor of IOLO), had seventeen years of trading experience.  Program Manager Information Sheet at 7.  In fact, Bala Trading LLC had only just been formed on December 7, 2016.  Stevens 56.1 Stmt. ¶ 12; *see also* Smaylovsky Decl., Exh. 3.  The Program Manager Information Sheet further represented that any funds invested in the program would be "fully [i]nsured against loss [and] non-performance" in "an amount equal to the deposit amount" and that reinsurance through the program would be obtained through Lloyd's of London.  Program Manager Information Sheet at 7; *see also* Hanke Dep. Tr. at 57:10-58:5.  This feature was among those that made the program attractive to Stevens, who, in evaluating investments, was principally focused on minimizing risk. Stevens 56.1 Stmt. ¶ 8.

---

[10]  As discussed *supra* note 5, Hanke testified that Program 100 "was never really instituted," and that neither Al Thani nor Stevens invested in that particular program.  Hanke Dep. Tr. at 630:20-24, 638:23-639:16; *see also id.* at 62:15-18 (Hanke testifying: "Program 100 never went anywhere.  It never did anything.  It wasn't—we got no client[] under Program 100.").

Through 2019, Stevens kept in contact with Hanke, preparing to invest in Hanke's program "as soon as [he] could free up the funds to do so."  Stevens Decl. ¶ 18.  In January 2019, Stevens attended an in-person meeting about Hanke's program in New York.  *Id.* ¶ 14; *see also* Hanke Dep. Tr. at 47:18-21.[11]  According to Stevens, Hanke "reiterated that he had 17 years of experience as a 'Trader' and 'Program Manager,'" represented "that his program was 'performing,'" and that Stevens's funds would be "secured by reinsurance procured through Lloyds of London."  Stevens Decl. ¶ 14.  At his deposition, however, Hanke denied making such representations to Stevens concerning his experience and his program's past performance, Hanke Dep. Tr. at 54:20-55:4, and denied explaining to Stevens how his program worked, *id.* at 55:7-10 (Hanke testifying: "There wasn't a program or how it works.").  Stevens was not at the time able to allocate the funds necessary to invest in Hanke's program.  Stevens Decl. ¶ 17.

And in or around April 2019, Hanke and SRM informed Stevens that IOLO had replaced Bala Trading LLC as the operating entity for Hanke's trading program.  *Id.* ¶ 19.  On November 27, 2019, Stevens again accessed and reviewed on SRM's website a written outline providing an overview of Program 100.  *Id.* ¶ 29.  Every version of this outline, although prepared by SRM, was approved by Hanke himself.  Stevens 56.1 Stmt. ¶ 16; *see also* Hanke Dep. Tr. at 31:3-14 ("Q[:] Okay.  So they wrote the program overview, but it was per your instructions, correct?  A[:] We

---

[11] In his declaration, Stevens attests that this meeting occurred in January 2020, Stevens Decl. ¶¶ 14-15, but later states that he "signed a Management and Deposit Agreement with Bala Trading LLC and was preparing to invest in [Hanke's] program *after* [their] New York meeting but was unable to allocate the necessary funds before January 11, 2019[.]"  *Id.* ¶ 17 (emphasis added).  The Court assumes that Stevens intended to provide a roughly chronological summary of events in his declaration, and thus infers that Stevens's reference to the year 2020 in Paragraphs 14 and 15 was a typographical error.  Moreover, it appears that Hanke, at his deposition, was shown an e-mail chain dated January 21, 2019, to refresh his recollection as to this New York meeting.  *See* Hanke Dep. Tr. at 48:18-50:22.

worked on it together, yes.  Q[:] Okay.  So you approved, ultimately, the program overview that
SRM prepared.  Is it fair to say?  A[:] There were several versions of it over the period of time.
[Q:] And did you approve each version?  A[:] Yes.").  Under the heading "Program Details," an
overview provides as follows:

- An initial leveraging operation will require approximately 50-banking days
  after funds are released from escrow.  Approximately 20-banking days later,
  Client funding will begin with a series of eleven monthly payments.

- The initial leveraging operation (there is no separate return of capital) will
  increase the Client's program participation up to 350%.

Stevens Decl., Exh. 9 ("Program Overview") at 1.  And under the heading "Funding," it provides:

- Upon the Transaction Paymaster's receipt of funds from the initial leveraging
  operation and for payments to Clients, those payments are made to the Client
  as specified in the MDA.

- A payment can be made to the Client at the end of the leveraging operation.  It
  is, however, expected that any initial payment would be minimal so it does not
  adversely impact the ability to meet the monthly payment schedule.

*Id.* at 2.  Notwithstanding Hanke's testimony that Program 100 was "put out" well before Stevens's
involvement, *see* Hanke Dep. Tr. at 18:19-20:6, Stevens apparently believed that these descriptions
of Program 100, particularly as to the program's leveraging component, pertained to whichever of
Hanke's programs in which he was planning to invest.  *See* Stevens Decl. ¶¶ 32, 33, 35.

    In fact, before he invested in Hanke's program, Stevens *expressly* shared with Hanke his
understanding of the leveraging component described in the program outlines (and, according to
Stevens, in his communications with Hanke).  *Id.* ¶¶ 34, 35; *see* Stevens Decl., Exh. 10 (e-mail
response from Hanke sent on November 28, 2019) at 3 (Hanke responding "Understood" to
Stevens's "proposal [] that after the *initial leveraging* and into the monthly trading[,] that [Hanke]
determine when [he] wish[es] to return the initial invested amount . . . and then cancel the surety"

(emphasis added)).  But once again, according to Hanke, there was no leveraging component to the program that Stevens had invested in; yet Hanke never disclosed that to Stevens.  *See* Hanke Dep. Tr. at 47:13-17, 359:12-24.

### a.    Stevens's Deposit Under the MDA

On November 28, 2019, Hanke e-mailed Stevens a draft management and deposit agreement with IOLO, *see* Stevens Decl., Exh. 11 at 4-9 ("Stevens Draft MDA"), which contained several provisions, including as follows, that were critical to Stevens's decision to execute the agreement, Stevens Decl. ¶¶ 37, 38:

- "IOLO has specific experience in the areas of finance, funding, and investments available for contribution."  Stevens Draft MDA at Recitals.

- "[T]he Parties have agreed to enter into this Agreement for the sole purpose of Client making the Assets described herein available to the loan and asset management services that will be provided by IOLO."  *Id.*

- "Upon receipt and clearing of Client's Assets into the IOLTA account, IOLO will place the Assets into one or more asset enhancement transactions ('Transaction') to be structured for Client by IOLO to produce the desired funding referenced in Appendix B herein, specifically, the lease and monetization of financial instruments for onward trading in Buy/Sell arrangements in which arbitrage has already been negotiated."  *Id.* § 2.2.

- "In the event of any non-performance by IOLO, Client may, at its discretion, extend additional time to IOLO to cure the condition of non-performance or Client, at its discretion, may choose to request the return of its original Assets and IOLO shall comply with this request."  *Id.* § 5.3.

- "There will be associated fees for various products or services as a result of this Agreement, to include Escrow Fees, Surety Fees, Bank Fees and Wire/Swift Fees.  These fees in no way affect the funding schedule described in Appendix B. Any fees will be paid by the Program Manager and are factored in as a normal cost of doing business in this type of transaction."  *Id.* § 10.

Appendix B, in turn, provided that the "desired funding" would entail "an initial payment of Five Million United States Dollars ($5,000,000) [to] be retained for use in a subsequent transaction as

agreed between the Parties" "[in a]pproximately fifty (50) international banking days[.]"   *Id.*,
App'x B.

In reliance on these terms, as well as on Hanke's prior oral and written representations and
the program overview provided on SRM's website, the following day, Stevens signed the
agreement, which Hanke countersigned on behalf of IOLO as "Managing Member."  Stevens Decl.
¶ 38; *see id.*, Exh. 12 (e-mail sent by Hanke to Stevens on November 29, 2019, with signed MDA
attached) at 3-8 ("Stevens MDA").  Under the terms of the Stevens MDA, Stevens was obligated
to transfer $1 million—referred to in the MDA as the "Assets" or "Client Assets"—to Rogers's
IOLTA, as designated in Appendix C of the MDA.  Stevens MDA, App'x A ("The Client Assets
described as the equivalent of One Million United States Dolars ($1,000,000) will be originating
from [HSBC.]"); *id.* § 4.3 ("Client must originate transfer of the Asset to the IOLTA account
designated in Appendix C within three (3) international banking days of receiving a fully executed
copy of the Escrow Agreement"); *id.*, App'x C (designating "S. Mills Rogers III IOLTA Account"
for transfer of the Assets).  Following the execution of this MDA, Stevens signed an escrow
agreement with IOLO and Rogers, pursuant to which agreement Rogers would retain custody of
Stevens's funds until the promised surety was in place.  Stevens Decl. ¶ 44; *see also* Stevens MDA
§ 5.1.

Accordingly, in December 2019, Stevens wired $1 million to Rogers's IOLTA in two
wires—the first in the amount of $300,000, sent on or around December 10, 2019, and the second
in the amount of $700,000, sent on or around December 23, 2019.  Stevens Decl. ¶ 45; *see* Hanke
Dep. Tr. at 23:3-20 ("Q[:] And Mr. Stevens, when he invested with you, he transferred a million
dollars into Mr. Rogers' IOLTA account, correct? . . .  He did provide a million dollars to Mr.
Rogers IOLTA account.  A[:] That's correct.  Yes.").

Hanke never secured insurance for Stevens's investment through Lloyd's of London. Stevens 56.1 Stmt. ¶ 54.  Instead, on January 7, 2020, Hanke provided Stevens with a Financial Guarantee between GIT (as "Guarantor"), IOLO (as "Principal"), and Stevens (as "Obligee"). Stevens Decl. ¶¶ 46, 49; *see id.*, Exh. 13 (e-mail sent by Hanke to Stevens on January 7, 2020, with attached financial guarantee) at 3-12 ("Stevens Financial Guarantee").  The Stevens Financial Guarantee provides, among other things, that GIT "is held and firmly bound unto Martin John Stevens . . . in the amount of $1,000,000 to which payment Guarantor unconditionally binds themselves," Stevens Financial Guarantee at AH_057135, that GIT "jointly and severally bind themselves . . . to [Stevens] for the performance of the [MDA]," *id.* ¶ 1 at AH_057135, and if IOLO "shall be declared in default, by written notice to GIT, acting in its capacity as Guarantor, shall remedy the default or defaults only by promptly, but not later than one hundred eighty (180) days after GIT receives notice of any default under the [Stevens MDA] from [Stevens], mak[ing] payment [to Stevens]," *id.* ¶ 2 at AH_057135.

Sims, who has no knowledge or experience with serving as a surety, is the trustee of GIT. Stevens 56.1 Stmt. ¶¶ 48, 49.  As earlier discussed, after the trustee of SGIT resigned, GIT, which operated in the same manner as did SGIT, was formed specifically to allow Sims to provide surety bonds that Hanke had already paid SGIT to provide.  *Id.* ¶¶ 50, 51.  In the course of its existence, GIT provided only one or two surety bond deals—with one of those being Stevens's transaction. Sims Dep. Tr. at 35:22-36:5.

### b.  Hanke's Use of Stevens's Funds

None of the one million dollars Stevens invested was placed in "asset enhancement transactions" involving "the lease and monetization of financial instruments for onward trading" to generate five million dollars to reinvest, as contemplated in Section 2.2 of the Stevens MDA.

Stevens 56.1 Stmt. ¶¶ 70, 71.  Instead, of the initial $300,000 Stevens wired to Rogers's IOLTA on December 10, 2019, $229,425 went into Hanke's personal account at Woodforest National Bank, *id.* ¶ 56; *see also* Hanke Dep. Tr. at 242:7-14; Smaylovsky Decl., Exh. 8 (December 2018 accounting statement for IOLO reflecting $229,425.00 transfer to Hanke); Smaylovsky Decl., Exh. 23 ("Hanke's Bank Statements") at 2 (statement showing $229,425.00 deposit on December 18, 2020); $29,500 was paid to Richard Presley for introducing Hanke to SRM, Stevens 56.1 Stmt. ¶ 58; $5,000 was paid to Patricia Howard, who had introduced Hanke to Presley, *id.* ¶ 59; $25,000 was paid to Rogers as an extracontractual "bonus," *id.* ¶ 60; and $1,824.94 was paid to Rogers as "escrow fees," *id.* ¶ 61.

Of the subsequent $700,000 Stevens transferred into Rogers's IOLTA on December 23, 2019, $295,000 was used by Hanke to purchase a small airplane, *id.* ¶ 63, which Hanke later sold for $150,000, keeping the proceeds to himself, *id.* ¶ 64; $150,000 was transferred to Hanke's personal account and earmarked for the return of funds to another investor in Hanke's program after that investor cancelled its trade, *id.* ¶ 65; $250,000 was transferred to Hanke's personal account and earmarked for another of Hanke's companies that Hanke claims also invested in his trading program, *id.* ¶ 66; $11,400 was used to pay commissions related to another of Hanke's clients, *id.* ¶ 67; and $3,487 was paid to Rogers as "escrow fees," *id.* ¶ 69.  On April 14, 2020, Hanke directed Rogers to transfer all remaining funds in the IOLTA ($9,915) to Hanke's personal account at Woodforest National Bank.  *Id.* ¶ 68; *see also* Hanke's Bank Statements at 22 (statement showing a $9,915.12 deposit on April 15, 2020).

Hanke used Stevens's money to pay personal expenses including credit card payments, car and boat loan payments, the mortgage on a residence shared with his fiancé, home improvement projects, and a car for his daughter.  Stevens 56.1 Stmt. ¶ 72.  He also used these funds to make

personal investments, including on behalf of an entity that Hanke and his fiancé had started and for which Hanke retained any proceeds.  *Id.* ¶ 73.

### c.  The Addendum to the Stevens MDA

In early April 2020, Stevens e-mailed Hanke asking about the status of his investment, given his understanding that the fifty-day leveraging period had ended in March of that year. Stevens Decl. ¶ 52, Exh. 16 at 3 (e-mail sent from Stevens to Hanke on April 8, 2020).  In response, on April 9, 2020, Hanke sent Stevens a proposed addendum to the Stevens MDA, which addendum Stevens entered into on April 15, 2020.  Stevens 56.1 Stmt. ¶¶ 75, 76; *see also* Stevens Decl., Exh. 17 (e-mail sent from Hanke to Stevens on April 9, 2020, with proposed addendum attached); *id.*, Exh. 18 ("Stevens MDA Addendum").  This addendum modified Appendices A and B of the Stevens MDA, and under the caption, "Description of the Cash Assets," provides as follows:

> **Assets Forward Amount:** The Assets are described as Five Million Two Hundred Thousand United States Dollars ($5,200,000) on deposit that was derived (Assets Forward Amount) from the previous transaction between the Parties.
>
> **Payment Timing:** Unless addressed in an addendum, it is understood that forty (40) international banking days following Moved Forward Date [April 6, 2020] a payment equivalent to eighty percent (80%), or Four Million One Hundred and Sixty Thousand United States Dollars ($4,160,000.00) shall be credited.  Any payments desired by the Client will be noticed to IOLO two weeks or more prior to the payment date and paid directly into the account specified in Appendix D below [*i.e.*, Stevens's bank account in Portugal] unless otherwise notified.

Stevens MDA Addendum at AH_008408; Stevens Decl. ¶¶ 56-57.  Hanke testified that he expected the amount referenced in the addendum (*i.e.*, $4,160,000.00) to be funded by a transaction IOLO had entered into with CDF.  Hanke Dep. Tr. at 395:2-5, 398:16-399:10.  And Hanke represented to Stevens that CDF was a subsidiary of CDB, that Stevens's money had been paid into an account in the name of CDB, and that payment would come from CDB and directly to Rogers before being disbursed to Stevens's account.  Stevens Decl., Exh. 24 at 2 (e-mail sent on

July 3, 2020, from Stevens to Hanke summarizing contents of a conversation held that day); *see also id.* Exh. 23 at 2 (e-mail sent from Hanke to Stevens on June 30, 2020, in which Hanke wrote, "To recap, the money goes from me to Mills, from Mills to CDB, from CDB back to Mills for distribution."); Hanke Dep. Tr. at 448:2-449:2.  Yet those funds failed to materialize by the specified deadline of on or around May 29, 2020 (*i.e.*, forty international banking days from the "Moved Forward Date" of April 6, 2020).  *See* Smaylovsky Decl., Exh. 32 at 2 (Stevens describing IOLO's default on the Stevens MDA and the Stevens MDA Addendum in an e-mail to GIT).

### d.  Hanke's Continued Misrepresentations and IOLO's Default

Through June and July 2019, Stevens was in regular contact with Hanke about the status of his investment and about other concerns.  On June 16, 2020, Hanke assured Stevens via e-mail that he was "taking as much effort as possible to ensure [Stevens's] transaction moves along as quickly as possible" and referenced a conversation that Stevens apparently had with Rogers about the "imminent" arrival of Stevens's funds.  Stevens Decl., Exh. 19 at 2.  On June 21, 2020, Stevens sent Hanke an e-mail in which Stevens, apparently outlining the substance of a phone call the two had the day before, wrote, "To recap, you have recently been in contact directly or indirectly with China Development Bank, the bank for the trading platform, who are going to send you a letter to confirm payment dates for the first and subsequent payments for our trade, and that you will send me a copy of this letter once received."  *Id.*, Exh. 20.  On June 29, 2020, Stevens e-mailed Hanke about the lawsuit that Al Thani had just filed against Hanke.  *Id.*, Exh. 22 at 3.  Hanke responded that the suit was filed "after many months of payments and unwillingness to . . . make further payments on additional contracts."  *Id.*  In fact, Hanke had not made any payments to Al Thani under their agreements.  *See* Hanke Dep. Tr. at 423:11-13.  On June 30, 2020, in response to Stevens expressing his understanding that "the money goes from me [Stevens] to Mills, from Mills

to CDB, from CDB back to Mills for distribution," and further that the pertinent contractual arrangements related to Stevens's investment were between "Stevens and IOLO under a MDA" and "IOLO and CDB under an FAMA as Principal Counterparts," Hanke wrote, "Correct." Stevens Decl., Exh. 23 at 2-3. But apparently, Hanke had no idea what a "FAMA" even was. *See* Hanke Dep. Tr. at 414:3-5, 434:14-19. Between July 6 and 8, 2020, Stevens repeatedly reached out to Hanke, by phone and e-mail, to determine when the payments would arrive in his account. Stevens Decl. ¶ 78; *see also id.*, Exh. 25.

Still, Hanke and IOLO failed to credit $4,160,000.00 to Rogers's IOLTA or make any payments to Stevens's account. Stevens Decl. ¶¶ 58, 80. Accordingly, Stevens demanded that Hanke immediately return the entirety of his investment, as required under MDA Section 5.3, both on the phone and through writing. Stevens 56.1 Stmt. ¶ 95. On July 16, 2020, Hanke agreed to return Stevens's $1 million investment. *Id.* ¶ 96; *see also* Stevens Decl., Exh. 32 at 2 (e-mail from Stevens to GIT). But Hanke failed to do so. Stevens 56.1 Stmt. ¶ 96.

### e.  Stevens Notifies GIT of IOLO's Default

As a result, on August 14, 2020, Stevens notified GIT of IOLO's default in writing. *Id.* ¶ 97; *see* Smaylovsky Decl., Exh. 32. GIT received this written notice at least by August 18, 2020. *See id.*, Exh. 32 (e-mail from "Standard Financial Global Investment Technology [information@sfgit.com]" to Hanke sent on August 18, 2020, forwarding Stevens's August 14, 2020 e-mail to GIT). GIT failed to perform its obligations under the guarantee, however. Stevens 56.1 Stmt. ¶ 96.

Then, on August 19, 2020, Stevens wrote directly to CDB to determine if there was any truth to Hanke's claim that IOLO had entered into an agreement with that bank or the CDF.

Stevens Decl. ¶ 82; *see also id.*, Exh. 27.  Neither the CDB nor the CDF had any connection with

Hanke, his associates, or IOLO.  Stevens Decl. ¶ 82; *see also id.*, Exh. 27.

## B.    Procedural History

### 1.    Al Thani Action Before Consolidation

On June 22, 2020, Al Thani commenced this action, proceeding against Hanke, IOLO, and

John Does 1-100 in his initial Complaint.  Dkt. 1.  In August 2020, Hanke and IOLO, who were

both represented by counsel at the time, moved to dismiss the action for lack of personal

jurisdiction and for failure to state a claim.  Dkts. 25-28.  In response, on September 25, 2020, Al

Thani amended his Complaint, naming Rogers, Romeo, Roy-Haeger, SGIT, and Sims as

Defendants, and adding, *inter alia*, factual allegations regarding each Defendant's conduct in

perpetrating the claimed fraud and regarding this Court's exercise of personal jurisdiction over

each Defendant.  *See generally* Al Thani Complaint.  In the operative Amended Complaint, Al

Thani brings claims for breach of the March MDA against Hanke and IOLO, *id.* ¶¶ 76-83 (Count

One), breach of the July MDA against Hanke and IOLO, *id.* ¶¶ 84-91 (Count Two), breach of the

surety bonds against SGIT and Sims, *id.* ¶¶ 92-98 (Count Three), fraudulent inducement against

all Defendants, *id.* ¶¶ 99-112 (Count Four), fraud against all Defendants, *id.* ¶¶ 113-122 (Count

Five), aiding and abetting fraud against Rogers, Romeo, Roy-Haeger, Sims, and SGIT, *id.* ¶¶ 123-

127 (Count Six), breach of fiduciary duties against Hanke and IOLO, *id.* ¶¶ 128-131 (Count

Seven), aiding and abetting breach of fiduciary duties against Hanke, *id.* ¶¶ 132-136 (Count Eight),

and violations of the IAA against Hanke and IOLO, *id.* ¶¶ 137-141 (Count Nine).

In November 2020, Hanke and IOLO moved again to dismiss the Amended Complaint for

lack of personal jurisdiction and failure to state a claim.  Dkts. 62-65.  That same month, Roy-

Haeger, proceeding *pro se*, moved to dismiss for lack of personal jurisdiction or to transfer venue,

as well as for failure to state a claim. Dkt. 82. Then, on December 11, 2020, Sims and SGIT, represented by counsel at the time, moved to dismiss the claims against them for lack of personal jurisdiction. Dkt. 96. That same day, Rogers, through counsel, likewise moved to dismiss the action on personal jurisdiction grounds, and he further argued that venue was improper (urging severance of the claims against him under Federal Rule of Civil Procedure 21 and transfer to Georgia under 28 U.S.C. § 1404(a)), and that the claims against him should be dismissed for failure to state a claim or stayed pending arbitration pursuant to 9 U.S.C. § 3. Dkt. 99. Also in December 2020, Romeo appeared in the action *pro se* and answered the Amended Complaint. Dkts. 105 (appearance), 109 (answer).

On March 17, 2021, while these four motions were pending, Jeffrey Dweck, counsel for Sims and SGIT, informed the Court that Sims had filed for bankruptcy, triggering an automatic stay of the action as to her. Dkt. 168. Two days later, Mr. Dweck moved to withdraw as counsel for just SGIT, explaining that, upon the resignation of SGIT's trustee, he had been unable to speak to anyone on behalf of SGIT and that his firm had not been paid for the services rendered. Dkt. 169. The Court granted the request over Al Thani's objection. Dkts. 173, 178-179, 180 (order issued on April 12, 2021).

On May 11, 2021, the Court denied Hanke and IOLO's motion to dismiss for lack of personal jurisdiction and failure to state a claim in its entirety, and—finding that Al Thani had failed to sufficiently plead a basis for this Court to exercise personal jurisdiction over the remaining Defendants (except for Sims, given the automatic stay of the action as against her)—granted Al Thani's request for jurisdictional discovery, while staying consideration of the remaining arguments for dismissal and transfer. *See Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC), 2021 WL 1895033, at *5-20 (S.D.N.Y. May 11, 2021). On May 20, 2021, the Court circumscribed the scope

of jurisdictional discovery, Dkt. 194, which was initially scheduled to conclude by mid-July 2021. Dkt. 205.

On June 9, 2021, counsel for Hanke and IOLO—specifically Thomas Herndon on behalf of Brooks, Berne & Herndon PLLC ("BBH")—requested leave to move to withdraw the firm's representation, citing Hanke's and IOLO's "fail[ure] to meet various obligations . . . that have rendered it unreasonably difficult for [the firm] to carry out its employment effectively." Dkt. 208. The next day, the Court received notice that Hanke had filed for bankruptcy. Dkt. 211. And the day after that, the Court learned during a telephonic status conference that IOLO also had filed for bankruptcy. *See* Dkt. 220 (transcript of June 11, 2021 conference) at 12:6-17; *see also* Dkt. 215 ¶ 6. On June 28, 2021, Rogers withdrew his motion to dismiss for lack of personal jurisdiction and asked the Court to rule on his outstanding arguments for dismissal and his requests for a stay pending arbitration or a transfer to Georgia, as set forth in his December 2020 motion. Dkt. 218. On September 21, 2021, the Court, construing Rogers's motion to dismiss as a motion to compel arbitration, ordered arbitration and stayed all claims against Rogers pending that arbitration. Dkt. 231. That same day, BBH renewed its request to withdraw as counsel for Hanke and IOLO, adding that Mr. Herndon had since left the firm. Dkt. 233.

At a conference held on September 27, 2021, the Court denied BBH's request to withdraw as counsel for Hanke and IOLO, and further denied without prejudice SGIT's pending motion to dismiss. *See* Minute Entry for Proceedings on September 27, 2021.

Jurisdictional discovery thus proceeded only as to Roy-Haeger, and after multiple extensions, concluded on December 15, 2021. *See* Dkts. 238 (setting deadline for November 16, 2021), 241 (extending deadline to November 19, 2021), 244 (extending deadline to December 15, 2021), 247 (extending deadline to December 15, 2021). Al Thani and Roy-Haeger thereafter

submitted supplemental briefing on Roy-Haeger's outstanding November 2020 motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue. Dkts. 250-251, 253. The Court denied that motion on February 17, 2022. *Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC), 2022 WL 489052, at *5-10 (S.D.N.Y. Feb. 17, 2022).

### 2. Stevens Action Before Consolidation

On October 2, 2020, Stevens filed an eight-count Complaint against Hanke, IOLO, GIT, Sims, Rogers, Roy-Haeger, and John Does 1-100, *see* Stevens Matter, Dkt. 2 ("Stevens Complaint"), alleging breach of the November 2019 MDA against Hanke and IOLO, *id.* ¶¶ 79-86 (Count One), fraudulent inducement against all Defendants, *id.* ¶¶ 87-97 (Count Two), fraud against all Defendants, *id.* ¶¶ 98-107 (Count Three), aiding and abetting fraud against Rogers, GIT, Sims, and Roy-Haeger, *id.* ¶¶ 108-112 (Count Four), breach of fiduciary duties against Hanke and IOLO, *id.* ¶¶ 113-117 (Count Five), aiding and abetting breach of fiduciary duties against Hanke, *id.* ¶¶ 118-122 (Count Six), violations of the IAA against Hanke and IOLO, *id.* ¶¶ 123-127 (Count Seven), and breach of the Financial Guarantee against Sims and GIT, *id.* ¶¶ 128-138 (Count Eight).

The undersigned accepted the case as related to the Al Thani Matter, and, in December 2020, stayed motions practice in the Stevens Matter pending resolution of the motions to dismiss in the Al Thani Matter. *See* Dkts. 51, 55. On May 20, 2021, Stevens moved to consolidate his case with the Al Thani Matter. Dkts. 76-79. While that motion for consolidation was pending, in October 2021, the parties stipulated to a stay pending arbitration of the Stevens Matter as to Rogers. Dkt. 95. On February 17, 2022, the Court granted Stevens's consolidation motion, which was unopposed, and consolidated the two actions for pretrial purposes, including discovery and the resolution of dispositive pretrial motions. *Stevens v. Hanke*, Nos. 20 Civ. 8181 (JPC), 20 Civ. 4765 (JPC), 2022 WL 489054, at *3-4 (S.D.N.Y. Feb. 17, 2022).

### 3. The Consolidated Action

On February 18, 2022, counsel for Al Thani and counsel for Stevens jointly advised the Court that the bankruptcy stays as to Hanke, IOLO, and Sims had been lifted. Dkt. 257. Discovery thus proceeded as to all Defendants except for Rogers. *See* Dkt. 258. On February 22, 2022, counsel for Hanke and IOLO—at that point called Brooks & Berne, PLLC ("B&B") due to Mr. Herndon's departure—renewed its intent to seek leave to withdraw as counsel. Dkt. 259. The next day, Mr. Dweck moved to withdraw as counsel for Sims, citing his inability to reach Sims and her nonpayment of his firm's services. Dkt. 261. (As mentioned at *supra* I.B.1, the Court earlier granted Mr. Dweck's request to withdraw as counsel for SGIT. Dkt. 178.) The day after that, Mr. Herndon renewed his request to withdraw as counsel for Hanke and IOLO. Dkt. 262.

On March 8, 2022, the Court held a conference, at which counsel for Al Thani listed ongoing deficiencies in Sims's and Hanke's production. *See* Dkt. 323 (transcript of March 8, 2022 conference) at 6:21-12:7. The Court thus denied without prejudice Mr. Dweck's motion to withdraw as counsel for Sims, as well as Mr. Herndon's and B&B's requests to withdraw as counsel for Hanke and IOLO, pending the completion of any outstanding discovery. *Id.* at 40:22-41:8, 79:20-80:6. On June 6, 2022, Plaintiffs informed the Court that the earlier identified deficiencies at to Sims's document production had been resolved. Dkt. 293. And so, with this Court's leave, Mr. Dweck once again renewed his requests to withdraw as counsel for Sims and further moved to withdraw as counsel for GIT. *See* Dkt. 299; Stevens Matter, Dkts. 124, 127. On June 16, 2022, the Court granted the requests, which were unopposed, and advised GIT that it *must* retain new counsel to participate in the two actions. Dkt. 302; *cf. Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d Cir. 2007) (explaining that a corporate entity may not proceed *pro se*); *see also J.J. Rissell, Allentown, PA Tr. v. Marchelos*, 976 F.3d 1233, 1236 (11th Cir. 2020) ("[A] nonlawyer

trustee has no authority to represent a trust in court. A trustee represents the interests of others and would therefore be engaged in the unauthorized practice of law if allowed to appear *pro se* as a nonlawyer." (internal quotation marks omitted)); *Van De Berg v. Comm'r*, 175 F. App'x 539, 541 (3d Cir. 2006) ("Thus, a non-lawyer trustee . . . may not represent a trust *pro se* before this Court."); *Knoefler v. United Bank of Bismarck*, 20 F.3d 347, 348 (8th Cir. 1994) ("A nonlawyer, such as these purported 'trustee(s) *pro se*[,]' has no right to represent another entity, *i.e.*, a trust, in a court of the United States.").

That same day, Court granted Al Thani's request for jurisdictional discovery as to Sims and directed Plaintiffs and Sims to meet and confer regarding the appropriate scope and timeline for such discovery. Dkt. 303. That discovery concluded on August 26, 2022, Dkt. 327, and on September 9, 2022, Al Thani and Stevens filed a supplemental brief in further opposition to Sims's outstanding December 2020 motion to dismiss for lack of personal jurisdiction. Dkts. 332-333. The Court denied Sims's motion in June 2023. Dkt. 345.

Meanwhile, deficiencies in Hanke and IOLO's discovery production persisted. *See* Dkt. 296. On June 24, 2022, while they expressed doubts as to the completeness of Hanke's production, Plaintiffs reported the resolution of then-current discovery disputes with Hanke and, citing Hanke's "extensive history of discovery abuses in this case," requested leave to move for sanctions against both Hanke and his counsel. Dkt. 310. On July 25, 2022, Mr. Herndon renewed his request to withdraw as counsel for Hanke and IOLO in both actions, while consenting to jurisdiction for the purpose of any sanctions motion. *See* Dkts. 319-321. Kelechi Ajoku, a former associate at B&B and counsel for Hanke and IOLO, also moved to withdraw as counsel for those Defendants. Dkt. 330. The Court granted these requests. Dkts. 329, 331.

On September 13, 2022, Al Thani moved for sanctions against Hanke, IOLO, and Mr. Herndon, requesting that the Court enter an order requiring the three to pay, jointly and severally, Al Thani's reasonable costs, including attorneys' fees, in seeking compliance with the Court's discovery orders. Dkts. 334-336. In September 2023, the Court granted the motion in part and ordered Hanke and IOLO to pay the reasonable attorneys' fees and costs incurred by Al Thani in connection with Hanke's noncompliance with the Court's discovery orders and ordered Mr. Herndon to pay $500 in sanctions to Al Thani. *See Al Thani v. Hanke*, Nos. 20 Civ. 4765 (JPC), 20 Civ. 8181 (JPC), 2023 WL 5744288, at *16 (S.D.N.Y. Sept. 6, 2023).

On October 23, 2023, Al Thani and Stevens each moved for summary judgment. Dkt. 380-384; Stevens Matter, Dkt. 157-162. As earlier previewed, Al Thani moves for summary judgment against IOLO (and Hanke as IOLO's alter ego) on Counts One (breach of the March MDA), Two (breach of the July MDA), and Seven (breach of fiduciary duty); against SGIT (and Sims as SGIT's alter ego) on Count Three (breach of the surety bonds); against Hanke on Counts Four (fraud), Five (fraudulent inducement), Six (aiding and abetting IOLO's breach of fiduciary duty), and Nine (violations of the IAA); against Roy-Haeger on Counts Four (fraud) and Five (fraudulent inducement); and against both Sims and Roy-Haeger on Count Six (aiding and abetting fraud). *See* Dkt. 381 ("Al Thani SJ Br.").[12] Stevens moves for summary judgment against IOLO and

---

[12] In his supporting brief, Al Thani notes that the defaults by both IOLO and SGIT (unrepresented corporate entities in this action) "will be the subject of a forthcoming motion for default judgment." Al Thani SJ Br. at 1 n.1, 2 n.2. At the same time, Al Thani expressly argues his entitlement to judgment as a matter of law against IOLO on Counts One, Two, and Seven, and against SGIT on Count Three. *Id.* at 11-16, 23-24. While it is thus unclear whether Al Thani is seeking judgment against IOLO and SGIT through his instant summary judgment motion or whether he intends to seek judgment against the two corporate entities through a later-filed default judgment motion, the Court assumes the former, given the strong preference for courts to adjudicate matters on their merits. *See Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 174 (2d

Hanke on Counts One (breach of the Stevens MDA), Three (fraud), and Five (breach of fiduciary duty); against Hanke on Counts Two (fraudulent inducement) and Six (aiding and abetting breach of fiduciary duty); against Sims on Count Four (aiding and abetting fraud); and against GIT on Count Eight (breach of the Financial Guarantee). *See* Stevens Matter, Dkt. 160 ("Stevens SJ Br."). The corporate Defendants—IOLO, SGIT, and GIT—failed to retain new counsel after their original counsel's withdrawal, and so have not participated in either action since those withdrawals. The individual Defendants, all proceeding *pro se*, failed to timely oppose Plaintiffs' summary judgment motions.

On February 8, 2024, Plaintiffs informed the Court that Hanke had been indicted by a federal grand jury in the Eastern District of New York. Dkt. 387; *see id.*, Exh. A ("Indictment"). The indictment, which was unsealed on January 25, 2024, charged Hanke with conspiracy to commit wire fraud, Indictment ¶¶ 25-26 (Count One), conspiracy to commit securities fraud, *id.* ¶¶ 27-29 (Count Two), conspiracy to commit money laundering, *id.* ¶¶ 30-31 (Count Three), four counts of wire fraud, *id.* ¶¶ 32-33 (Counts Four through Seven), false bankruptcy declaration, *id.* ¶¶ 34-35 (Count Eight), and bankruptcy fraud, *id.* ¶¶ 36-37 (Count Nine). The indictment alleged that between November 2018 and August 2021, Hanke and two co-conspirators—the first described as an individual residing in Texas and the second described as individual residing in Georgia with a license to practice law in Georgia, *id.* ¶¶ 2-3—"conspired to defraud clients of IOLO Global and Bala through a series of misrepresentations and omissions." *Id.* ¶ 8. As further alleged, Hanke persuaded clients and potential clients that he was a sophisticated investor with access to high-yield instruments, falsely promised that IOLO or Bala Trading LLC would invest

---

Cir. 2001) ("It is well established that default judgments are disfavored. A clear preference exists for cases to be adjudicated on the merits.").

their money (often in SBLCs) and produce large returns within short periods of time, falsely represented that their investments were protected by highly-rated sureties, and subsequently misappropriated the clients' investments funds, transferring them to his co-conspirators and other associates, to his private accounts, and to other clients. *Id.* According to the Indictment, Hanke perpetrated this fraud through the execution of management and deposit agreements that represented that either IOLO or Bala Trading LLC would manage the clients' funds in a "fiduciary capacity" and invest the funds "into one or more asset enhancement transactions." *Id.* ¶ 9. On February 16, 2024, Hanke asked this Court to stay the instant proceedings pending resolution of his criminal matter. Dkt. 388.

On April 4, 2024, Roy-Haeger requested an extension to oppose Plaintiffs' summary judgment motions. Dkt. 391. The next day, April 5, 2024, the Court denied Hanke's request to stay the instant matters and *sua sponte* extended the deadline to May 3, 2024, for all Defendants, including Hanke, Roy-Haeger, and Sims, to oppose the pending summary judgment motions. Dkt. 395. Roy-Haeger and Sims filed respectively on May 3, 2024, and May 5, 2024 (past the deadline), a curious batch of submissions, including personal affidavits and documents styled as "Response[s] in Opposition," which intersperse text from Al Thani's motion for summary judgment with factual objections unaccompanied by any record citations. *See* Dkts. 399-401 (Sims's submissions); 404-406 (Roy-Haeger's submissions).[13] Romeo also filed a submission

---

[13] Certain of Sims's submissions appear largely to be copied from Roy-Haeger's submissions. *Compare* Dkt. 404 (captioned "Roy-Haeger Response in Opposition to Plaintiff's Motion for Summary Judgment") (filed on May 3, 2024), *with* Dkt. 400 (captioned "Sims Response in Opposition to Plaintiff's Motion for Summary Judgment") (filed on May 5, 2024); *compare* Dkt. 405 (captioned "Roy-Haeger Affidavit to Motion for Summary Judgment") (filed on May 3, 2024), *with* Dkt. 401 (captioned "Sims Affidavit to Motion for Summary Judgment") (filed on May 5, 2024).

captioned "Motion to Dismiss Laura Romeo" in the Al Thani Matter, Dkt. 396, and another submission captioned "Objection Statements from Defendant Laura Romeo on Summary Judgment," Dkt. 397, although Al Thani has not moved for summary judgment against her. On May 17, 2024, Plaintiffs filed a joint reply, in which Al Thani expressed his intent to voluntarily dismiss his claims against Romeo and asked the Court to grant their summary judgment motion as to Hanke and Sims (given her untimely opposition) as unopposed. Dkts. 407 ("Reply") at 1, 408.

On June 11, 2024, Hanke pleaded guilty in the Eastern District of New York to Count Two of the Indictment for conspiracy to commit securities fraud. *United States v. Hanke*, 24 Cr. 27 (RER) (E.D.N.Y. June 11, 2024), Dkt. 20 (minute entry of change of plea hearing held on June 11, 2024); *see also* Dkt. 409, Exh. A ("Hanke Guilty Plea Tr.") at 22:4-6, 24:14-22.[14]  At his plea hearing before the Honorable Ramon E. Reyes, Jr., Hanke allocuted to the following:

> [D]uring the period of late 2018 and 2021, I solicited investments from customers of mine and in soliciting those investments, falsely informed those investors that they would receive larger than normal return for that period of time. Those guarantees were false and the investors never ended up getting those returns as promised. I had an agreement with others to solicit those investments and received these investments. In furtherance of the scheme, on March 12, 2019, I signed the management deposit agreement with an investor regarding an investment of about $3 million. On or about March 27th of 2019, that investor wired $3 million into an associate's bank account and never got the returns he was expecting.

Hanke Guilty Plea Tr. at 22:21-23:9. He further allocuted to undertaking those actions "knowingly and willfully." *Id.* at 23:10-12.

On June 25, 2024, Plaintiffs jointly informed the Court of Hanke's guilty plea, which Plaintiffs argue was "sufficient to collaterally estop" Hanke from challenging his liability in the

---

[14] While the transcript indicates that the plea hearing took place on June 25, 2024, at 3:00 p.m., the minute entry indicates that the hearing took plea on June 11, 2024, at 3:00 p.m. Hanke's sentencing is currently scheduled for October 31, 2024. *See United States v. Hanke*, 24 Cr. 27 (RER) (E.D.N.Y.), Dkt. 20.

instant civil action and urged the Court to enter summary judgment against Hanke on that basis. Dkt. 409.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted).  The non-movant must present more than a "scintilla of evidence."  *Anderson*, 477 U.S. at 252.

While the same standards for summary judgment apply when a *pro se* litigant is involved, "'the *pro se* litigant should be given special latitude in responding to a summary judgment motion.'"  *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015) (quoting *Knowles v. N.Y.C. Dep't of Corr.*, 904 F. Supp. 217, 220 (S.D.N.Y. 1995)); *see Harris v. Miller*, 818 F.3d 49,

57 (2d Cir. 2016) ("'[I]t is well established that a court is ordinarily obligated to afford a special solicitude to pro se litigants,' 'particularly where motions for summary judgment are concerned.'" (internal quotation marks omitted)). "This special solicitude is not unlimited, however, and does not 'relieve' a [party] of his or her 'duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 65 (S.D.N.Y. 2016) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

Still, even "a non-response [from the nonmovant] does not risk a default judgment." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). Rather, "before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Id.* "In doing so, the court may rely on other evidence in the record even if uncited." *Id.* (citing Fed. R. Civ. P. 56(c)(3)). "And, of course, the court must determine whether the legal theory of the motion is sound." *Id.* Indeed, "[i]f the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (internal quotation marks and emphasis omitted). In sum, a party's failure to respond to an opponent's motion, for summary judgment does not relieve the Court of its independent obligation to "examine the movant's statement of undisputed facts and the proffered record support and determine whether the movant is entitled to summary judgment." *Jackson*, 766 F.3d at 197.

### III.  Discussion

Before addressing each Plaintiff's motion for summary judgment in turn, the Court addresses two preliminary matters that apply to both motions.

First, the Court declines Plaintiffs' request to enter summary judgment against Hanke on estoppel grounds. Dkt 409. Under the doctrine of offensive collateral estoppel, a plaintiff may preclude "a defendant from relitigating an issue the defendant has previously litigated but lost against another plaintiff." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 303 (2d Cir. 1999) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979)). For the doctrine to apply, "a plaintiff must show that: (1) the issues in both proceedings are identical; (2) the relevant issues were actually litigated and actually decided in the prior proceeding[]; (3) there was a full and fair opportunity for the litigation of the issues in the prior proceeding; and (4) the issues were necessary to support a valid and final judgement on the merits." *Roe v. City of Waterbury*, 542 F.3d 31, 41 (2d Cir. 2008) (internal quotation marks omitted); *accord S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) (quoting *NLRB v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999)). Accordingly, while "[a] party in a civil action may be collaterally estopped from challenging liability when that party has pleaded guilty to criminal charges addressed to the same incident," the plaintiff must first establish an "identity of issues" between the civil lawsuit and the criminal case. *Hammock v. Moving State to State, LLC*, No. 18 Civ. 5628 (RPK), 2023 WL 3204575, at *2-3 (E.D.N.Y. May 2, 2023) (citing *Olsson v. MacDonald*, 792 N.Y.S.2d 250, 251 (N.Y. App. Div. 2005)).

Plaintiffs have failed to do so here. As earlier discussed, Hanke pleaded guilty to conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, which, as Judge Reyes explained at Hanke's guilty plea hearing, requires the Government to prove the following elements:

> First, that two or more persons entered the unlawful agreement charged in the indictment starting on or about the date specified in the indictment; second, that [the defendant] knowingly and willfully became a member of the conspiracy; third,

that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and, fourth, that the overt act or acts were committed to further some objective of the conspiracy. Securities fraud involves the following elements. The first is that in connection with the purchase or sale of a security, [the defendant] did one or more of the following. First, employed a device, scheme or artifice to defraud or, second, made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made not misleading or, three, engaged in an act, practice or course of business that operated or would operate as a fraud or deceit upon a purchaser or seller of any security. The second element is that [the defendant] acted willfully, knowingly and with intent to defraud. . . . [And t]hird . . . that [the defendant] knowingly used or caused to be used any means or instrumentalities of transportation or communication in interstate commerce in furtherance of the fraudulent conduct.

Hanke Guilty Plea Tr. at 7:19-9:1. In his plea allocution, Hanke pleaded guilty to soliciting investments from customers, falsely informing them that they would receive unusually large returns, and signing an agreement on March 12, 2019, in furtherance of this scheme. *Id.* at 22:21-23:9.

In the instant civil actions, as previewed at *supra* I.B.3, Plaintiffs seek summary judgment against Hanke on their claims for breach of contract, breach of fiduciary duty and aiding and abetting the same, fraud, and fraudulent inducement. While Hanke's allocution and guilty plea to conspiracy to commit securities fraud may supply an adequate factual predicate for individual elements of certain of Plaintiffs' civil claims (such as the scienter element of Plaintiffs' fraud claims), they fall far short of independently establishing Hanke's liability on these civil claims. The Court thus declines to grant summary judgment on Plaintiffs' claims against Hanke solely on estoppel grounds.

Turning to the second preliminary matter, this consolidated action largely involves state law claims, over which this Court exercises its diversity jurisdiction and supplemental jurisdiction. *See* Al Thani Complaint ¶¶ 17-18 (alleging diversity, federal question, and supplemental

jurisdiction); Stevens Complaint ¶¶ 24-25 (same).  The Court thus applies New York's choice-of-law rules to determine at the threshold what law it should apply to each Plaintiff's state law claims. *See Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989) ("A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state.").

Under these rules, "the first step in any choice of law inquiry is to determine whether there is an actual conflict between the rules of the relevant jurisdictions." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (internal quotation marks omitted).  "If there is such a conflict, the court must then classify the conflicting laws by subject matter with reference to New York law." *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001).  Next, "[h]aving classified the conflicting laws, the court must then select and apply the proper body of choice of law rules." *Id.* at 420.  "However, where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).  For instance, if "[t]he parties' briefs assume that New York substantive law governs the issues . . . such implied consent is . . . sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (internal quotation marks omitted).

Here, each Plaintiff urges the application of different states' laws, where overlapping factual circumstances underlying their parallel claims suggest that the same state's law should in fact apply.  Al Thani broadly presumes that New York state law applies to each of his claims (providing no analysis as to how that outcome obtains under New York's choice-of-law rules), whereas Stevens urges the applications of Wyoming, Illinois, or New York law to his claims.  At the same time, the opposing Defendants, Sims and Roy-Haeger, do not contest either Plaintiff's

55

position on the applicable law as to the claims against them, *see generally* Dkts. 400 (Sims's opposition brief), 406 (Roy-Haeger's opposition brief), and Plaintiffs' motions are otherwise unopposed. In effect, neither Plaintiff's position on the applicable law is contested.

In these circumstances, the Court may simply apply the state's law urged by each Plaintiff in his respective matter based on implied consent. Given the individual Defendants' *pro se* status, the corporate Defendants' nonparticipation, and this Court's independent obligation to determine whether summary judgment is legally and factually appropriate, however, the Court engages *sua sponte* in a choice-of-law analysis for each state law claim. *Cf. Negri v. Friedman*, No. 14 Civ. 10233 (GHW), 2017 WL 2389697, at *4 (S.D.N.Y. May 31, 2017) (engaging in a choice-of-law analysis where the plaintiff failed to respond to the defendant's motion for summary judgment).

### A.    Al Thani's Motion for Summary Judgment

Al Thani moves for summary judgment on all his claims, save for those claims asserted against Rogers and Romeo and his claims for fraudulent inducement and fraud against IOLO and SGIT. Specifically, Al Thani urges that he is entitled to judgment as a matter of law as to IOLO's breach of the March MDA (Count One), IOLO's breach of the July MDA (Count Two), IOLO's breach of its fiduciary duty under those agreements (Count Seven), and Hanke's liability for all three of those claims under the veil-piercing doctrine (and, in the alternative, under an aiding and abetting liability theory specifically for the breach of fiduciary duty claim). Al Thani further moves for summary judgment on his claim for breach of the surety bonds (Count Three) against SGIT and Sims as SGIT's alter ego, his claims for fraudulent inducement (Count Four) and fraud (Count Five) against each of Hanke and Roy-Haeger, his claims for aiding and abetting fraud (Count Eight) against Sims and Roy-Haeger, and finally his claim for violations of the IAA (Count Nine) against both Hanke and IOLO. The Court addresses each claim in turn.

56

### 1.    Breach of Contract as to IOLO (Counts One and Two)

In moving for summary judgment on Counts One and Two, Al Thani contends that IOLO (and Hanke as IOLO's alter ego) breached the July and March MDAs and the addenda thereto, and so urges his entitlement to the full amount of the returns contemplated by these agreements— that is, approximately $134 million.  Al Thani SJ Br. at 13-14; *see also* Al Thani Complaint ¶¶ 83 (seeking "no less than $111,974,400.00" for the breach of the March MDA in Count One), 91 (seeking "no less than $22.5 million" for the breach of the July MDA in Count Two).

"New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); *accord Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006) ("Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.").  Here, the July and March MDAs each provide that the respective agreement is to be "is governed by and interpreted and construed in accordance with the laws of the State of Wyoming."  March MDA § 14; July MDA § 15.

Because IOLO, a party to these agreements, is registered in Wyoming, *see* Hanke Dep. Tr. at 543:20-22 (discussing IOLO Holdings LLC's formation in Wyoming), 544:8-10 (referring to both IOLO Holdings and IOLO as "entities in Wyoming"), the parties' chosen law bears a sufficiently reasonable relationship to the transaction.  *See EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 541 (S.D.N.Y. 2020) (explaining that "courts in this Circuit have deemed one party's incorporation in the state of the parties' chosen law sufficient for purposes of the 'reasonable relationship' test" and collecting cases).  The Court thus applies Wyoming law, under which the

"elements for a breach of contract claim consist of a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of [the] injured party to damages." *Halling v. Yovanovich*, 391 P.3d 611, 616-17 (Wyo. 2017).  The relevant breach of contract law in New York, whose application Al Thani urges, does not substantively differ.  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999) ("The elements of a breach of contract claim under New York law are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." (internal quotation marks omitted)).  And under either state's law, the uncontroverted record evidence demonstrates IOLO's liability for breaching the July and March MDAs.

To start, the July and March MDAs plainly are valid, enforceable contracts constituting an "offer, acceptance, and consideration" that evince the parties' intent to be bound.  *Frost Const. Co. v. Lobo, Inc.*, 951 P.2d 390, 394 (Wyo. 1998).  The MDAs were executed by Al Thani and IOLO (through Hanke) in March and July 2019.  March MDA at 1, 6; July MDA at 1, 5.  Under the terms of each agreement, Al Thani was required to wire deposits into the IOLTA specified in the agreement, while IOLO was required, among other obligations, to insure the deposits through "a private deposit Surety [], issued by a syndication of Surety companies, each rated 'A' or better by AM Best" within five days of the execution of the Escrow Agreement, and to "place [Al Thani's assets] into one or more asset enhancement transactions . . . to produce the desired funding." March MDA §§ 3.2, 4, 5.3.2, 5.4; July MDA §§ 3.2, 4 5.3.2, 5.4; *see Hall v. Perry*, 211 P.3d 489, 493 (Wyo. 2009) ("Contractual consideration is defined as a benefit to the promisor or a detriment to the promisee." (internal quotation marks omitted)).

Al Thani performed his obligations under each agreement by wiring $3 million into Rogers's IOLTA on March 27, 2019, as required under the March MDA, Rogers Ledger at RSM-A00002, and wiring $3.5 million into that account on August 8, 2019, as required under the July MDA, *id.* at RSM-A00007.  But IOLO failed to hold up its end of the bargain.  For instance, while IOLO procured surety bonds from SGIT in connection with Al Thani's deposits for both the March and July MDAs, these bonds were not "rated 'A' or better by AM Best."  Al Thani 56.1 Stmt. ¶ 26.  And, of course, as detailed extensively at *supra* I.A.2.b, I.A.2.e, rather than being placed into "asset enhancement transactions [] to be structured for [Al Thani] by IOLO," Al Thani's funds were used in large part to pay unauthorized fees and commissions to Hanke's business associates (many of whom appeared to have had no role in Al Thani's investments) or to pay off IOLO creditors; large sums of Al Thani's funds were also transferred into Al Thani's personal bank account for no stated purpose.  And finally, IOLO failed to make any payments under either agreement, except for a $500,000 payment to Papi, one of Al Thani's advisers.  *See* Hanke Dep. Tr. at 624:24-625:7.

While these breaches certainly entitle Al Thani to damages in some form, Al Thani has failed to demonstrate his entitlement as a matter of law to the full amount of the returns contemplated by the agreements.  Under the March MDA, as ultimately modified, the payment plan described in Appendix B provided for eight consecutive payments of $13,996,800 to be made directly into Al Thani's account for a total of $111,974,400.  *See generally* Third Addendum to the March MDA.  And under the July MDA, as ultimately modified, the payment plan described in Appendix B provided for a payment of $22,500,000 to be made directly into Al Thani's account.  *See* Second Addendum to the July MDA.  Al Thani thus argues that the sum total, approximately $134 million, represents "lost profits" that are "provable with reasonable certainty" and "were within the contemplation of the parties at the time of the contract," Al Thani SJ Br. at 14 (quoting

59

*Jacobs v. Maza*, No. 20 Civ. 3320 (ARR) (TAM), 2023 WL 5680180, at *11 (E.D.N.Y. Aug. 18, 2023)), because "IOLO agreed to pay [Al Thani] sums certain on particular dates and to backstop [Al Thani's] investment in full via the surety bonds," *id.*

To be sure, the evidentiary record confirms that IOLO failed to make the payments contemplated under these agreements. *See* Hanke Dep. Tr. at 624:24-625:20. The problem for Al Thani, however, is that his purported entitlement to the full amount of the returns as expectation damages is difficult to square with the plain language of the MDAs. As discussed, Al Thani predicates his theory of damages on the payment schedule described in Appendix B of each MDA, each as modified by its latest addendum. But the MDAs describe IOLO's obligations to include "plac[ing] the Assets into one or more asset enhancement transactions . . . to be structured for [Al Thani] by IOLO, to produce the *desired funding referenced in Appendix B* herein." March MDA § 3.2 (emphasis added); July MDA § 3.2 (emphasis added). In other words, the MDAs expressly cast the funding plan described in Appendix B as an intended and desired outcome, not a guaranteed one. This makes sense, given the inherent risk involved in investments. Moreover, each MDA expressly provides:

> In the event of any non-performance by IOLO after the period specified in Appendix B, [Al Thani] may at [his] discretion, extend additional time to IOLO to cure the condition of non-performance, or [Al Thani], at [his] discretion, may choose to request the return of [his] original Assets and IOLO shall comply with this request within seven (7) business days.

March MDA § 5.5; July MDA § 5.5. There is a colorable argument that, under these terms, the only form of damages within the parties' reasonable contemplation was the return of Al Thani's "original Assets." Indeed, when confronted with the suggestion that "[Hanke] owed [Al Thani] over a hundred million dollars" when he received the demand letter in April 2020 in connection with IOLO's default under the MDAs, Hanke responded, "No, not at all. I'm not sure where—if

anywhere they came up with that number. That's just egregious and outrageous." Hanke Dep. Tr. at 331:8-16. In Hanke's view, Al Thani was entitled only to the investment amount under the agreements. *Id.* at 331:17-24.

Against this backdrop, Al Thani provides little in the way of support for his proposition that he is entitled to approximately $134 million. With no accompanying analysis, he offers a single citation to *Ashland Management v. Janien*, 624 N.E.2d 1007 (N.Y. 1993), a 1993 New York Court of Appeals decision affirming the award of lost profits as damages, where the plaintiff had been found liable for breach of contract on the defendant's counterclaim. *See* Al Thani SJ Br. at 14. That case is distinguishable.

In *Ashland Management*, the plaintiff, an investment advisory company managing over $1 billion in client funds, had contracted with the defendant, who was at the time working as a consultant for the plaintiff-company, for the use of an investment model that the defendant was to construct. 624 N.E.2d at 1008-09. Under the terms of the agreement, if the model developed by the defendant was found to be satisfactory by an independent third party, ownership of the model would be transferred to a subsidiary of the plaintiff, which would employ the defendant and in which the defendant was to have an equity interest. *Id.* at 1009. Under the sixth iteration of the contract, on which the parties settled after extensive negotiations, the defendant was entitled to "a royalty of the higher of $50,000 or 15% of gross revenues per annum of any and all existing or future accounts" using the model "or any derivative thereof" if he left the plaintiff's employment "for any reason," with the contract projecting the minimum sums expected to be under management by the model between 1988 and 1992. *Id.* In light of these provisions, the Court of Appeals reasoned that "the issue of future earnings was not only contemplated but also fully debated and analyzed by sophisticated business professionals at the time of these extended contract

notifications" and thus concluded that "[i]nasmuch as [the defendant] was entitled to damages based upon revenues derived from 'any and all existing or future' accounts, [the] plaintiff must have foreseen that if it breached the contract, [the] defendant would be entitled to lost profits." *Id.* at 1011.

The Court is unable to arrive at such a conclusion here, considering the contractual language referenced above, Hanke's testimony, and the lack of developed argumentation on Al Thani's part on his entitlement to damages of approximately $134 million dollars as "lost profits." Accordingly, while the Court grants Al Thani's motion for summary judgment on Counts One and Two as to the issue of liability against IOLO, it denies Al Thani's motion on those Counts as to the issue of damages. *Cf. Hastad v. Hippos in Tanks, LLC*, No. 17 Civ. 2518 (VEC), 2019 WL 1228076, at *5 (S.D.N.Y. Mar. 15, 2019) (granting summary judgment in favor of the plaintiff as to liability for breach of contract but denying summary judgment as to damages, where the plaintiff had failed to offer sufficient evidence to prove the amount of his damages).

### 2. Breach of Fiduciary Duty as to IOLO (Count Seven)

Al Thani further seeks summary judgment against IOLO on his claim for breach of fiduciary duty. Al Thani SJ Br. at 23-24.

Generally, "the relevant analytical approach to choice of law in tort actions in New York is the '[i]nterest test.'" *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 394 (2d Cir. 2006) (second alteration in original) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985)). Under this test, courts "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)). The states' interests entail primarily "the

parties' domiciles and the locus of the tort." *Schultz*, 480 N.E.2d at 684.  As New York courts consider breach of fiduciary duty laws as  "conduct-regulating" (as opposed to "loss-allocating"), *Rose v. Arthur J. Gallagher & Co.*, 928 N.Y.S.2d 783, 784 (2d Dep't 2011), "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders," *White Plains Coat & Apron Co.*, 460 F.3d at 284 (quoting *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993)).

Tort claims arising incident to a contract containing a choice-of-law clause, however, may instead be governed by the state law selected therein.  *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).  For the choice-of-law provision to apply to such torts, "the express language of the provision must be sufficiently broad as to encompass the entire relationship between the contracting parties." *Id.* (internal quotation marks omitted).  By way of example, the Second Circuit has held that a choice-of-law provision expressly covering "any controversy or claim arising out of or relating to" the contract was sufficiently broad to include tort claims related to the contract. *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309-10 (2d Cir. 1994).  In contrast, courts have found a choice-of-law provisions covering only the terms of the agreement itself insufficiently broad to encompass such tort claims.  *See, e.g.*, *Krock*, 97 F.3d at 645 (holding that where the subject mortgage document stated that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts," the language could not be read broadly enough to encompass a fraudulent misrepresentation claim); *Williams v. Deutsche Bank Sec., Inc.*, No. 04 Civ. 7588 (GEL), 2005 WL 1414435, at *5 (S.D.N.Y. June 13, 2005) (explaining that "language providing that the Agreement itself will be governed by, and construed in accordance with, a particular state's laws have regularly been construed in this circuit

63

as applying only to disputes concerning the agreement itself and its interpretation, and not to all disputes arising from the parties' relationship" and collecting cases).

Under these principles, the relevant jurisdictions are Wyoming, the forum selected under both the March and July MDAs, *see* March MDA § 14; July MDA § 15, and New York, where most of the meetings between Hanke and Al Thani's advisers occurred, *see* Miginnis Affidavit ¶¶ 3, 9; Al Thani 56.1 Stmt. ¶¶ 19, 38. Because the choice-of-law provisions in the MDAs cover only the agreements themselves, the provisions are insufficiently broad to encompass Al Thani's breach of fiduciary duty claim. *See* March MDA § 14 ("This Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Wyoming."); July MDA § 15 (same). The Court thus applies New York law.[15]

To prevail on a claim for breach of fiduciary duty in New York, a plaintiff must establish "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Yuko Cap. S.A.R.L. v. Feldman,* 977 F.3d 216, 241 (2d Cir. 2020); *accord Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) ("The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary relationship; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009))).

"A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d

---

[15] In any case, Wyoming's law for breach of fiduciary duty does not meaningfully differ from New York's laws. *See J. Kent Kinniburgh Revocable Tr. v. Moncur*, 2023 P.3d 579, 587 (Wyo. 2023) ("To establish a claim for breach of fiduciary duties, the plaintiff must show a duty based on a fiduciary relationship, breach of the duty, and the breach caused him damage." (quoting *Gowdy v. Cook*, 455 P.3d 1201, 1208 (Wyo. 2020))).

439, 442 (1st Dep't 2000)).  In other words, a plaintiff may pursue a breach of fiduciary duty only

if he can show

> a duty . . . apart from and independent of promises made and therefore apart from
> the manifested intention of the parties to a contract.  Thus, a defendant may be liable
> in tort . .  when it has engaged in tortious conduct separate and apart from its failure
> to fulfill its contractual obligations. . . .  [W]here a party is merely seeking to
> enforce its bargain, a tort claim will not lie.

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL

23018888, at *16 (S.D.N.Y. Dec. 22, 2003) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d

763, 767-68 (N.Y. 1995)) (alterations in original), *aff'd*, 110 F. App'x 191 (2d Cir. 2004).

Accordingly, "where there [is] a 'formal written agreement covering the precise subject matter of

the alleged fiduciary duty,' there is no actionable tort for a breach of fiduciary duty." *Fillmore E.*

*BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 17 (2d Cir. 2014) (quoting *Pane v.*

*Citibank, N.A.*, 797 N.Y.S.2d 76, 77 (1st Dep't 2005)); *see Bayerische Landesbank, N.Y. Branch*

*v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) ("Under New York law, a breach of

contract will not give rise to a tort claim unless a legal duty independent of the contract itself has

been violated." (citation omitted)).

Under special circumstances, a fiduciary duty may be found notwithstanding the existence

of a contract—specifically, when there is "a relationship of higher trust than would arise from

the . . . agreement alone."  *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005);

*see also Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008) ("By their nature, arms-

length commercial transactions ordinarily do not involve relationships defined by the New York

courts as fiduciary.  However, a fiduciary duty may arise in the context of a commercial transaction

upon a requisite showing of trust and confidence." (citing *In re Mid–Island Hosp., Inc.*, 276 F.3d

123, 130 (2d Cir. 2002))).  For instance, "[a] fiduciary relationship 'exists between two persons

when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *EBC I*, 832 N.E.2d at 31 (quoting Restatement (Second) of Torts § 874 cmt. a). As such, "New York courts have held that, where a 'defendant had discretionary authority to manage [the plaintiff's] investment accounts, it owed [the plaintiff] a fiduciary duty of the highest good faith and fair dealing.'" *Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 523-24 (S.D.N.Y. 2018) (quoting *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 7, 16 (1st Dep't 2010), *aff'd*, 962 N.E.2d 765 (N.Y. 2011)).

Here, the July and March MDAs expressly obligated IOLO to act under the agreement "in a fiduciary capacity." March MDA § 3.1; July MDA § 3.1. And under the agreement's express terms, Hanke (on IOLO's behalf) was afforded wide-ranging discretion to invest Al Thani's funds entrusted to him. *See* March MDA § 3.3 ("[Al Thani] grants to IOLO full power, and sole authority to perform every reasonable act necessary to be done for the transaction in the same extent as [Al Thani] might or could do or cause to be done . . . ."); July MDA § 3.3 (same). Accordingly, IOLO owed a fiduciary duty to Al Thani. *Cf. Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 712 (2d Cir. 2014) ("The contract at issue, an investment management agreement, afforded [the defendant] considerable discretion with respect to [the plaintiff's] portfolio. This gave rise to a duty of care . . . ."); *I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 542 (S.D.N.Y. 2017) ("Investment advisors owe a fiduciary duty to the clients they advise.").

Al Thani has failed to demonstrate the absence of a material fact as to the next two elements, however. First, Al Thani argues that IOLO (through Hanke) breached its fiduciary duty to Al Thani by misusing Al Thani's investment funds. Al Thani SJ Br. at 23-24. To be sure, the record is replete with uncontroverted evidence that Hanke distributed a large portion of the funds

entrusted to him to his own back account, to his business associates in the form of undisclosed and unexplained "commissions," and to former investors in IOLO. *See supra* I.A.2.b, I.A.2.e. But this breaching conduct is entirely "encompassed within the contractual relationship" between Al Thani and IOLO, and so cannot give rise to a separate breach of fiduciary duty claim. *Brooks v. Key Tr. Co. Nat'l Ass'n*, 809 N.Y.S.2d 270, 272 (3d Dep't 2006) (finding no separate claim for breach of fiduciary duty where the "allegations underlying [the] plaintiff's fiduciary duty claim . . . are either expressly raised in the plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith"); *see also Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003) ("Where the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty independent of its duties under the contract; otherwise [the] plaintiff is limited to an action in contract." (internal quotation marks omitted)); *Snyder*, 594 F. App'x at 712-23 (affirming the district court's vacatur of the jury's verdict on the plaintiff's fiduciary duty claim where the claim rested on the "same failed duty as [the plaintiff's] breach-of-contract claim: namely, [the] failure to implement an agreed-on hedging strategy for [the plaintiff's] investments"). As such, Al Thani has failed to demonstrate his entitlement to summary judgment on his breach of fiduciary duty to claim.

Moreover, Al Thani has not specified what damages he seeks at this stage in connection with his breach of fiduciary duty claim. *See* Al Thani SJ Br. at 23-24 (discussing only the breach and duty elements of the claim). Accordingly, even had Al Thani demonstrated breaching conduct arising outside of his contractual relationship with IOLO, the Court would not be able to assess whether Al Thani sustained his burden of demonstrating damages that were proximately caused by such breach. *See Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009) (explaining that

67

"where damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability"); *Webb v. Robert Lewis Rosen Assocs., Ltd.*, No. 03 Civ. 4275 (HB), 2003 WL 23018792, at *6 (S.D.N.Y. Dec. 23, 2003) ("It is well settled that proving a breach of fiduciary duty requires a showing of damages." (citing *Indep. Order of Foresters v. Donald, Lufkin, & Jenrette, Inc.*, 157 F.3d 933, 943-44 (2d Cir. 1998))).

The Court thus denies Al Thani's motion for summary judgment against IOLO on his breach of fiduciary duty claim in Count Seven.

### 3. Hanke's Liability as IOLO's Alter Ego

Al Thani further seeks to hold Hanke liable for IOLO's misconduct as IOLO's alter ego. Under New York choice-of-law rules, "[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). And for a limited liability company, "New York similarly looks to the LLC's state of registration." *Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, No. 18 Civ. 5831 (PAE), 2020 WL 6690659, at *6 (S.D.N.Y. Nov. 13, 2020). As IOLO is a Wyoming limited liability company, the Court applies Wyoming law to assess whether Hanke should be held liable as IOLO's alter ego.[16]

---

[16] At the motion to dismiss stage, Hanke and IOLO, then counseled, relied on New York law in urging dismissal of Al Thani's claims. Dkt. 65 at 13-15 (urging inappropriateness of veil-piercing as to IOLO under New York law). At that time, Al Thani noted that Wyoming law may be applicable to some of the claims under New York choice-of-law principles. *See* Dkt. 78 at 14-15 n.8. Because the parties had not briefed the issue and because it appeared that New York law required a higher showing for alter ego liability, the Court applied New York law solely for the purpose of resolving the Hanke and IOLO's motion to dismiss. *Al Thani*, 2021 WL 1895033, at *15 n.11.

Under Wyoming law, alter ego liability may be imposed on the owner of a limited liability company if "(1) the limited liability company is not only owned, influenced and governed by its members, but the required separateness has ceased to exist due to misuse of the limited liability company; and (2) the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity." *GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454, 462 (Wyo. 2014).  This veil-piercing inquiry is "fact-driven and flexible, and it focuses on whether the limited liability company has been operated as a separate entity . . . , or whether the member has instead misused the entity in an inequitable manner to injure the plaintiff." *Id.* at 463; *see also Kaycee Land & Livestock v. Flahive*, 46 P.3d 323, 325 (Wyo. 2002) ("Wyoming courts, as well as courts across the country, have typically utilized a fact driven inquiry to determine whether circumstances justify a decision to pierce a corporate veil.").  The Wyoming Supreme Court has identified several factors to consider in evaluating whether to pierce the corporate veil of a limited liability company, including (i) "whether there has been fraud"; (ii) whether the limited liability company was adequately capitalized; and (iii) the degree to which funds of the company and the individual were intermingled.  *GreenHunter Energy*, 337 P.3d at 463-64.[17]  "While not a prerequisite for piercing

---

[17] In 2016, following these decisions, the Wyoming legislature amended Section 17-29-304 of the state's statutory code, codifying the factors courts may consider when determining whether to hold the members and managers of a limited liability company liable for the debts of the company.  2016 Wyo. Sess. Laws ch. 54.  The Wyoming Limited Liability Company Act provides in relevant part:

(c) For purposes of imposing liability on any member or manager of a limited liability company for the debts, obligations or other liabilities of the company, a court shall consider only the following factors no one (1) of which, except fraud, is sufficient to impose liability:

(i) Fraud;

a limited liability company's veil, fraud can be a powerful reason to do so." *Id.* at 469; *accord*

*Kaycee Land*, 46 P.3d at 328 (explaining that "when the LLC has caused damage and has

inadequate capitalization, co-mingled funds, diverted assets, or [was] used . . . as a mere shell,"

individual members should not be held immune from liability, even if there was no fraud alleged).

Here, the undisputed record evidence supports the imposition of alter ego liability on

Hanke.  IOLO plainly lacked the capital to meet its obligations to investors, including both Al

Thani and Stevens.  *See, e.g.*, Hanke Dep. Tr. at 624:19-23 ("Q[:] So, if I look down the 13

investments that IOLO made, it's fair to say, is it not, that none of these investments have paid out

a single dollar of returns?  A[:] It's fair to say, but hard to hear.  Yes."), 624:24-625:7 (Hanke

admitting that no payments were made to Al Thani, except for $500,000 to Papi); Stevens 56.1

---

(ii) Inadequate capitalization;

(iii) Failure to observe company formalities as required by law; and

(iv) Intermingling of assets, business operations and finances of the company and the members to such an extent that there is no distinction between them.

(d) In any analysis conducted under subsection (c) of this section, a court shall not consider factors intrinsic to the character and operation of a limited liability company, whether a single or multiple member limited liability company.  Factors intrinsic to the character and operation of a limited liability company include but are not limited to:

(i) The ability to elect treatment as a disregarded or pass-through entity for tax purposes;

(ii) Flexible operation or organization including the failure to observe any particular formality relating to the exercise of the company's powers or management of its activities;

(iii) The exercise of ownership, influence and governance by a member or manager; [and]

(iv) The protection of members' and managers' personal assets from the obligations and acts of the limited liability company.

Wyo. Stat. Ann. § 17-29-304 (2016).

70

Stmt. ¶¶ 95, 96 (Hanke's failure to make payments to Stevens or return his initial investment); Hefter Decl., Exh. 47 (Hanke writing to Hubner that the "payment delay [] adversely affected [his] other business clients" and left him "grossly behind on all other payments and contracts"). Nor did IOLO operate as a "separate entity": it had no office other than Hanke's home in Illinois (even though IOLO was registered in Wyoming), and there was no evident separation between IOLO's and Hanke's funds. Hanke Dep. Tr. at 545:19-546:4. In fact, Hanke admitted that whenever he incurred expenses in connection with IOLO's business, he used his personal funds to cover them, and did not seek reimbursement from IOLO. *Id.* at 549:16-550:5. And while IOLO had its own bank account for a brief period, *id.* at 547:15-20, none of Al Thani's funds deposited into Rogers's IOLTA were transferred to IOLO; instead, as Rogers's transaction ledger reveals, Hanke directed Rogers to transfer Al Thani's funds either directly to third parties or into Hanke's personal bank account. *See generally* Rogers Ledger; *cf.* Stevens 56.1 Stmt. ¶ 56 ("Of the $300,000 Mr. Stevens initially wired to the IOLTA Account, $229,425 went into Hanke's personal account at Woodforest National Bank as a payment to himself."). Finally, Hanke's guilty plea to conspiracy to commit securities fraud by executing management and deposit agreements on IOLO's behalf, Guilty Plea Tr. at 22:21-23:9 (Hanke allocuting to signing an agreement "with an investor regarding an investment of about $3 million" on March 12, 2019, in furtherance of his fraudulent scheme), provides a "powerful," if not dispositive, reason to pierce IOLO's veil. *GreenHunter Energy*, 337 P.3d at 469; Wyo. Stat. Ann. § 17-29-304(c) (2016) (explaining that fraud is sufficient to pierce the LLC's veil).

Accordingly, the Court finds that Hanke is liable as IOLO's alter ego and so grants summary judgment on Counts One and Two (once again, as to liability only) against Hanke as well.

### 4. Aiding and Abetting Breach of Fiduciary Duty as to Hanke (Count Six)

Al Thani further seeks summary judgment on his claim against Hanke for aiding and abetting IOLO's breach of fiduciary duty. Al Thani SJ Br. at 24. Of course, a claim for aiding and abetting a breach of fiduciary duty requires an underlying breach of the fiduciary duty in the first instance. *Lerner v. Fleet Bank*, 459 F.3d 273, 294 (2d Cir. 2006) ("A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that [the] plaintiff suffered damage as a result of the breach." (citation omitted)). Because the Court has denied Al Thani's motion for summary judgment on Al Thani's breach of fiduciary duty claim against IOLO, the Court necessarily denies Al Thani's motion for summary judgment on this aiding and abetting claim against Hanke.[18]

### 5. Breach of the Surety Bonds as to SGIT and Sims (Count Three)

Next, Al Thani moves for summary judgment on his breach of contract claim against SGIT (and Sims under an alter ego liability theory). While in his Amended Complaint, Al Thani premises his claim on the breach of three separate bond agreements, *see* Al Thani Complaint ¶¶ 92-98, Al Thani appears to move for summary judgment only as to the breach of the first surety bond agreement, which was executed on April 4, 2019. *See* Al Thani SJ Br. at 15 (citing to paragraphs of his Rule 56.1 statement discussing only the first surety bond); *see also* Al Thani 56.1 Stmt. ¶¶ 25 ("SGIT issued a $3 million surety bond to IOLO for the benefit of Plaintiff on

---

[18] Because Al Thani appears to bring this aiding and abetting claim only as an alternative to establishing Hanke's direct liability for breach of fiduciary duty under the veil-piercing doctrine, even had the Court granted summary judgment on Al Thani's breach of fiduciary duty claim, this claim would be moot. *See* Al Thani SJ Br. at 24 ("Even if Hanke were not IOLO's alter ego, however, he is indisputably liable for aiding and abetting IOLO's breach of its fiduciary duty in his capacity as IOLO's sole owner and manager.").

April 4, 2019."), 118 ("On March 5, 2020, Plaintiff's representatives called the first SGIT surety bond in light of IOLO and Hanke's default.").

By its terms, that surety bond agreement is to "be governed and construed in accordance with the law of the State of Texas." April 4, 2019 Financial Guarantee ¶ 8. As Hanke and Sims met in Texas and SGIT maintained its post office box in that state, Texas law bears a reasonable relationship to the parties and transaction. *See Welsbach Elec. Corp.*, 859 N.E.2d at 500 ("Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction."). The Court thus applies Texas law, under which "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (alteration in original) (internal quotation marks omitted).[19]

Here, there is no dispute that Hanke provided Al Thani with a financial guarantee between SGIT (as Guarantor), IOLO (as Principal), and Al Thani (as Obligee) that was executed on April 4, 2019. *See* April 4, 2019 Financial Guarantee. Under the terms of that agreement, SGIT was

---

[19] The relevant contract laws in New York, whose law Al Thani urges the Court apply, and in Wyoming, under whose law both IOLO and SGIT are organized, are not materially different from that in Texas. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (explaining that under New York law, the elements of a breach of contract claim are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages"); *Halling*, 391 P.3d at 616-17 (listing the elements of a claim for breach of contract under Wyoming law as "a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of [the] injured party to damages").

bound to repay Al Thani the $3 million amount of his first deposit in IOLO's investment program, within 180 days of receiving notice of IOLO's default under the March MDA.  *Id.* ¶ 3.

Al Thani has proffered no evidence, however, that he notified SGIT, in writing or otherwise, of IOLO's default or that SGIT failed to perform its obligation once notified.  As described *supra* note 9, Al Thani claims in his Rule 56.1 Statement that Al Thani's representatives "called the first SGIT surety bond in light of IOLO and Hanke's default" on March 5, 2020, and that "[n]o payment was made by SGIT."  Al Thani 56.1 Stmt. ¶ 118.  But the accompanying record citation supports neither assertion.  Indeed, Al Thani points only to an e-mail that Vincent sent to Sims on March 5, 2020, in which Vincent merely raises the *possibility* of Al Thani notifying SGIT of IOLO's default and of calling the first surety bond:

> If the Principal of the above referenced Financial Guarantee is in default and no extension of the above referenced Financial Guarantee has been received fully executed by the Obligee by the end of the business day, March 31, 2020, then [] *in that event, a Notice of Default and Calling of the Financial Guarantee will be emailed to you on April l, 2020.*  Hopefully the Obligee will not need me to send such an email on April l, 2020.

Hefter Decl., Exh. 64 (emphasis added).  Having failed to adduce any record evidence that Al Thani triggered SGIT's obligations under the agreement in the first instance or that SGIT subsequently failed to perform, Al Thani has not shown his entitlement to judgment as a matter of law on this claim.  The Court thus denies Al Thani's motion for summary judgment on Count Three as to SGIT.

Al Thani further contends that "Sims is liable for all of SGIT's breaches because SGIT is Sims's alter ego."  Al Thani SJ Br. at 15.  As the Court has denied Al Thani's motion to grant summary judgment on Al Thani's breach of contract claim against GIT, consideration of Sims's liability for that breach as SGIT's alter ego is premature.

In any case, the Court would not be prepared to hold as a matter of law at this juncture that Sims is SGIT's alter ego.  As a preliminary matter, Wyoming law appears to apply to the determination of whether piercing of SGIT's veil is warranted here, given that SGIT is organized under the laws of Wyoming, *see* Sims Dep. Tr. at 8:21-9:1.  *Cf. Kalb, Voorhis & Co.*, 8 F.3d at 132 ("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.").  And although Al Thani has provided authority that the veil piercing doctrine applies to trusts under New York law, *see* Al Thani SJ Br. at 15, he has presented no authority that the same is true under Wyoming law.  *See Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 90 (2d Cir. 2003) ("The question whether the 'alter ego theory' of piercing applies to trusts is a matter of state law.").

Accordingly, Al Thani's motion for summary judgment on Sims's putative liability under Count Three as SGIT's alter ego also is denied.

### 6. Fraud and Fraudulent Inducement as to Hanke and Roy-Haeger (Counts Four and Five)

Next, Al Thani moves for summary judgment on Counts Four and Five, respectively for fraud and fraudulent inducement, as to each of Hanke and Roy-Haeger.  Al Thani SJ Br. at 16-21.  As Al Thani does not differentiate Count Four from Count Five in his summary judgment motion, the Court considers them together here.

As with breach of fiduciary duty laws, fraud laws in New York regulate conduct and thus the "locus of the tort" determines the applicable law.  *See Krock*, 97 F.3d at 646 ("Thus, because the case at hand concerns laws regulating allegedly fraudulent conduct, the proper body of law to be applied turns on the locus of the tort.").  Here, it appears that most of the alleged fraudulent misrepresentations—to the extent they occurred in person and not through electronic messaging—

occurred in New York.  The Court thus applies New York law.[20]  Under New York law, fraud requires a showing that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied on the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996).  Misrepresentations of "present facts, not contractual promises regarding prospective performance," give rise to claims of fraudulent inducement.  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). "At the summary judgment stage, a plaintiff must offer enough evidence to allow a reasonable jury to find by clear and convincing evidence that each of the elements is met." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259-60 (2d Cir. 2021).  "Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions." *Id.* at 260 (internal quotation marks omitted).

### a.  Hanke

In moving for summary judgment on his undifferentiated fraud claims against Hanke, Al Thani cites a whole host of allegedly fraudulent misrepresentations made by Hanke.  *See* Al Thani SJ Br. at 17-21.  For instance, he points to Hanke's presentation of wealth enhancement program

---

[20] The Court recognizes that under New York choice-of-law rules, "[t]he place in which the injury is deemed to have occurred is usually where the plaintiff is located." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (internal quotation marks omitted); *see also Krock*, 97 F.3d at 646 ("New York courts have not directly ruled on which state's substantive law is to be applied to a fraud claim.  It may well be . . . that New York courts would apply the substantive law of Massachusetts because, while the alleged fraud occurred in New York, the plaintiffs suffered their injuries in Massachusetts.").  As the record is bereft of evidence indicating where Al Thani, who is a foreign plaintiff, suffered his injuries, the Court is satisfied that New York has the most significant contacts to Al Thani's fraud claims.

options for Al Thani and his representations concerning his history of generating returns for IOLO's investment clients when meeting with Al Thani's representatives before the execution of the March MDA. *Id.* at 16-17; *see* Miginnis Affidavit ¶ 3 (Miginnis describing his January 16, 2019 meeting with Hanke, at which Hanke showed Miginnis bank statements as proof of payment from other clients and transactions). Al Thani further complains of Hanke's failure to disclose his misuse of Al Thani's funds, as extensively set forth at *supra* I.A.2, and Hanke's numerous representations to Al Thani's advisers that the promised returns were forthcoming, including specifically Hanke's forwarding an e-mail from Metro States Capital Bank, of which Hanke was the sole owner, manager, and employee. Al Thani SJ Br. at 17-18; *see also* Hefter Decl., Exh. 61 at PLF00000525-PLF00000526. Al Thani urges that these statements and omissions induced him to invest an additional $3.5 million in IOLO and to enter into the multiple addenda under both MDAs. Al Thani SJ Br. at 19-20.

Glaringly absent from Al Thani's line of argument, however, is any showing that Al Thani's reliance on these purported misrepresentations was reasonable. Indeed, "[u]nder New York law, reasonable reliance is an essential element of fraudulent inducement." *Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 371 (2d Cir. 2009). "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). Accordingly, it is "a rare circumstance in which the issue of reasonable reliance can be resolved at the stage of summary judgment." *Glob. Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 215 (1st Dep't 2006).

Moreover, New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the business they are acquiring. *See, e.g.*, *Abrahami v. UPC Constr. Co., Inc.*, 638 N.Y.S.2d 11, 14 (1st Dep't 1996) (concluding that sophisticated businessmen had a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they were assuming). When the party to whom a misrepresentation is made receives hints of its falsity, a heightened degree of diligence is required of that party. *Banque Franco–Hellenique de Comm. Intl. et Maritime, S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997). That party cannot reasonably rely on such representations without making additional inquiry to determine their accuracy. *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994). When a party fails to make further inquiry or insert appropriate language in the agreement for its protection, it has willingly assumed the business risk that the facts may not be as represented. *Rodas v. Manitaras*, 552 N.Y.S.2d 618, 620 (1st Dep't 1990).

Here, Al Thani has not even attempted to demonstrate that his reliance on the string of purported misrepresentations from Hanke was reasonable. To be sure, the persistent efforts made on the part of Al Thani's various advisers inquiring as to the status of Al Thani's investments are well documented in the record. *See, e.g.*, Hefter Decl., Exh. 26 (e-mail chain with Papi, Miginnis, and Hanke in July 2019 concerning status of payments); *id.*, Exh. 37 (e-mail chain with Papi and Hanke in August 2019 concerning status of payments). But the Court is unable to find that Al Thani has sustained his burden of demonstrating by clear and convincing evidence any reasonable reliance on Hanke's continued promises of astronomic returns on Al Thani's investment and of

the imminence of overdue payments—especially where Al Thani has not even attempted to argue the point.[21]

### b. Roy-Haeger

As to Roy-Haeger, Al Thani points to her alleged representations that she was the "head of compliance" for the "trade group" managing Al Thani's investment and that the profits from Al Thani's investments would be paid out shortly. Al Thani SJ Br. at 20. But Roy-Haeger testified that she "d[id] not think [she] introduced [her]self" at all on this call. Roy-Haeger Dep. Tr. at 123:16-24. She explained, "I just got on and answered questions and gave an update, but I really don't remember." *Id.* at 123:19-21. With respect to these updates, Roy-Haeger testified that she likely relayed any information she received from "Pedro [Lobo] or Craig [Huber]." *Id.* at 123:2-14; *see also id.* at 320:15-21 (Roy-Haeger testifying: "[Papi and Miginnis] thought I was involved in the actual trade, which I was not. So I really wanted to stick with just updating the facts of where the status was with the transaction for the trade and the status of the loan being paid back.").

Moreover, while Al Thani asserts that "[t]hese representations were false when made, as Roy-Haeger knew," Al Thani SJ Br. at 20, and that her "statements were intended to conceal the fraudulent scheme," *id.* at 21, Al Thani's mere say-so is insufficient to show that Roy-Haeger had the requisite intent to defraud Al Thani and his advisers. Indeed, the record citations Al Thani

---

[21] Al Thani's conclusory assertion that "Miginnis and Papi reasonably relied on the email that Hanke forwarded from Metro States Capital Bank" in his Rule 56.1 statement, Al Thani 56.1 Stmt. ¶ 116, is plainly insufficient. *See All. Sec. Prods., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) ("[L]egal arguments . . . belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact."); *cf. Asset Co IM Rest, LLC v. Katzoff*, 23 Civ. 9691 (JPC), 2024 WL 167333, at *15 n.11 (S.D.N.Y. Jan. 16, 2024) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

provides demonstrate merely that Roy-Haeger arranged certain of Al Thani's investments—including those with John Porter and Craig Hubner—and that she often relayed updates that were provided to her by the individuals involved in the trades. *See id.* at 20-21. This showing does not constitute clear and convincing evidence that Roy-Haeger made knowingly false statements with the intent to defraud Al Thani.

In fact, Roy-Haeger has consistently denied such accusations. For instance, when asked with respect to the Hubner Loan whether "there [came] a point in time when [she] believed that [the] money was not going to become available, and these transactions were not going to be consummated," Roy-Haeger testified, "No. There was not because they have never given up. They have stayed on top of trying to make good on this loan, and the worst thing I can do is give up on it because I am going to stay on it until it gets paid back." Roy-Haeger Dep. Tr. at 309:18-310:4; *see also id.* at 313:9-15 (Roy-Haeger testifying that Hubner's "main focus [was] on getting the money paid back"). She further testified that she provided updates on the investment to Al Thani's advisers because she "felt like they deserved communications," that she "pushed very hard to get multiple communications going," and that "by [her] trying to push to get the loan paid back on the loan agreement and to get the information over to Mr. Hanke for the contract he had been able to participate in I wanted to . . . be in constant communication." *Id.* at 318:6-22.

This testimony appears consistent with documentary evidence suggesting Roy-Haeger's genuine confusion as to the lack of returns generated by the Hubner Loan. *See e.g.*, Hefter Decl., Exh. 47 (e-mail sent on July 4, 2019, by Roy-Haeger to Hubner in which Roy-Haeger wrote, "Craig, how did Alan get left hanging? . . . Why are all these deals no closing?"). Moreover, Roy-Haeger's testimony that she "did not receive any personal income or profits made by [the investment with John Porter]" and that she "did not receive any money on the Craig Hubner

80

investment" further calls into question what motive would have driven Roy-Haeger to intentionally defraud Al Thani.  Roy-Haeger Dep. Tr. at 268:11-17.

Al Thani thus has failed to sustain his burden of establishing by clear and convincing evidence that Roy-Haeger intended to defraud him.  And, of course, Al Thani's motion for summary judgment on his fraud claims against Roy-Haeger independently fails for his failure to demonstrate that he reasonably relied on any alleged misrepresentations that she made.  *See supra* III.A.6.a.  Accordingly, the Court denies Al Thani's motion for summary judgment against Hanke and Roy-Haeger on Counts Four and Five.

### 7.  Aiding and Abetting Fraud as to Sims and Roy-Haeger (Count Eight)

Al Thani also moves for summary judgment against Sims and Roy-Haeger on his claim for aiding and abetting fraud.  Under New York law (which the Court applies here for the same reason it applies New York law to Al Thani's fraud claims in Counts Four and Five, *see supra* III.A.6), to establish a claim for aiding and abetting fraud, a plaintiff must show "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009); *cf. Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (2d Cir. 2001) (applying New York law to an aiding and abetting fraud as "the fraud originated and . . . substantial activities in furtherance of the fraud were committed" in New York).  As the Court has denied Al Thani's motion for summary judgment on the underlying fraud, the Court also denies Al Thani's motion for summary judgment against Sims and Roy-Haeger on Count Eight for aiding and abetting fraud.

In addition, the Court notes that Al Thani's arguments as to Sims's and Roy-Haeger's knowledge of the fraud are particularly deficient: Al Thani merely states in conclusory fashion that

"[t]he record is replete with evidence and sworn testimony showing that Sims and Roy-Haeger unquestionably knew that Hanke and IOLO's purported 'trading program' was nothing more than a scheme to defraud [Al Thani] for their own benefit and for the benefit of Hanke's other associates and investors," yet provides no record support for this naked accusation.  Al Thani SJ Br. at 21. Accordingly, even had Al Thani demonstrated the existence of an underlying fraud, summary judgment on this claim still would be unwarranted.

### 8.   Violations of the Investment Advisers Act as to Hanke (Count Nine)

Lastly, the Court turns to Al Thani's request for summary judgment against Hanke on Al Thani's claim under the IAA.  Al Thani contends that he is entitled as a matter of law to the "limited private remedy" provided in Section 215 of the IAA, *see Transamerica Mortg. Advisors, Inc. ("TAMA") v. Lewis*, 444 U.S. 11, 24 (1979), based on Hanke's purported violations of Section 206.

The IAA applies to "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2.  Section 206 is a "broad antifraud provision," *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 417 (2d Cir. 2023), that makes it "unlawful for any investment advisor . . . to employ any device, scheme, or artifice to defraud any client . . . [or] to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," 15 U.S.C. §§ 80b-6(1), (2).  And Section 215 provides:

> Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall

have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

15 U.S.C. § 80b-15(b).

The Supreme Court has found that Section 215(b) implies a private right of action, reasoning that the provision's inclusion of the term "void" evinced Congress's intent for "the customary legal incidents of voidness [to] follow, including the availability of a suit for rescission . . . and for restitution" of consideration paid. *TAMA*, 444 U.S. at 19. At the same time, the Supreme Court, viewing Section 206 "quite differently," held that Section 206 "simply proscribes conduct, and does not in terms create or alter any civil liabilities," and thus determined that, save for the limited private remedy available under Section 215, the IAA "confers no other private causes of action, legal or equitable." *Id.* at 19, 24.

Against this backdrop, the Second Circuit, has clarified that the remedy under Section 215 "is available only where the performance of the contract—that is, fulfilling the contract according to its terms—involves the violation of the IAA." *NexPoint Diversified Real Est. Tr.*, 80 F.4th at 419. The Second Circuit distinguished Section 215's focus on *contracts* from Section 206's focus on the *conduct* of investment advisers, *id.*, and in holding that Section 215 does not permit claims "based solely on conduct not required by the contract," the Second Circuit reasoned that such allowance "would create . . . 'a backdoor to the private right of action that the Supreme Court refused to find under [Section] 206,'" *id.* at 419-20 (quoting *Omega Overseas Partners, Ltd. v. Griffith*, No. 13 Civ. 4202 (RJS), 2014 WL 3907082, at *2 (S.D.N.Y. Aug. 7, 2014)). Accordingly, the Second Circuit in *NexPoint Diversified Real Estate Trust* affirmed the dismissal of a claim brought under Section 215 where the plaintiff alleged that the defendants "engaged in self-dealing

83

conduct" purportedly in breach of the contract the plaintiff sought to void, on the ground that the contract itself did not require a party to engage in conduct prohibited by the IAA.  *Id.* at 418, 422.

Here, Al Thani similarly premises his IAA claim on conduct undertaken by Hanke purportedly in violation of Section 206.  *See* Al Thani SJ Br. at 24 ("Finally, the record is clear that Hanke's conduct violated [Section] 206 of the [IAA].").  Indeed, in contending that "Hanke held himself and IOLO out as investment advisors who would act as [Al Thani's] fiduciaries in providing asset management and investment services" and that "Hanke also raised money for IOLO from multiple investors for investment in private companies and financial instruments . . . as part of a broad scheme to defraud" Al Thani, *id.* at 24-25, Al Thani merely describes conduct proscribed by Section 206.  Al Thani "does not contend that any provision of the [March or July MDA] requires anything unlawful."  *NexPoint Diversified Real Est. Tr.*, 80 F.4th at 418.  If anything, Al Thani's claim appears predicated on conduct in *breach* of those MDAs.

Accordingly, the Court is not prepared to hold that Al Thani is entitled as a matter of law to the remedy available under Section 215, and so denies Al Thani's motion for summary judgment on Count Eight against Hanke.

* * *

In sum, the Court grants Al Thani's motion for summary judgment on Counts One and Two against IOLO and Hanke on the issue of liability alone.  Al Thani's motion is otherwise denied.

**B.    Stevens's Motion for Summary Judgment**

Stevens moves for summary judgment on all his claims (although not against all Defendants), except for his claim for violations of the IAA.  Specifically, Stevens seeks summary judgment on his breach of contract claim against IOLO and Hanke as IOLO's alter ego (Count

One), his breach of fiduciary duty claim against IOLO and Hanke (either as IOLO's alter ego or as an aider and abettor of IOLO's breach) (Count Five), his fraudulent inducement claim against Hanke (Count Two), his fraud claim against both Hanke and IOLO (Count Three), his aiding and abetting fraud claim against Sims (Count Four), and his breach of contract claim as to GIT (Count Six).  *See generally* Stevens SJ Br.  The Court considers Stevens's entitlement to judgment as a matter of law on each claim in turn.

### 1. Breach of Contract as to IOLO and Hanke (Count One)

First, Stevens contends that he is entitled to judgment on his breach of contract claim against IOLO and Hanke (as IOLO's alter ego), for which he principally seeks $4.16 million in damages.  Stevens SJ Br. at 16-18.

As with the MDAs that IOLO entered into with Al Thani, *see supra* III.A.1, the Stevens MDA includes a choice-of-law clause providing for the application of law of Wyoming, where IOLO is registered.  Stevens MDA § 16.  The Court thus applies Wyoming law to the breach of contract claims.  *See Hartford Fire Ins. Co.*, 230 F.3d at 556 ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." (citation omitted)).  Once again, in Wyoming, the elements of a claim for breach of contract are "a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of [the] injured party to damages." *Halling*, 391 P.3d at 616-17.  The record here contains ample uncontroverted evidence establishing each of these elements.

First, the Stevens MDA undisputedly is a valid, enforceable contract constituting an "offer, acceptance, and consideration," and demonstrating the parties' intent to be bound.  *Frost Const.*

*Co.*, 951 P.2d at 394.  On November 29, 2019, Stevens and Hanke (on IOLO's behalf) entered into the Stevens MDA, under which Stevens was required to wire $1 million into the IOLTA specified in the agreement, while IOLO was required to, among other obligations, "place [Stevens's assets] into one or more asset enhancement transactions . . . to produce the desired funding."  Stevens MDA §§ 2.2, 4.3.

Next, although Stevens performed his obligations under the Stevens MDA by wiring $1 million into the specified IOLTA, Stevens Decl. ¶ 45; Hanke Dep. Tr. at 23:3-20, IOLO undisputedly failed to perform its various obligations under that MDA.  To start, rather than investing Stevens's funds in asset enhancement transactions structured to produce the "desired funding," including specifically "the lease and monetization of financial instruments [such as an SBLC] for onward trading in Buy/Sell arrangements in which arbitrage has already been negotiated," Hanke used Stevens's funds for his personal benefit, to repay other investors, and to pay commissions to his business associates.  Stevens 56.1 Stmt. ¶¶ 70, 71.  In fact, these commissions themselves violated the Section 10 of the Stevens MDA, which expressly provides that "[a]ny fees will be paid by the Program Manager and are factored in as a normal cost of doing business in this type of transaction."  Stevens MDA § 10.  And when Stevens demanded the return of his $1 million pursuant to Section 5.3 of the MDA, IOLO breached that provision by failing to do so.  Stevens 56.1 Stmt. ¶ 96.

While there is no question that Stevens incurred damages as a result of IOLO's breach, the Court finds, for similar reasons discussed above in the context of Al Thani's breach of contract claims, that summary judgment as to the precise amount of damages is inappropriate at this stage.  *See supra* at III.A.1.  In his motion, Stevens argues that he is entitled to $4.16 million in damages as the alleged benefit of the bargain under Appendix B of the Stevens MDA, as amended by the

addendum.  Al Thani SJ Br. at 18.  He then contends that "[a]t a minimum, [he] is entitled to judgment in the amount of his original capital investment of $1 million" under Section 5.3 of the Stevens MDA.  *Id.*  Neither assertion is accompanied by any developed legal argumentation.  And given the MDA's use of precatory language in referring to the payment plan providing for the payment of $4.16 million, Stevens MDA § 2.2 (explaining that IOLO was obligated to place Stevens's assets into transactions "to produce the *desired* funding" described in Appendix B—*i.e.*, the provision of $4.16 million under the Stevens Addendum (emphasis added)), and what appears to be an express circumscription of IOLO's contractual liability in Section 5.3 of the MDA, *id.* § 5.3 (providing that in the event of any non-performance by IOLO, Stevens is entitled to request the return of his "original Assets"), the Court is not prepared to determine on summary judgment the amount of damages to which Stevens is entitled.

The Court thus grants summary judgment against IOLO on Count One only as to liability. Moreover, for the reasons provided at *supra* III.A.3, the Court further grants summary judgment on Hanke's liability on Count One as IOLO's alter ego.  The Court denies summary judgment on Count One as to damages.

### 2.  Breach of Fiduciary Duty as to IOLO and Hanke (Count Five)

Stevens also seeks summary judgment on his breach of fiduciary claim against IOLO and Hanke as IOLO's alter ego.  Stevens SJ Br. at 23-24.  Stevens argues that "Wyoming law applies because [IOLO's and Hanke's] fiduciary duties arise from the MDA, which is governed by Wyoming law."  *Id.* at 23 n.5.  But, as with IOLO's MDAs with Al Thani, the choice-of-law provision in the Stevens MDA is insufficiently broad to encompass tort claims arising incident to that MDA.  *See* Stevens MDA § 16 ("This Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Wyoming.").  Given that Stevens and Hanke

met only in New York, where Stevens attests that Hanke made certain representations inducing his entering into the MDA with IOLO, Stevens Decl. ¶ 14; Hanke Dep. Tr. at 47:18-21, the Court applies New York law.

As discussed *supra*, to prevail on a claim for breach of fiduciary duty in New York, a plaintiff must establish "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Yuko Cap. S.A.R.L.*, 977 F.3d at 241. And once again, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *William Kaufman Org.*, 703 N.Y.S.2d at 443.

Here, as in the Al Thani Matter, Stevens's breach of fiduciary duty claim appears to be duplicative of his breach of contract claim. In his motion, Stevens maintains that IOLO and Hanke breached their fiduciary duties when Hanke (1) failed to invest the assets Stevens entrusted to Hanke as contemplated in the MDA, (2) misappropriated those assets and used them for his own benefit rather than for Stevens's benefit, (3) provided Stevens with "a bogus Financial Guarantee and failing to procure reinsurance to safeguard [Stevens's] investment," and (4) repeatedly made intentionally false statements as to the status of Stevens's investment. Stevens SJ Br. at 24. This breaching conduct appears entirely "encompassed within the contractual relationship" between Stevens and IOLO and "by the requirement implicit in all contracts of fair dealings and good faith." *Brooks,* 809 N.Y.S.2d at 272.

Moreover, Stevens, seeks as damages the investment returns promised in the Stevens MDA as amended and the loss of the $1 million Stevens invested in IOLO's program. Stevens SJ Br. at 24. These damages appear duplicative of the damages that Stevens seeks in connection with his breach of contract claim in Count One.

Stevens's motion for summary judgment against both IOLO and Hanke on his breach of fiduciary duty claim in Count Five is thus denied.

### 3. Fraudulent Inducement as to Hanke (Count Two) and Fraud as to Hanke and IOLO (Count Three)

Next, Stevens seeks summary judgment on his fraudulent inducement claim against Hanke, based on purported misrepresentations that Hanke made before Stevens and IOLO entered into the Stevens MDA, and on his fraud claim against Hanke and IOLO, based on misrepresentations that Hanke made with respect to the status of Stevens's investments. Stevens SJ Br. at 19-22. The Court applies New York law to these claims, as urged by Stevens, because many of the alleged misrepresentations on which his fraud claims are predicated allegedly occurred in New York. *See id.* at 19 n.4. As discussed above, under New York law, fraud requires a showing that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied on the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone*, 98 F.3d at 19. The elements of fraudulent inducement are functionally identical. *See Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 481 (S.D.N.Y. 2006) (listing the elements of fraudulent inducement as "(1) a misrepresentation of an existing material fact; (2) made with knowledge of its falsity; and (3) with an intent to defraud; (4) that induces reasonable reliance; and (5) damages the plaintiff"). Moreover, as also indicated above, New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 88-89 (2d Cir. 1992).

As to his fraudulent inducement claim, Stevens submits that Hanke's misrepresentations included his "false promises to reinsure [Stevens] against IOLO's loss and non-performance through Lloyd's of London," "misrepresentations that misle[]d [Stevens] about Hanke's experience and expertise in trading and investments," "false statements in Hanke's program overview, including statements that [Stevens's] investment would be leveraged to increase [Stevens's] participation in the program," and "statements concerning the timing and basis for commission payments." Stevens SJ Br. at 19-20. Stevens additionally urges that "Hanke's most significant misrepresentations were the promises in the draft MDA he provided to [Stevens], including the promise to place [Stevens's] funds in specific asset enhancement transactions structured for [Stevens] to generate $5 million of reinvestment." *Id.* at 20.

Most of these statements are promissory statements underlying Stevens's claim for breach of the Stevens MDA and so cannot also give rise to a fraudulent inducement claim. *See Stewart*, 976 F.2d at 88-89. On the other hand, the statements concerning Hanke's experience and expertise in trading investments and as to the timing and basis for commission payments constitute misrepresentations of present fact, and so may validly underlie Stevens's fraudulent inducement claim. *See id.* Stevens urges that he relied on these statements, and that they were intentionally made to induce his reliance and to enter into the MDA. Stevens SJ Br. at 20.

But, like Al Thani, Stevens has made no showing that his reliance on these statements was reasonable. As discussed at *supra* III.A.6, reasonable reliance is an essential element of fraudulent inducement, and the assessment of the reasonableness of a plaintiff's reliance entails consideration "of the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt.*, 343 F.3d at 195. Generally, the "plaintiff is expected to exercise ordinary

90

diligence and may not claim to have reasonably relied on a defendant's representations [or silence] where he [or she] has means available to him [or her] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation." *Feldman v. Byrne*, 178 N.Y.S.3d 525, 529 (2d Dep't 2022) (alterations in original). "The resolution of the issue of whether a plaintiff reasonably relied on a defendant's misrepresentation . . . is ordinarily relegated to the finder of fact." *Id.* As Stevens has proffered no record evidence from which this Court may conclude as a matter of law that his reliance on Hanke's statements was reasonable, the Court denies Stevens's motion for summary judgment on his fraudulent inducement claim in Count Two.

With respect to his general fraud claim against both Hanke and IOLO, Stevens highlights Hanke's references to the "FAMA" agreement between IOLO and CDB and his representations as to the fictitious $5.2 million purportedly derived from Stevens's original investment. Stevens SJ Br. at 21. But once again Stevens fails to demonstrate that his reliance on these statements was reasonable. Accordingly, Stevens's motion for summary judgment on his fraud claim in Count Three also is denied.

### 4. Aiding and Abetting Fraud as to Sims (Count Four)

Stevens moves for summary judgment against Sims on his claim for aiding and abetting fraud. Once again under New York law, to establish a claim for aiding and abetting fraud, a plaintiff must show "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Kottler*, 607 F. Supp. 2d at 464. As the Court has denied Stevens's motion for summary judgment on the underlying fraud, *see supra* III.B.3, the Court also denies Stevens's motion for summary judgment against Sims for aiding and abetting this purported fraud.

The Court additionally finds that Stevens has failed to sustain his burden of demonstrating that Sims had the requisite knowledge of the fraud.  "New York law requires that the alleged aider and abettor have 'actual,' as opposed to merely constructive, knowledge of the primary wrong." *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007).  And as with fraud, to survive summary judgment, "[a] claim for aiding and abetting fraud must be proven by clear and convincing evidence."  *de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011) (citation omitted).  While Stevens accuses Sims of "knowingly writing a phony guarantee," he has pointed to no evidence indicating, letting alone *proving* under the clear and convincing evidence standard, that Sims was aware of Hanke's purported fraud.  In fact, Sims testified that GIT operated in the same manner as SGIT, and that SGIT did not know the origin of the funds that SGIT received as fees for providing surety bonds for transactions.  Sims Dep. Tr. at 55:9-17.  At a minimum, a genuine dispute remains as to whether Sims had the requisite knowledge of the fraud that Stevens accuses Hanke of perpetrating.

Stevens's motion for summary judgment on Count Four as against Sims is thus denied.

### 5.  Breach of Contract as to GIT (Count Six)

Finally, Stevens moves for summary judgment on his breach of contract claim against GIT. Stevens SJ Br. at 24-25.[22]  By its terms, the financial guarantee is to be "governed and construed in accordance with the law of the State of Georgia."  Stevens Financial Guarantee § 8.  The Court is unable to discern from the record whether Georgia bears a "reasonable relationship" to the parties and transaction, however.  *Welsbach Elec. Corp.*, 859 N.E.2d at 500.  As the relevant

---

[22] Although Count Six is brought against Sims and GIT, *see* Stevens Complaint ¶¶ 128-138, Stevens only argues for summary judgment on Count Six as against GIT, *see* Stevens SJ Br. at 24-25.

Georgia contract law does not meaningfully differ from New York contract law, the Court applies

New York law.[23]  *Compare Oconee Fed. Sav. & Loan Ass'n v. Brown*, 831 S.E.2d 222, 229 (Ga.

2019) ('The elements for a breach of contract claim in Georgia are the (1) breach and the (2)

resultant damages (3) to the party who has the right to complain about the contract being broken."),

*with Marks*, 61 F. Supp. 2d at 88 ("The elements of a breach of contract claim under New York

law are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3)

breach of contract by the defendant; and, (4) damages resulting from the breach." (internal

quotation marks omitted)).

Here, the uncontroverted record evidence demonstrates that Hanke provided Stevens with

a financial guarantee between GIT (as Guarantor), IOLO (as Principal), and Stevens (as Obligee).

Stevens Declaration, Exh. 13 (e-mail sent by Hanke to Stevens on January 7, 2020, with attached

financial guarantee executed on November 27, 2019).  Under the terms of this agreement, GIT was

obligated to repay Stevens $1 million, the entire amount of his investment in Hanke's managed

leveraging program, within 180 days after it received notice of IOLO's default under the Stevens

MDA.  Stevens Financial Guarantee ¶ 2.  Moreover, there is no dispute that Stevens provided GIT

with notice of IOLO's default, that GIT received this notice no later than August 18, 2020, and

that after receiving that notice, GIT failed to perform.  *See* Smaylovsky Decl., Exh. 32 (e-mail

from "Standard Financial Global Investment Technology [information@sfgit.com]" to Hanke sent

on August 18, 2020, forwarding Stevens's August 14, 2020 e-mail to GIT); Stevens 56.1 Stmt. ¶

96.  Stevens is thus entitled in damages in the sum of $1 million under the financial guarantee.

---

[23] Stevens does not specify under which state's law he moves for summary judgment on this claim.  Stevens SJ Br. at 24-25.

Accordingly, the Court grants summary judgment on Count Six against GIT. The Court reserves any determination on whether and to what extent GIT's liability for $1 million is to be shared by IOLO or Hanke, as this issue has not been briefed.

*  *  *

In sum, the Court grants Stevens's motion for summary judgment on Count One against IOLO and Hanke as to liability only, and on Count Six against GIT also as to liability only. Stevens's motion is otherwise denied.

## IV.  Conclusion

For the foregoing reasons, Al Thani's motion for summary judgment is granted on Counts One and Two as to Hanke and IOLO, both as to liability alone, and otherwise denied, while Stevens's motion for summary judgment is granted on Counts One as to Hanke and IOLO and on Count Six as to GIT, also both as to liability only, and is otherwise denied. The parties are ordered to appear for a status conference to discuss next steps in this litigation. The status conference will take place in Courtroom 12D of the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007, on October 8, 2024, at 3:00 p.m. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 380 in Case Number 20 Civ. 4765 and the motions pending at Docket Numbers 157, 158, 161, and 162 in Case Number 20 Civ. 8181.

SO ORDERED.

Dated: September 22, 2024
     New York, New York

                                         JOHN P. CRONAN
                             United States District Judge